UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
     Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
     Defendants

## PLAINTIFF'S SUPPLEMENTAL EXHIBIT IN OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS FOR FAILURE TO COMPLY WITH ORDER AND CROSS-MOTION FOR SANCTIONS FOR MISREPRESENTATION TO THE COURT

Attached hereto as an exhibit to the plaintiff's previously filed above-stated opposition, please find plaintiff's supplementation of expert disclosures.

The primary grounds for the submission of plaintiff's instant supplementation herein is based not he fact that on Monday of this week, June 25, 2007, when plaintiff's counsel received in the mail the defendant's expert disclosures the defendant, C.B. Marine identified Captain Arthur Fournier as their expert maritime Captain. Plaintiff's expert maritime Captain was disclosed on March 22, 2007 as Captain Brian Fournier, the son of C.B. Marine's expert witness Captain Arthur Fournier. The plaintiff's expert witness, Captain Brian Fournier has made it clear that he will be unable to testify on behalf of the plaintiff as a result his father now being C.B. Marine's expert, as well as other conflicts that exist with various employees of the defendants.

The following day after receiving the expert disclosures of the defendants, plaintiff's counsel contacted by telephone Captain Raymond Bono of Everett,

Massachusetts. Yesterday, Thursday, June 28, 2007 Captain Raymond Bono met with plaintiff's counsel and reviewed various documentation and prepared a detailed report identical to the information included in his expert disclose attached hereto. Captain Raymond Bono's testimony is virtually identical to the testimony that was expected from Captain Brian Fournier. It is also in substantial part consistent with the expert disclosure made by C.B. Marine with respect to anticipated testimony from Captain Arthur Fournier.

Wherefore, plaintiff respectfully submits the expert disclosure of Captain Raymond Bono of Everett, Massachusetts so he may be substituted for Captain Brian Fournier as plaintiff's expert maritime Captain and that the expert disclose as set out in excessive detail herein be viewed as adequate by this Honorable Court for the purposes of Captain Raymond Bono being permitted to testify on behalf of the plaintiff at the time of trial.

Respectfully submitted,

Attorney for the Plaintiff

/s/ John P. LeGrand

_____

John P. LeGrand
JOHN P. LEGRAND & ASSOCIATES, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
(617) 623-3001
BBO No: 550185

Dated: June 29, 2007

## **CERTIFICATION OF SERVICE**

I, John P. LeGrand, attorneys for the plaintiff certify that on the 29th day of June, 2007 I made service of the foregoing document titled;" Plaintiff's Supplemental Exhibit in Opposition to Defendant's Motion for Sanctions for Failure to Comply with Order and Cross-Motion for Sanctions for Misrepresentation to the Court" with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Cathy S. Roberts, Esquire
Robert J. Murphy, Esquire
Mark G. Furey, Esquire
Aaron K. Baltes, Esquire
Michael S. D'Orsi, Esquire
T. Christopher Donnelly, Esquire


/s/ John P. LeGrand
John P. LeGrand, Esquire

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


C.A. NO: 05-10347-RGS



KEITH R. ABLOW,
        Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
        Defendants

## **PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS DISCLOSURE**

## **SUBJECT MATTER OF EXPERT TESTIMONY**


1.      Jean Francois Barre, Licensed Real Estate Broker, RE-Max Newburyport,

MA


Mr. Barre has written a report which has been produced to the defendants.

Mr. Barre has also been deposed by the defendants.


Mr. Barre is expected to testify regarding the diminished value of the

plaintiff's property due to the grounding and removal of the barge DS64.


Mr. Barre is also expected to testify that Dr. Ablow and any real estate

agent he employs to market the property will be obligated to divulge to any

prospective buyer that sharp pieces of metal are present on Dr. Ablow's

property and property extending past the low tide mark and into the waters

in front of Dr. Ablow's property.

## Substance of Facts, Opinions and Summary of Grounds of Expert Testimony

Please see deposition transcript of Jean Francois Barre as well as

Plaintiff's Expert Witness Disclosure.

## Exhibits to be Used by Expert

No final decision has been made as to what exhibits will be used or relied

upon by Mr. Barre.

## Qualifications of Expert

Mr. Barre is a licensed real estate professional with extensive experience

on Plum Island, the locus of the grounding and removal of barge DS64.

## Compensation to be Paid

Mr. Barre will be compensated at the rate of $250.00 per hour for trial testimony and will be compensated $2,000.00 for his deposition by the defendants.

2.     Mary Beth Eisenman, Clean Harbors Environmental Services, Weymouth, MA

As previously discussed with the defendants, Ms. Eisenmann will not be used or called as an expert by the plaintiff.

Ms. Eisenmann may be called by the plaintiff to testify concerning her site inspection and estimate contained in a two page document dated May 17, 2006 which describes scope of services, project costs and general conditions regarding a clean-up of the plaintiff's property and areas which negatively impact the value of plaintiff's property if left in their present condition.

The May 17, 2006 document has been produced to the defendants.

3.     Verne Fisher, Visionary Landscape

**Substance of Facts, Opinions and Summary of Grounds of Expert Testimony**

Please see report attached.

**Data or Other Information Considered by the Expert**

Site inspection by Mr. Fisher

**Exhibits to be Used by the Expert**

A decision has not been made as to what exhibits will be used. This information will be provided in accordance with the Court's Orders.

**Compensation**

A compensation rate will be provided.

4.      Robert Walsh, J.D., Title Examiner, Billerica, MA

The plaintiff has decided that Mr. Walsh will not be called as an expert as his testimony would be cumulative.

5.      Linda Ahearn, Ahearn Appraisal, Inc., Ipswich, MA

**Subject Matter of Expert Testimony**

See report dated March 16, 2007 which has been produced to the defendants.

**Data or Other Information Considered by the Expert**

Please see report dated March 16, 2007.

**Exhibits to be Used by the Expert**

A decision has not been made as to what exhibits will be used. This information will be provided in accordance with the Court's Orders.

**Qualifications of Expert**

Please see report dated March 16, 2007.

**Compensation to be Paid**

Ahearn Associates has been paid $2,500.00 by the plaintiff. Plaintiff anticipates paying additional compensation for Court testimony.

6.      Neve-Morin Group, Inc., 447 Boston Street, Topsfield, MA

**Subject Matter of Expert Testimony**

Please see Points Set Plan showing survey results.

**Data or Other Information Considered by Expert**

The plaintiff believes the Neve-Morin Group used all available tools and

information to determine the boundary lines of his property.

**Exhibits to be Used by the Expert**

A decision has not been made as to what exhibits will be used. This

information will be provided in accordance with the Court's Orders.

**Qualifications of Expert**

Mr. Thomas E. Neve, PLS is a surveyor in the Commonwealth of

Massachusetts.

**Compensation to be Paid**

The expert was paid $2,500.00 as a retainer to complete the survey.

7.     Marilyn Firth

The plaintiff will not call Marilyn Firth as an expert but reserves the right to
call her as a lay witness.

8.     John D. Halamka, M.D., M.S.

The plaintiff will not call Dr. Halamka as an expert witness.

9.     Captain Brian Fournier of Boston, Massachusetts and Portland, Maine
was originally designated in the Plaintiff's Expert Witness Disclosure on
March 22, 2007 together with an overview of his anticipated testimony at
that time. Two days ago on Monday, June 25, 2007 plaintiff received in the
mail the designation of expert witnesses by C.B. Marine Corporation. In
said designation the defendant, C.B. Marine has identified Captain Arthur
Fournier as their expert witness. Captain Arthur Fournier is the father
plaintiff's expert witness Captain Brian Fournier. In a conversation with
Captain Brian Fournier it has been determined that Captain Brian Fournier
will be unable to testify on behalf of the plaintiff as a result of the fact that
his father Captain Arthur Fournier will be testifying on behalf of the
defendant, C.B. Marine. Additionally, Captain Brian Fournier believes that

there are other conflicts precluding him to act as an expert witness on behalf of the plaintiff as a result of his knowledge of and interactions with employees of the parties that the plaintiff has brought actions against in this matter.

10.    Captain Raymond Bono, Everett, Massachusetts.

Accordingly, yesterday plaintiff contacted Captain Raymond Bono of Everett, Massachusetts and discussed generally the facts of this action and arranged for a meeting with Captain Bono this morning at which time substantial documentation was reviewed including all of these defendant's expert disclosures, U.S. U.S. Coast Guard accident report and various other documents. As a result of that meeting the attached following report was made by Captain Raymond Bono.

Plaintiff will not be calling Captain Brian Fournier to testify as an expert witness at the time of trial and hereby substitutes Captain Raymond Bono who is expected to testify as set out herein and in his attached report. Captain Raymond Bono has previously been qualified to testify as an expert maritime witness in the United States District Court for the District of Massachusetts.

**Report of Captain Raymond Bono**

Captain Bono is a fifth generation Captain. Captain Bono started working as a Captain for the first time in 1953. Since that time I have served as a Captain for approximately 16 different vessels. I have served as a Captain on vessels owned by my father for an excess of 12 years and I have served as Captain on vessels owned by me in excess of 4 years. I have well in excess of 50 years of experience in the commercial marine industry. I have worked approximately 40 years as a marine Captain and at least 15 years as a marine engineer on various vessels. From my review of the various documentation this morning I have formed various opinions concerning the negligence of all of the defendants including the company that owned the vessel, the company that leased the vessel, the company that provided the Captain, as well as the Captain himself.

The hatch on the vessel should have been closed and secured while the vessel was at sea.

The twin GM8-71 Marine Diesel engines rated at 300 horsepower on the Seawind at the time of the accident are well known to me. I have operated vessels powered by the GM8-71 engines and have a personal knowledge of their power. I have personally had to adjust tow gear weight according to the power generated by the GM8-71 engines to enable vessels that I

operated to match the amount of horsepower to the weight of the gear being towed.

When the GM8-71 engines are overworked they tend to over heat and you must pay attention to the alarms, adjust the RPM's accordingly and not tow in excess of the engines ability. Based on my experience with the operation of the GM8-71 engines it is my opinion that the Seawind which was a vessel which was less than 25 feet long with those two engines totaling 600 horsepower was dramatically underpowered and inadequate to tow the barge DS-64. This is even more dramatically inappropriate considering the fact that there was a crane and gear on board the barge at the time it was being hauled with a mere 600 horsepower of propulsion in adverse weather conditions. The owner of the Seawind and barge DS-64 never should have allowed that combination to be leased or used together. I will need more information about the vessel Albany to state whether the combination of that vessel and the barge DS-64 would have been suitable. This opinion is also equally true of the company that was leasing the Seawind and the DS-64 at the time of the grounding. The company that leased the incredibly small and underpowered Seawind and the barge DS-64 should have known that that vessels capacity to tow that barge was inadequate and unsafe, especially in the weather conditions at the time of the grounding. Of course the company that provided the Captain and the Captain also should have known that the 600 horsepower

10

capacity of the less than 25 feet long Seawind was grossly inadequate to tow the barge DS-64, particularly in the weather that existed at the time of the grounding.

There are many reasons why the owner of the Seawind and barge, the company that leased the Seawind and barge, the company that provided the Captain for the Seawind and barge and the Captain that was operating the Seawind and barge at the time of the grounding were negligent. These reasons are fairly well documented in the evaluation conducted by the U.S. Coast Guard following the grounding. The weather conditions before, during and after the grounding are all important factors in how this grounding could have been avoided. In the first instance under no circumstances should the Seawind with a mere two 300 horsepower GM8-71 engines be towing that large barge with that crane on top of it as well as all the equipment that the barge was carrying. That weight is extremely excessive for 600 horsepower to tow. I have had the exact same problem while operating the GM8-71 in towing gear. I have actually had to remove gear because it was too heavy to be towed with that engine when I first went on a particular vessel.

Let me say to start the most obvious act of negligence by all parties was to allow that vessel that was less than 25 feet long with a mere 600 horsepower to attempt to tow that barge, crane and equipment

combination in those weather conditions. The owner should have never let it happen. The lessor should never have let it happen and the company that provided the Captain as well as the Captain never should have let it happen.

Moving on to more specific particulars about various ways that the grounding could have been avoided even with that inadequate vessel towing the barge. To begin with the vessel never should have left the Annisquam River until it got another weather report indicating that the conditions were going to be diminishing and not increasing. It was December of the year and anybody who has any maritime experience in this area knows that when adverse weather is coming in from the northeast the vast majority of the time it's going to get worse rather than better. The vessel should not have left the Annisquam River until it heard the next weather report which showed that the weather conditions were getting worse and not better.

I do not know what contractual or time deadlines were in place that would have forced that inadequate vessel and barge combination to attempt to move from the Annisquam River up to the Merrimac River in those weather conditions. For starters that vessel and barge never should have left the Annisquam River until the bad weather passed.

Once the vessel and barge left the Annisquam River and got caught in the bad weather the underpowered Seawind should have began to jog into the seas and hold its position and call for help rather than try to push on to complete a mission that is never should have started. Even after the water went down the open hatch and stalled one engine, if that was in fact the cause of the stalled one engine, if the vessel and barge took a course far enough off shore or were far enough off shore when that happened the Captain still could have turned that vessel immediately into the seas and began to jog with one engine holding the tug in position with minimum RPM's just enough to hold position and sustain electronic equipment and the wind would have held the barge back off the vessel so that they did not collide and the vessel would not have ended up getting the tow line caught in its one remaining operating propeller.

When the Captain realized that the weather was going to be too severe for him to safely undertake the journey he should have given up his objective and attended to the safety of the crew first and hold and jog steady with the bow into the wind, and as I stated slow down enough to hold steady and support the electronics to relieve the burden from the one remaining engine, or two engines if the Captain recognized that his vessel was under powered and call for a rescue. Even with one engine out of operation if the vessel jogged into the wind the crew, tug and barge as well as the crane and equipment on the barge could have been saved and rescued and the

grounding could have been avoided. If the Captain recognized the adverse weather conditions and acted immediately by jogging and calling for a rescue the barge probably would have been rescued independently from the tug. It seems all but certain to me that the Captain should not have attempted to complete the mission after loosing the first of the two engines and it is likely that he probably did not try.

In my initial review of this documentation I need further clarification on how far off shore the Seawind was when it was towing the barge and where it was located exactly at the location that the U.S. Coast Guard has identified as the collision point. With the weather conditions as described in the U.S. Coast Guard report the Seawind and barge seemingly should not have been so close to shore.

With the wind blowing from the northeast toward the land the tug and barge should have been towing further off shore. I am investigating now to learn if the reason that they were closer to shore than they should have been was simply because they were trying to enter the Merrimac River. In any event the prevailing wind at the time of the accident from the northeast when considered with the location where the U.S. Coast Guard said the collision occurred and where the grounding occurred on Plum Island should easily of been something that should have been known by the Captain and that is why I say that the instant that first engine went

down he should have immediately attempted to jog to the northeast into the wind and hold that boat and tug in position without getting the howser line caught in his propeller shutting down the second engine. He should have called for a mayday immediately and waited for rescue.

The entire grounding could have been avoided by simply not pairing that little under powered boat with that barge.

In my mind there is a question whether or not corners were cut on time to rush the arrival of the barge on the Merrimac. I say this because despite the fact that the vessel was too small to tow that barge the weather conditions that were being forecasted and would have been forecasted if the Captain waited for one more report showing the increased intensity of the weather leads me to questions why that underpowered vessel attempted to bring that barge up to the Merrimac and why it was so close to shore.

Another problem I see with the vessel Seawind that should have been acknowledged by the owner, the company that leased the Seawind, the company that provided the Captain and the Captain was the way that the engine room was set up for ventilation of the twin GM8-71 300 horsepower marine diesel engines at the time of the accident. It would be helpful for me to inspect the Seawind to determine if the ventilation was

adequate. If there were ventilation stacks I would be able to determine if they were adequate or not. I would like to know what size they were to determine if they were appropriate and if they had the ability to turn and face in the proper direction to get maximum ventilation into the engine room and avoid any water going down into the engine room through those stacks. The U.S. Coast Guard report indicates that the vessel was turned 180 degrees and struck the barge because of inadequate power or no power. That is exactly why I say that even when the Seawind lost one engine the vessel could have safely jogged northeast into the wind and call for a rescue immediately and allowed time for the rescue to arrive and occur. If done properly this would have kept all electronics working and the wind would have kept the barge away from the vessel while waiting for the rescue to arrive.

Until I am provided with additional facts it seems to me that the vessel and the barge should have been towing further off shore. Also, waiting to throw the first anchor until the vessel and barge was 100 yards off the beach was too late to allow the anchor or anchors to catch on the bottom. Immediately upon realizing that the little Seawind was not going to be able to perform the job in that weather and immediately upon loosing one engine the vessel immediately should have turned into the northeast and jogged into the wind. As far as throwing the anchors, that should have been done immediately when the Captain either realized that the little

Seawind was not going to be able to do the job in those weather conditions or immediately when he decided not to jog into the wind. Without jogging in time or throwing the anchors out in time the Seawind was simply blown by the wind coming out of the northeast straight up onto the beach where the tug and barge grounded on Plum Island. It certainly did not do any good to throw the first anchor out 100 yards off shore. It was very unlikely that that anchor was going to have time to catch and stop the barge from grounding at that point in time. That action was done too late.

Once the weather report was known to the Captain the Captain should have allowed himself more time and started his journey earlier to beat the bad weather. Without the bad weather the engines would not have had to work so hard. With my experience with the GM8-71 engines over working those engines very likely could have caused them to overheat and shut down.

Alternatively to starting the journey earlier the Captain could have monitored his barometer and waited for the next weather report. As a general rule bad weather coming in from the northeast in December very often gets worse before it passes. In short the Captain should have waited for a better weather report and let the bad weather pass.

17

In my experience towing equipment behind my vessels for more than 50 years I have had to calculate the weight of the gear to be towed behind the boat according to the engine horsepower of each vessel. Like the U.S. Coast Guard report in this case states, the tug was too small and lacked enough power to tow the barge and crane which grounded. This is even more true giving the bad weather conditions at the time of the grounding.

When the U.S. Coast Guard responded to the distress call the vessel and barge were only 100 yards off the beach. Because of the closeness of the vessel and barge to the beach the U.S. Coast Guard were unable to approach the vessel and the barge to put a line on the tug or a line on the barge or even simply remove the crew for safety. I understand that the U.S. Coast Guard was forced to back off with its vessel and send a helicopter to remove the crew. If the tug and barge were further off shore it would have increased the chance of a successful rescue of not only the crew, but the tug and the barge and would have avoided the grounding on Plum Island.

The evening forecast called for worsening weather. More wind velocity and higher seas were forecasted. The wind and sea conditions were forecasted to increase and not diminish. The Captain should have waited for a more favorable forecast before starting out to sea. If the Captain waited for the next weather report the 8 to 10 foot seas would not have

come over the stern of the tug or entered the engine room. The engine would not have stalled if it was the water that caused it rather than overheating. The hatch never should have been off while the vessel was at sea. In short the engine should not have stalled due to water coming over the rail because the bad weather could have been avoided. The engine should not have stalled due to over heating because the over heating could have been avoided by going slower and not going out in the bad weather and the hatch cover never should have been off the vessel and should not be off the vessel even in the calmest of weather for ventilation.

In summary, the under sized and under powered Seawind never should have been coupled with the barge; the vessel never should have went to sea with the forecasted weather conditions; the hatch never should have been off  while the vessel was at sea; the Captain should have began to jog into the wind the instant he knew a problem was beginning to arise weather it was when he knew the weather was too bad for him to safely make the journey or when he lost the first engine; the engine room should not be allowed to flood under any circumstances while the vessel is being operated at sea; and under no circumstances should the vessel or barge have ended up grounded on the beach at Plum Island.

Captain Bono has been paid a $500.00 retainer.

Plaintiff
By his attorney,

_____
John P. LeGrand, Esquire
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
(617) 623-3001
BBO No: 550185

Dated:        June 29, 2007