UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
      Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
      Defendants

## RESPONSE TO ORDER TO SHOW CAUSE

1.     Plaintiff's counsel now understands that the scope of the allowance of

"Motion for Enlargement of Time for Defendants to Designate Experts" by

this Honorable Court was misinterpreted by counsel to only grant the

Defendants additional time to designate experts and plaintiff's counsel

remedied that inadvertence even before issuance and receipt of this

Honorable Court's Show Cause Order by filing Plaintiff's Supplemental

Expert Disclosures. (See attached Plaintiff's Expert Disclosure, Plaintiff's

Supplemental Expert Disclosure, report of Captain Raymond Bono, report

of Vern Fisher and Thomas Neve's Survey Report.)

2.     Plaintiff's counsel mistakenly did not in good faith believe the Order

required the plaintiff to do anything in response to the allowance of

"Defendant's Motion to Extend Time for Expert Disclosure."

3.    Due to counsel's inadvertence, the plaintiff did not comply with the Court's

      May 21, 2007 Order in a timely fashion.


4.    Counsel's misreading of the scope of the Order was a mistake and was

      not motivated by bad faith.


5.    On June 29, 2007, counsel for Mr. Ablow filed and served Plaintiff's

      Supplemental Expert Disclosure in the event counsel was mistaken

      regarding the scope of the original May 21, 2007 Order. Said

      Supplemental Expert Witness Disclosure fully complies with Fed. R. Civ.

      P. 26 (a) (2). Thereafter plaintiff received this Honorable Court's Show

      Cause Order.


6.    By way of explanation, and not of excuse, while counsel for Mr. Ablow

      concedes they were mistaken regarding the interpretation of the allowance

      of the Motion for Enlargement of Time for Defendants to Designate

      Experts, the history of this case bears mention. The circumstances of the

      grounding of the DS64 and Tug Seawind has resulted in at least 5

      separate and distinct lawsuits filed in the Massachusetts Federal District

      Court, Maine Federal District Court and Maine State Court, in which all

      defense counsel in this action have been involved, including trials. While

      Mr. Ablow's counsel admits being mistaken by misinterpreting this Court's

May 21, 2007 allowance of defendants motion and Order, Mr. Ablow argues that his counsel's mistake, while plainly in error, did not cause harm or detriment to the defendants, particularly in light of this Honorable Court's allowance of the Motion to Enlarge Time for the Defendants to Designate Experts. Many of the defendants' designated experts have been used previously in the other lawsuits which arose out of the grounding.

7.     Regarding Defendant Maine Coast's Request for Sanctions in the form of prohibiting plaintiff from naming certain experts, Mr. Ablow argues as follows with respect to each such expert so challenged:

A.     Mary Beth Eisenmann of Clean Harbors works for a company that did some clean up and barge removal on behalf of the defendants in this case and refuses to testify as an expert on behalf of the plaintiff.

Mr. Ablow has repeatedly advised the defendants that Mary Beth Eisenmann, Clean Harbors Environmental Services would be called as a fact witness rather then an expert.  Ms. Eisenmann put together a proposal for Mr. Ablow and Mr. Ablow's request for cleaning the beach of barge debris. Said proposal was in writing and has been produced to the

defendants on numerous occasions, certainly as early as September 2006.

B.     Verne Fisher, Visionary Landscapes

Verne Fisher was retained directly by Dr. Keith Ablow. The defendants have been provided with a preliminary as well as an updated report from Mr. Fisher. Mr. Ablow is not in possession of any other materials from Mr. Fisher and his preliminary report was provided to the defendants on numerous occasions as early as September 2006. (See attached recent report dated May 30, 2006 provided to defendants)

C.     Robert Walsh, J.D.

Robert Walsh, J.D. is a title examiner. Plaintiff has established an alternative method to prove to the jury at the time of trial that the plaintiff Keith R. Ablow is the owner of the subject property. Accordingly, the plaintiff will not use this expert.

D.     Thomas Neve of Neve-Morin Group, Inc.

Thomas Neve of Neve-Morin Group, Inc. was disclosed in a timely fashion and a timely disclosure statement indicated that that Thomas Neve would

survey the property to establish the plaintiff's right of ownership of his property and prepare a Point Set Plan. Thomas Neve did ultimately prepare that survey Point Set Plan. The defendants have now been supplied with the Survey Point Set Plan generated by Neve-Morin Group, Inc. Neve-Morin's survey simply shows the boundaries of plaintiff's property which the plaintiff believes is already well known to the defendants. (See attached Survey Point Set Plan)

E.     Marilyn Firth

Marilyn Firth is an expert that was located by Dr. Ablow. We are informed that she became ill and required surgery and her assistance was untimely. Accordingly, the plaintiff will not call this expert.

F.     John D. Halamka, M.D.

Through the direct efforts of the plaintiff, Keith R. Ablow, M.D. we were expecting to call John D. Halamka, M.D. to provide expert testimony concerning the carcinogenic effects of an iron and silica combination and the health hazardous condition caused when interacted for prolonged periods of time with wind. By the time that Dr. Ablow contacted John D. Halamka, M.D. and we attempted to retain him as an expert he indicating that he was not inclined to get involved in litigation on the topic. Though

we did put effort into having Dr. Ablow expedite his assistance we did not learn whether or not Dr. Halamka would be on board in a timely fashion. Accordingly,  we will not call John D. Halamka, M.D.  as an expert to testify at the time of trial.

G.    Captain Brian Fournier

Due to a conflict, Captain Fournier has been replaced by Captain Raymond Bono. Captain Bono's report was supplied to the Defendant's on June 29, 2007 and his opinions are entirely consistent with Captain Fournier. Furthermore, Captain Bono's report dated June 29, 2007 also constitutes plaintiff's expert disclosure with reference to Captain Bono's expected testimony and the reason why he is being substituted for Captain Brian Fournier. Captain Brian Fournier's conclusions and Captain Raymond Bono's conclusions are also consistent with Captain Arthur Fournier's conclusions, who is the father of plaintiff's original expert Captain Brian Fournier. Captain Arthur Fournier has now been retained as an expert by C.B. Marine. Captain Brian Fournier refuses to testify in the same case on behalf of the plaintiff when his father is testifying on behalf of a defendant. His father Captain Arthur Fournier, we have learned, has been involved as an expert in other cases arising out of the subject grounding. Please refer to the following language constituting plaintiff's expert disclosure and expert report executed by Captain Raymond Bono

two days after we learned Captain Arthur Fournier was disclosed and we lost Captain Brian Fournier as an expert witness.

## **REPORT OF CAPTAIN RAYMOND BONO**

Captain Bono is a fifth generation Captain. Captain Bono started working as a Captain for the first time in 1953. Since that time I have served as a Captain for approximately 16 different vessels. I have served as a Captain on vessels owned by my father for an excess of 12 years and I have served as Captain on vessels owned by me in excess of 4 years. I have well in excess of 50 years of experience in the commercial marine industry. I have worked approximately 40 years as a marine Captain and at least 15 years as a marine engineer on various vessels. From my review of the various documentation this morning I have formed various opinions concerning the negligence of all of the defendants including the company that owned the vessel, the company that leased the vessel, the company that provided the Captain, as well as the Captain himself.

The hatch on the vessel should have been closed and secured while the vessel was at sea.

The twin GM8-71 Marine Diesel engines rated at 300 horsepower on the Seawind at the time of the accident are well known to me. I have operated

vessels powered by the GM8-71 engines and have a personal knowledge of their power. I have personally had to adjust tow gear weight according to the power generated by the GM8-71 engines to enable vessels that I operated to match the amount of horsepower to the weight of the gear being towed.

When the GM8-71 engines are overworked they tend to over heat and you must pay attention to the alarms, adjust the RPM's accordingly and not tow in excess of the engines ability. Based on my experience with the operation of the GM8-71 engines it is my opinion that the Seawind which was a vessel which was less than 25 feet long with those two engines totaling 600 horsepower was dramatically underpowered and inadequate to tow the barge DS-64. This is even more dramatically inappropriate considering the fact that there was a crane and gear on board the barge at the time it was being hauled with a mere 600 horsepower of propulsion in adverse weather conditions. The owner of the Seawind and barge DS-64 never should have allowed that combination to be leased or used together. I will need more information about the vessel Albany to state whether the combination of that vessel and the barge DS-64 would have been suitable. This opinion is also equally true of the company that was leasing the Seawind and the DS-64 at the time of the grounding. The company that leased the incredibly small and underpowered Seawind and the barge DS-64 should have known that that vessels capacity to tow that

barge was inadequate and unsafe, especially in the weather conditions at the time of the grounding. Of course the company that provided the Captain and the Captain also should have known that the 600 horsepower capacity of the less than 25 feet long Seawind was grossly inadequate to tow the barge DS-64, particularly in the weather that existed at the time of the grounding.

There are many reasons why the owner of the Seawind and barge, the company that leased the Seawind and barge, the company that provided the Captain for the Seawind and barge and the Captain that was operating the Seawind and barge at the time of the grounding were negligent. These reasons are fairly well documented in the evaluation conducted by the U.S. Coast Guard following the grounding. The weather conditions before, during and after the grounding are all important factors in how this grounding could have been avoided. In the first instance under no circumstances should the Seawind with a mere two 300 horsepower GM8-71 engines be towing that large barge with that crane on top of it as well as all the equipment that the barge was carrying. That weight is extremely excessive for 600 horsepower to tow. I have had the exact same problem while operating the GM8-71 in towing gear. I have actually had to remove gear because it was too heavy to be towed with that engine when I first went on a particular vessel.

9

Let me say to start the most obvious act of negligence by all parties was to allow that vessel that was less than 25 feet long with a mere 600 horsepower to attempt to tow that barge, crane and equipment combination in those weather conditions. The owner should have never let it happen. The lessor should never have let it happen and the company that provided the Captain as well as the Captain never should have let it happen.

Moving on to more specific particulars about various ways that the grounding could have been avoided even with that inadequate vessel towing the barge. To begin with the vessel never should have left the Annisquam River until it got another weather report indicating that the conditions were going to be diminishing and not increasing. It was December of the year and anybody who has any maritime experience in this area knows that when adverse weather is coming in from the northeast the vast majority of the time it's going to get worse rather than better. The vessel should not have left the Annisquam River until it heard the next weather report which showed that the weather conditions were getting worse and not better.

I do not know what contractual or time deadlines were in place that would have forced that inadequate vessel and barge combination to attempt to move from the Annisquam River up to the Merrimac River in those

weather conditions. For starters that vessel and barge never should have left the Annisquam River until the bad weather passed.

Once the vessel and barge left the Annisquam River and got caught in the bad weather the underpowered Seawind should have began to jog into the seas and hold its position and call for help rather than try to push on to complete a mission that is never should have started. Even after the water went down the open hatch and stalled one engine, if that was in fact the cause of the stalled one engine, if the vessel and barge took a course far enough off shore or were far enough off shore when that happened the Captain still could have turned that vessel immediately into the seas and began to jog with one engine holding the tug in position with minimum RPM's just enough to hold position and sustain electronic equipment and the wind would have held the barge back off the vessel so that they did not collide and the vessel would not have ended up getting the tow line caught in its one remaining operating propeller.

When the Captain realized that the weather was going to be too severe for him to safely undertake the journey he should have given up his objective and attended to the safety of the crew first and hold and jog steady with the bow into the wind, and as I stated slow down enough to hold steady and support the electronics to relieve the burden from the one remaining engine, or two engines if the Captain recognized that his vessel was under

powered and call for a rescue. Even with one engine out of operation if the vessel jogged into the wind the crew, tug and barge as well as the crane and equipment on the barge could have been saved and rescued and the grounding could have been avoided. If the Captain recognized the adverse weather conditions and acted immediately by jogging and calling for a rescue the barge probably would have been rescued independently from the tug. It seems all but certain to me that the Captain should not have attempted to complete the mission after loosing the first of the two engines and it is likely that he probably did not try.

In my initial review of this documentation I need further clarification on how far off shore the Seawind was when it was towing the barge and where it was located exactly at the location that the U.S. Coast Guard has identified as the collision point. With the weather conditions as described in the U.S. Coast Guard report the Seawind and barge seemingly should not have been so close to shore.

With the wind blowing from the northeast toward the land the tug and barge should have been towing further off shore. I am investigating now to learn if the reason that they were closer to shore than they should have been was simply because they were trying to enter the Merrimac River. In any event the prevailing wind at the time of the accident from the northeast when considered with the location where the U.S. Coast Guard

said the collision occurred and where the grounding occurred on Plum Island should easily of been something that should have been known by the Captain and that is why I say that the instant that first engine went down he should have immediately attempted to jog to the northeast into the wind and hold that boat and tug in position without getting the howser line caught in his propeller shutting down the second engine. He should have called for a mayday immediately and waited for rescue.

The entire grounding could have been avoided by simply not pairing that little under powered boat with that barge.

In my mind there is a question whether or not corners were cut on time to rush the arrival of the barge on the Merrimac. I say this because despite the fact that the vessel was too small to tow that barge the weather conditions that were being forecasted and would have been forecasted if the Captain waited for one more report showing the increased intensity of the weather leads me to questions why that underpowered vessel attempted to bring that barge up to the Merrimac and why it was so close to shore.

Another problem I see with the vessel Seawind that should have been acknowledged by the owner, the company that leased the Seawind, the

company that provided the Captain and the Captain was the way that the

engine room was set up for ventilation of the twin GM8-71

300 horsepower marine diesel engines at the time of the accident. It would

be helpful for me to inspect the Seawind to determine if the ventilation was

adequate. If there were ventilation stacks I would be able to determine if

they were adequate or not. I would like to know what size they were to

determine if they were appropriate and if they had the ability to turn and

face in the proper direction to get maximum ventilation into the engine

room and avoid any water going down into the engine room through those

stacks. The U.S. Coast Guard report indicates that the vessel was turned

180 degrees and struck the barge because of inadequate power or no

power. That is exactly why I say that even when the Seawind lost one

engine the vessel could have safely jogged northeast into the wind and

call for a rescue immediately and allowed time for the rescue to arrive and

occur. If done properly this would have kept all electronics working and the

wind would have kept the barge away from the vessel while waiting for the

rescue to arrive.


Until I am provided with additional facts it seems to me that the vessel and

the barge should have been towing further off shore. Also, waiting to throw

the first anchor until the vessel and barge was 100 yards off the beach

was too late to allow the anchor or anchors to catch on the bottom.

Immediately upon realizing that the little Seawind was not going to be able

to perform the job in that weather and immediately upon loosing one engine the vessel immediately should have turned into the northeast and jogged into the wind. As far as throwing the anchors, that should have been done immediately when the Captain either realized that the little Seawind was not going to be able to do the job in those weather conditions or immediately when he decided not to jog into the wind. Without jogging in time or throwing the anchors out in time the Seawind was simply blown by the wind coming out of the northeast straight up onto the beach where the tug and barge grounded on Plum Island. It certainly did not do any good to throw the first anchor out 100 yards off shore. It was very unlikely that that anchor was going to have time to catch and stop the barge from grounding at that point in time. That action was done too late.

Once the weather report was known to the Captain the Captain should have allowed himself more time and started his journey earlier to beat the bad weather. Without the bad weather the engines would not have had to work so hard. With my experience with the GM8-71 engines over working those engines very likely could have caused them to overheat and shut down.

Alternatively to starting the journey earlier the Captain could have monitored his barometer and waited for the next weather report. As a

general rule bad weather coming in from the northeast in December very often gets worse before it passes. In short the Captain should have waited for a better weather report and let the bad weather pass.

In my experience towing equipment behind my vessels for more than 50 years I have had to calculate the weight of the gear to be towed behind the boat according to the engine horsepower of each vessel. Like the U.S. Coast Guard report in this case states, the tug was too small and lacked enough power to tow the barge and crane which grounded. This is even more true giving the bad weather conditions at the time of the grounding.

When the U.S. Coast Guard responded to the distress call the vessel and barge were only 100 yards off the beach. Because of the closeness of the vessel and barge to the beach the U.S. Coast Guard were unable to approach the vessel and the barge to put a line on the tug or a line on the barge or even simply remove the crew for safety. I understand that the U.S. Coast Guard was forced to back off with its vessel and send a helicopter to remove the crew. If the tug and barge were further off shore it would have increased the chance of a successful rescue of not only the crew, but the tug and the barge and would have avoided the grounding on Plum Island.

The evening forecast called for worsening weather. More wind velocity and higher seas were forecasted. The wind and sea conditions were forecasted to increase and not diminish. The Captain should have waited for a more favorable forecast before starting out to sea. If the Captain waited for the next weather report the 8 to 10 foot seas would not have come over the stern of the tug or entered the engine room. The engine would not have stalled if it was the water that caused it rather than overheating. The hatch never should have been off while the vessel was at sea. In short the engine should not have stalled due to water coming over the rail because the bad weather could have been avoided. The engine should not have stalled due to over heating because the over heating could have been avoided by going slower and not going out in the bad weather and the hatch cover never should have been off the vessel and should not be off the vessel even in the calmest of weather for ventilation.

In summary, the under sized and under powered Seawind never should have been coupled with the barge; the vessel never should have went to sea with the forecasted weather conditions; the hatch never should have been off  while the vessel was at sea; the Captain should have began to jog into the wind the instant he knew a problem was beginning to arise weather it was when he knew the weather was too bad for him to safely make the journey or when he lost the first engine; the engine room should

not be allowed to flood under any circumstances while the vessel is being operated at sea; and under no circumstances should the vessel or barge have ended up grounded on the beach at Plum Island.

WHEREFORE, plaintiff requests this Honorable Court to issue an Order precluding the plaintiff from calling as expert witnesses, Mary Beth Eisenmann, of Clean Harbor Environmental Services, Robert Walsh, J.D., Title Examiner, Marilyn Firth and John D. Halamka, M.D.. Plaintiff hereby requests that this Honorable Court issue an Order allowing the plaintiff to call Verne Fisher of Visionary Landscapes, whose preliminary report and identity and expected testimony was provided to the defendant in a timely fashion. A supplemental report was provided to the defendant's even prior to the issuance of this Show Cause Order, Thomas Neve, Surveyor of Neve-Morin Group, Inc. whose survey report who was provided to the defendant  and who was identified as an expert with expected testimony in a timely fashion and whose survey report attached hereto has been provided to the defendant even prior to the Show Cause Order and Captain Raymond Bono as substitution for Captain Brian Fournier whose testimony are essentially identical to each other and to the expected testimony from Captain Arthur Fournier who was disclosed by the defendant C.B. Marine as their marine expert in this case, who has been acting as an expert during other lawsuits which arose out of this grounding litigation for C.B. Marine, unbeknown to plaintiff's counsel until that

18

disclosure. When plaintiff disclosed Captain Brian Fournier as his marine expert plaintiff was not informed that defendant's expert Captain Arthur Fournier, plaintiff's experts father, was already the defendant C.B. Marine's expert. Captain Bono was disclosed to the defendants two days later and the defendants were provided a detail written report two days after learning that Captain Brian Fournier's father Captain Arthur Fournier has been and will be the marine expert for C.B. Marine in this and had been their expert in other litigation arising out of the grounding. The plaintiff's marine expert Captain Brian Fournier will not testify for the plaintiff while his Father Captain Arthur Fournier testifies for the Defendant C.B. Marine in this case.

Respectfully Submitted,
Plaintiff by his attorney

/s/ John P. LeGrand

_____
John P. LeGrand
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
617-623-3001
BBO # 550185

Dated:       July 13, 2007

## CERTIFICATION OF SERVICE

I, John P. LeGrand, attorney for the plaintiff certify that on the 13th day of July, 2007 I made service of the foregoing document titled;" Plaintiff's Motion to Inspect, Photograph and Survey Tug Seawind" with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Cathy S. Roberts, Esquire
Robert J. Murphy, Esquire
Mark G. Furey, Esquire
Aaron K. Baltes, Esquire
Michael S. D'Orsi, Esquire
T. Christopher Donnelly, Esquire


/s/ John P. LeGrand
John P. LeGrand, Esquire

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
     Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
     Defendants

## **PLAINTIFFS EXPERT WITNESS DISCLOSURE**

1.     Jean Francois Barre, Licensed Real Estate Broker, Re-Max Newburyport, Massachusetts.

Mr. Barre will testify concerning the diminution of the value of Dr. Ablow's property as well as a market analysis concerning value. He will also testify concerning ethical obligations to divulge certain information to prospective buyers. The plaintiff reserves the right to supplement this response.

2.     Mary Beth Eisenmann, Clean Harbors Environmental Services, Weymouth, Massachusetts.

Ms. Eisenmann will testify concerning the procedure and pricing of further clean up attempts. The plaintiff reserves the right to supplement this response.

3.     Verne Fisher, Visionary Landscapes, New Hampshire.

Mr. Fisher will testify concerning the procedure and pricing of long range clean up attempts. The plaintiff reserves the right to supplement this response.

4.      Robert Walsh, J.D., Title Examiner, Billerica Massachusetts.

Mr. Walsh will testify, if necessary, concerning issues of title and ownership of the plaintiff's property. The plaintiff reserves the right to supplement this response.

5.      Linda Ahern, Ahern Appraisal, Inc., Ipswich, Massachusetts.

Ms. Ahern will testify concerning the value of the plaintiff's property using well recognized methods of valuation. The plaintiff reserves the right to supplement this response.

6.      Neve-Morin Group, Inc., 447 Boston Street, Topsfield, Massachusetts.

Will survey the area on and near the plaintiff's property to establish ownership rights and prepare a Points Set Plan. The plaintiff reserves the right to supplement this response.

7.      Marilyn Firth, Newburyport, Massachusetts.

Ms. Firth will testify concerning the composition and toxicity of the materials contained in the barge and its components parts. The plaintiff reserves the right to supplement this response.

8.   John D. Halamka, M.D., MS, Chief Information Officer CareGorup Health
     System. Associate Dean for Educational Technology at Harvard Medical
     School.

     Dr. Halamka or another well recognized expert in the field will testify about
     the potentially fatal effects of airborne silica and iron to humans. The
     plaintiff reserves the right to supplement this response.

9.   Captain Brian Fournier, Boston Massachusetts.

     Captain Fournier is expected to testify concerning the operation and use
     of tugboats with respect to the circumstances surrounding the facts and
     damages in this action.


                              Plaintiff
                              By his attorney,

                              _____
                              John P. LeGrand, Esquire
                              John P. LeGrand & Associates, P.C.
                              375 Broadway, Suite 2
                              Somerville, MA 02145
                              (617) 623-3001
                              BBO No: 550185


                    _____
                              Eric Stafford, Esquire
                              John P. LeGrand & Associates, P.C.
                              375 Broadway, Suite 2
                              Somerville, MA 02145
                              BBO No: 551074
                              (617) 623-3001

## <u>CERTIFICATE OF SERVICE</u>

I, John P. LeGrand, Esquire, hereby certify that on this 22nd day of March,

2007, I served a copy of the attached document on all parties to this action by

mailing same by certified mail return receipt requested postage prepaid to:

Robert Murphy, Esquire
Seth Holbrook, Esquire
Holbrook & Murphy
238-240 Lewis Wharf
Boston, MA 02110

Mark G. Furey, Esquire
Thompson, Bull, Furey, Bass & MacColl
120 Exchange Street
P.O. Box 447
Portland, ME 04112-0447

Cathy S. Roberts, Esquire
Thompson & Bowie, LLP
3 Canal Plaza
P.O. Box 4630
Portland, ME 04112-4630

Aaron Baltes, Esquire
Peter J. DeTroy, Esquire
Norman, Canton & DeTroy, LLC
415 Congress Street
P.O. Box 4600
Portland, ME 04112-4600

_____
John P. LeGrand

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
        Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
        Defendants

## **PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS DISCLOSURE**

## **SUBJECT MATTER OF EXPERT TESTIMONY**

1.      Jean Francois Barre, Licensed Real Estate Broker, RE-Max Newburyport,

MA

Mr. Barre has written a report which has been produced to the defendants.

Mr. Barre has also been deposed by the defendants.

Mr. Barre is expected to testify regarding the diminished value of the

plaintiff's property due to the grounding and removal of the barge DS64.

Mr. Barre is also expected to testify that Dr. Ablow and any real estate

agent he employs to market the property will be obligated to divulge to any

1

prospective buyer that sharp pieces of metal are present on Dr. Ablow's

property and property extending past the low tide mark and into the waters

in front of Dr. Ablow's property.

**Substance of Facts, Opinions and Summary of Grounds of Expert**

**Testimony**

Please see deposition transcript of Jean Francois Barre as well as

Plaintiff's Expert Witness Disclosure.

**Exhibits to be Used by Expert**

No final decision has been made as to what exhibits will be used or relied

upon by Mr. Barre.

**Qualifications of Expert**

Mr. Barre is a licensed real estate professional with extensive experience

on Plum Island, the locus of the grounding and removal of barge DS64.

**Compensation to be Paid**

Mr. Barre will be compensated at the rate of $250.00 per hour for trial testimony and will be compensated $2,000.00 for his deposition by the defendants.

2.    Mary Beth Eisenman, Clean Harbors Environmental Services, Weymouth, MA

As previously discussed with the defendants, Ms. Eisenmann will not be used or called as an expert by the plaintiff.

Ms. Eisenmann may be called by the plaintiff to testify concerning her site inspection and estimate contained in a two page document dated May 17, 2006 which describes scope of services, project costs and general conditions regarding a clean-up of the plaintiff's property and areas which negatively impact the value of plaintiff's property if left in their present condition.

The May 17, 2006 document has been produced to the defendants.

3.    Verne Fisher, Visionary Landscape

**Substance of Facts, Opinions and Summary of Grounds of Expert Testimony**

Please see report attached.


**Data or Other Information Considered by the Expert**


Site inspection by Mr. Fisher


**Exhibits to be Used by the Expert**


A decision has not been made as to what exhibits will be used. This information will be provided in accordance with the Court's Orders.


**Compensation**


A compensation rate will be provided.


4.     Robert Walsh, J.D., Title Examiner, Billerica, MA


The plaintiff has decided that Mr. Walsh will not be called as an expert as his testimony would be cumulative.


5.     Linda Ahearn, Ahearn Appraisal, Inc., Ipswich, MA

**Subject Matter of Expert Testimony**

See report dated March 16, 2007 which has been produced to the defendants.

**Data or Other Information Considered by the Expert**

Please see report dated March 16, 2007.

**Exhibits to be Used by the Expert**

A decision has not been made as to what exhibits will be used. This information will be provided in accordance with the Court's Orders.

**Qualifications of Expert**

Please see report dated March 16, 2007.

**Compensation to be Paid**

Ahearn Associates has been paid $2,500.00 by the plaintiff. Plaintiff anticipates paying additional compensation for Court testimony.

6.    Neve-Morin Group, Inc., 447 Boston Street, Topsfield, MA

**Subject Matter of Expert Testimony**

Please see Points Set Plan showing survey results.

**Data or Other Information Considered by Expert**

The plaintiff believes the Neve-Morin Group used all available tools and information to determine the boundary lines of his property.

**Exhibits to be Used by the Expert**

A decision has not been made as to what exhibits will be used. This information will be provided in accordance with the Court's Orders.

**Qualifications of Expert**

Mr. Thomas E. Neve, PLS is a surveyor in the Commonwealth of Massachusetts.

**Compensation to be Paid**

The expert was paid $2,500.00 as a retainer to complete the survey.

7.    Marilyn Firth

The plaintiff will not call Marilyn Firth as an expert but reserves the right to
call her as a lay witness.

8.    John D. Halamka, M.D., M.S.

The plaintiff will not call Dr. Halamka as an expert witness.

9.    Captain Brian Fournier of Boston, Massachusetts and Portland, Maine
was originally designated in the Plaintiff's Expert Witness Disclosure on
March 22, 2007 together with an overview of his anticipated testimony at
that time. Two days ago on Monday, June 25, 2007 plaintiff received in the
mail the designation of expert witnesses by C.B. Marine Corporation. In
said designation the defendant, C.B. Marine has identified Captain Arthur
Fournier as their expert witness. Captain Arthur Fournier is the father
plaintiff's expert witness Captain Brian Fournier. In a conversation with
Captain Brian Fournier it has been determined that Captain Brian Fournier
will be unable to testify on behalf of the plaintiff as a result of the fact that
his father Captain Arthur Fournier will be testifying on behalf of the
defendant, C.B. Marine. Additionally, Captain Brian Fournier believes that

there are other conflicts precluding him to act as an expert witness on
behalf of the plaintiff as a result of his knowledge of and interactions with
employees of the parties that the plaintiff has brought actions against in
this matter.

10.    Captain Raymond Bono, Everett, Massachusetts.

Accordingly, yesterday plaintiff contacted Captain Raymond Bono of
Everett, Massachusetts and discussed generally the facts of this action
and arranged for a meeting with Captain Bono this morning at which time
substantial documentation was reviewed including all of these defendant's
expert disclosures, U.S. U.S. Coast Guard accident report and various
other documents. As a result of that meeting the attached following report
was made by Captain Raymond Bono.

Plaintiff will not be calling Captain Brian Fournier to testify as an expert
witness at the time of trial and hereby substitutes Captain Raymond Bono
who is expected to testify as set out herein and in his attached report.
Captain Raymond Bono has previously been qualified to testify as an
expert maritime witness in the United States District Court for the District
of Massachusetts.

**Report of Captain Raymond Bono**

Captain Bono is a fifth generation Captain. Captain Bono started working as a Captain for the first time in 1953. Since that time I have served as a Captain for approximately 16 different vessels. I have served as a Captain on vessels owned by my father for an excess of 12 years and I have served as Captain on vessels owned by me in excess of 4 years. I have well in excess of 50 years of experience in the commercial marine industry. I have worked approximately 40 years as a marine Captain and at least 15 years as a marine engineer on various vessels. From my review of the various documentation this morning I have formed various opinions concerning the negligence of all of the defendants including the company that owned the vessel, the company that leased the vessel, the company that provided the Captain, as well as the Captain himself.

The hatch on the vessel should have been closed and secured while the vessel was at sea.

The twin GM8-71 Marine Diesel engines rated at 300 horsepower on the Seawind at the time of the accident are well known to me. I have operated vessels powered by the GM8-71 engines and have a personal knowledge of their power. I have personally had to adjust tow gear weight according to the power generated by the GM8-71 engines to enable vessels that I

operated to match the amount of horsepower to the weight of the gear being towed.

When the GM8-71 engines are overworked they tend to over heat and you must pay attention to the alarms, adjust the RPM's accordingly and not tow in excess of the engines ability. Based on my experience with the operation of the GM8-71 engines it is my opinion that the Seawind which was a vessel which was less than 25 feet long with those two engines totaling 600 horsepower was dramatically underpowered and inadequate to tow the barge DS-64. This is even more dramatically inappropriate considering the fact that there was a crane and gear on board the barge at the time it was being hauled with a mere 600 horsepower of propulsion in adverse weather conditions. The owner of the Seawind and barge DS-64 never should have allowed that combination to be leased or used together. I will need more information about the vessel Albany to state whether the combination of that vessel and the barge DS-64 would have been suitable. This opinion is also equally true of the company that was leasing the Seawind and the DS-64 at the time of the grounding. The company that leased the incredibly small and underpowered Seawind and the barge DS-64 should have known that that vessels capacity to tow that barge was inadequate and unsafe, especially in the weather conditions at the time of the grounding. Of course the company that provided the Captain and the Captain also should have known that the 600 horsepower

capacity of the less than 25 feet long Seawind was grossly inadequate to tow the barge DS-64, particularly in the weather that existed at the time of the grounding.

There are many reasons why the owner of the Seawind and barge, the company that leased the Seawind and barge, the company that provided the Captain for the Seawind and barge and the Captain that was operating the Seawind and barge at the time of the grounding were negligent. These reasons are fairly well documented in the evaluation conducted by the U.S. Coast Guard following the grounding. The weather conditions before, during and after the grounding are all important factors in how this grounding could have been avoided. In the first instance under no circumstances should the Seawind with a mere two 300 horsepower GM8-71 engines be towing that large barge with that crane on top of it as well as all the equipment that the barge was carrying. That weight is extremely excessive for 600 horsepower to tow. I have had the exact same problem while operating the GM8-71 in towing gear. I have actually had to remove gear because it was too heavy to be towed with that engine when I first went on a particular vessel.

Let me say to start the most obvious act of negligence by all parties was to allow that vessel that was less than 25 feet long with a mere 600 horsepower to attempt to tow that barge, crane and equipment

combination in those weather conditions. The owner should have never let it happen. The lessor should never have let it happen and the company that provided the Captain as well as the Captain never should have let it happen.

Moving on to more specific particulars about various ways that the grounding could have been avoided even with that inadequate vessel towing the barge. To begin with the vessel never should have left the Annisquam River until it got another weather report indicating that the conditions were going to be diminishing and not increasing. It was December of the year and anybody who has any maritime experience in this area knows that when adverse weather is coming in from the northeast the vast majority of the time it's going to get worse rather than better. The vessel should not have left the Annisquam River until it heard the next weather report which showed that the weather conditions were getting worse and not better.

I do not know what contractual or time deadlines were in place that would have forced that inadequate vessel and barge combination to attempt to move from the Annisquam River up to the Merrimac River in those weather conditions. For starters that vessel and barge never should have left the Annisquam River until the bad weather passed.

Once the vessel and barge left the Annisquam River and got caught in the bad weather the underpowered Seawind should have began to jog into the seas and hold its position and call for help rather than try to push on to complete a mission that is never should have started. Even after the water went down the open hatch and stalled one engine, if that was in fact the cause of the stalled one engine, if the vessel and barge took a course far enough off shore or were far enough off shore when that happened the Captain still could have turned that vessel immediately into the seas and began to jog with one engine holding the tug in position with minimum RPM's just enough to hold position and sustain electronic equipment and the wind would have held the barge back off the vessel so that they did not collide and the vessel would not have ended up getting the tow line caught in its one remaining operating propeller.

When the Captain realized that the weather was going to be too severe for him to safely undertake the journey he should have given up his objective and attended to the safety of the crew first and hold and jog steady with the bow into the wind, and as I stated slow down enough to hold steady and support the electronics to relieve the burden from the one remaining engine, or two engines if the Captain recognized that his vessel was under powered and call for a rescue. Even with one engine out of operation if the vessel jogged into the wind the crew, tug and barge as well as the crane and equipment on the barge could have been saved and rescued and the

13

grounding could have been avoided. If the Captain recognized the adverse weather conditions and acted immediately by jogging and calling for a rescue the barge probably would have been rescued independently from the tug. It seems all but certain to me that the Captain should not have attempted to complete the mission after loosing the first of the two engines and it is likely that he probably did not try.

In my initial review of this documentation I need further clarification on how far off shore the Seawind was when it was towing the barge and where it was located exactly at the location that the U.S. Coast Guard has identified as the collision point. With the weather conditions as described in the U.S. Coast Guard report the Seawind and barge seemingly should not have been so close to shore.

With the wind blowing from the northeast toward the land the tug and barge should have been towing further off shore. I am investigating now to learn if the reason that they were closer to shore than they should have been was simply because they were trying to enter the Merrimac River. In any event the prevailing wind at the time of the accident from the northeast when considered with the location where the U.S. Coast Guard said the collision occurred and where the grounding occurred on Plum Island should easily of been something that should have been known by the Captain and that is why I say that the instant that first engine went

down he should have immediately attempted to jog to the northeast into the wind and hold that boat and tug in position without getting the howser line caught in his propeller shutting down the second engine. He should have called for a mayday immediately and waited for rescue.

The entire grounding could have been avoided by simply not pairing that little under powered boat with that barge.

In my mind there is a question whether or not corners were cut on time to rush the arrival of the barge on the Merrimac. I say this because despite the fact that the vessel was too small to tow that barge the weather conditions that were being forecasted and would have been forecasted if the Captain waited for one more report showing the increased intensity of the weather leads me to questions why that underpowered vessel attempted to bring that barge up to the Merrimac and why it was so close to shore.

Another problem I see with the vessel Seawind that should have been acknowledged by the owner, the company that leased the Seawind, the company that provided the Captain and the Captain was the way that the engine room was set up for ventilation of the twin GM8-71 300 horsepower marine diesel engines at the time of the accident. It would be helpful for me to inspect the Seawind to determine if the ventilation was

adequate. If there were ventilation stacks I would be able to determine if

they were adequate or not. I would like to know what size they were to

determine if they were appropriate and if they had the ability to turn and

face in the proper direction to get maximum ventilation into the engine

room and avoid any water going down into the engine room through those

stacks. The U.S. Coast Guard report indicates that the vessel was turned

180 degrees and struck the barge because of inadequate power or no

power. That is exactly why I say that even when the Seawind lost one

engine the vessel could have safely jogged northeast into the wind and

call for a rescue immediately and allowed time for the rescue to arrive and

occur. If done properly this would have kept all electronics working and the

wind would have kept the barge away from the vessel while waiting for the

rescue to arrive.

Until I am provided with additional facts it seems to me that the vessel and

the barge should have been towing further off shore. Also, waiting to throw

the first anchor until the vessel and barge was 100 yards off the beach

was too late to allow the anchor or anchors to catch on the bottom.

Immediately upon realizing that the little Seawind was not going to be able

to perform the job in that weather and immediately upon loosing one

engine the vessel immediately should have turned into the northeast and

jogged into the wind. As far as throwing the anchors, that should have

been done immediately when the Captain either realized that the little

Seawind was not going to be able to do the job in those weather conditions or immediately when he decided not to jog into the wind. Without jogging in time or throwing the anchors out in time the Seawind was simply blown by the wind coming out of the northeast straight up onto the beach where the tug and barge grounded on Plum Island. It certainly did not do any good to throw the first anchor out 100 yards off shore. It was very unlikely that that anchor was going to have time to catch and stop the barge from grounding at that point in time. That action was done too late.

Once the weather report was known to the Captain the Captain should have allowed himself more time and started his journey earlier to beat the bad weather. Without the bad weather the engines would not have had to work so hard. With my experience with the GM8-71 engines over working those engines very likely could have caused them to overheat and shut down.

Alternatively to starting the journey earlier the Captain could have monitored his barometer and waited for the next weather report. As a general rule bad weather coming in from the northeast in December very often gets worse before it passes. In short the Captain should have waited for a better weather report and let the bad weather pass.

17

In my experience towing equipment behind my vessels for more than 50 years I have had to calculate the weight of the gear to be towed behind the boat according to the engine horsepower of each vessel. Like the U.S. Coast Guard report in this case states, the tug was too small and lacked enough power to tow the barge and crane which grounded. This is even more true giving the bad weather conditions at the time of the grounding.

When the U.S. Coast Guard responded to the distress call the vessel and barge were only 100 yards off the beach. Because of the closeness of the vessel and barge to the beach the U.S. Coast Guard were unable to approach the vessel and the barge to put a line on the tug or a line on the barge or even simply remove the crew for safety. I understand that the U.S. Coast Guard was forced to back off with its vessel and send a helicopter to remove the crew. If the tug and barge were further off shore it would have increased the chance of a successful rescue of not only the crew, but the tug and the barge and would have avoided the grounding on Plum Island.

The evening forecast called for worsening weather. More wind velocity and higher seas were forecasted. The wind and sea conditions were forecasted to increase and not diminish. The Captain should have waited for a more favorable forecast before starting out to sea. If the Captain waited for the next weather report the 8 to 10 foot seas would not have

come over the stern of the tug or entered the engine room. The engine would not have stalled if it was the water that caused it rather than overheating. The hatch never should have been off while the vessel was at sea. In short the engine should not have stalled due to water coming over the rail because the bad weather could have been avoided. The engine should not have stalled due to over heating because the over heating could have been avoided by going slower and not going out in the bad weather and the hatch cover never should have been off the vessel and should not be off the vessel even in the calmest of weather for ventilation.

In summary, the under sized and under powered Seawind never should have been coupled with the barge; the vessel never should have went to sea with the forecasted weather conditions; the hatch never should have been off  while the vessel was at sea; the Captain should have began to jog into the wind the instant he knew a problem was beginning to arise weather it was when he knew the weather was too bad for him to safely make the journey or when he lost the first engine; the engine room should not be allowed to flood under any circumstances while the vessel is being operated at sea; and under no circumstances should the vessel or barge have ended up grounded on the beach at Plum Island.

Captain Bono has been paid a $500.00 retainer.

Plaintiff
By his attorney,

_____
John P. LeGrand, Esquire
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
(617) 623-3001
BBO No: 550185


Dated:        June 29, 2007

## REPORT OF CAPTAIN RAYMOND BONO

Captain Bono is a fifth generation Captain. Captain Bono started working as a Captain for the first time in 1953. Since that time I have served as a Captain for approximately 16 different vessels. I have served as a Captain on vessels owned by my father for an excess of 12 years and I have served as Captain on vessels owned by me in excess of 4 years. I have well in excess of 50 years of experience in the commercial marine industry. I have worked approximately 40 years as a marine Captain and at least 15 years as a marine engineer on various vessels. From my review of the various documentation this morning I have formed various opinions concerning the negligence of all of the defendants including the company that owned the vessel, the company that leased the vessel, the company that provided the Captain, as well as the Captain himself.

The hatch on the vessel should have been closed and secured while the vessel was at sea.

The twin GM8-71 Marine Diesel engines rated at 300 horsepower on the Seawind at the time of the accident are well known to me. I have operated vessels powered by the GM8-71 engines and have a personal knowledge of their power. I have personally had to adjust tow gear weight according

to the power generated by the GM8-71 engines to enable vessels that I operated to match the amount of horsepower to the weight of the gear being towed.

When the GM8-71 engines are overworked they tend to over heat and you must pay attention to the alarms, adjust the RPM's accordingly and not tow in excess of the engines ability. Based on my experience with the operation of the GM8-71 engines it is my opinion that the Seawind which was a vessel which was less than 25 feet long with those two engines totaling 600 horsepower was dramatically underpowered and inadequate to tow the barge DS-64. This is even more dramatically inappropriate considering the fact that there was a crane and gear on board the barge at the time it was being hauled with a mere 600 horsepower of propulsion in adverse weather conditions. The owner of the Seawind and barge DS-64 never should have allowed that combination to be leased or used together. I will need more information about the vessel Albany to state whether the combination of that vessel and the barge DS-64 would have been suitable. This opinion is also equally true of the company that was leasing the Seawind and the DS-64 at the time of the grounding. The company that leased the incredibly small and underpowered Seawind and the barge DS-64 should have known that that vessels capacity to tow that barge was inadequate and unsafe, especially in the weather conditions at the time of the grounding. Of course the company that provided the

2

Captain and the Captain also should have known that the 600 horsepower capacity of the less than 25 feet long Seawind was grossly inadequate to tow the barge DS-64, particularly in the weather that existed at the time of the grounding.

There are many reasons why the owner of the Seawind and barge, the company that leased the Seawind and barge, the company that provided the Captain for the Seawind and barge and the Captain that was operating the Seawind and barge at the time of the grounding were negligent. These reasons are fairly well documented in the evaluation conducted by the U.S. Coast Guard following the grounding. The weather conditions before, during and after the grounding are all important factors in how this grounding could have been avoided. In the first instance under no circumstances should the Seawind with a mere two 300 horsepower GM8-71 engines be towing that large barge with that crane on top of it as well as all the equipment that the barge was carrying. That weight is extremely excessive for 600 horsepower to tow. I have had the exact same problem while operating the GM8-71 in towing gear. I have actually had to remove gear because it was too heavy to be towed with that engine when I first went on a particular vessel.

Let me say to start the most obvious act of negligence by all parties was to allow that vessel that was less than 25 feet long with a mere 600

horsepower to attempt to tow that barge, crane and equipment combination in those weather conditions. The owner should have never let it happen. The lessor should never have let it happen and the company that provided the Captain as well as the Captain never should have let it happen.

Moving on to more specific particulars about various ways that the grounding could have been avoided even with that inadequate vessel towing the barge. To begin with the vessel never should have left the Annisquam River until it got another weather report indicating that the conditions were going to be diminishing and not increasing. It was December of the year and anybody who has any maritime experience in this area knows that when adverse weather is coming in from the northeast the vast majority of the time it's going to get worse rather than better. The vessel should not have left the Annisquam River until it heard the next weather report which showed that the weather conditions were getting worse and not better.

I do not know what contractual or time deadlines were in place that would have forced that inadequate vessel and barge combination to attempt to move from the Annisquam River up to the Merrimac River in those weather conditions. For starters that vessel and barge never should have left the Annisquam River until the bad weather passed.

Once the vessel and barge left the Annisquam River and got caught in the bad weather the underpowered Seawind should have began to jog into the seas and hold its position and call for help rather than try to push on to complete a mission that is never should have started. Even after the water went down the open hatch and stalled one engine, if that was in fact the cause of the stalled one engine, if the vessel and barge took a course far enough off shore or were far enough off shore when that happened the Captain still could have turned that vessel immediately into the seas and began to jog with one engine holding the tug in position with minimum RPM's just enough to hold position and sustain electronic equipment and the wind would have held the barge back off the vessel so that they did not collide and the vessel would not have ended up getting the tow line caught in its one remaining operating propeller.

When the Captain realized that the weather was going to be too severe for him to safely undertake the journey he should have given up his objective and attended to the safety of the crew first and hold and jog steady with the bow into the wind, and as I stated slow down enough to hold steady and support the electronics to relieve the burden from the one remaining engine, or two engines if the Captain recognized that his vessel was under powered and call for a rescue. Even with one engine out of operation if the vessel jogged into the wind the crew, tug and barge as well as the crane

and equipment on the barge could have been saved and rescued and the grounding could have been avoided. If the Captain recognized the adverse weather conditions and acted immediately by jogging and calling for a rescue the barge probably would have been rescued independently from the tug. It seems all but certain to me that the Captain should not have attempted to complete the mission after loosing the first of the two engines and it is likely that he probably did not try.

In my initial review of this documentation I need further clarification on how far off shore the Seawind was when it was towing the barge and where it was located exactly at the location that the U.S. Coast Guard has identified as the collision point. With the weather conditions as described in the U.S. Coast Guard report the Seawind and barge seemingly should not have been so close to shore.

With the wind blowing from the northeast toward the land the tug and barge should have been towing further off shore. I am investigating now to learn if the reason that they were closer to shore than they should have been was simply because they were trying to enter the Merrimac River. In any event the prevailing wind at the time of the accident from the northeast when considered with the location where the U.S. Coast Guard said the collision occurred and where the grounding occurred on Plum Island should easily of been something that should have been known by

the Captain and that is why I say that the instant that first engine went down he should have immediately attempted to jog to the northeast into the wind and hold that boat and tug in position without getting the howser line caught in his propeller shutting down the second engine. He should have called for a mayday immediately and waited for rescue.

The entire grounding could have been avoided by simply not pairing that little under powered boat with that barge.

In my mind there is a question whether or not corners were cut on time to rush the arrival of the barge on the Merrimac. I say this because despite the fact that the vessel was too small to tow that barge the weather conditions that were being forecasted and would have been forecasted if the Captain waited for one more report showing the increased intensity of the weather leads me to questions why that underpowered vessel attempted to bring that barge up to the Merrimac and why it was so close to shore.

Another problem I see with the vessel Seawind that should have been acknowledged by the owner, the company that leased the Seawind, the company that provided the Captain and the Captain was the way that the engine room was set up for ventilation of the twin GM8-71

300 horsepower marine diesel engines at the time of the accident. It would be helpful for me to inspect the Seawind to determine if the ventilation was adequate. If there were ventilation stacks I would be able to determine if they were adequate or not. I would like to know what size they were to determine if they were appropriate and if they had the ability to turn and face in the proper direction to get maximum ventilation into the engine room and avoid any water going down into the engine room through those stacks. The U.S. Coast Guard report indicates that the vessel was turned 180 degrees and struck the barge because of inadequate power or no power. That is exactly why I say that even when the Seawind lost one engine the vessel could have safely jogged northeast into the wind and call for a rescue immediately and allowed time for the rescue to arrive and occur. If done properly this would have kept all electronics working and the wind would have kept the barge away from the vessel while waiting for the rescue to arrive.

Until I am provided with additional facts it seems to me that the vessel and the barge should have been towing further off shore. Also, waiting to throw the first anchor until the vessel and barge was 100 yards off the beach was too late to allow the anchor or anchors to catch on the bottom. Immediately upon realizing that the little Seawind was not going to be able to perform the job in that weather and immediately upon loosing one engine the vessel immediately should have turned into the northeast and

8

jogged into the wind. As far as throwing the anchors, that should have been done immediately when the Captain either realized that the little Seawind was not going to be able to do the job in those weather conditions or immediately when he decided not to jog into the wind. Without jogging in time or throwing the anchors out in time the Seawind was simply blown by the wind coming out of the northeast straight up onto the beach where the tug and barge grounded on Plum Island. It certainly did not do any good to throw the first anchor out 100 yards off shore. It was very unlikely that that anchor was going to have time to catch and stop the barge from grounding at that point in time. That action was done too late.

Once the weather report was known to the Captain the Captain should have allowed himself more time and started his journey earlier to beat the bad weather. Without the bad weather the engines would not have had to work so hard. With my experience with the GM8-71 engines over working those engines very likely could have caused them to overheat and shut down.

Alternatively to starting the journey earlier the Captain could have monitored his barometer and waited for the next weather report. As a general rule bad weather coming in from the northeast in December very

often gets worse before it passes. In short the Captain should have waited for a better weather report and let the bad weather pass.

In my experience towing equipment behind my vessels for more than 50 years I have had to calculate the weight of the gear to be towed behind the boat according to the engine horsepower of each vessel. Like the U.S. Coast Guard report in this case states, the tug was too small and lacked enough power to tow the barge and crane which grounded. This is even more true giving the bad weather conditions at the time of the grounding.

When the U.S. Coast Guard responded to the distress call the vessel and barge were only 100 yards off the beach. Because of the closeness of the vessel and barge to the beach the U.S. Coast Guard were unable to approach the vessel and the barge to put a line on the tug or a line on the barge or even simply remove the crew for safety. I understand that the U.S. Coast Guard was forced to back off with its vessel and send a helicopter to remove the crew. If the tug and barge were further off shore it would have increased the chance of a successful rescue of not only the crew, but the tug and the barge and would have avoided the grounding on Plum Island.

The evening forecast called for worsening weather. More wind velocity and higher seas were forecasted. The wind and sea conditions were

forecasted to increase and not diminish. The Captain should have waited

for a more favorable forecast before starting out to sea. If the Captain

waited for the next weather report the 8 to 10 foot seas would not have

come over the stern of the tug or entered the engine room. The engine

would not have stalled if it was the water that caused it rather than

overheating. The hatch never should have been off while the vessel was

at sea. In short the engine should not have stalled due to water coming

over the rail because the bad weather could have been avoided. The

engine should not have stalled due to over heating because the over

heating could have been avoided by going slower and not going out in the

bad weather and the hatch cover never should have been off the vessel

and should not be off the vessel even in the calmest of weather for

ventilation.

In summary, the under sized and under powered Seawind never should

have been coupled with the barge; the vessel never should have went to

sea with the forecasted weather conditions; the hatch never should have

been off  while the vessel was at sea; the Captain should have began to

jog into the wind the instant he knew a problem was beginning to arise

weather it was when he knew the weather was too bad for him to safely

make the journey or when he lost the first engine; the engine room should

not be allowed to flood under any circumstances while the vessel is being

operated at sea; and under no circumstances should the vessel or barge

have ended up grounded on the beach at Plum Island.

# Visionary Landscapes LLC

*Landscape Art*
*Design / Build*     www.VisionaryLandscapes.com

5/30/06

Keith and Debra Ablow
#12 49th Street
Newbury, Ma 01951

Proposal:

Visionary Landscapes LLC will monitor the beach in front of your residence, to
locate, secure and remove any and all metal parts, fragments, and debris that is
uncovered along the beach off of 12th street in Newbury.  The debris is from the
barge accident several years before.  Visionary Landscapes LLC will use metal
detectors and visual surveillance to monitor the beach.  If metal is detected we
will obtain the necessary permits to excavate and remove the located fragments.
The estimated range to complete the scope of work listed below is two hundred
and twenty thousand and two hundred and fifty thousand dollars.  Visionary
Landscapes LLC will locate, secure, and remove any debris in connection to the
barge wreckage distributed along the beach off of 12th street in Newbury
Massachusetts over a three year period.

Scope of work:

> ➢ Contact local Town officials regarding the monitoring of the beach
> in front of 12th street in Newbury
> ➢ Obtain and secure any permits required for the removal of debris
> along the beach around 12th street Newbury
> ➢ Monitor the beach for debris two days a week on a weekly basis
> and after each and every storm that hits the coast over a three year
> period starting on the first Monday after the date of a signed
> contract (Mondays and Fridays a scout will walk and monitor the
> beach in front of #12 49th street  for about 1000'in each direction
> with a metal detector and visual observation)
> ➢ Comb beach if and when debris is uncovered and quadroon off the
> site for public safety utilizing signage and snow fencing.  A
> Visionary employee will guard the site for safety twenty four hours a
> day until the site is made safe and any hazardous debris is
> removed

➢ Contact all local agencies, town officials and the Environmental Protection Agency as well as abutters to inform them of the debris found and the measures that will be taken to remove it.

➢ Remove all debris by manual means when able and by a machine if needed ( skid steer with trax  to cause the least amount of impact or a backhoe and any other equipment as needed such as a crane or tow truck )

➢ All material / debris found from the wreckage will be discarded in an approved EPA rubbish container and removed off site to a salvage yard approved by the town and state officials

➢ All appropriate paperwork such as a field report will be submitted to the town, the EPA and state officials

➢ Weekly written monitoring reports will be filed and copies sent to Dr. Keith Ablow and any other people or agencies that may request such information with the written consent from the above client Dr. Ablow

➢ Repair all disturbed areas on the beach with grading and additional sand if required

My estimated range is between two hundred and twenty and two hundred and fifty
thousand dollars ($220,000 and $250,000) for the above scope of work.

The acceptance of this proposal requires the fee to be paid in four installments.  The first will be a twenty five percent retainer of thirty thousand dollars ($30,000.00) to be paid when the proposal has been accepted.   The second payment of thirty thousand dollars shall be due after one year to the date of the signed contract.  The third payment of thirty thousand dollars shall be due after the second year to the date of the signed contract. The final and last payment is due in full upon receipt on the three year anniversary of the signed contract date.   The final fee is due in the amount of thirty thousand dollars.  The actual final bill may be higher depending on actual costs incurred over the quoted estimate to remove debris.  Any additional cost that may bring the incurred costs higher then the one hundred and twenty thousand dollar estimate will be presented to the client with a written estimate of additional cost. If agreed upon by both the client and Visionary an addendum will be written and signed by both parties.

The acceptance of this proposal requires that the balance will be due in full upon completion of the above specified services in the scope of work.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements are contingent upon accidents or delays beyond our control.

The above price, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

If the above proposal is accepted, please sign and return to Visionary Landscapes LLC. Two proposals have been provided. Please keep one for your records.

I accept the proposal:   Client signature_____ Date: _____

Thank you,



Plan Of Land
In
**Newbury. Mass.**
Prepared for
**Plum Island Realty Trust**
(12 – 49th Street)
Assessors Map U04 – Block 0
Parcel 108
(Deed Book 23317 – Page 287)
Scale:1"=30'         April 30, 2007

Propertyline Is The Average Line Of
Foot (Bottom) Of Slope As Shown On
Plan Recorded In The South Essex
Registry In Plan Book 34 Plan No.
22b Dated May 1920.

Approximate High Tide
Elevation For April 20,
2007 = 15.0'

Bottom Of Sand Dunes
(Approx El. = 16.3')
(After Storm)
(Bottom Of Dunes Was
Eroded Approximately
5' To 6' Due To The
April 2007 Nor'Easter.)

Top Of Sand Dunes
(Approx.El. = 23.4')
(After Storm)
(Top Of Dunes Was
Eroded Approximately
5' To 6' Due To The
April 2007 Nor'Easter.)

Total Area
18,095 S.F.
0.42 Acres

**The Neve – Morin Group, Inc.**
Engineers – Surveyors – Environmental
Consultants – Land Use Planners
447 Old Boston Road – U.S. Route 1
Topsfield, Massachusetts  01983   978-887-8586

2626-PSP

PDF created with pdfFactory Pro trial version www.pdffactory.com