UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
       Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
       Defendants

**PLAINTIFF'S MOTION FOR LEAVE TO RESPOND TO DEFENDANT MAINE
COAST MARINE CONSTRUCTION, INC.'S OBJECTION TO INSPECT,
PHOTOGRAPH AND SURVEY TUG SEAWIND**

**AND**

**PLAINTIFF'S OPPOSITION TO DEFENDANT MAINE COAST MARINE
CONSTRUCTION INC.'S "INCORPORATED" MOTION TO STRIKE
PLAINTIFF'S "EXPERT DESIGNATION"**

Now comes the plaintiff and moves this Honorable Court for leave to
respond to the Defendant Maine Coast Marine's Objection to Plaintiff's Motion to
Inspect, Photograph and Survey the Seawind Tug.

As grounds therefore plaintiff's trial counsel states that they wish to
inspect, photograph and survey the Tug Seawind themselves in preparation for
Trial. Defense Counsel for Main Coast Marine Construction who at most provided
the Captain that beached the tug and barge, and has no ownership or lessor

interest in the Seawind. Maine Coast Marine Construction also contests that Captain Splettstoesser was even acting in the scope of Maine Coast Marine Construction as an employee with authority, even though Captain Splettstoesser is a 50 % owner of Maine Coast Marine Construction.

With the Court's permission, plaintiff's counsel would like to have Captain Raymond Bono, the plaintiff's marine expert, inspect the Tug Seawind with trial counsel at the same time in preparation of trial. However, in the alternative, plaintiffs' trial counsel wish to inspect, photograph and survey the Tug Seawind for presentation of photographs to the jury and to learn the configuration of the Seawind to be more suitably able to examine witnesses at the time of trial concerning size, horse power, configuration and ventilation of the Tug Seawind. The Seawind is twenty-five 25 feet long and photographs of this undersized craft which was towing a very large barge with a crane and an enormous amount of tools with two (2) three hundred (300) horse power engines. These photographs and inspection by trial counsel, with or without plaintiff's marine expert, will create important evidence for use at the time of trial.

To date no objection has been filed by the owner of the Seawind C.B. Marine Corporation represented by Attorney Mark Furey or the present lessor of the Tug Seawind being Fore River Dock & Dredge, Inc. being represented by Attorney Murphy. That is not to say that opposition is not forthcoming but simply that the owner and lessor of the Tug Seawind had not voiced opposition with

respect to the inspection through this point in time. I have had discussions with Attorney Murphy and Attorney Furey regarding the inspection. No opposition was voiced, but no inspection has been scheduled.

### PLAINTIFF'S OPPOSITION TO MAINE COAST MARINE'S (INCORPORATED)   MOTION TO STRIKE THE PLAINTIFF'S EXPERT DESIGNATION OF CAPTAIN RAYMOND BONO AS A SUPPLEMENTED MARINE EXPERT.)

Plaintiff hereby states its opposition to this Honorable Court to Defendant's Maine Coast Marine Construction's "**Incorporated**" Motion to Strike Plaintiff's Captain Raymond Bono's Designation. As grounds therefore, plaintiff states that on March 22, 2007plaintiff had originally designated Captain Brian Fournier as plaintiff's marine expert in a timely fashion. Plaintiff was never informed by any of the defendants' attorney's that plaintiff's marine expert Captain Brian Fournier's father, Captain Arthur Fournier, who was designated in this case on June 25, 2007 was originally designated by C.B. Marine Corporation as their maritime expert by Attorney Mark Furey in the case filed and tried in the State of Maine over two (2) years ago in a case that all of the same defense counsel were involved which arose out of the instant grounding. On July 16, 2007 in a Response to a Proposed Motion to Compel Production of Documents it was further disclosed that Attorney Mark Furey designated Captain Arthur Fournier on June 25, 2007 as his marine expert in the instant action, (who is the father of the plaintiff's originally designated marine expert Captain Brian Fournier who was designated by the plaintiff in March of 2007) in the case of C.B. Marine v. Maine Coast Marine, et al, State of Maine, Cumberland County Superior Court Civil

Action No.: CV04-774 entitled Plaintiff's Designation of Expert Witnesses dated May 27, 2005, which commenced trial.

All defense counsel (the identical counsel in the instant case) knew at least since plaintiff's expert disclosure on March 22, 2007 that Captain Arthur Fournier was C.B. Marine's expert in the State of Maine case previously referenced when said Plaintiff's (C.B. Marine) Designation was filed on May 27, 2005. Yet when the plaintiff, designated Captain Brian Fournier on March 22, 2007 as their marine expert in a timely fashion none of the defense attorney's came forward to inform plaintiff's counsel that the plaintiff had named the son of C.B. Marine's long time marine expert. Accordingly, when plaintiff's marine expert Brian Fournier was informed that his father Captain Arthur Fournier was the defendant C.B. Marine's expert he indicated that he would be unable to testify at the same trial for the plaintiff, Keith Ablow while his father Captain Arthur Fournier was testifying before this Honorable Court in the same case on behalf of C.B. Marine.

Within three (3) days of learning that Captain Brian Fournier would not be able to testify as the plaintiff's marine expert because his father Captain Arthur Fournier was designated as defendant C.B. Marine's expert, plaintiff immediately retained and met with Captain Raymond Bono, supplemented plaintiff's expert disclosure, and prepared a long and detailed expert report executed by Captain Raymond Bono and served that Supplemental Expert Designation of Captain

Raymond Bono, with the executed report (see Exhibit 1), on all defense counsel and this Honorable Court as a fair and reasonable method to respond to the fact that plaintiff's originally designated expert witness Captain Brian Fournier was not going to be able to testify in the same case and against his father Captain Arthur Fournier.

It seems note worthy that all defense counsel knew since March 25, 2005 that the designated maritime expert that C.B. Marine has used in the State of Maine case which reportedly settled after commencement of trial and then renamed again in this case on June 29, 2007 was not brought to the attention of the plaintiff when the plaintiff in a timely fashion named Captain Brian Fournier as their marine expert. Defense counsel seemingly simply baited plaintiff's counsel and seemingly should have disclosed the fact that Captain Arthur Fournier was going to be C.B. Marine's marine expert much sooner then June 29, 2007, and certainly immediately after plaintiff disclosed his son Captain Brian Fournier as plaintiff's expert in March of 2007. Plaintiff's counsel was completely surprised by the designation of Captain Arthur Fournier as C.B. Marine's marine expert, and even more surprised when two (2) days ago supplemental documents including Plaintiff C.B. Marine's expert designations from the State of Maine case dated March of 2005 revealed Captain Fournier as C.B. Marine's marine expert in that collateral case and revealed that Captain Arthur Fournier was designated as C.B. Marine's expert back on May 25, 2005.

Plaintiff scrambled to find and supplement Captain Raymond Bono for Captain Brian Fournier within three (3) days after learning that Captain Arthur Fournier was C.B. Marine's marine expert. Plaintiff's counsel remains shocked and even further surprised since two (2) days ago in response to a motion to compel documents yet to be filed for various deposition exhibits that were produced on July 16, 2007 revealed that Captain Arthur Fournier had been C.B. Marine's expert since March of 2005. This issue may be worthy of the Court's investigation with respect to fair play by defense counsel with respect to fairly and reasonably disclosing Captain Arthur Fournier in a timely fashion and perhaps Captain Arthur Fournier should be precluded from testifying as a result of this late designation. This issue is particularly concerning since defense counsel sought and received an additional sixty (60) days Court Ordered extension by motion within which to designate defendant's expert witness when in fact Captain Arthur Fournier had been in the defendant C.B. Marine's fold as their marine expert since March of 2005 and did not disclose Captain Arthur Fournier until the very last day of the sixty (60) day extension.

## **CONDENSED FACT SUMMARY**

1.    Plaintiff's timely designation of Captain Brian Fournier as Marine Expert dated March 22, 2007.

2.    Defendant C.B. Marine's designation of Captain Arthur Fournier, (plaintiff's marine expert's father) Marine Expert on the last day after a sixty (60) day Court Ordered extension on motion to designate expert received on June 25, 2007.

3.      Plaintiff's Supplementation of Captain Raymond Bono for Captain Brian
        Fournier with executed report of Captain Raymond Bono dated June 28,
        2007. (Report attached – Exhibit 1)

4.      July 13, 2007 letter producing documents therewith identifying C.B.
        Marine's designation of Captain Arthur Fournier as marine expert on May
        22, 2005 in collateral grounding case entitled: C.B. Marine vs. Maine
        Coast Marine, Fore River Dock & Dredge and Guy Splettstoesser, State of
        Maine, Cumberland County Superior Court Civil Action No.: CV04-774.
        This case reportedly started trial with all the exact same defense attorneys
        representing the same parties as in the instant action.

        These facts seemingly should lead the Court to inquire why defense
        counsel did not disclose Captain Arthur Fournier earlier, or at least inform
        plaintiff's counsel that their maritime expert's father had been C.B.
        Marine's expert for over two years since May 25, 2005 when plaintiff
        designated Captain Brian Fournier as their marine expert on March 22,
        2007.

        Now to preclude plaintiff's maritime expert for an alleged expert disclosure
        flaw seems inappropriate. Plaintiff's marine expert is now overdone and
        the defendant's suffer no prejudice. The defendant's counsel's long
        standing camaraderie as well as, united coordinated defense seems to be
        revealing itself. Such effort should not be deceptive, but coordinated and
        fair.

In short plaintiff hereby moves this Honorable Court to view all the discovery issues which are before and coming before this Honorable Court in a fair and reasonable fashion and:

1.    Allow the plaintiff to inspect, photograph and survey the Tug Seawind in preparation for trial, specifically identifying whether or not plaintiff's counsel may inspect the vessel with or without Captain Raymond Bono.

2.    Deny Defendant Maine Coast Marine's Motion "**INCORPORATED**" herein Motion to Strike Plaintiff's Expert Designation of Captain Raymond Bono as Plaintiff's Marine Expert.

Respectfully Submitted,
Plaintiff by his attorney

/s/ John P. LeGrand
_____
John P. LeGrand
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
617-623-3001
BBO # 550185

Dated:        July 18, 2007

## CERTIFICATION OF SERVICE

I, John P. LeGrand, attorney for the plaintiff certify that on the 18[nth]day of July, 2007 I made service of the foregoing document titled;" Plaintiff's Motion for Leave to Respond to Defendant Maine Coast Marine Construction, Inc.'s Objection to Inspect, Photograph and Survey Tug Seawind and Plaintiff's Opposition to Defendant's Maine Coast Marine Construction Inc.'s "INCORPORATED" Motion to Strike Plaintiff's "Expert Designation"" with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Cathy S. Roberts, Esquire
Robert J. Murphy, Esquire
Mark G. Furey, Esquire
Aaron K. Baltes, Esquire
Michael S. D'Orsi, Esquire
T. Christopher Donnelly, Esquire


/s/ John P. LeGrand
John P. LeGrand, Esquire

## REPORT OF CAPTAIN RAYMOND BONO

Captain Bono is a fifth generation Captain. Captain Bono started working as a Captain for the first time in 1953. Since that time I have served as a Captain for approximately 16 different vessels. I have served as a Captain on vessels owned by my father for an excess of 12 years and I have served as Captain on vessels owned by me in excess of 4 years. I have well in excess of 50 years of experience in the commercial marine industry. I have worked approximately 40 years as a marine Captain and at least 15 years as a marine engineer on various vessels. From my review of the various documentation this morning I have formed various opinions concerning the negligence of all of the defendants including the company that owned the vessel, the company that leased the vessel, the company that provided the Captain, as well as the Captain himself.

The hatch on the vessel should have been closed and secured while the vessel was at sea.

The twin GM8-71 Marine Diesel engines rated at 300 horsepower on the Seawind at the time of the accident are well known to me. I have operated vessels powered by the GM8-71 engines and have a personal knowledge of their power. I have personally had to adjust tow gear weight according

to the power generated by the GM8-71 engines to enable vessels that I operated to match the amount of horsepower to the weight of the gear being towed.

When the GM8-71 engines are overworked they tend to over heat and you must pay attention to the alarms, adjust the RPM's accordingly and not tow in excess of the engines ability. Based on my experience with the operation of the GM8-71 engines it is my opinion that the Seawind which was a vessel which was less than 25 feet long with those two engines totaling 600 horsepower was dramatically underpowered and inadequate to tow the barge DS-64. This is even more dramatically inappropriate considering the fact that there was a crane and gear on board the barge at the time it was being hauled with a mere 600 horsepower of propulsion in adverse weather conditions. The owner of the Seawind and barge DS-64 never should have allowed that combination to be leased or used together. I will need more information about the vessel Albany to state whether the combination of that vessel and the barge DS-64 would have been suitable. This opinion is also equally true of the company that was leasing the Seawind and the DS-64 at the time of the grounding. The company that leased the incredibly small and underpowered Seawind and the barge DS-64 should have known that that vessels capacity to tow that barge was inadequate and unsafe, especially in the weather conditions at the time of the grounding. Of course the company that provided the

Captain and the Captain also should have known that the 600 horsepower capacity of the less than 25 feet long Seawind was grossly inadequate to tow the barge DS-64, particularly in the weather that existed at the time of the grounding.

There are many reasons why the owner of the Seawind and barge, the company that leased the Seawind and barge, the company that provided the Captain for the Seawind and barge and the Captain that was operating the Seawind and barge at the time of the grounding were negligent. These reasons are fairly well documented in the evaluation conducted by the U.S. Coast Guard following the grounding. The weather conditions before, during and after the grounding are all important factors in how this grounding could have been avoided. In the first instance under no circumstances should the Seawind with a mere two 300 horsepower GM8-71 engines be towing that large barge with that crane on top of it as well as all the equipment that the barge was carrying. That weight is extremely excessive for 600 horsepower to tow. I have had the exact same problem while operating the GM8-71 in towing gear. I have actually had to remove gear because it was too heavy to be towed with that engine when I first went on a particular vessel.

Let me say to start the most obvious act of negligence by all parties was to allow that vessel that was less than 25 feet long with a mere 600

horsepower to attempt to tow that barge, crane and equipment combination in those weather conditions. The owner should have never let it happen. The lessor should never have let it happen and the company that provided the Captain as well as the Captain never should have let it happen.

Moving on to more specific particulars about various ways that the grounding could have been avoided even with that inadequate vessel towing the barge. To begin with the vessel never should have left the Annisquam River until it got another weather report indicating that the conditions were going to be diminishing and not increasing. It was December of the year and anybody who has any maritime experience in this area knows that when adverse weather is coming in from the northeast the vast majority of the time it's going to get worse rather than better. The vessel should not have left the Annisquam River until it heard the next weather report which showed that the weather conditions were getting worse and not better.

I do not know what contractual or time deadlines were in place that would have forced that inadequate vessel and barge combination to attempt to move from the Annisquam River up to the Merrimac River in those weather conditions. For starters that vessel and barge never should have left the Annisquam River until the bad weather passed.

Once the vessel and barge left the Annisquam River and got caught in the bad weather the underpowered Seawind should have began to jog into the seas and hold its position and call for help rather than try to push on to complete a mission that is never should have started. Even after the water went down the open hatch and stalled one engine, if that was in fact the cause of the stalled one engine, if the vessel and barge took a course far enough off shore or were far enough off shore when that happened the Captain still could have turned that vessel immediately into the seas and began to jog with one engine holding the tug in position with minimum RPM's just enough to hold position and sustain electronic equipment and the wind would have held the barge back off the vessel so that they did not collide and the vessel would not have ended up getting the tow line caught in its one remaining operating propeller.

When the Captain realized that the weather was going to be too severe for him to safely undertake the journey he should have given up his objective and attended to the safety of the crew first and hold and jog steady with the bow into the wind, and as I stated slow down enough to hold steady and support the electronics to relieve the burden from the one remaining engine, or two engines if the Captain recognized that his vessel was under powered and call for a rescue. Even with one engine out of operation if the vessel jogged into the wind the crew, tug and barge as well as the crane

and equipment on the barge could have been saved and rescued and the grounding could have been avoided. If the Captain recognized the adverse weather conditions and acted immediately by jogging and calling for a rescue the barge probably would have been rescued independently from the tug. It seems all but certain to me that the Captain should not have attempted to complete the mission after loosing the first of the two engines and it is likely that he probably did not try.

In my initial review of this documentation I need further clarification on how far off shore the Seawind was when it was towing the barge and where it was located exactly at the location that the U.S. Coast Guard has identified as the collision point. With the weather conditions as described in the U.S. Coast Guard report the Seawind and barge seemingly should not have been so close to shore.

With the wind blowing from the northeast toward the land the tug and barge should have been towing further off shore. I am investigating now to learn if the reason that they were closer to shore than they should have been was simply because they were trying to enter the Merrimac River. In any event the prevailing wind at the time of the accident from the northeast when considered with the location where the U.S. Coast Guard said the collision occurred and where the grounding occurred on Plum Island should easily of been something that should have been known by

the Captain and that is why I say that the instant that first engine went down he should have immediately attempted to jog to the northeast into the wind and hold that boat and tug in position without getting the howser line caught in his propeller shutting down the second engine. He should have called for a mayday immediately and waited for rescue.

The entire grounding could have been avoided by simply not pairing that little under powered boat with that barge.

In my mind there is a question whether or not corners were cut on time to rush the arrival of the barge on the Merrimac. I say this because despite the fact that the vessel was too small to tow that barge the weather conditions that were being forecasted and would have been forecasted if the Captain waited for one more report showing the increased intensity of the weather leads me to questions why that underpowered vessel attempted to bring that barge up to the Merrimac and why it was so close to shore.

Another problem I see with the vessel Seawind that should have been acknowledged by the owner, the company that leased the Seawind, the company that provided the Captain and the Captain was the way that the engine room was set up for ventilation of the twin GM8-71

300 horsepower marine diesel engines at the time of the accident. It would be helpful for me to inspect the Seawind to determine if the ventilation was adequate. If there were ventilation stacks I would be able to determine if they were adequate or not. I would like to know what size they were to determine if they were appropriate and if they had the ability to turn and face in the proper direction to get maximum ventilation into the engine room and avoid any water going down into the engine room through those stacks. The U.S. Coast Guard report indicates that the vessel was turned 180 degrees and struck the barge because of inadequate power or no power. That is exactly why I say that even when the Seawind lost one engine the vessel could have safely jogged northeast into the wind and call for a rescue immediately and allowed time for the rescue to arrive and occur. If done properly this would have kept all electronics working and the wind would have kept the barge away from the vessel while waiting for the rescue to arrive.

Until I am provided with additional facts it seems to me that the vessel and the barge should have been towing further off shore. Also, waiting to throw the first anchor until the vessel and barge was 100 yards off the beach was too late to allow the anchor or anchors to catch on the bottom. Immediately upon realizing that the little Seawind was not going to be able to perform the job in that weather and immediately upon loosing one engine the vessel immediately should have turned into the northeast and

jogged into the wind. As far as throwing the anchors, that should have been done immediately when the Captain either realized that the little Seawind was not going to be able to do the job in those weather conditions or immediately when he decided not to jog into the wind. Without jogging in time or throwing the anchors out in time the Seawind was simply blown by the wind coming out of the northeast straight up onto the beach where the tug and barge grounded on Plum Island. It certainly did not do any good to throw the first anchor out 100 yards off shore. It was very unlikely that that anchor was going to have time to catch and stop the barge from grounding at that point in time. That action was done too late.

Once the weather report was known to the Captain the Captain should have allowed himself more time and started his journey earlier to beat the bad weather. Without the bad weather the engines would not have had to work so hard. With my experience with the GM8-71 engines over working those engines very likely could have caused them to overheat and shut down.

Alternatively to starting the journey earlier the Captain could have monitored his barometer and waited for the next weather report. As a general rule bad weather coming in from the northeast in December very

often gets worse before it passes. In short the Captain should have waited for a better weather report and let the bad weather pass.

In my experience towing equipment behind my vessels for more than 50 years I have had to calculate the weight of the gear to be towed behind the boat according to the engine horsepower of each vessel. Like the U.S. Coast Guard report in this case states, the tug was too small and lacked enough power to tow the barge and crane which grounded. This is even more true giving the bad weather conditions at the time of the grounding.

When the U.S. Coast Guard responded to the distress call the vessel and barge were only 100 yards off the beach. Because of the closeness of the vessel and barge to the beach the U.S. Coast Guard were unable to approach the vessel and the barge to put a line on the tug or a line on the barge or even simply remove the crew for safety. I understand that the U.S. Coast Guard was forced to back off with its vessel and send a helicopter to remove the crew. If the tug and barge were further off shore it would have increased the chance of a successful rescue of not only the crew, but the tug and the barge and would have avoided the grounding on Plum Island.

The evening forecast called for worsening weather. More wind velocity and higher seas were forecasted. The wind and sea conditions were

forecasted to increase and not diminish. The Captain should have waited

for a more favorable forecast before starting out to sea. If the Captain

waited for the next weather report the 8 to 10 foot seas would not have

come over the stern of the tug or entered the engine room. The engine

would not have stalled if it was the water that caused it rather than

overheating. The hatch never should have been off while the vessel was

at sea. In short the engine should not have stalled due to water coming

over the rail because the bad weather could have been avoided. The

engine should not have stalled due to over heating because the over

heating could have been avoided by going slower and not going out in the

bad weather and the hatch cover never should have been off the vessel

and should not be off the vessel even in the calmest of weather for

ventilation.

In summary, the under sized and under powered Seawind never should

have been coupled with the barge; the vessel never should have went to

sea with the forecasted weather conditions; the hatch never should have

been off  while the vessel was at sea; the Captain should have began to

jog into the wind the instant he knew a problem was beginning to arise

weather it was when he knew the weather was too bad for him to safely

make the journey or when he lost the first engine; the engine room should

not be allowed to flood under any circumstances while the vessel is being

operated at sea; and under no circumstances should the vessel or barge

have ended up grounded on the beach at Plum Island.