UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| KEITH ABLOW, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FORE RIVER DOCK & DREDGE, | ) | |
| INC. & C-B MARINE CORPORATION | ) | |
| | ) | Case No. 1:05-CV-10347-RGS |
| Defendants | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MAINE COAST MARINE | ) | |
| CONSTRUCTION, | ) | |
| | ) | |
| Third-Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GUY SPLETTSTOESSER | ) | |
| | ) | |
| Third-Party Defendant | ) | |

## GUY SPLETTSTOESSER'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### Background

1. This case arises out of an incident that occurred on December 11, 2002, in which a tugboat and barge grounded on a beach at Plum Island in Newbury, Massachusetts.  Complaint ¶ 5.

2. The Plaintiff owns property on Plum Island.  Ablow Depo. at 6.

3. The tugboat in question is known as the *Seawind II* and the barge in question was known as DS-64.  Complaint ¶ 4.

4.  At the time of the grounding, C-B Marine Corporation ("C-B"), a Maine corporation, owned the *Seawind II* and barge DS-64.  Complaint ¶ 11; Answer of C-B Marine ¶ 11.

5.  At the time of the grounding, Fore River Dock & Dredge, Inc. ("Fore River"), a Maine corporation, leased the *Seawind II* and barge DS-64 from C-B Marine Corporation.  Complaint ¶ 4; Answer of Fore River ¶ 4.

6.  Guy Splettstoesser was the captain of the *Seawind II* on the voyage that ultimately resulted in the grounding incident.  Spletts Depo. at 62, 71-73, 78, 85-88.

7.  At the time of the grounding, Captain Splettstoesser was a part owner and employee of Maine Coast Marine Construction ("Maine Coast"), a Maine corporation.  Spletts Depo. at 15, 34.

## Captain Splettstoesser's credentials

8.  Captain Splettstoesser has been working in the marine industry for almost 20 years, working his way up from a deckhand and marine construction laborer to being the captain of large tugboats.  Spletts Depo. at 9-12, 24-25.

9.  At the time of the grounding, Captain Splettstoesser had a captain's license issued by the Coast Guard to operate 200-ton tugboats.  Spletts Depo. at 12, 15.

10. Captain Splettstoesser attended a two-week training course in New Orleans to prepare for the Coast Guard test to obtain his captain's license, a test he successfully completed.  Spletts Depo. at 12, 25-26, 100.

11. In addition to passing the applicable test, Captain Splettstoesser had to log 1100 eight-hour days at sea on a 200-ton tugboat as a prerequisite to obtaining his captain's license.  Spletts Depo. at 12, 29-30.

## The Grounding

12. Prior to the grounding, Fore River was dredging a marina on the Annisquam River near Gloucester.  Spletts Depo. at 41-43.

13. Fore River contacted Captain Splettstoesser and requested that he pilot the *Seawind II* and bring barge DS-64 from the marina out the north end of the Annisquam River up to the Merrimac River to a new marine construction project in Newburyport.  Spletts Depo. at 57-58, 103.

14. The President of Fore River, Roger A. Hale, also had a captain's license at the time of the grounding.  <u>Spletts Depo.</u> at 19-20.

15. Captain Splettstoesser consulted the marine weather forecast prior to the voyage that ultimately resulted in the grounding incident.  <u>Spletts Depo.</u> at 63, 93.

16. The voyage to transport barge DS-64 to the Newburyport job site began around noon on December 11, 2002.  <u>Spletts Depo.</u> at 62.

17. During the voyage, Captain Splettstoesser encountered rougher weather than forecasted and made a decision to switch from pushing barge DS-64 to pulling it because the rough waves were smashing the two vessels together. <u>Spletts Depo.</u> at 71-73, 93.

18. The decision to switch from pushing to pulling barge DS-64 ultimately delayed the voyage because a tugboat can generally push a barge faster than it can pull it.  <u>Spletts Depo.</u> at 78, 126.

19. The rougher-than-forecasted weather and the delay in the voyage resulted in the *Seawind II* and barge DS-64 arriving at the mouth of the Merrimac with the tide going out to sea.  <u>Spletts Depo.</u> at 86.

20. Captain Splettstoesser used radar to find a sea buoy marking the mouth of the Merrimac River.  <u>Spletts Depo.</u> at 80.

21. As Captain Splettstoesser approached the mouth of the Merrimac River, he lost control of the *Seawind II* and barge DS-64 and the vessels collided. <u>Spletts Depo.</u> at 85-86, 87-88, 91.

22. The *Seawind II* and barge DS-64 were "spudded" or anchored off the beach of Plum Island and Captain Splettstoesser and the rest of the crew were air-lifted off the vessels by the Coast Guard.  <u>Daigle Depo.</u> at 8.

**The Beach**

23. The *Seawind II* and barge DS-64 eventually grounded on an area of beach between the low tide line and the high tide line.  <u>Ablow Depo.</u> at 113, 154; <u>Packer Depo.</u> at 8, 66-67.

24. The Plaintiff's deed to his Plum Island property is recorded at Book 16067, Page 465 in the Essex South District Registry of Deeds, and describes the

land conveyed as Lots 225, 226 and 227 in Block D of a "Plan of Sections One and Two of Land of Plum Island Beach Company" dated May 1920, said plan recorded as Plan 22 of Plan Book 34 in the Essex South District Registry of Deeds.  Ablow Depo. at 6; Deed from Betsy Peet to Keith Ablow dated November 24, 1999.

25. The Plan referenced in the Plaintiff's deed to his Plum Island property shows that Lot 227 referenced in said deed abuts the beach.  Plan of Sections One and Two of Land of Plum Island Beach Company dated May 1920.

26. The Plan referenced in the Plaintiff's deed to his Plum Island property shows that the easterly boundary of Lot 227 referenced in said deed is above, or westerly of, the high water line.  Plan of  Sections One and Two of Land of Plum Island Beach Company dated May 1920.

### The Case

27. The Plaintiff's Complaint names C-B, Fore River and Maine Coast as defendants, and asserts claims of negligence, trespass to land and private nuisance.  Complaint.

28. Maine Coast filed a Third-Party Complaint against Captain Splettstoesser, asserting claims of contribution and indemnification for any judgment awarded to the Plaintiff against Maine Coast.  Third-Party Complaint.

29. The Plaintiff initially designated Captain Brian Fournier as a liability expert to testify about Captain Splettstoesser's operation and use of the vessels during the voyage that resulted in the grounding.  Plaintiff's Expert Witness Disclosure.

30. By order dated July 20, 2007, this Court granted Maine Coast's Motion for Sanctions and prohibited the Plaintiff from designating a number of experts, including Captain Fournier.  Order dated July 20, 2007.

Dated at Portland, Maine, this 10th day of August, 2007.

GUY SPLETTSTOESSER

By his attorneys,

NORMAN, HANSON & DETROY, LLC

By:     /s/ Aaron K. Baltes
        Aaron K. Baltes, Esquire
        Attorney for Third-Party Defendant
        Guy Splettstoesser

415 Congress Street
P.O. Box 4600
Portland, ME 04112
207-774-7000
 abaltes@nhdlaw.com

## Page 1

VOLUME I
PAGES 1 TO 163
EXHIBITS 1 TO 13
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KEITH R. ABLOW,
    Plaintiff,

vs.

FORE RIVER DOCK & DREDGE,
INC., ET AL.,
    Defendants.

and

MAINE COAST MARINE
CONSTRUCTION,
    Third-party plaintiff,

vs.

GUY SPLETTSTOESSER,
    Third-Party Defendant.

) Case No.
) 1:05-CV-10347-RGS

DEPOSITION OF KEITH RUSSELL ABLOW, M.D., a witness called on behalf of the Defendant Maine Coast Marine Construction, Inc., taken pursuant to the Federal Rules of Civil Procedure, before Lisa Abdo, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at 10 State Street, Newburyport, Massachusetts, on Friday, March 9, 2007, commencing at 11:07 a.m.

## Page 2

APPEARANCES:

John P. LeGrand & Associates
(by John P. LeGrand, Esq.,
and Eric Stafford, Esq.)
375 Broadway, Suite 2
Somerville, Massachusetts 02145
617.623.3001
for Keith R. Ablow.

Holbrook & Murphy
(by Robert J. Murphy, Esq.)
238-240 Lewis Wharf
Boston, Massachusetts 02110
617.428.1151
murphy@holbrookmurphy.com
for Fore River Dock & Dredge, Inc.

Thompson, Bull, Furey, Bass & MacColl, LLC, P.A.
(by Mark G. Furey, Esq.)
120 Exchange Street
P.O. Box 447
Portland, Maine 04112-0447
for C.B. Marine Corporation.

## Page 3

APPEARANCES (Continued):

Thompson & Bowie
(by Cathy S. Roberts, Esq.)
3 Canal Plaza
Portland, Maine 04112
for Maine Coast Marine Construction, Inc.

Norman, Hanson & DeTroy, LLC
(by Aaron K. Baltes, Esq.)
415 Congress Street
P.O. Box 4600
Portland, Maine 04112
207.774.7000
for Guy Splettstoesser.

## Page 4

INDEX

| WITNESS: | DIRECT | CROSS |
|---|---|---|
| Keith Russell Ablow, M.D. | | |
| (by Ms. Roberts) | 5 | |
| (by Mr. Furey) | 75 | |
| (by Mr. Murphy) | 100 | |
| (by Mr. Baltes) | 153 | |

EXHIBITS

| NO. | | PAGE |
|---|---|---|
| 1 | Three Deeds | 13 |
| 2 | Plaintiff's Answers to Defendant Maine Coast Marine Construction, Inc.'s Interrogatories | 13 |
| 3 | Letter dated May 23, 2006, from Jean-Francois Barre | 20 |
| 4 | Google map | 29 |
| 5 | Letter dated 5/30/06 to Keith and Debra Ablow from Verne Fisher | 66 |
| 6 | Letter dated May 17, 2006 to Mr. Keith Ablow from Mary Beth Eisenmann | 68 |
| 7 | Laser photograph | 79 |
| 8-9 | Photographs | 111 |
| 10 | Photograph | 135 |
| 11 | Photograph | 136 |
| 12 | Photograph | 138 |
| 13 | Photograph | 139 |

Page 5

1         PROCEEDINGS
2         KEITH RUSSELL ABLOW, M.D.
3    a witness called for examination by counsel for the
4    Defendant Maine Coast Marine Construction, Inc.,
5    being first satisfactorily identified and duly
6    sworn, was examined and testified as follows:
7         DIRECT EXAMINATION
8    BY MS. ROBERTS:
9    Q. Dr. Ablow, I'm Cathy Roberts and I'm representing
10      Maine Coast Marine Construction in the lawsuit that
11      you have filed. Can you state your full name for
12      the record, please.
13   A. Keith Ablow, M.D.
14   Q. Do you have a middle name?
15   A. Russell, R-U-S-S-E-L-L.
16   Q. And what's your current address?
17   A. 12 49th Street -- 4-9-T-H -- in Newbury,
18      Mass., 01951.
19   Q. How much time do you spend at that residence as
20      opposed to staying elsewhere in a given year?
21      Let's start with the last year being 2006.
22   A. Okay. So in 2006, I would say I split my
23      time -- my family is there permanently and
24      all the time. But I split my time between

Page 6

1    New York and Massachusetts. In the future,
2    it shall be apparently Massachusetts with
3    some journeys to New York for business.
4    Q. Okay. You purchased the property on 49th Street at
5      Plum Island in November of 1999?
6    A. I don't have the relevant documents, but that
7      sounds accurate to me.
8    Q. I'll show you what's been marked as Deposition
9      Exhibit 1, which suggests that the purchase and
10      passing of the deed occurred on November 24, 1999.
11      Could you take a look at that.
12   A. (Witness reviews document) It looks good to
13      me.
14   Q. Would you agree?
15   A. Yes.
16   Q. You would agree?
17   A. I agree.
18   Q. And you purchased the property for $710,000 in
19      November of 1999?
20   A. Correct.
21   Q. There were three lots involved, Lots 225, 226 and
22      227, of a given plan?
23   A. Yes.
24   Q. And you purchased it from a Betsy Peet?

Page 7

1    A. Correct.
2    Q. P-E-E-T?
3    A. Yes.
4    Q. So that's the quitclaim deed for the sale that
5      you're looking at there on the first page of
6      Exhibit 1, right?
7    A. Correct.
8    Q. And if you'll flip the pages there to the -- is the
9      second page also the deed?
10   A. It's the deed.
11   Q. And if you flip to the third page, you see there a
12      conveyance of the property to a trust?
13   A. Correct.
14   Q. And that's a document reflecting that conveyance
15      that you made to a trust in August of 2004?
16   A. Correct.
17   Q. And when we say "a conveyance," you know I'm
18      talking about the property at 49th Street?
19   A. Correct.
20   Q. You are the trustee of the property -- I mean of
21      the trust?
22   A. Correct.
23   Q. And who are the scheduled beneficiaries of the
24      trust?

Page 8

1    A. We have to source that from the attorneys
2      involved in creating it. But my memory is
3      that in the event of my death, my wife is the
4      beneficiary. In the event of our deaths, our
5      children are the beneficiaries. But the way
6      it's structured would require the paperwork.
7    Q. Okay. It's my understanding that the trust would
8      have beneficiaries right now regardless of anyone's
9      death. Is it your testimony that you don't know,
10      as you sit here today, who the beneficiaries of the
11      real estate trust holding the 49th Street property
12      are?
13         MR. STAFFORD: Only if you know.
14   A. Yeah, no. I guess I -- to be honest, I don't
15      even know what would classify someone as the
16      beneficiary of a trust. I'm a psychiatrist,
17      not a lawyer.
18   Q. So you would agree with me that you don't know who
19      the beneficiaries of the trust are today as you sit
20      here?
21   A. Yeah, no. I wouldn't know whether it was my
22      daughter or my wife or...
23   Q. Or yourself?
24   A. Or myself.

## Page 113

1  the beach and shards in the dune. And I think you
2  said when Mark was asking you questions that it was
3  more dense on the beach?
4  A. Well, I said I didn't know but that my
5  guesstimate would be that it's more dense on
6  the beach.
7  Q. The tug and the barge washed up on the beach,
8  right?
9  A. The tug and the barge washed up on the beach.
10 Q. Grounded on the beach?
11 A. Yes, sir.
12 Q. The actual -- and you could see them? We've got a
13 photo right here, right? Exhibit 7?
14 A. Yes.
15 Q. The actual tug and barge, in fact, never ended up
16 in the dune, right?
17 A. No, sir.
18 Q. So it would be the elements over time? Is that
19 your opinion?
20 A. I think it would be three sources. One is
21 the guys who initiated the attempt to contain
22 some of the damage who may have left some
23 pieces in a pile here and there.
24 Q. Okay. People piled up stuff on the dune.

## Page 114

1  A. Other people who piled -- who now collect
2  stuff and leave it in the dunes. And then
3  probably, since the waves come up onto the
4  dune on occasion and sometimes even sculpt
5  out a piece. This is sort of a fluid --
6  literally and figuratively, a sort of fluid
7  question that you're asking. So that pieces
8  will be deposited on the quote/unquote dune
9  because the dune itself changes form, shape
10 and length.
11 Q. Based on the elements?
12 A. Based on the elements. But that third piece
13 of the equation that I'm referencing would
14 still only comprise a minority of the dune
15 because it's never the case that the waves
16 wash up over the dune. They might come onto
17 the dune but not any significant distance
18 onto the dune.
19 Q. As far as you or somebody else piling up metal on
20 the dune, that metal, I trust, was eventually
21 removed?
22 A. Well, I don't know if there are piles now. I
23 have no idea. But generally I took a couple
24 of garbage bags away.

## Page 115

1  Q. That's what I mean. If the workers piled up the
2  metal, you would expect them to cart it away; but
3  if they didn't, you certainly would have?
4  A. Yes, I guess. I mean, I guess. I always
5  worried about bringing in trash bags and then
6  having someone cut his hand on it who's a
7  trash guy. So for some period of time, there
8  might have been a pile gathering that people
9  would like toss a fragment into.
10 Q. But you didn't scatter it back down the beach? If
11 someone piled up trash on your property, you'd get
12 rid of it, right?
13 A. Yes. You either leave it there or you get
14 rid of it.
15 Q. And you're not the kind of guy that would leave it
16 there?
17 A. No, I might. I might leave it in the pile
18 for a period of time thinking, Am I going to
19 put this in a trash bag? Where do I get rid
20 of it? Is it going to cut the guy's hand?
21 Q. But eventually you'd get rid of it one way or the
22 other?
23 A. Yes, somebody would. Me, John, John the
24 neighbor.

## Page 116

1  Q. The handyman, whoever?
2  A. Steven Richard, the carpenter.
3  Q. Let's put aside the metal that people purposely
4  piled. Okay? So now we're talking about the
5  random -- it's random, right? I think you were
6  pretty clear that the metal you come across is
7  fairly random?
8  A. It's fairly random and pretty widespread,
9  yes.
10 Q. And so putting aside the stuff that people have
11 purposely piled up, would you say that
12 overwhelmingly the metal that you come across is on
13 the beach and not on the dune?
14 A. Yes.
15 Q. Is it fair to say that very little random metal has
16 been located on the dune?
17 A. No, that's not the case. Because I think
18 what happens is that people out of curiosity
19 might pick up pieces of metal and like kids
20 carry it, let's say, ten yards. And they're
21 like, "Daddy, what's this?" And this person
22 is like, "Get rid of that. That's going to
23 cut you. You're going to end up in the
24 hospital with tetanus or dead." And then the

## Page 153

1  A. No, not to my knowledge.

2  Q. Any times when you've put something either on the

3     dune or the beach that the Town or anyone else has

4     required you to remove?

5  A. No.

6  Q. Let me ask you this because this is the last time

7     we'll have this chance to talk like this. Is there

8     anything else that you want to add to your

9     deposition testimony? Anything that you think we

10    haven't gone over? Anything you think we need to

11    know to evaluate the thing properly?

12         MR. STAFFORD: Objection. You can

13    answer.

14 A. I have nothing to add, but I don't know if

15    there are other things that we should have

16    gone over.

17 Q. Okay. Fair enough.

18         MR. MURPHY: That's it for me.

19         THE WITNESS: Thank you, sir.

20         MR. BALTES: I just have a few questions.

21              CROSS EXAMINATION

22 BY MR. BALTES:

23 Q. Aaron Baltes for Guy Splettstoesser. Let me show

24    you Exhibit No. 7, Dr. Ablow. Is all the land in

## Page 154

1     that picture yours as far as you know?

2  A. (Witness reviews photograph) No. Well, it's

3     hard to say. Because I'd say probably, yes.

4     Actually, it probably is. The confusion in

5     my initial assessment was that this pathway

6     here that used to exist where it is was

7     actually on my land: So we moved the pathway

8     to its proper location because it ought to

9     be, and so that what appears to be running

10    through a division of property -- actually,

11    my property line is over here. So, yeah,

12    it's entirely on my land.

13 Q. Okay. And from your observation of the barge and

14    the tug when they were on the beach, were they

15    above the low tide line or low water line?

16 A. Yes.

17 Q. They were. Okay.

18 A. Well, yes. Otherwise, you wouldn't be able

19    to see them. You wouldn't be able to see the

20    beach.

21 Q. Well, I didn't know if this is low tide or high

22    tide in this picture. That's why I asked.

23 A. Okay.

24 Q. Have you since the grounding gone into the ocean

## Page 155

1     with a snorkel and a mask to see if there are

2     pieces of metal under there that are visible?

3  A. I have not gone into the water with a snorkel

4     and mask to see if there are pieces of water

5     (sic) visible.

6  Q. All right. Can you tell me how much less you and

7     your family use the beach since the grounding?

8  A. I can't estimate, really. I could say that

9     somewhat less and with greater concern on

10    each occasion.

11 Q. Okay.

12 A. So that I guess the operative word there is

13    "use." My enjoyment of the beach is

14    different. And all I want is my beach

15    returned to the state that it was prior to

16    someone crashing their barge on it and

17    defiling it with metal. If this were oil, it

18    would be easier, right, because it would be

19    more obvious. But someone who we don't have

20    apparently the same feeling about

21    contamination with other substances, but it's

22    the same.

23 Q. Do you go on the beach about every day to walk your

24    dog?

## Page 156

1  A. No. Different days. Different times,

2     different days.

3  Q. What months of the year do you and your family go

4     on the beach barefoot? In other words, in the

5     winter you probably don't do that. But in the

6     summer --

7  A. In the summer. Maybe the late spring.

8  Q. Is it fair to say that months other than late

9     spring and summer, your use of the beach isn't

10    affected by the metal because you're wearing shoes?

11 A. No. It's constantly affected because when

12    you buy a home on the beach, like it's -- you

13    want to feel like you've made a good

14    investment. You want to feel like it's a

15    pristine piece of land. You don't want to

16    look outside your window and see a sign that

17    says, "Caution: Sharp Fragments of Metal to

18    Be Found Here." You don't want guests who

19    come up to your house to say, "Jeez, he says

20    he lives on the beach, but don't let the kids

21    play out here." So it affects -- it just

22    affects the whole property and the whole

23    notion of the difference between having a

24    beach that -- and a home that is

**Page 157**

1  environmentally sound and well maintained and
2  not with metal fragments on it and having one
3  that is.
4      It's almost like if there were a
5  piece of your yard that I said, "Well, you
6  don't use that piece very much. What do you
7  care if it's soaked with oil?" You would be
8  like, "Well, but it's my yard and it kind of
9  bugs me. And, also, there's this big sign in
10  my driveway that says there's a cesspool out
11  back filled with oil. And you'd say, "Well,
12  it changes certainly my feeling about my
13  property and the way I can use it and enjoy
14  it."
15  Q. Remind me, do you have any pieces of metal at your
16  house that you picked off the beach?
17  A. There may be in my kitchen drawer a fragment
18  in a bag. But I'm not sure because I'm not
19  good about keeping stuff. And then there may
20  be, if I didn't throw it out, a grounded
21  piece of metal in my trash area that is under
22  my house in a -- like behind sliding Epay
23  doors, actually as it were.
24  Q. And if I went on the beach right now, would I see

**Page 158**

1  metal fragments?
2  A. You would indeed.
3  Q. And how big are these fragments?
4  A. They're between one and six inches. Perhaps
5  longer but that would be a less frequent
6  event. And what you -- you know, what we
7  would find if we sifted the sand is perhaps
8  smaller pieces. And then again my concern if
9  we aerosol that, you know, if we collected
10  the sand that blows -- let's say we collected
11  the sand that blows onto my limestone -- no,
12  onto my bluestone patio. My concern is that
13  we would find it in there, too. And then
14  we'd be wondering, "But is it in the fence?
15  Is it" -- you know, all that stuff.
16  Q. Is it fair to say based on what you know about how
17  the grounding occurred that this was an accident as
18  opposed to some intentional act?
19  A. Well, no one has ever suggested that anyone
20  intended --
21  Q. Right.
22  A. -- to do this. That I would use to write
23  mysteries.
24      MR. LEGRAND: No Al-Queda or like aliens?

**Page 159**

1  A. No. For a time, but only for periods of
2  hours since this followed 9/11, we were
3  convinced -- my wife, myself, and my young
4  daughter -- that this was a terrorist event.
5  But that's because we were all at that time
6  very anxiety prone. And whenever helicopters
7  like would fly and be looking for things, I
8  was certain that someone had landed on our
9  beach in a very bad way. And since a big
10  bang had preceded it, you know, we had one of
11  those moments where we thought the Russians
12  were coming.
13      MR. BALTES: Okay. I don't have any more
14  questions. Thank you.
15      THE WITNESS: Yes. Thank you, man. I
16  appreciate it.
17      (Whereupon, the deposition was
18          concluded at 2:42 p.m.)

**Page 160**

1  DEPONENT'S ERRATA SHEET
2  AND SIGNATURE PAGE INSTRUCTIONS
3
4      The original of the Errata Sheet has been
5  delivered to John P. LeGrand, Esq.
6      When the Errata Sheet has been completed
7  by the deponent and signed, a copy thereof should
8  be delivered to each party of record and the
9  ORIGINAL delivered to John P. LeGrand, Esq., to
10  whom the original deposition transcript was
11  delivered.
12
13      INSTRUCTIONS TO DEPONENT
14
15      After reading this volume of your
    deposition, indicate any corrections or changes to
16  your testimony and the reasons therefor on the
    Errata Sheet supplied to you and sign it. DO NOT
17  make marks or notations on the transcript volume
    itself.
18
19  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20  COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

Page 161

1   ATTACH TO THE DEPOSITION OF KEITH RUSSELL ABLOW
    CASE: KEITH R. ABLOW VS. FORE RIVER DOCK & DREDGE,
2   INC., ET AL.
3          ERRATA SHEET
4   INSTRUCTIONS: After reading the transcript of your
    deposition, note any change or correction to your
5   testimony and the reason therefor on this sheet.
    DO NOT make any marks or notations on the
6   transcript volume itself. Sign and date this
    Errata Sheet (before a Notary Public, if required).
7   Refer to page 160 of the transcript for Errata
    Sheet distribution instructions.
8   PAGE LINE
    _____ _____ CHANGE: _____
9          _____ REASON: _____
    _____ _____ CHANGE: _____
10         _____ REASON: _____
    _____ _____ CHANGE: _____
11         _____ REASON: _____
    _____ _____ CHANGE: _____
12         _____ REASON: _____
    _____ _____ CHANGE: _____
13         _____ REASON: _____
    _____ _____ CHANGE: _____
14         _____ REASON: _____
    _____ _____ CHANGE: _____
15         _____ REASON: _____
    _____ _____ CHANGE: _____
16         _____ REASON: _____
    _____ _____ CHANGE: _____
17         _____ REASON: _____
18      I have read the foregoing transcript of
    my deposition and except for any corrections or
19  changes noted above, I hereby subscribe to the
    transcript as an accurate record of the statements
20  made by me.
21
22
23
24  _____  _____
        KEITH RUSSELL ABLOW      DATE

Page 162

1   COMMONWEALTH OF MASSACHUSETTS)
2   SUFFOLK, SS.              )
3       I, Lisa Abdo, Certified Shorthand
4   Reporter and Notary Public in and for the
5   Commonwealth of Massachusetts, do certify that
6   pursuant to appropriate notice of taking
7   deposition, there came before me the subject
8   deponent, who was by me duly sworn; that said
9   deponent was thereupon examined under oath and said
10  examination reduced to writing by me; and that the
11  deposition is a true record of the testimony given
12  by the deponent.
13      I further certify that I am not a
14  relative or employee of or counsel or attorney for
15  any of the parties, or a relative or employee of
16  such counsel or attorney, nor am I financially or
17  otherwise interested in the outcome of the action.
18      Witness my hand at Boston, Massachusetts,
19  this 13th day of April, 2007.
20
21
22  _____
23  Notary Public
24  My commission expires: 12/11/09

Page 163

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 1

1
2       UNITED STATES DISTRICT COURT
3         DISTRICT OF MASSACHUSETTS
4         Civil Action No. 03-10318 WGY
5
6
7   AMERICAN HOME ASSURANCE COMPANY,
8            Petitioner,
9       vs.
10  FORE RIVER DOCK & DREDGE, INC.,
11  C-B MARINE CORPORATION, and
12  ROGER A. HALE,
13           Respondent.
14
15
16          DEPOSITION of RONALD J. DAIGLE, taken
17  pursuant to agreement, at the offices of Kelly, Remmel &
18  Zimmerman, 53 Exchange Street, Portland, Maine, on
19  November 11, 2003, commencing at 1:20 P.M., before
20  Catherine Cook, a Notary Public in and for the State of
21  Maine.
22
23
24        Downing & Peters Reporting Associates
25        79 Atlantic Place, South Portland, Maine 04106

Page 2

1   APPEARANCES:
2   For the Petitioner:
3           Robert J. Murphy, Jr., Esq.
4   Holbrook & Murphy, 150 Federal Street, 12th Floor,
5   Boston, Massachusetts 02110 - (617) 428-1151
6
7   For the Respondents Fore River Dock & Dredge, Inc.
8   and Roger A. Hale:
9           U. Charles Remmel, II, Esq.
10  Kelly, Remmel & Zimmerman, 53 Exchange Street, P.O. Box
11  597, Portland, Maine 04112-0597 - (207) 775-1020
12
13  For the Respondent C-B Marine Corporation:
14          Mark G. Furey, Esq.
15  Thompson, Bull, Furey, Bass & MacColl, 120 Exchange Street,
16  P.O. Box 447, Portland, Maine 04112-0447 - (207) 774-7600
17
18
19              INDEX
20                      PAGE
21  EXAMINATION BY MR. MURPHY         3
22
23
24
25

Page 3

1          STIPULATION
2       It is hereby agreed by and between the parties
3   that signature is waived.
4       - - - - -
5       RONALD J. DAIGLE, having been sworn by the Notary
6   Public, was examined and deposed as follows:
7       EXAMINATION BY MR. MURPHY:
8   Q.  We just met. I'm Bob Murphy and I'm sure Chuck has
9   given you the lowdown on this, and I'm going to go through
10  it as quick as we can. Tell me where you live?
11  A.  114 Grant Road, Durham, Maine.
12  Q.  Who do you live there with?
13  A.  My wife and granddaughter.
14  Q.  Is that a house that you own?
15  A.  Yes.
16  Q.  Any present plans of moving?
17  A.  No.
18  Q.  Tell me who you are employed by.
19  A.  Fore River Dock & Dredge.
20  Q.  How long have you worked for them?
21  A.  Almost 12 years.
22  Q.  What's your position with them?
23  A.  Foreman.
24  Q.  Good outfit to work for?
25  A.  They have been fair to me.

Page 4

1   Q.  Real quick, give me your education background.
2   A.  Graduated high school, quite a few military schools.
3   Q.  High school military schools?
4   A.  No, in the military.
5   Q.  How long have you been in the marine construction
6   business?
7   A.  Fore River 12 years, but I have always been involved
8   in construction and heavy equipment.
9   Q.  You know we are looking into the grounding of the tug
10  and the barge?
11  A.  Right.
12  Q.  Tell me how that all started out? Where did you start
13  off your day that day?
14  A.  Anasquam River.
15  Q.  What were you doing that day?
16  A.  Just finishing up a dredging contract.
17  Q.  What time of day was that?
18  A.  Shortly after lunch.
19  Q.  And then what happened?
20  A.  We moved out of the river going to another job.
21  Q.  This was some time after lunch?
22  A.  Right.
23  Q.  Tell me how that all happened. How did you move out
24  of the river?
25  A.  Small tug.

1 (Pages 1 to 4)

Page 5

Q. The SEAWIND II?
A. SEAWIND II.
Q. Pulling the barge?
A. It was pushing it out of the river.
Q. Pushing?
A. Right.
Q. Who else was with you that day?
A. Jack Eichhorn, Mike Buchanan, Jason Gammon and Guy Splettstoesser.
Q. There were five of you in all?
A. Yes.
Q. Let me ask you this: Do you have any merchant marine background?
A. No.
Q. Do you hold any Coast Guard documents?
A. No.
Q. Have you ever piloted a tug?
A. I have occasionally.
Q. Have you ever been at the helm of the SEAWIND.
A. Yes.
Q. The SEAWIND II, I mean.
A. Uh-huh.
Q. You have been?
A. Yes.
Q. And you are qualified to hold that position on that

Page 6

vessel, right?
A. I believe so, yes.
Q. So the five of you were leaving Gloucester?
A. Right.
Q. And where were the people located as you departed the dock?
A. Myself, Jack and Mike were on the barge and Jason and Guy were on the SEAWIND.
Q. Jason Gammons?
A. Yes, G-A-M-M-O-N, I believe.
Q. What were you guys doing on the barge?
A. Basically, just hanging out at that point in time.
Q. Taking a ride to the next job?
A. Taking a ride. When we got there, we take and untie the crane, set the spuds, hand the lines, if we need, and that's it.
Q. That's all the guys who were on the barge would do those types things?
A. Right.
Q. Guy, in the tug, was at the helm?
A. Yes.
Q. Who else was with him?
A. Jason Gammon.
Q. What was Jason doing on the tug?
A. Deckhand, basically.

Page 7

1  Q.  As deckhand, he would do whatever the captain told him
2  to do?
3  A.  Right.
4  Q.  When did you first know that there was some trouble?
5  A.  When we see the SEAWIND coming around.
6  Q.  Because the SEAWIND had been pushing the barge?
7  A.  It was towing.
8  Q.  Towing at this point?
9  A.  Right.
10 Q.  At some point, you saw the SEAWIND where?
11 A.  Been on the port side of the barge.
12 Q.  How was the weather before you left?
13 A.  Fairly comfortable.
14 Q.  Was there any talk or conversation about getting
15 underway in view of the weather or the weather forecast?
16 A.  There was.
17 Q.  What was that conversation?
18 A.  The weather was supposed to blow up later that night
19 around midnight.
20 Q.  Did anyone have any concern about getting underway?
21 A.  No.
22 Q.  So, at some point, you saw the tug alongside the
23 barge?
24 A.  Right.
25 Q.  What happened next?

Page 8

1  A.  Came to the stern of the barge and it struck the
2  stern.
3  Q.  So what did you do?
4  A.  I didn't do anything except catch Jason and Guy as
5  they come across.
6  Q.  From the tug?
7  A.  From the tug to the barge.
8  Q.  Jason and Guy were thrown from the tug to the barge?
9  A.  Yes.
10 Q.  And then it is all five of you on the barge now?
11 A.  Right.
12 Q.  Then what happened?
13 A.  We contacted the Coast Guard.
14 Q.  From the barge or had you already done that?
15 A.  I'm not sure if he had done that from the boat or not,
16 but they had a portable radio.  They contacted them with
17 that.
18 Q.  Cell phone?
19 A.  No, portable radio.
20 Q.  This was on the barge?
21 A.  Right.
22 Q.  Then what happened?
23 A.  We were drifting in surf.  I put one spud down.  It
24 was self-powered and that steadied it up and brought it in
25 line with the surf.

ages 5 to 8)

Page 9

1 Q. How did you know to do that or was it just a lucky
2 guess?
3 A. Instinct, lucky guess, call it what you want.
4 Q. At some point, the Coast Guard appeared?
5 A. Briefly.
6 Q. What happened?
7 A. They sent up a flare, looked at our position,
8 contacted us on the radio, turned around and went back to
9 their station.
10 Q. Too rough for the Coast Guard?
11 A. They didn't want to come that close to us.
12 Q. What happened next?
13 A. We waited until a helicopter come out of Cape Cod.
14 Q. How long was that?
15 A. I'm really not sure.
16 Q. Did it seem like forever?
17 A. Seemed like forever, yes.
18 Q. Eventually you were airlifted?
19 A. Right.
20 Q. To the beach?
21 A. No, to the Merrimack station.
22 Q. There you were interviewed by the Coast Guard?
23 A. Yes.
24 Q. Did you tell the Coast Guard that it was two guys in
25 the tug and three guys on the barge?

Page 10

1 A. I'm not sure.
2 Q. Was there like a debriefing officer taking notes or
3 taking a statement?
4 A. Yes, we all gave statements that night.
5 Q. To the Coast Guard?
6 A. Yes.
7 Q. Handwritten?
8 A. It was basically a form and handwritten statement.
9 Q. They drug tested everyone?
10 A. Yes.
11 Q. Everyone passed, to your knowledge?
12 A. To my knowledge, yes.
13 Q. Then what happened? How did you get home that day?
14 A. I would say we took Roger's truck and went back to
15 Gloucester where our vehicles were.
16 Q. Have you ever been employed by C-B Marine
17 Construction?
18 A. Yes, prior to the foreman of Fore River Dock & Dredge.
19 Q. Who owned the company then?
20 A. Young Roger.
21 Q. Have you ever worked for Roger senior?
22 A. Yes, I have.
23 Q. When was that?
24 A. Early this year, I worked for him for a week.
25 Q. While you were employed by Fore River?

Page 11

1 A. Right.
2 Q. Tell me about that.
3 A. It was kind of like sharing. I put some pumps
4 together for him.
5 Q. When you say sharing, it was kind of like a shared
6 employee?
7 A. No, Roger could spare me and his father needed me.
8 Q. How were you paid at Fore River?
9 A. How do you mean?
10 Q. Hourly, salary?
11 A. Hourly.
12 Q. You get paid for the hours you work?
13 A. Right.
14 Q. You don't work, you don't get paid?
15 A. Exactly.
16 Q. You went off of Fore River's payroll onto Roger,
17 Senior's?
18 A. Yes.
19 Q. Was it the same rates?
20 A. Yes.
21 Q. For Roger Junior, do you have health insurance?
22 A. Yes, I do.
23 Q. Other benefits?
24 A. Right.
25 Q. Was your health insurance in full force and effect

Page 12

1 during the time you were with Roger Senior?
2 A. Yes.
3 Q. Still under Fore River's -- still on their nickel, as
4 far as the health insurance?
5 A. Right.
6 Q. They didn't switch you over to Roger Senior?
7 A. No.
8 Q. How often would that happen that you would work for --
9 A. That's the only time it ever happened.
10 Q. How often do you see Roger Senior during your work for
11 Fore River?
12 A. That varies. I might not see him for three weeks and
13 I might see him every day for a week, depends on my job
14 site.
15 Q. Do you see him even when you are not doing jobs with
16 regard to his property?
17 A. Just in passing, yes.
18 Q. Does he have -- involve himself in the work, Roger
19 Senior, that is?
20 A. In my work?
21 Q. The Fore River work?
22 A. Not to my knowledge.
23 Q. When you are working for Fore River, has Roger Senior
24 ever directed you or instructed you or shown you how to do
25 the work?

3 (Pages 9 to 12)

Page 13

A. Only when working on his property.
Q. How about when not working on his property?
A. No.
Q. Never?
A. I don't believe so, no.
Q. You know, I'm looking into this incident. Anything I should know about or anything you want to add?
A. Not really.
      MR. MURPHY: That's all I've got.
      MR. REMMEL: Waive reading and signing.
            (TIME: 1:35 P.M.)

Page 14

CERTIFICATE

I, Catherine Cook, a Notary Public in and for the State of Maine, hereby certify that the within-named deponent was sworn to testify the truth, the whole truth, and nothing but the truth, in the aforementioned cause of action.

I further certify that this deposition was stenographically reported by me and later reduced to print through Computer-Aided Transcription, and the foregoing is a full and true record of the testimony given by the deponent.

I further certify that I am a disinterested person in the event or outcome of the above-named cause of action.

IN WITNESS WHEREOF, I subscribe my hand and affix my seal this date: December 11, 2003

Dated at                        _____
Portland, Maine.        Catherine Cook, Notary Public
My Commission Expires: October 31, 2008

ages 13 to 14)

11/26/99 11:18 inst. 177
BK 16067 PG 465

# DEED

I, Betsy J Peet of Newburyport, Essex County, Massachusetts

in consideration of **$710,000.00**

grant with *Quitclaim Covenants* to **Keith R Ablow** of 12, 49th Street, Plum Island,
Newbury MA 01951

the land with the improvements thereon situate at said 12, 49th Street, Newbury, Essex County, Massachusetts being shown as
Lots 225, 226 and 227 in Block "D" on plan entitled "Plan of Sections One and Two of
Land of Plum Island Beach Company" dated May 1920 and recorded with the Essex
South District Registry of Deeds as Plan 22 of Plan Book 34.

Being the same premises conveyed to the Grantor by Deed recorded with the aforesaid
Registry at Book 13778 Page 93.

Witness my hand and seal this 24 day of November 1999:

_Betsy J Peet_
Betsy J Peet

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss                                          24  November 1999

Then personally appeared Betsy J Peet and acknowledged the foregoing to be her free act
and deed, before me

Notary public/commission expires:
E Douglas Reslick 5/5/2000

CANCELLED
SALEM
DEEDS REG.
ESSEX S.D.

Ret
Grantee

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -
KEITH R. ABLOW,
                        Plaintiff,
        v.                      Case No.
                                06-CA-11235RGS
FORE RIVER DOCK & DREDGE, INC., C.B.
MARINE CORPORATION AND MAINE COAST
MARINE CONSTRUCTION,
                        Defendants.
- - - - - - - - - - - - - - - -      VOLUME I
                                PAGES 1-154

DEPOSITION of DOUGLAS PACKER, a
witness called by counsel for the Plaintiff,
taken pursuant to Rule 30 of the Massachusetts
Rules of Civil Procedure before Lorraine S.
Foley, Registered Professional Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Newbury Town
Hall, 25 High Road, Newbury, Massachusetts, on
Thursday, March 29, 2007, commencing at 10:10
a.m.

Page 2

1  A P P E A R A N C E S:
2
3  JOHN P. LeGRAND & ASSOCIATES, P.C.
4    John P. LeGrand, Esquire
5    Eric Stafford, Esquire
6    375 Broadway, Suite 2
7    Somerville, Massachusetts 02145
8    LeGrandlaw@aol.com
9    On Behalf of the Plaintiff
10
11 HOLBROOK & MURPHY
12   Robert J. Murphy, Esquire
13   238 Lewis Wharf
14   Boston, Massachusetts 02109
15   holbrook-murphy@msn.com
16   On Behalf of Fore River Dock & Dredge
17
18 THOMPSON, BULL, FUREY, BASS & MacCOLL
19   Mark Furey, Esquire
20   120 Exchange Street
21   Portland, Maine 04112-0447
22   On Behalf of C.B. Marine Corporation
23
24

Page 3

1  THOMPSON & BOWIE
2    Cathy S. Roberts, Esquire
3    Three Canal Plaza
4    Portland, Maine 04112
5    croberts@thompsonbowie.com
6    On Behalf of Maine Coast Marine Construction
7
8  NORMAN, HANSON & DeTROY, LLC
9    Aaron K. Baltes, Esquire
10   415 Congress Street
11   Portland, Maine 04112
12   abaltess@nhdlaw.com
13   On Behalf of Guy Splettstoesser
14
15 BOWMAN & PENSKI ATTORNEYS
16   Anthony E. Penski, Esquire
17   10 Still Street
18   Brookline, Massachusetts 02446
19   apenski@comcast.net
20   On Behalf of the Town of Newbury
21
22
23
24

Page 4

1            I N D E X
2  Deposition of: Direct Cross Redirect Recross
3  DOUGLAS PACKER
4  By Mr. Stafford: 7          145
5  By Mr. Furey:       40
6  By Mr. Baltes:      85          150
7  By Ms. Roberts:     90          148
8  By Mr. Murphy:      106
9
10         E X H I B I T S
11 No.                     Page
12 1  Fax of 12/12/02              7
13 2  Letter of 12/12/02           7
14 3  Certificate of Emergency 12/16/02    7
15 4  Letter by Telefax Re: Seawind    7
16 5  Removal Plan of 12/19/02         7
17 6  Fax of 1/21/03               7
18 7  Fax of Sterling Equipment 1/21/03    7
19 8  Fax of 2/4/03                7
20 9  Letter of 2/6/03             7
21 10 Fax of 2/26/03               7
22 11 Handwritten Undated Notes        7
23 12 Letter of 3/3/03             7
24 13 Letter of 3/10/03            7

Page 5

1   14 Letter of 3/10/03                          7
2   15 W.P.A. Emergency Certification Form
3      3/12/03                                    7
4   16 W.P.A. Emergency Certification Form    7
5   17 Fax of 3/11/03                            7
6   18 W.P.A. Emergency Certification Form    7
7   19 Letter of Undertaking 3/11/03            7
8   20 Letter of 3/26/03                          7
9   21 Fax of 4/2/03                             7
10  22 Letter of 4/3/03                           7
11  23 Letter of 10/29/03                         7
12  24 Email of 12/29/03                          7
13  25 Handwritten Notes                          7
14  26 Photograph with Handwritten Note         7
15  27 Email of 7/4/05                            7
16  28 Photograph of Sign                         7
17  29 File of the Witness                       41
18  29A Photograph                               59
19  29B Photograph                               59
20  29C Photograph                               62
21  29D Photograph                               62
22  30 Letter of 3/11/07                         98
23  29E W.P.A. Emergency Certification Form
24     with Attachment                           99

Page 6

PROCEEDINGS
1
2       (Exhibit Nos. 1 through 28, inclusive,
3   marked for identification.)
4       MR. STAFFORD:  I've never had cases
5   with people from Maine, so I'm going to waive
6   all objections except as to the form of the
7   question and reserve motions to strike until
8   the time of trial.
9       Also, sir, you have an opportunity to
10  read and sign the deposition transcript if you
11  so choose.  I'll be glad to provide you our
12  copy or provide a copy for signature, if that's
13  what you decide to do.
14      MR. FUREY:  So the record's clear, I
15  am not waiving any objections or agreeing to
16  postpone anything until trial.  We'll proceed
17  by the rules.
18      MS. ROBERTS:  I concur.  We agree to
19  proceed by the rules.
20
21      DOUGLAS PACKER,
22
23  a witness called for examination by counsel for
24  the Plaintiff, having been satisfactorily

Page 7

1   identified by the production of his driver's
2   license being first duly sworn by the notary
3   public, was examined and testified as follows:
4
5       DIRECT EXAMINATION
6   BY MR. STAFFORD:
7   Q.  Okay.  What is your name, sir?
8   A.  Douglas Packer.
9   Q.  And where do you work, Mr. Packer?
10  A.  I work here at 25 High Road for the Town of
11      Newbury.
12  Q.  And we're taking your deposition at the Newbury
13      Town Hall today; is that correct?
14  A.  That's correct.
15  Q.  And your office is here?
16  A.  Correct.
17  Q.  And what is your title?
18  A.  I'm the conservation agent and assistant
19      building inspector.
20  Q.  And what training or education have you had
21      that relates to your duties as the conservation
22      agent?
23  A.  I have approximately 15 years of experience
24      here at this seat, and I've attended numerous

Page 8

1   conferences over those 15 years.
2   Q.  And you may have just answered this.  How long
3       have you been the conservation agent?
4   A.  I've been the agent since 2000, 2001, but I've
5       sat on the commission.  I've been its chair for
6       approximately eight to nine years, and I've sat
7       on the commission for about 15.
8   Q.  Mr. Packer, what was the first notice that you
9       received that there was a grounding of the tug
10      and barge?
11  A.  I don't remember the exact date.
12  Q.  What was the first thing that you did when you
13      received the information?
14  A.  Went down and took a look at it.
15  Q.  What did you see?
16  A.  I saw a barge parallel to the shore, up against
17      the beach, and I saw a tug oriented east/west
18      behind it.
19  Q.  Were you able at that time to ascertain whether
20      that was on anybody's property?
21  A.  Well, it was on -- it was obvious it was on
22      someone's property, but I obviously had no idea
23      whose at the time.
24  Q.  And who was the first person or persons that

Page 9

1    you contacted or who contacted you?
2  A.  I was contacted by -- I think his name was Roe
3    from Fore River Dock & Dredge.
4  Q.  And what did he -- what was the substance of
5    that conversation, Mr. Packer?
6  A.  It was just informative, stated the obvious.
7    We had a barge that got into trouble last
8    night. We got the guys off. We're dealing
9    with the Coast Guard. Pretty much the basics
10    at that point, just what had happened.
11  Q.  And do you remember if you had a conversation
12    with Christine Crawford from American Home
13    Insurance Company?
14  A.  I did. But I can't tell you whether it was
15    that first day or not. I don't know that it
16    was the first day, but I remember at least one
17    conversation with her.
18  Q.  Okay. I'm going to show you what I've marked
19    as Plaintiff's Exhibit No. 1 for Packer. It's
20    27 in the Harden deposition. I'll just wait.
21    Let me know when you're ready.
22  A.  Okay.
23  Q.  Do you remember receiving that document,
24    Mr. Packer?

Page 10

1  A.  I remember seeing it. I don't remember
2    receiving it, but I have seen it before.
3  Q.  You have seen it?
4  A.  Yes.
5  Q.  Okay. And in that document, did Christine
6    Crawford assure the Town of Newbury that the
7    insurance company would be responsible for the
8    damages for removal as well as any
9    damages caused by the wreck removal?
10  A.  It appears as though it does.
11  Q.  On the basis of the conversation that you had
12    with Larry Roe, did you or on behalf of the
13    Town of Newbury issue any orders?
14  A.  I think we started to with Mr. Roe, but then
15    there appeared to be some issues concerning
16    whether he was going to be allowed to do the
17    removal. And it seemed as though there was
18    some opposition to him doing the removal at the
19    time, whether it was a legal opposition or
20    whether it was just who was going to do it, and
21    I remember some conversation that he was not
22    going to be allowed to do it because he may
23    have been the responsible party when it went
24    aground is my recollection.

Page 11

1  Q.  And when you say "he," do you mean he
2    individually or he as -- I'm sorry. As an
3    employee of Fore River Dock & Dredge?
4  A.  His entity, yes.
5  Q.  Okay. I'm going to show you what has been
6    marked as Exhibit No. 2. It's Exhibit No. 6 in
7    the Harden deposition.
8  A.  Uh-huh.
9  Q.  And on December 12, 2002, did the Town of
10    Newbury order Fore River Dock & Dredge to
11    remove the tug and barge?
12  A.  Yes, we did.
13  Q.  And what were the Town of Newbury's concerns
14    that led to that order?
15  A.  At that point that barge was starting to break
16    up. It was already starting to break up. It
17    didn't take very long. And we were very
18    concerned that the longer it sat there, the
19    greater the damage was going to be and the
20    greater the threat we were going to have to our
21    citizens.
22  Q.  And obviously, that was a concern?
23  A.  Definitely a definite concern, as well as the
24    hazardous materials and anything else that may

Page 12

1    be on board.
2  Q.  So it was the board's opinion that the wreck
3    posed a possible threat to the safety of the
4    citizens of Newbury and the Commonwealth?
5  A.  Absolutely.
6  Q.  I'm going to show you what's been marked as
7    Exhibit No. 3, which is Exhibit No. 28 in the
8    Harden deposition.
9  A.  Okay. Okay.
10  Q.  Can you tell me what that is, sir?
11  A.  It's an emergency order.
12  Q.  And who was it issued to?
13  A.  It was issued to Larry Roe. I'm sorry. It was
14    requested by Larry Roe. I don't know that it
15    was ever issued.
16  Q.  Okay. Was it your intent to issue it to Fore
17    River Dock & Dredge?
18  A.  It was my intent to issue it to whoever would
19    take that barge off the beach.
20  Q.  And there is a second page to that document,
21    Mr. Packer, that was signed by Larry Roe. On
22    that second page, does it state that Fore River
23    agrees to be responsible for any damages to the
24    beach?

Page 65

1    up to the beach grass --
2    A. Yes.
3    Q. -- does the water ever get up that high?
4    A. Yes.
5    Q. Okay. And that would be on an exceptionally
6      high tide?
7    A. Exceptionally high tide or a storm or
8      event-driven tide.
9    Q. Okay. In all the times that you've been down
10     to that beach and seen some debris from time to
11     time, have you ever seen any debris above the
12     rise in the sand leading up to the dune area?
13   A. Only during highly unusual events can you get
14     overwash or can you get water running up this
15     beach face so that it would deposit something
16     on top of that rise. That rise is there
17     because that is pretty much the extent of your
18     beach/dune interface and the start of your
19     primary frontal dune. If it got up there on a
20     regular basis, it would not be there. It would
21     be further back.
22   Q. Okay. So the question is, have you ever seen
23     debris that you think was from this barge above
24     that rise?

Page 66

1    A. No.
2    Q. And would it be your opinion that the debris
3      couldn't get up that high anyway?
4        MR. STAFFORD: Objection.
5    A. No. That wouldn't be my opinion.
6    Q. You think it could?
7    A. On a particularly vicious storm event like we
8      just talked about, if there was something in
9      this water out there, there is a possibility
10     that it could get carried up there, it's my
11     opinion.
12   Q. It would be a remote possibility, would you
13     say?
14   A. Yes.
15   Q. Okay.
16       MR. BALTES: Can I see that?
17   Q. Now, 29A, as you indicated earlier, shows the
18     barge, and 29B also shows the barge. What is
19     the state of the tide in those two pictures?
20     Is that low tide, high tide, mid tide, or can
21     you tell?
22   A. I can't be certain, but my best educated guess
23     would be mid tide or lower, simply because we
24     know where the wrack line was in similar

Page 67

1    photos, and it was a considerable amount -- a
2    considerable space up the beach from where it
3    is now. And in my experience going down there
4    after it went aground, there was never a time
5    when you could walk around and see the ocean
6    side of the barge. So it never got too much
7    lower than that right there.
8    Q. Okay. So the seaward side of the barge would
9      always have water up against it?
10   A. That's correct.
11   Q. And the landward side of the barge would be
12     surrounded by water certainly at high tide?
13   A. At times.
14   Q. And maybe even at mid tide?
15   A. Correct.
16   Q. Now, you were shown Packer Exhibit No. 2.
17     That's a letter that you wrote to Fore River
18     Dock & Dredge ordering it to remove the tug,
19     Seawind, and the barge from the beach; correct?
20   A. Correct.
21   Q. And that letter is dated December 12th, 2002?
22   A. It is.
23   Q. The letter references a meeting of the
24     Conservation Commission; correct?

Page 68

1    A. This one does not.
2    Q. It does not?
3    A. No, it does not. This is not the one that
4      references the meeting. It was a longer
5      letter.
6    Q. All right. Well, it says here, "It is the
7      board's opinion that the vessels pose a
8      possible threat to the safety of the citizens
9      of the Commonwealth of Massachusetts."
10   A. That's correct. It does.
11   Q. What board are we talking about?
12   A. We would be talking about the Conservation
13     Commission.
14   Q. Okay. Now, because of the date of the letter
15     and, of course, I know the date this
16     happened --
17   A. Uh-huh.
18   Q. -- did the board meet?
19   A. We did not. That would have been my speaking
20     generically as the board.
21   Q. Okay. So you were basically taking it upon
22     yourself that if the board did meet, that would
23     have been its opinion?
24   A. That's correct. That's correct.

Page 69

1    Q.  All right.  So there was never any actual
2        meeting, or anything?
3    A.  There was not.
4    Q.  And I take it later on, there were actual
5        meetings about this incident?
6    A.  I would have to look in the minutes.
7    Q.  All right.  So a little while ago we were
8        talking about the contents of your file, which
9        is Exhibit 29, and whether there were other
10       files.  The Conservation Commission has files
11       that reflect its meetings and activities, its
12       votes, and things like that?
13   A.  It does.
14   Q.  And those are minutes?
15   A.  Those would be minutes.
16   Q.  Who would have kept the minutes in 2002, 2003,
17       2004?
18   A.  The secretary, who at the time may have been
19       Loretta.
20   Q.  Do you know Loretta's last name?
21   A.  I don't recall right at the moment, believe it
22       or not.
23   Q.  If I wanted to get my hands on those minutes,
24       how would I do it?

Page 70

1    A.  You would contact the secretary -- send a
2        letter to the commission requesting minutes of
3        the meetings of particular dates.  And then the
4        secretary, that is the keeper of records, would
5        go through her files, see what she has and send
6        you anything that resides in those files.
7    Q.  And which particular individual would I write
8        to at this point?
9    A.  Right now it would be Susan Noyes.
10   Q.  N O Y C E?
11   A.  N O Y E S.
12   Q.  Susan Noyes.  Would the letter be addressed
13       Care of Town Hall?
14   A.  Yes.
15   Q.  Other than minutes, would the Conservation
16       Commission have any other records on this
17       incident?
18   A.  Not that I know of.
19   Q.  Okay.
20   A.  Because there was never a filing.  I would
21       doubt that we would find anything.  The only
22       other files that we have would either be
23       requests for determination or notices of intent
24       filings.  And neither of those happened in this

Page 71

1        case.
2    Q.  Okay.  It's the primary business of the
3        Conservation Commission approving or
4        disapproving various projects that affect
5        certain ecologically-sensitive areas?
6    A.  Yes.
7    Q.  Would that be like 80 or 90 percent of what it
8        does?
9    A.  Yes.
10   Q.  Now, throughout this time period, by which I
11       mean from the date of the grounding through to
12       the end of the removal project, what person
13       were you talking to the most?  Was it Rick
14       Harden?
15   A.  Rick Harden was pretty much my exclusive
16       contact.
17   Q.  And what did you understand -- who was
18       Rick Harden representing, as far as you
19       understood it?
20   A.  I'm not quite sure.  It was my understanding
21       that his job was to ascertain what needed to be
22       done and then how it was -- more of a
23       go-between between all of the parties.  If I
24       had an issue, if the insurance company had an

Page 72

1        issue, if Fore River had an issue, Rick seemed
2        to be the pivotal point or the hub for all
3        these activities.  So more of a coordinator, I
4        guess.
5    Q.  And you don't know -- obviously, he wasn't
6        doing it for free?
7    A.  Obviously.
8    Q.  You don't know --
9    A.  Most don't.
10   Q.  We know that.  You don't know who was paying
11       his bill?
12   A.  I don't.
13   Q.  Now, one of the documents that you were shown
14       on direct examination was Packer Exhibit 5, and
15       one of the documents within Exhibit No. 5 is a
16       so-called Removal Plan, Barge DS-4 and Cargo.
17   A.  Uh-huh.
18   Q.  Isn't that true?
19   A.  Yes, it is.
20   Q.  And that document is signed by Larry Roe?
21   A.  It is.
22   Q.  And by you; correct?
23   A.  It is.
24   Q.  Did that document ever become operative?

## Page 149

1  Q. And that a lien on the deed is placed when an
2     order of conditions is issued?
3  A. That is correct.
4  Q. Is there any similar thing that the town would
5     impose a lien on a deed when it issues a letter
6     of undertaking, like it did in this case?
7        MR. MURPHY: Objection.
8        MR. FUREY: The town didn't issue the
9     letter. I object.
10 A. Not that I know of. I don't know that we've
11    ever taken a letter of undertaking or a letter
12    of understanding and registered it at Salem.
13 Q. So only the order of conditions actually is
14    something that would be a lien on a deed?
15 A. That is correct.
16 Q. But you draw a corollary between the order of
17    conditions and the emergency certificate that
18    was issued in this case?
19 A. That's correct. But emergency
20    certs. or determinations of applicability do
21    not get that recording status, only the order
22    of conditions.
23       MS. ROBERTS: Okay. Thanks.
24       MR. PENSKI: Since you guys are all

## Page 150

1     over the place on this, you might want to just
2     look at the statute, which is Chapter 131,
3     Section 40 of the Massachusetts General Laws.
4     You'll have a better understanding what he's
5     talking about.
6        You might also want to know that with
7     respect to Conservation Commissions 99 and
8     44/100ths percent are going to come from
9     homeowners that want to do things. It's very
10    rare that a barge washes up on shore. That's
11    why he talks about recording something in the
12    Registry of Deeds, because you've got to hammer
13    on somebody who owns a piece of paper in the
14    town, not to say a barge on the shore.
15       MR. FUREY: We understand. Thank you
16    very much for your time. I know it's an
17    imposition. So you'll hold onto that file.
18       THE WITNESS: I will.
19       MR. BALTES: I have one question.
20       RECROSS EXAMINATION.
21 Q. Packer Exhibit No. 17, who is that from?
22 A. It's from a valued customer.
23 Q. Do you know who the customer is? Just curious.
24 A. I don't. If you wanted me to guess, I would.

## Page 151

1  Q. Right. Would you guess that it's town counsel?
2  A. That would be my guess.
3        MR. BALTES: Thank you.
4        MR. FUREY: So the witness is going to
5     read and sign; right?
6        MR. STAFFORD: Yes.
7        (Whereupon, at 1:30 o'clock p.m., the
8     deposition was concluded.)

## Page 152

1        C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS
3  COUNTY OF MIDDLESEX, ss.
4
5        I, Lorraine S. Foley, a Registered
6  Professional Reporter and Notary Public in and
7  for the Commonwealth of Massachusetts, do
8  hereby certify that the foregoing transcript of
9  the deposition of DOUGLAS PACKER, having been
10 duly sworn, on March 29, 2007, is true and
11 accurate to the best of my knowledge, skill and
12 ability.
13       IN WITNESS WHEREOF, I have hereunto
14 set my hand and seal this     day of
15 , 2007.
16
17
18
19           Lorraine S. Foley
20           Notary Public
21
22
23
24 My commission expires: November 24, 2011

Page 153

1    DEPONENT'S ERRATA SHEET
2    AND SIGNATURE INSTRUCTIONS
3
4         The original of the Errata Sheet has
5    been delivered to Eric Stafford, Esq.
6         When the Errata Sheet has been
7    completed by the deponent and signed, a copy
8    thereof should be delivered to each party of
9    record and the ORIGINAL delivered to Eric
10   Stafford, Esq. to whom the original deposition
11   transcript was delivered.
12
13        INSTRUCTIONS TO DEPONENT
14
15        After reading this volume of your
     deposition, indicate any corrections or changes
16   to your testimony and the reasons therefor on
     the Errata Sheet supplied to you and sign it.
17   DO NOT make marks or notations on the
     transcript volume itself.
18
19   REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20   COMPLETED AND SIGNED ERRATA SHEET WHEN
21   RECEIVED.
22
23
24

Page 154

1    ATTACH TO THE DEPOSITION OF DOUGLAS Packer
     CASE: KEITH R. ABLOW V. FORE RIVER DOCK &
2    DREDGE, INC., ET AL
3         ERRATA SHEET
4    INSTRUCTIONS: After reading the transcript of
     your deposition, note any change or correction
5    to your testimony and the reason therefor on
     this sheet. DO NOT make any marks or notations
6    on the transcript volume itself. Sign and
     date this errata sheet (before a Notary Public,
7    if required). Refer to Page 153 of the
     transcript for errata sheet distribution
8    instructions.
9    PAGE   LINE
            CHANGE:
10          REASON:
            CHANGE:
11          REASON:
            CHANGE:
12          REASON:
            CHANGE:
13          REASON:
            CHANGE:
14          REASON:
            CHANGE:
15          REASON:
            CHANGE:
16          REASON:
            CHANGE:
17          REASON:
            CHANGE:
18          REASON:
            CHANGE:
19          REASON:
20
          I have read the foregoing transcript
21   of my deposition and except for any corrections
     or changes noted above, I hereby subscribe to
22   the transcript as an accurate record of the
     statements made by me.
23
24        DOUGLAS PACKER    DATE

SECT. A.

**PLAN OF**
**SECTIONS 1 & 2**
OF LAND OF
**PLUM ISLAND BEACH CO.**
IN
**NEWBURY & NEWBURYPORT.**
ROWLAND H. BARNES & HENRY F. BEAL, CIVIL ENGRS.
BOSTON & WALTHAM, MASS.
MAY 1920

NOTE: All rights of way unless otherwise
indicated are 10 feet wide.

This plan has been reduced. For
correct scaling see original on file.

NOTE: ALL AREAS ON INDEX PAGE.

SECTION 1 INCLUDES BLOCKS
A, B, C, D, E, F.
SECTION 2 INCLUDES BLOCKS
G, H, I.

Book of Plans 34, Plan No. 22
Salem, July 30, 1920 Rec. 8 C.M.
in Essex Reg. Deeds So. Dist.
Attest: Moody Kimball, Reg.

GRAPHIC SCALE IN FEET

NORTHERN          BOULEVARD

Average Line of Foot of Slope

Approximate     High     Water     Line



COMMONWEALTH OF MASSACHUSETTS
ESSEX REGISTRY OF DEEDS SO. DIST. SALEM, MASS.
A TRUE COPY OF PLAN FILED IN THIS OFFICE
ATTEST:
REGISTER

BK. 34
PL. 86

SECT. B.

THE BASIN

U.S. COAST GUARD RESERVATION

Average Line of Foot of Slope

Approximate High Water Line

GRAPHIC SCALE IN FEET



COMMONWEALTH OF MASSACHUSETTS
ESSEX REGISTRY OF DEEDS, SO. DIST., SALEM, MASS.
ESSEX SS.
A TRUE COPY OF PLAN FILED IN THIS OFFICE
ATTEST
REGISTER

**SECTION A**
LOT  AREA

**SECTION G**
LOT  AREA

**SECTION D**
LOT  AREA

**SECTION B**
LOT  AREA

**SECTION E**
LOT  AREA


COMMONWEALTH OF MASSACHUSETTS
ESSEX REGISTRY OF DEEDS, SOUTHERN DISTRICT
March  28  07
A TRUE COPY OF RECORD BOOK AND PLAN
ATTEST:
REGISTER

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
        Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
        Defendants

## PLAINTIFFS EXPERT WITNESS DISCLOSURE

1.    Jean Francois Barre, Licensed Real Estate Broker, Re-Max Newburyport,
      Massachusetts.

      Mr. Barre will testify concerning the diminution of the value of Dr. Ablow's
      property as well as a market analysis concerning value. He will also testify
      concerning ethical obligations to divulge certain information to prospective
      buyers. The plaintiff reserves the right to supplement this response.

2.    Mary Beth Eisenmann, Clean Harbors Environmental Services,
      Weymouth, Massachusetts.

      Ms. Eisenmann will testify concerning the procedure and pricing of further
      clean up attempts. The plaintiff reserves the right to supplement this
      response.

3.    Verne Fisher, Visionary Landscapes, New Hampshire.

Mr. Fisher will testify concerning the procedure and pricing of long range clean up attempts. The plaintiff reserves the right to supplement this response.

4.    Robert Walsh, J.D., Title Examiner, Billerica Massachusetts.

Mr. Walsh will testify, if necessary, concerning issues of title and ownership of the plaintiff's property. The plaintiff reserves the right to supplement this response.

5.    Linda Ahern, Ahern Appraisal, Inc., Ipswich, Massachusetts.

Ms. Ahern will testify concerning the value of the plaintiff's property using well recognized methods of valuation. The plaintiff reserves the right to supplement this response.

6.    Neve-Morin Group, Inc., 447 Boston Street, Topsfield, Massachusetts.

Will survey the area on and near the plaintiff's property to establish ownership rights and prepare a Points Set Plan. The plaintiff reserves the right to supplement this response.

7.    Marilyn Firth, Newburyport, Massachusetts.

Ms. Firth will testify concerning the composition and toxicity of the materials contained in the barge and its components parts. The plaintiff reserves the right to supplement this response.

8.  John D. Halamka, M.D., MS, Chief Information Officer CareGorup Health System. Associate Dean for Educational Technology at Harvard Medical School.

    Dr. Halamka or another well recognized expert in the field will testify about the potentially fatal effects of airborne silica and iron to humans. The plaintiff reserves the right to supplement this response.

9.  Captain Brian Fournier, Boston Massachusetts.

    Captain Fournier is expected to testify concerning the operation and use of tugboats with respect to the circumstances surrounding the facts and damages in this action.

Plaintiff
By his attorney,

John P. LeGrand, Esquire
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
(617) 623-3001
BBO No: 550185

Eric Stafford, Esquire
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
BBO No: 551074
(617) 623-3001

## CERTIFICATE OF SERVICE

I, John P. LeGrand, Esquire, hereby certify that on this 22nd day of March, 2007, I served a copy of the attached document on all parties to this action by mailing same by certified mail return receipt requested postage prepaid to:

Robert Murphy, Esquire
Seth Holbrook, Esquire
Holbrook & Murphy
238-240 Lewis Wharf
Boston, MA 02110

Mark G. Furey, Esquire
Thompson, Bull, Furey, Bass & MacColl
120 Exchange Street
P.O. Box 447
Portland, ME 04112-0447

Cathy S. Roberts, Esquire
Thompson & Bowie, LLP
3 Canal Plaza
P.O. Box 4630
Portland, ME 04112-4630

Aaron Baltes, Esquire
Peter J. DeTroy, Esquire
Norman, Canton & DeTroy, LLC
415 Congress Street
P.O. Box 4600
Portland, ME 04112-4600

John P. LeGrand

3

```
                                            1
        UNITED STATES DISTRICT COURT

              DISTRICT OF MAINE




FIRST SPECIALTY INSURANCE   )
119 CORPORATION,            )
                            )        Docket No.
Plaintiffs,                 )        NO. 06-CV-119
                            )
Vs.                         )
                            )
MAINE COAST MARINE          )
CONSTRUCTION, INC., et al., )
                            )
Defendants.



        DEPOSITION OF:  GUY W. SPLETTSTOESSER,

    taken before Erin M. Leighton, pursuant to notice dated

    July, 2007, at Richardson, Whitman, Large & Badger, 465

    Congress Street, Portland, Maine, on July 30, 2007,

    commencing at 9:25 a.m.

    APPEARANCES:

                JOHN S. WHITMAN, ESQ.
                AARON K. BALTES, ESQ.
                J. CHRISTOPHER CALLAHAN, ESQ.
                MARK G. FUREY, ESQ.
                ROBERT J. MURPHY, ESQ.
                ROSIE M. WILLIAMS, ESQ.


                Erin M. Leighton
                BOYCE & LEIGHTON
                Post Office Box 954
                Scarborough, Maine 04074
                (207) 883-0378
```

1   GUY W. SPLETTSTOESSER, having been duly sworn by the Notary

2       Public, was deposed and testified as follows:

3           EXAMINATION-BY ATTY. WHITMAN:

4   Q.  Could you state your full name please and spell your

5       last name?

6   A.  Guy Walter Splettstoesser.  S P L E T T S T O E S S E R.

7   Q.  With your permission, I will refer to you as Guy

8       throughout this deposition, is that okay?

9   A.  Yes.

10  Q.  Guy, have you spoken to anyone other than your attorney,

11      Aaron Baltes, in preparation for testifying here today?

12  A.  No.

13  Q.  And you gave a deposition, I think, roughly a year ago

14      that went on for some four hours in a related case, do

15      you remember that?

16  A.  Yes.

17  Q.  Did you have a chance to look over that transcript?

18  A.  No.

19  Q.  Didn't bother?

20  A.  No.

21  Q.  Were you satisfied when you left the deposition that

22      your answers had been accurate and honest to the best of

23      your ability?

24  A.  Yes.

25  Q.  All right.  So you would endorse your testimony in the

---

2

```
                                            2
1

2

3            I N D E X

4    WITNESS

5    GUY SPLETTSTOESSER

6

7        See keyword index at end of transcript.

8

9

10   (Exhibits retained by Atty. Whitman.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1       prior deposition?

2   A.  Yes.

3   Q.  I will try not to cover stuff that you said, but at the

4       same time, I have got to plow some of the same ground

5       and as I said off the record, I apologize if this is a

6       little bit tedious.

7   A.  Okay.

8               (Notice

9               Exhibit-No. 1 marked for identification.)

10              (Handwritten entries

11              Exhibit-No. 2 marked for identification.)

12              (Map

13              Exhibit-No. 3 marked for identification.)

14              (Appraisal

15              Exhibit-No. 4 marked for identification.)

16              (Coast Guard report

17              Exhibit-No. 7 marked for identification.)

18              (Incident brief

19              Exhibit-No. 8 marked for identification.)

20              (Coast Guard report

21              Exhibit-No. 9 marked for identification.)

22              (Chart

23              Exhibit-No. 10 marked for identification.)

24              (Weather forecasts

25              Exhibit-No. 11 marked for identification.)

**5**

1        (Statements

2        Exhibit-No. 12 marked for identification.)

3        (Coast Guard report

4        Exhibit-No. 13 marked for identification.)

5        (Vendor guide report

6        Exhibit-No. 14 marked for identification.)

7        (1099

8        Exhibit-No. 15 marked for identification.)

9  Q.  Now, did you receive or did Aaron Baltes show you a copy

10    of the deposition notice for today which I have marked

11    as Exhibit 1?

12  A.  Yes. I think so.

13  Q.  And did either of you bring any additional documents

14    today or did you bring any documents today with you?

15  A.  No.

16  Q.  All right. Let me go down this list very quickly. Do

17    you have any papers in your possession or custody at

18    this point reflecting your employment by Maine Coast

19    Marine Construction which I may refer to as Maine Coast

20    from time to time?

21  A.  I don't think so.

22  Q.  That ended practically five years ago, is that correct?

23  A.  Right.

24  Q.  And you haven't kept anything?

25  A.  No.

**6**

1  Q.  So similarly, you don't have any documents reflecting

2    the ownership interest that you once had in Maine Coast?

3  A.  I may have tax returns kicking around the house but I

4    think that's probably about it.

5  Q.  All right. Do you think you have tax returns for

6    calendar year 2002?

7  A.  I really don't know.

8  Q.  All right. Possibly?

9  A.  Possibly. I am usually pretty good about it but finding

10    them is a different story.

11  Q.  Items 3 and 4 ask for documents reflecting your

12    compensation during the years 1999 through 2002. First

13    by Maine Coast Marine Construction and secondly by Fore

14    River Dock & Dredge. During those three or four years,

15    you were regularly employed by Maine Coast and, in fact,

16    you became a part owner, correct?

17  A.  Yes.

18  Q.  And you were paid how, weekly?

19  A.  Yes, weekly.

20  Q.  Other than tax returns that you may still have around

21    the house, do you have any record of amounts you were

22    paid by Maine Coast?

23  A.  No, nope.

24  Q.  And during those same three or four years from time to

25    time, you did side jobs for Roger Hale at Fore River

**7**

1    Dock & Dredge?

2  A.  Yes.

3  Q.  And on those jobs or at least some of them, you were

4    paid as an independent contractor; in other words, there

5    was no withholding or anything of that sort, is that

6    fair to say?

7  A.  Yes.

8  Q.  Do you have, Guy, any records at this point of those

9    payments that you received from Fore River?

10  A.  I don't know. It is hard to tell. I doubt it, but I

11    mean there may be some things kicking around the house.

12  Q.  Where do you live, by the way?

13  A.  South Portland.

14  Q.  Can you give me the address?

15  A.  124 Briarwood Road.

16  Q.  And how long have you lived there?

17  A.  About four years.

18  Q.  Getting back to the deposition notice, in the fall of

19    2002, you went down to Gloucester a certain number of

20    times to do some work for Fore River which was working

21    on a job down there?

22  A.  Yes.

23  Q.  And do you have any documents pertaining to that job or

24    the compensation you got for it?

25  A.  I don't know. I don't think so.

**8**

1  Q.  You haven't actually looked for any documents?

2  A.  Right. I mean I know I had them but like I said,

3    finding them, who knows. I don't know if they are still

4    kicking around the house.

5  Q.  Fair enough.

6    Do you have any documents reflecting your

7    compensation for captaining the tugboat Seawind II on

8    December 11, 2002?

9  A.  I am not sure.

10  Q.  And Seawind II which I will refer to from now on just as

11    Seawind, that was a roughly 25 and a half foot -- how

12    would you describe that boat?

13  A.  Yeah. It is just a 25-foot square push boat.

14  Q.  Okay. And December 11, 2002, is the date of the

15    so-called grounding incident that's given rise to all

16    these suits?

17  A.  Uh-huh.

18  Q.  Yes?

19  A.  Yes.

20  Q.  Did you bring any of your captain's licenses that you

21    have ever held?

22  A.  No.

23  Q.  We will get back to that later.

24    MR. WHITMAN: I would like to follow up on this,

25    Aaron, but I don't want to waste time on it now.

9

1        MR. BALTES: Okay.
2        MR. WHITMAN: To the extent that Guy has an
3     opportunity at some point to go through whatever papers
4     he may have at home, but since it hasn't been done
5     before today, let's move on.
6   Q. How are you employed today?
7   A. I work down for Portland Tugboat.
8   Q. And is that the full name of the company?
9   A. It is McAllister Towing and Transportation and we are a
10     subdivision, Portland Tugboat, LLC.
11  Q. Where are they located?
12  A. 446 Commercial Street, I believe it is.
13  Q. The tugs that I see from time to time that have a name
14     like Tonya McAllister or that kind of thing, are these
15     all tugs owned by McAllister?
16  A. Yes.
17  Q. And Portland Tugboat is a subsidiary?
18  A. Yes.
19  Q. I live out on Peaks Island so I commute every day right
20     by there so I see them all the time which is why I
21     asked.
22        I am going to go through quickly some information
23     just confirming what I think I already know. You were
24     born on January 6, 1974?
25  A. Yes.

10

1   Q. And you graduated Gray-New Gloucester High School in
2     '91?
3   A. Yes.
4   Q. Okay. Then you went to work -- in fact, during high
5     school, you had already been working for C. B. Marine?
6   A. Yes.
7   Q. Was C. B. Marine owned by Roger P. Hale, in other words,
8     Roger, Senior?
9   A. No. It was always Roger, Junior, while I was there.
10  Q. Okay. So do you refer to him as Roger, Junior?
11  A. Yup, Junior.
12  Q. They have a different middle name, I guess, but do
13     people call them Senior and Junior?
14  A. Yes.
15  Q. And how long did you work there, eight or nine years,
16     something like that?
17  A. Yeah, I think so.
18  Q. What did you do for C. B. Marine?
19  A. Pretty much everything. Welding, crane operating,
20     running the tugboats.
21  Q. And when you say the tugboats, what boats are you
22     referring to?
23  A. They have had a bunch of small ones throughout the year.
24     The Seawind they have always had and a couple of small
25     ones, the Seboomek or Melody I think is one and the Reed

11

1     McAllister and the Albany, I guess.
2   Q. Now, the Seawind was built to be under 26 feet, is that
3     correct?
4   A. Yes.
5   Q. And there is a reason for that which is that for Coast
6     Guard purposes, boats under 26 feet are not subject to
7     certain regulations?
8   A. Right.
9        MR. FUREY: Object. Lack of foundation.
10       MR. MURPHY: Objection.
11  Q. Are boats like that sometimes referred to as rule
12     beaters?
13  A. I don't know.
14  Q. You never heard that term?
15  A. No.
16  Q. Of the five boats you just listed, the Seawind, Melody,
17     Seboomek, Albany and Reed McAllister, was the Seawind
18     the only one that was under 26 feet or were the others
19     also that size?
20  A. All of them are under 26 except for the Albany and the
21     Reed McAllister.
22  Q. Okay. Now, you started working for C. B. Marina when
23     you were what, 16 years old, something like that?
24  A. Yes.
25  Q. You were still in school?

12

1   A. I think so.
2   Q. How old were you when you first began running the boats
3     that were under 26 feet?
4   A. Oh, geez, probably -- right off the bat. Depends what
5     we were doing. If we are moving a barge, five or six
6     feet, whoever is closest to it jumps in it.
7   Q. What about the Albany and Reed McAllister, these are
8     longer than 26 feet?
9   A. Right.
10  Q. Did you need a license to run them?
11  A. Yes.
12  Q. And when did you first have such a license?
13  A. I believe my first issue was eight years ago. May,
14     2001, or something. Shortly before all of this.
15  Q. Were you operating, running the Albany or the Reed
16     McAllister before you actually had that license?
17  A. Just a little bit. If we went on long trips, I would --
18     if the captain had to go to the bathroom or eat or
19     whatever, we would steer it on a certain course they
20     were steering.
21  Q. So you got a little practice on those boats before you
22     actually had a license to run it yourself?
23  A. Yes.
24  Q. And was it a daily part of your day at C. B. Marine to
25     run one or another of these boats at least for a few

First Specialty v Maine Coast 7/30/07                                Guy Splettstoesser

| | 13 |
|---|---|
| 1 | minutes? |
| 2 | A. Yes. |
| 3 | Q. Pretty much you had to move a barge around or something |
| 4 | like that? |
| 5 | A. Right. If we had a barge on the island, we would need a |
| 6 | boat to get to the job. |
| 7 | Q. One way or another, you were doing a lot of running |
| 8 | boats? |
| 9 | A. Yes. |
| 10 | Q. As well as running cranes and welding and other things? |
| 11 | A. Yes. |
| 12 | Q. Okay. You left C. B. Marine when, around '98, '99, |
| 13 | somewhere in there? |
| 14 | A. Yeah. I would think so. I am not positive but yeah. |
| 15 | Q. And you went with Jimmy Laplante? |
| 16 | A. Right. |
| 17 | Q. You knew him from both of you working at C. B. Marine? |
| 18 | A. Yes. |
| 19 | Q. And had he started up Maine Coast Marine at that point |
| 20 | or was he still with South Port? |
| 21 | A. I think he was still with South Port. |
| 22 | Q. But then at some point, he and Rick Hale started Maine |
| 23 | Coast? |
| 24 | A. Yes. |
| 25 | Q. And you were -- you were one of the original employees |

| | 14 |
|---|---|
| 1 | there? |
| 2 | A. Yes. |
| 3 | Q. Did they do exactly the same kind of work that you |
| 4 | described that you were doing at C. B. Marine or was |
| 5 | there a different focus? |
| 6 | A. Yes. Pretty much the same stuff but we do a lot of |
| 7 | marina stuff since we were based on the marina, too. If |
| 8 | they needed help with their boats or whatever. |
| 9 | Q. South Port? |
| 10 | A. Yes. |
| 11 | Q. So that's South Port Marina in South Portland? |
| 12 | A. Yeah. |
| 13 | Q. So if -- when you say they needed help with their boats, |
| 14 | do you mean taking sailboats in and out of the water? |
| 15 | A. Right. Moving them around the yard or helping them out. |
| 16 | The guys in the yard. |
| 17 | Q. And after South Port -- excuse me, after Jimmy Laplante |
| 18 | started Maine Coast Marine, was he based somewhere |
| 19 | differently from the South Port Marina? |
| 20 | A. No. |
| 21 | Q. Still in the same place? |
| 22 | A. Same place. |
| 23 | Q. Did you continue to move sailboats around and do stuff |
| 24 | like that or not after Maine Coast started? |
| 25 | A. I don't think so. I mean nothing that we would be paid |

| | 15 |
|---|---|
| 1 | for. Just if we were there helping them and they needed |
| 2 | help, we would lend a hand. |
| 3 | Q. Sure. Maine Coast Marine Construction did marine |
| 4 | construction? |
| 5 | A. Right. |
| 6 | Q. As the name implies? |
| 7 | A. Yeah. |
| 8 | Q. All right. At some point, you borrowed and as I |
| 9 | understand Jimmy Laplante cosigned on a loan so that you |
| 10 | could buy out Ricky Hale? |
| 11 | A. Yes. |
| 12 | Q. As a part owner of the Maine Coast? |
| 13 | A. Right. |
| 14 | Q. Approximately when was that, do you recall? |
| 15 | A. No. I don't. |
| 16 | Q. And then in -- I think you said May of 2001, you got |
| 17 | your first marine license? |
| 18 | A. Right. |
| 19 | Q. Or mariner's license, what do they call it, captain's |
| 20 | license? |
| 21 | A. Captain's license. |
| 22 | Q. And that was a so-called 200 ton operator of uninspected |
| 23 | towing vessels license? |
| 24 | A. Yes. |
| 25 | Q. Would that have been a sufficient license for you to |

| | 16 |
|---|---|
| 1 | captain on the Albany or the Reed McAllister? |
| 2 | A. Yes. |
| 3 | Q. After you got that license, did you do a little |
| 4 | moonlighting or some side jobs working on tugs when it |
| 5 | didn't interfere with Maine Coast work? |
| 6 | A. Yes. For Roger, yeah. |
| 7 | Q. Did you do any of these side jobs working on tugboats |
| 8 | for anyone other than Roger Hale? |
| 9 | A. Yes. Probably Portland Tugboat. |
| 10 | Q. Okay. So this would be back starting in mid 2001? |
| 11 | A. Right. |
| 12 | Q. Anyone else? |
| 13 | A. Maybe Winslow Marine. |
| 14 | Q. Now, you got done with Maine Coast Marine not too long |
| 15 | after the grounding incident in 2002, is that right? |
| 16 | A. Yes. |
| 17 | Q. And as I understand it, you went down to New York City |
| 18 | for a year or two and worked for McAllister? |
| 19 | A. Yes. |
| 20 | Q. That's the Maine company, the parent company of Portland |
| 21 | Tug? |
| 22 | A. Right. |
| 23 | Q. And were you captaining a tugboat down there? |
| 24 | A. Yes. |
| 25 | Q. Were you always on the same tugboat or did you shift |

BOYCE & LEIGHTON

17

1    around?
2  A.  Basically, on the same. Unless they shipped it out,
3      then we would jump on -- it might have been on one boat
4      for six months and another one for three months.
5  Q.  What was the size of the tugboats that you were running
6      down in New York?
7  A.  They are all anywhere from 90 foot to 110 foot.
8  Q.  Similar in size?
9  A.  Yeah.
10 Q.  Similar to the Albany?
11 A.  They are all basically the same size.
12 Q.  What did you do for McAllister New York, did you do ship
13     docking?
14 A.  Both. Half ship docking in the harbor and half towing
15     oil barges up and down the coast and the rivers.
16 Q.  And the oil barges would be owned by oil companies?
17 A.  Yeah. Mostly Bouchard.
18 Q.  Who is Bouchard?
19 A.  Just another big oil company out of New York.
20 Q.  You came back to the Portland area in what year, 2004?
21 A.  I think so, yeah. I am not positive.
22 Q.  Anyway, you have been back for two or three years now,
23     three or four years?
24 A.  Yeah, probably closer to four. Maybe five years, yeah.
25     Four years.

18

1  Q.  You have lived in South Portland for the last four
2      years?
3  A.  Right.
4  Q.  You are doing the same kind of work but you are doing it
5      for the local subsidiary, Portland Tugboat at this
6      point?
7  A.  Yes.
8  Q.  Same type of ships?
9  A.  Yes.
10 Q.  Same type of tugboats, I mean?
11 A.  Yes.
12 Q.  Are you still doing some towing as well as ship docking?
13 A.  Yes.
14 Q.  Still about 50, 50?
15 A.  Mostly into just towing now.
16 Q.  And again, oil barges primarily?
17 A.  Oil barges, yeah.
18 Q.  How big are the oil barges typically?
19 A.  The one we are in contract with, 300 feet, I believe.
20 Q.  And you go up and down the coast from where to where?
21 A.  This one is just a harbor boat. We bring fuel oil to
22     the ships that come into harbor here so we fill them up
23     down the river and bring them to whoever wants it.
24 Q.  I see. Now, you spent a lot of years with Roger Hale,
25     Roger, Junior. Do you still have a relationship with

19

1      him?
2  A.  I haven't seen him in a long time but he has hired
3      McAllister to do a couple of things for him here and
4      there. It has been awhile but yes, I still see him.
5  Q.  I know with one thing or another, you and Jimmy Laplante
6      parted company on less than the best of terms, I guess,
7      in December of '02. Have you seen him at all or dealt
8      with him at all lately?
9  A.  No.
10 Q.  Not since then?
11 A.  No.
12 Q.  Do you know what he is doing now?
13 A.  I don't. I believe he is still at the marina but that's
14     about all I know.
15 Q.  South Port Marina?
16 A.  Yeah.
17 Q.  Now, when you were at C. B. Marine, who taught you how
18     to run the push boats, the little ones?
19 A.  Any of the captains that would be working there. They
20     had a couple of captains throughout the years.
21 Q.  Who were the captains they had, do you recall?
22 A.  Probably Jack Eichhorn is the biggest one that taught me
23     everything and Roger himself. He has a license also.
24 Q.  Is Jack Eichhorn the same as Hans Eichhorn?
25 A.  Yes.

20

1  Q.  But he goes by Jack?
2  A.  Jack is what we always called him, yeah.
3  Q.  Close enough.
4  A.  That's right.
5  Q.  So they were both -- they had some kind of a captain's
6      license?
7  A.  Yeah. I think we all had the same license.
8  Q.  And tell me day in and day out, what did you typically
9      use those push boats for, like the Seawind?
10 A.  Just moving the barges around. All the barges had
11     cranes on them so when we had a job to build a dock, we
12     would push the barge to where the dock was and work all
13     day and then take the boat home and leave the barge
14     wherever the job was.
15 Q.  And as you have testified occasionally, you would get to
16     take the controls of one of the larger tugs but there
17     would be a captain aboard at that time?
18 A.  Yes.
19 Q.  All right. Licensed captain?
20 A.  Yes.
21 Q.  Now, when you started working for Jimmy Laplante, at
22     Maine Coast Marine, what boats did Maine Coast have,
23     whether it owned them or leased them or whatever?
24 A.  We just had one small, geez, I guess, around 30 foot.
25     Something we converted into a little tugboat. It used

First Specialty v Maine Coast 7/30/07                                    Guy Splettstoesser

---

**21**

1    to be a scallop dragger or lobster boat or something. I
2    don't even know what it was.
3    Q. All right. Was that the Seguin?
4    A. Seguin, yes.
5    Q. Was it called the Seguin, is that the name of the boat?
6    A. Yes.
7    Q. And it had been a fishing boat of some kind but you made
8       some mods to it?
9    A. Yes.
10   Q. And did Maine Coast own that or lease it if you know?
11   A. It was owned by South Port Marine but I believe they
12      leased it.
13   Q. Now, by the time you started at Maine Coast, you had
14      eight or nine years of running the Seawind and other
15      boats of that size so this was not much bigger than
16      that?
17   A. Right.
18   Q. Was it similar in any way or was it -- I guess as an
19      ex-fishing boat, it would have been a little different?
20   A. It is a little different. One engine and pointy bow
21      instead of the square like the Seawind. Just a
22      traditional style boat.
23   Q. It was just a convenient boat to use?
24   A. Yeah.
25   Q. How do you push with a pointy bow?

**22**

1    A. Just put the bow against it and then we have cables that
2       we put out that would tighten up. One of them is a
3       fixed cable and one you tighten up just so you are
4       pushing straight.
5    Q. I see. So it works out even though it is --
6    A. Yeah.
7    Q. And by the time -- by the time you got to Maine Coast
8       Marine, I assume you probably didn't need much more
9       training to run that boat?
10   A. Right.
11   Q. Now, during the time you were at Maine Coast, did you
12      from time to time run one boat or another for Fore
13      River?
14   A. Yes.
15   Q. What were the boats that you ran for Fore River?
16   A. I think at that point, all they had was the Albany and
17      Seawind.
18   Q. And the Albany was roughly 100 feet long?
19   A. Yes.
20   Q. So your captaining of the Albany would not have started
21      I assume, but correct me if I am wrong, until you got
22      your license in May of '01?
23   A. Right.
24   Q. Now, other than the crash course you went to down in New
25      Orleans which I will get to in a minute, did you have

**23**

1    any sea time, any actual hands-on sea time on the larger
2    sort of 100-foot tugs before you started running the
3    Albany in 2001?
4    A. Not really. Just like I said, helping the captains out
5       on long trips and stuff like that.
6    Q. So occasionally, you would take the helm if they needed
7       a rest?
8    A. Right.
9    Q. And you were just pushing or towing a barge on the same
10      course, you could maintain the course all right?
11   A. Yes.
12   Q. And begin to get a feel for how the tug handled?
13   A. Yes.
14   Q. When you were doing that, were you typically towing or
15      pushing or doing something else completely --
16   A. Both. We had either a light boat -- all of them. Light
17      boat, pushing or towing.
18   Q. Light boat?
19   A. Yeah. Just a tug itself if we were going someplace to
20      get something.
21   Q. I assume that's the easiest of the three?
22   A. Oh, yeah.
23   Q. And as between pushing and towing, which would you say
24      is more difficult?
25   A. I don't know. They are about the same, I guess.

**24**

1    Q. They have got different things you have to look out for?
2    A. Yeah. I mean towing, pushing, it is all a big boat so
3       they go whichever way you point it.
4    Q. All right. When you started running the Albany for
5       Roger Hale in 2001 or whenever you first began to run it
6       for him, did he or anyone else like Jack Eichhorn give
7       you any pointers or had you already become familiar with
8       that?
9    A. I had already been familiar with it. I think Jack was
10      always with me when we went somewheres because he was a
11      crane operator also. So if we got somewhere, he was
12      running the crane and I would run the boat.
13   Q. So over the periods of years, you benefited from having
14      either Roger or Jack aboard and you could learn things
15      about the Albany even before you got your license?
16   A. Yes.
17   Q. All right.
18   A. And I worked part time with Portland Tugboat since I was
19      15 or 16 also so.
20   Q. Really?
21   A. Roger -- if they needed help, Roger would send us to
22      help Portland Tugboat if they needed an extra deckhand
23      or something.
24   Q. So at an early age, you pretty much knew what you wanted
25      to do?

---

First Specialty v Maine Coast 7/30/07

**25**

1  A.  Yeah.

2  Q.  Work on tugboats, marine construction, that kind of

3      thing?

4  A.  Right.

5  Q.  And that's what you have done straight on through?

6  A.  Yes.

7  Q.  Now, in order to get that license in May of '01, you had

8      to take a course as I understand it from your previous

9      deposition, is that right?

10  A.  Yes.

11  Q.  And this is what, a Coast Guard course?

12  A.  Well, it is a private school but then when you get out

13      of the school, you take the test with the Coast Guard at

14      the Coast Guard base.

15  Q.  All right.  So it is a course that's designed to get you

16      through the test and pass the test?

17  A.  Right.

18  Q.  We have that in my business, too.

19  A.  Right.

20  Q.  Bar cram course.

21  A.  Right.

22  Q.  So by the time you took this course, which I take it was

23      in April of 2001?

24  A.  Right.

25  Q.  And you went down to New Orleans or somewhere for it?

**26**

1  A.  Yes.

2  Q.  You lived there for how long was it, two weeks?

3  A.  Two weeks.

4  Q.  By that time, you had hands-on experience going back to

5      the time you were 15, 16 years old in a sense?

6  A.  Yes.

7  Q.  On tugboats?

8  A.  Yes.

9  Q.  But I assume there was a lot of kind of classroom stuff

10      that you needed to pick up in order to pass the test, is

11      that a fair way of putting it?

12  A.  Yeah, yup.

13  Q.  Those two weeks, was that five days a week, seven days a

14      week?

15  A.  Six days a week.  Monday through Saturday.

16  Q.  And what hours were you taking the course?

17  A.  I believe it was from 8:00 in the morning until 5:00.

18  Q.  Pretty intense two weeks?

19  A.  Oh, yeah.  Long days.

20  Q.  Were there different instructors for different subjects

21      or did one person teach the whole course?

22  A.  Most of it was all computer, on a computer until you got

23      to a navigation part.  Then there was all hands-on with

24      an instructor.

25  Q.  What were the subjects that you covered either with a

**27**

1      computer or with the instructor?  There was navigation

2      obviously.  Is that --

3  A.  Navigation.  Plotting, I guess.  Rules of the road.  I

4      think there was five tests altogether so probably deck

5      general, deck safety.

6  Q.  What's deck general, what did that cover?

7  A.  I believe that just went over things on the boat like

8      what cleats are, lines are, how to drop anchors.

9  Q.  And deck safety I guess is -- speaks for itself but what

10      are some of the things that can happen to you?

11  A.  How to load the boat without tipping it over, you know,

12      fuel and water and firefighting and stuff like that.

13  Q.  How is navigation done these days on a tugboat?

14  A.  Well, a lot of it nowadays is all computerized, all

15      computers and plotters, chart plotters and stuff like

16      that.  But you have to do it on charts, too, itself, the

17      tools, the pencils, the compasses.

18  Q.  So you have radar obviously?

19  A.  Yes.

20  Q.  You have some sort of GPS?

21  A.  Yeah.  There is usually a couple on the boat.

22  Q.  You have computers or a computer?

23  A.  Yes.

24  Q.  I mean you are talking to somebody here who knows

25      nothing about this.

**28**

1  A.  Well, I have my own computer that I bring on whatever

2      boat and plug it into the GPS and it is pretty much an

3      electronic chart that shows you where you are at all

4      times.

5  Q.  And do you actually use paper charts anymore or is that

6      a thing of the past?

7  A.  Yes, we use them.  You have to have them unless you have

8      two chart plotters, you have to have charts on the boat.

9  Q.  Okay.  But sextons and things like that are a thing of

10      the past?

11  A.  Yes.  That's for bigger licenses, guys that run the big

12      tankers and stuff.

13  Q.  They still have to know that?

14  A.  They have that in their school but not with the 200 ton.

15  Q.  Did the course have anything to do with mechanics?

16  A.  No.

17  Q.  When you are the captain of the tugboat like these

18      100-footers that you have been on recently, how many

19      other people are onboard typically?

20  A.  Well, there is usually -- if you go on a long trip,

21      usually 24 hours, five people.

22  Q.  Some of them are deckhands?

23  A.  Yeah.  Usually two captains, two deckhands and an

24      engineer.

25  Q.  The engineer is the guy who is in charge of the engines?

29

1   A.  Yes.
2   Q.  Keeping the engines running and so forth?
3   A.  Yes.
4   Q.  And other systems like electricity?
5   A.  Yeah.  They are pretty much in charge of the way the
6       whole boat operates.
7   Q.  So that wasn't something you needed for your captain's
8       license because that would be the engineer?
9   A.  No.  That's a separate school.
10  Q.  Did they attempt to teach you anything about ship
11      handling or whatever the term would be?
12  A.  No.
13  Q.  I assume you already knew how to do that?
14  A.  Yeah.  One of the requirements before you even go to
15      school is sea time.  You have to have like I think
16      1,100, eight-hour days on a tugboat that size.
17  Q.  And you had that much sea time?
18  A.  Yes.  Anything over 26 feet counts.
19  Q.  1,100, eight hour days?
20  A.  Yeah.
21  Q.  I mean that's like three years' worth of full-time work
22      on a tugboat?
23  A.  Right.
24  Q.  Did you actually have that much in 2001?
25  A.  Oh, yeah.  Geez, I mean for half my life with Hale, we

30

1       did bunker jobs as what I am doing now so I mean if you
2       are 36 hours on a boat, I mean that counts as a few
3       days, you know.  12 hours is a day and a half.
4   Q.  All right.  I am glad I asked because this gives me a
5       better idea of how much, you know, on-the-job training
6       you had and experience before you even sat for the test?
7   A.  All my sea time comes from Roger Hale and Portland
8       Tugboat and Winslow.  All the companies -- they write
9       the letters and saying that I worked that much.
10  Q.  And that sea time can be as a deckhand?
11  A.  Yeah.
12  Q.  It can't be a captain until you take the test?
13  A.  Right.
14  Q.  All right.  I get it.
15          So things like ship handling and how to tow a
16      barge, they assume you have got that from hands-on?
17  A.  Right.
18  Q.  Was there -- did you have to learn anything about, I
19      don't know how to put this, Coast Guard regulations and
20      that kind of thing?
21  A.  Just the rules of the road.
22  Q.  Just the rules of the road.  What about communications,
23      radio or whatever you have on a tug, is that something
24      you were assumed -- did they assume you already knew?
25  A.  Right.  I think for an uninspected vessel, you don't

31

1       need a radio license or anything so.
2   Q.  What kind of communications do you have on one of these
3       tugs?
4   A.  VHF radios.
5   Q.  And that enables you to get the weather and contact the
6       Coast Guard?
7   A.  Yeah.
8   Q.  If you were -- if you are out towing a barge, who else
9       can you contact?  Can you contact anybody that is
10      listening in on the radio?
11  A.  Yeah.  If you see anybody you want to talk, as long as
12      they are listening, you can call them.
13  Q.  Go to the particular channel?
14  A.  Right.
15  Q.  What about weather, was that a subject -- weather,
16      weather forecasting or how to use weather information,
17      was that a subject on the test?
18  A.  Not really.  I think it vaguely goes over, I guess,
19      looking at the clouds and telling if it is going to be
20      nice or crappy but that's about it.
21  Q.  All right.  So then after the two weeks of six days a
22      week, you took some sort of an exam?
23  A.  Yup.
24  Q.  And how long a test was that?
25  A.  It depends.  All the sections were different.  Some of

32

1       them were 20 questions.  Some of them were 60.  They do
2       them all different.  I think like deck general, it was
3       like 60 questions, you had to score a 70 or higher.  I
4       think with the navigation and plotting, it was 20
5       questions.  You had to score a 90 or higher.  So they
6       are all different.
7   Q.  So all significant component, maybe the most significant
8       component, of getting this license is that 1,100 days of
9       sea time?
10  A.  Yes.
11  Q.  And would it be fair to say that the cram course and the
12      actual test makes sure that you haven't been asleep for
13      those 1,100 days?
14  A.  Yes.
15  Q.  And that you picked up what you needed to know?
16  A.  Yes.
17  Q.  All right.  And you passed the test the first time you
18      took it?
19  A.  Yes.
20  Q.  Okay.  Now, again forgive my ignorance, but in the world
21      of captain's licenses, marine licenses, in this country,
22      does anyone issue them other than the Coast Guard to
23      your knowledge?
24  A.  No.  I believe it was just the Coast Guard.
25  Q.  If you get a Coast Guard license that enables you to do

First Specialty v Maine Coast 7/30/07

33

1    a certain thing, you can do it in any port in the United
2    States?
3    A.    Yes.
4    Q.    There is no local authority you have to get a license
5          from?
6    A.    No.
7    Q.    You began with a 200 ton OUTV license, operator of
8          uninspected towing vessel, what does uninspected mean,
9          below a certain size, they don't have to --
10   A.    Typically, tugboats under 300 tons are uninspected so.
11   Q.    And as I understand it, that license automatically
12         upgraded a few years later to -- by virtue of your sea
13         time to a different license?
14   A.    Yes.
15   Q.    What was that license?
16   A.    Just a master of all towing.
17   Q.    What does that entitle you to do, does that entitle you
18         to captain any tugboat no matter how large?
19   A.    Any tugboat.
20   Q.    Now, if you hadn't gone off into the tugboat line, but
21         you were progressing up the ladder of being a captain of
22         an ordinary ship, is the progression similar that you
23         start out with a license that's good up to a certain
24         number of tons and keep working your way up?
25   A.    I believe so, yeah. I think for -- I mean my license is

34

1    a master of towing vessels so it is not a passenger
2    license. I mean the next step I think is like 500-ton
3    master's license or 1600 master's license. I think
4    those are a little different schooling. I think you
5    start doing celestial training and stuff like that.
6    Q.    So that would be a ship company captain or a tanker or
7          something like that?
8    A.    Right.
9    Q.    As far as running the tugboat is concerned, have you got
10         now the top license that anyone can get?
11   A.    As far as the tugboat, yeah.
12   Q.    When you were working at Maine Coast, it was you and
13         Jimmy Laplante and who else was employed there that you
14         recall?
15   A.    Rodney Sirois and Curtis Thompson, I guess.
16   Q.    All right. And what position did Rodney Sirois hold?
17   A.    Mostly crane operator.
18   Q.    You had a 30 by 90 foot barge?
19   A.    Yes.
20   Q.    With an A frame crane on the back of it?
21   A.    An A frame on one side and a crane on the other side.
22   Q.    The A frame would be for salvage?
23   A.    Yes.
24   Q.    And the crane -- the regular crane would be used for
25         what?

35

1    A.    Anything else. Building the piers, lifting equipment.
2    Q.    Dredging?
3    A.    Dredging, yeah.
4    Q.    Did you do some dredging at Maine Coast?
5    A.    Yes.
6    Q.    Curtis Thompson, did you say, what was his position?
7    A.    He was pretty much just a laborer. Foreman laborer, I
8          guess.
9    Q.    Had you known him before you started with Maine Coast?
10   A.    Yes. They both worked with Hale for a few years.
11   Q.    Typical job that you handled might be to what, build a
12         pier, repair a pier, that kind of thing?
13   A.    Right. Drive piling.
14   Q.    Drive pilings?
15   A.    Hammer nails in boards. Stuff like that. Building
16         docks pretty much.
17   Q.    And Maine Coast Marine Construction, the name suggests
18         that you worked on the Maine Coast, is that right?
19   A.    Yes.
20   Q.    Did you work in any other states?
21   A.    No.
22   Q.    And what was the extent of your range during that time
23         you can remember, how far south and how far north did
24         you go or east and west?
25   A.    I don't think we went anywhere south. I think we went

36

1    up to Boothbay Harbor one time for a salvage job.
2    Q.    So South Portland to Boothbay?
3    A.    Yeah.
4    Q.    Most of your work in the Portland, South Portland area?
5    A.    Yeah.
6    Q.    You had the Seguin. You had the 30 by 90 barge. And
7          that was basically what you had?
8    A.    Yeah. We had a small 15, 16-foot skiff just to help
9          with the barge but that was about it.
10   Q.    Did the company have an office somewhere?
11   A.    Yes. Right in the South Port Marina building.
12   Q.    Oh, yeah.
13         Is that just a single room?
14   A.    Yes.
15   Q.    Was there any permanent office staff?
16   A.    No.
17   Q.    Who did the bookkeeping?
18   A.    I did most of it.
19   Q.    Were you assisted by anyone?
20   A.    No.
21   Q.    At tax time, did you go to an outside service to do the
22         taxes?
23   A.    Yes.
24   Q.    Did you also do payroll?
25   A.    We had a payroll company.

BOYCE & LEIGHTON

37

1  Q.  What about paying bills, writing checks, did you do
2       that?
3  A.  Yeah.
4  Q.  Getting work and bidding work, did Jimmy do most of
5       that?
6  A.  Yeah, most of it.
7  Q.  That would be Jimmy Laplante.
8          When you had done work, when Maine Coast, I should
9       say, had done work and it was time to bill a customer,
10      did you send out invoices?
11  A.  Yes.
12  Q.  Who did that?
13  A.  I did.
14  Q.  When it came time to renew insurance or to get insurance
15      in the first place, who handled that?
16  A.  I want to say Jimmy.
17  Q.  When you say you want to say Jimmy, are you saying, in
18      effect, does that mean, Guy, that it wasn't you so you
19      assume it must have been Jimmy?
20  A.  Yes.
21  Q.  Is that a fair way of putting it?
22  A.  Yes.  I don't know if -- I mean that might have been
23      started before when Ricky Hale and Jimmy were there.
24  Q.  So if anybody did anything about it, it was more likely
25      to be Jimmy?

38

1  A.  Right.
2  Q.  It wasn't you?
3  A.  Right.  I mean the company was running for a couple of
4      years before I bought it so --
5  Q.  Before you bought in?
6  A.  Stuff like that was already taken care of, payroll,
7      insurances and stuff like that.
8  Q.  Something had been set up and it just kept rolling
9      along?
10  A.  Exactly.
11  Q.  Do you know who was Maine Coast's insurance agent?
12  A.  I want to say Clark Associates.
13  Q.  Did you personally ever have contact with them?
14  A.  I don't believe so.  I am not sure.  Well, I guess I
15      have been there once or twice before but I am not sure
16      what it was for.
17  Q.  Would you think it was even in connection with Maine
18      Coast?
19  A.  Yeah.  I mean when I went there, I think I went with
20      Jimmy so.
21  Q.  And do you have any recollection at all as to what it
22      was about?
23  A.  No.
24  Q.  Did you ever discuss insurance with either Roger, Junior
25      or Melody Hale during the time you were at Maine Coast?

39

1  A.  I don't think so.
2  Q.  Did you ever have any conversations or discussions of
3      any kind with anybody about certificates of insurance
4      when you were at Maine Coast?
5  A.  No.
6  Q.  Did you ever see or hear of any agreement whether
7      written or oral where Maine Coast would make Fore River
8      Docking & Dredge an additional insured on its policies?
9  A.  I don't think so.  The only thing I ever remember seeing
10      is a contract for the barge that we leased from Hale.
11  Q.  And that was the 30 by 90 barge?
12  A.  Yes.
13  Q.  That's the only written agreement you can think of?
14  A.  I think so, yeah.  From what I remember.
15  Q.  Now, you had -- you meaning Maine Coast had a very close
16      relationship with Fore River, is that fair to say?
17  A.  Yes.
18  Q.  And, in fact, roughly half of your work was done -- it
19      was work that was sent to you by Fore River?
20  A.  Yes.
21  Q.  The other 50 percent, was that generated largely by
22      Jimmy Laplante?
23  A.  Yes.
24  Q.  And then from time to time, you would do side jobs that
25      required a captain?

40

1  A.  Yes.
2  Q.  All right.  There is reference in one of these many
3      depositions, I can't even remember which one at this
4      point, to an incident of the Seawind hitting a dinghy or
5      something like that.  Does that ring a bell?
6  A.  Yes, vaguely.  Yeah.
7  Q.  Were you running the Seawind at the time?
8  A.  I can't remember.  I was there but usually if we were
9      moving a barge around the harbor, I had the most
10      experience so I had a radio on deck and would put
11      someone else in the whatever boat we were running to
12      tell them what to do.
13  Q.  All right.  Just so I am clear.
14  A.  I was kind of like a pilot.  Let someone else run the
15      boat and tell them what to do, you know.
16  Q.  All right.  Are you talking about a time when you would
17      be pushing a barge with the Seawind?
18  A.  Yes.
19  Q.  Or pushing a barge with the Seguin?
20  A.  Right, right.
21  Q.  All right.  Let's take the Seguin.  So if you are in the
22      Seguin or if the Seguin is pushing a barge, would you be
23      at the controls at the Seguin or would you be somewhere
24      else?
25  A.  I would be on deck with the radio.

First Specialty v Maine Coast 7/30/07                                Guy Splettstoesser

41

1    Q. On deck of the Seguin?
2    A. On deck of the barge.
3    Q. The barge. So you are up front basically?
4    A. Right.
5    Q. And you would be telling them what to do?
6    A. Right. Exactly. Turn left, right, slow down, come
7        faster, whatever.
8    Q. All right. Is it -- I guess it varies a lot according
9        to the vessels but is it sometimes hard when you are
10       pushing a big barge to see past it, see where you are
11       going?
12   A. Yes. With the equipment on the barge, the cranes and
13       stuff, you can't see anything in front of you.
14   Q. So that's why you would do it this way?
15   A. Right.
16   Q. So, in effect, you were running the push boat by remote
17       control you might say?
18   A. Right. Exactly.
19   Q. All right. I am going to switch now to the fall of 2002
20       when you did some work for Roger Hale on a job that I
21       understand Fore River was doing down in Gloucester,
22       Massachusetts at something called the Heron Way Marina,
23       have I got that correct?
24   A. I believe so. I was never really at that job site.
25   Q. You were never actually at the Heron Way Marina, is that

43

1        there, was this a dredging job?
2    A. I think they were dredging, yeah. Yeah, they were
3        dredging.
4    Q. And jumping ahead a little bit, as I understand it, your
5        job or part of your job at any rate was to captain the
6        Albany, the 100-foot tug which would take a dump scow
7        which that's a big barge that can hold in this case mud?
8    A. Yeah.
9    Q. And what, tow it or push it out to sea?
10   A. We would tow it.
11   Q. Tow it out several miles to a place where you were
12       allowed to dump the mud?
13   A. Yes.
14   Q. Okay. So one of the vessels then that was involved was
15       the Albany which was either owned or leased by Fore
16       River?
17   A. Yes.
18   Q. It might have been owned by C. B. Marine, I am not sure?
19   A. I am not sure.
20   Q. One way or another it was a Hale operation, is that fair
21       to say?
22   A. Yes.
23   Q. All right. And this was about 100 feet long. How
24       powerful is the engine or engines on the Albany?
25   A. I believe it was 1800 horsepower.

42

1        fair to say?
2    A. Yes.
3    Q. I have marked as Deposition Exhibit 3, there is a 2 but
4        I will come back to it, Deposition Exhibit 3, Guy, is
5        just something I photocopied out of a road atlas. It is
6        obviously not a nautical chart. Where is your
7        understanding of -- if you have any understanding of
8        where the Heron Way Marina actually was? Was it
9        somewhere in Gloucester?
10   A. Yeah. I believe it is whatever river runs through here.
11       I guess it doesn't show it. I think it is halfway in
12       the middle. There is a river that goes -- winds up
13       through here.
14   Q. There is a little town called Annisquam?
15   A. Right. I believe that's what the river is called also.
16   Q. The Annisquam River. So the Heron Way Marina as you
17       understand it is somewhere up the Annisquam River?
18   A. Yeah.
19   Q. I think it is roughly where that No. 11 is?
20   A. I think so.
21   Q. The No. 11 is just a road exit. Route 128, I guess?
22   A. Yeah.
23   Q. Your job never took you to the marina itself?
24   A. Right.
25   Q. What was the nature of the job that Fore River was doing

44

1    Q. Was it single engine or --
2    A. Single engine.
3    Q. And of course, you needed a license to operate that boat
4        which you had?
5    A. Yes.
6    Q. Okay. The dump scow, did that have a name, was it
7        called the Mary P?
8    A. The Mary P.
9    Q. And how big was that vessel if I can call it that?
10   A. Probably 150 feet.
11   Q. And how much mud could it carry, any idea?
12   A. 750 yards, I believe.
13   Q. That would be cubic yards?
14   A. Yes.
15   Q. Which probably weighs a ton?
16   A. Oh, yes.
17   Q. Literally, a cubic yard of mud?
18   A. Yeah.
19   Q. So your job involved just towing the dump scow, the Mary
20       P with the Albany. Was the Mary P brought out to the
21       mouth of the river by the Seawind?
22   A. Yes.
23   Q. And you would then pick it up there?
24   A. Yes.
25   Q. And was that because the Albany drew too much water to

First Specialty v Maine Coast 7/30/07

45

1    go up the Annisquam?
2  A. Yes.
3  Q. When the Seawind was brought out with the dump scow, I
4    take it would push the dump scow down the river?
5  A. Yes.
6  Q. Who would typically be driving the Seawind?
7  A. Probably Jack Eichhorn.
8  Q. Let me digress for just a minute here.
9       I put in front of you Exhibit No. 4. You may not
10    have seen this before or maybe you have. It is a May
11    20, 1999, appraisal of the Seawind by something called
12    Marine Safety Consultants here in Portland. Take a look
13    in the first page where it says the -- it gives the
14    length and the breadth or beam and the depth or draft
15    and the horsepower. Do those numbers seem to be at
16    least approximately correct?
17  A. Yes.
18  Q. So the Seawind had two engines, each with 350
19    horsepower?
20  A. Yes.
21  Q. Okay. I assume but correct me if I am wrong, that meant
22    it had two propellers as well?
23  A. Yes.
24  Q. Did it have two rudders?
25  A. Yes.

46

1  Q. One for each propeller so to speak?
2  A. One behind each propeller, yes.
3  Q. I don't know a lot about boats, but that would seem to
4    me to give it a lot of maneuverability, is that fair to
5    say?
6  A. Yes.
7  Q. You could reverse one engine and forward with another?
8  A. Yes.
9  Q. Moving on, the barge which is known as barge DS 64 and I
10    may sometimes just refer to it as DS 64, that was a
11    barge that later on December 11 you were moving up to
12    Newburyport, correct?
13  A. Yes.
14  Q. So it was down in Gloucester as well?
15  A. Yes.
16  Q. What role or purpose, if any, did it have in the Heron
17    Way dredging job?
18  A. It held the crane on it so that was the boat that dug
19    the mud and put it in the Mary P.
20  Q. Of course.
21       And do you know the dimensions of the DS 64?
22  A. I am going to say that is about 150 also. 150 by 40 or
23    150 by 36 or something.
24  Q. All right. So 150 feet long by 36?
25  A. I believe so.

47

1  Q. Feet wide.
2       Do you have any idea how -- I don't know how to
3    refer to a height of a barge, but --
4  A. Probably had a draft of only two feet or something and
5    then it probably had a freeboard of another 10 feet out
6    of the water.
7  Q. Well, you anticipated one of my questions which was how
8    did they get this huge barge in and out of this small
9    river but apparently it didn't draw that much --
10  A. Right.
11  Q. Now, during the time this Heron Way dredging job was
12    going on, to your knowledge, what Fore River employees
13    were working down there? I assume Jack Eichhorn would
14    be one of them?
15  A. Jack Eichhorn, Ron Daigle. I believe there was a couple
16    more guys but I don't know their names.
17  Q. All right.
18  A. Will something and I don't know.
19  Q. What was Daigle's position?
20  A. He was the foreman.
21  Q. And Eichhorn was the crane operator who also held the
22    captain's license?
23  A. Yes.
24  Q. So Eichhorn could have captained the Albany to take the
25    mud out and dump it?

48

1  A. Yes.
2  Q. Is there -- do you happen to know why he didn't do that
3    and why you were asked to come down and do it?
4  A. I believe because he was running the crane all day so he
5    was already working 12 hours a day filling the barge.
6  Q. And --
7  A. And then we would do the towing at night.
8  Q. So he would have had to be up all 24 hours to do that?
9  A. Right.
10  Q. So this was a -- this was one of these side jobs that we
11    spoke about earlier where you got a call from Roger, is
12    that right?
13  A. Yes.
14  Q. Roger Hale, and he asked you on several occasions to go
15    down to Gloucester, captain the Albany, take the mud out
16    and dump it?
17  A. Yes.
18  Q. And when you ran the Albany on those jobs, who did you
19    have aboard?
20  A. I think usually Ron Daigle and I don't know who else.
21    Probably a couple of kids that worked for him or
22    something to handle lines and dump the barge.
23  Q. So you would have maybe three guys helping you out?
24  A. Probably three guys on the boat and one on the barge,
25    yes.

First Specialty v Maine Coast 7/30/07

Guy Splettstoesser

49

1   Q.  And when you went down to Gloucester on those several
2         occasions to run the Albany and dump the mud, you were
3         paid not on an hourly but on a daily rate?
4   A.  Yeah. I think it was a job rate.
5   Q.  A job rate?
6   A.  Yes.
7   Q.  What was that job rate if you recall?
8   A.  I want to say $400 a trip.
9   Q.  Typically, the actual dump run was made at night?
10  A.  Yes.
11  Q.  So you would drive down in the evening and get back to
12        Portland early in the morning?
13  A.  I don't know how late they went, but I mean it all
14        depended when they finished loading, maybe leaving there
15        at 6:00 P.M., doing the trip and getting back into port
16        probably 10:00 or 11:00, I guess.
17  Q.  Into port?
18  A.  Back into Gloucester harbor after the tow.
19  Q.  Then you would have to drive back to Portland to get
20        back where you started from?
21  A.  Yes.
22  Q.  So it was what, maybe a 12-hour commitment for you from
23        Portland down to Gloucester and back?
24  A.  Probably not quite that long but maybe 10 hours.
25  Q.  And this started approximately when, in the fall of

50

1        2002?
2   A.  When did the towing start? Oh, I am not sure. Sometime
3        in the fall, I guess.
4   Q.  Is there a dredging season when you're allowed to
5        dredge?
6   A.  There is in Portland. I don't know --
7   Q.  You don't know in Massachusetts?
8   A.  I don't know about Gloucester. I know it is all about
9        lobster season, I guess. I am not sure when they shut
10       down.
11  Q.  At any rate, these side trips were okay with Jimmy
12        Laplante?
13  A.  Yes.
14  Q.  As long as Maine Coast didn't have anything that
15        required you, he was fine with you going and doing a
16        little moonlighting and putting a few bucks in your
17        pocket?
18  A.  Yes.
19          MR. CALLAHAN: Objection.
20  Q.  What's your best recollection -- I know this is five
21        years ago, but what's your best recollection of the
22        number of times that you did a mud dumping run with the
23        Albany?
24  A.  For that job?
25  Q.  On that job.

51

1   A.  Four, five, six maybe.
2   Q.  Did you also -- did you also tow the equipment or the
3        vessels down to Gloucester at the start of that job?
4   A.  Yes, yes.
5   Q.  I am going to show you what I have marked as Exhibit 2.
6        It has another sticker from some previous deposition.
7        This is an exhibit of four pages. It is a photocopy of
8        handwritten entries. Guy, I am guessing, I have no
9        idea, so this is pure guess, but this looks like it
10       might be some sort of a log from the Albany?
11  A.  Yes.
12  Q.  Can you take a look at it and tell me whether you think
13        that's what it is?
14  A.  Yes, it is the logbook.
15  Q.  All right. And the first entry is dated 10/22/02. And
16        after that, it says Albany, Guy, Ron. I am pretty sure
17        the Jack that appears on the far right may come from --
18        well, I am not positive. I think it may come from the
19        very last page where there was sort of an overlap in
20        photocopying.
21  A.  Oh, yes.
22  Q.  But I mean I don't want you to be confused but I don't
23        want you to take my word for it either.
24         Ron, would that be Ron Daigle, the fellow you just
25       mentioned?

52

1   A.  Yes.
2   Q.  And Guy would be you, I assume?
3   A.  Yes.
4   Q.  And does that suggest to you that on October 22 of 2002,
5        you and Ron Daigle perhaps accompanied by others but at
6        any rate the two of you went somewhere on the Albany?
7   A.  Yes.
8   Q.  It looks to me as if this reflects a trip going down to
9        Gloucester in the first place, is that correct?
10  A.  Yes.
11  Q.  Where it says 0015 depart something, I can't read that?
12  A.  Deakes.
13  Q.  Deakes. What's Deakes?
14  A.  That's Roger Hale's dock. Deakes Wharf.
15  Q.  Is this in your handwriting?
16  A.  Yes.
17  Q.  And then it says 0100, pick up Mary P and 64 barge,
18        that's the DS 64?
19  A.  Yes.
20  Q.  So you were towing them down to Gloucester?
21  A.  Yes.
22  Q.  With the Albany and did you also tow the Seawind if you
23        recall?
24  A.  They pick up the Seawind and put it inside the 64 barge.
25  Q.  Oh, all right. Pick it right up with the crane?

53

1   A.   Yes.
2   Q.   And Alden Rock and Boon Island are just landmarks on the
3        way?
4   A.   Yes.
5   Q.   The next entry seems to say 10:30, Albany, Gloucester to
6        Annisquam.  Is this also in your handwriting? .
7   A.   No.
8   Q.   Do you recognize the handwriting?
9   A.   Yes.  I believe that's Jack.
10  Q.   Jack Eichhorn's.  It doesn't say who was aboard.
11       Do you have any recollection of being aboard on
12       that trip?
13  A.   No.
14  Q.   The next entry says -- the date seems to be 11/05/2002,
15       if I am reading that correctly.  Is this in your
16       handwriting?
17  A.   No.  I don't believe so, no.
18  Q.   All right.  And do you think that is also Jack's or you
19       are not sure?
20  A.   I am not sure.
21  Q.   Then there is an entry on the second page which is a
22       little hard to read the date but it might be 11/12/02.
23       Any idea whose handwriting that is, is that yours?
24  A.   No.  I believe it might be a guy named Jeff Losier that
25       did some of those jobs.

54

1   Q.   L O S I E R?
2   A.   I think so.
3   Q.   Another licensed captain?
4   A.   Yeah.
5   Q.   11/13/02, do you recognize that handwriting?
6   A.   No.
7   Q.   It is not yours?
8   A.   No.
9   Q.   11/15/02, do you recognize that handwriting?
10  A.   No.
11  Q.   How about 11/20/02?
12  A.   No.
13  Q.   All right.  The third page has just one entry.  It
14       doesn't seem to have a date on it.  The first line says
15       onboard Bill, Ron, Brian, Mike, Guy.  I assume Guy is
16       you?
17  A.   Yes.
18  Q.   And it looks like just another dump run with the Mary P,
19       is that how you read it?
20  A.   Yes.
21  Q.   Is this a trip on which you would have been the captain?
22  A.   Yes.
23  Q.   Is this in your handwriting?
24  A.   Yup.
25  Q.   After the entry dump barge, then a couple, three hours

55

1        later, it says something Mary P to Seawind, is that
2        release Mary P?
3   A.   Yes.  I think so.
4   Q.   So you are giving the dump scow back to the Seawind to
5        tow back up the Annisquam River and fill up with mud
6        again?
7   A.   Right.
8   Q.   What does A S mean, the last line?
9   A.   All secure.
10  Q.   The last page has an entry 12/9/02.  Is this also in
11       your handwriting?
12  A.   Yes.
13  Q.   And this was a trip where you were the captain?
14  A.   Yes.
15  Q.   Another dump trip?
16  A.   Uh-huh.
17  Q.   That's a yes?
18  A.   Yes.
19  Q.   And this would have been, I take it -- well, I shouldn't
20       take it, I am guessing that this might have been the
21       last dump trip before the December 11 when the equipment
22       got towed up toward Newburyport?
23  A.   I believe so, yup.
24  Q.   All right.  Exhibit 12 -- I am sorry, Exhibit 14 which I
25       will show you now.  This is five or six pages.  The

56

1        first page is a printout of something called a vendor
2        quick report from Fore River which reflects apparently
3        payments made to Guy Splettstoesser starting in 1999 and
4        continuing to December of 2002.  And then there are
5        attached to it pages with various photocopies of various
6        checks.  The first page suggests that -- well, it refers
7        to five checks that I can see.  The first one is 592
8        had.  This is back from August of 1999.  Do you have any
9        recollection at all?  I know this is an awful long time
10       ago, but do you have any recollection at all of what you
11       were doing for Fore River in the summer of '99?
12  A.   I want to say some kind of salvage job if it says clean
13       harbors here.
14  Q.   Okay.  Next check is from August of 2002 in the amount
15       of $2,602.  And do you have any recollection of what
16       that was for?
17  A.   Yeah, I believe that's a salvage job also up in
18       Boothbay.
19  Q.   Where it refers to the FV Aaron, is that a fishing
20       vessel named Aaron that went down or something?
21  A.   Yes.
22  Q.   And the last three payments, all of them different dates
23       in early December, 2002, were these payments for the mud
24       towing that you did down in Gloucester?
25  A.   Yes.  They look like it.

First Specialty v Maine Coast 7/30/07                                                      Guy Splettstoesser

---

57

1  Q.  Now, this suggests that there were only three actual mud
2      tows that you did. Is that possible, does that seem
3      right?
4  A.  Yes. It is very possible.
5  Q.  Okay. It has been a long time ago.
6      So whenever you did one of these mud tows, you
7      were paid with a check? You never got paid in cash, is
8      that fair to say?
9  A.  Yes.
10 Q.  So if the records are accurate, they should reflect all
11     of them?
12 A.  Yes.
13 Q.  If December 9 of 2002 was the last tow, then as I
14     understand it, some of the equipment, specifically the
15     64 barge and the Seawind then had to be taken up to a
16     different job that Roger Hale was going to be doing
17     somewhere up the Merrimack River?
18 A.  Yes.
19 Q.  And was this a bridge job of some kind?
20 A.  As far as I know, yes.
21 Q.  That's what you heard?
22 A.  Right.
23 Q.  You had never had anything to do with it?
24 A.  Right.
25 Q.  So again at some point, did Roger Hale call you and say

---

58

1      basically, we are done with the mud towing, now I want
2      you to take the Seawind and the barge 64 up to the
3      Merrimack River?
4  A.  I believe so.
5  Q.  And I realize that due to the weather and other
6      circumstances, you never actually reached the
7      destination but was it your understanding that you were
8      going to be taking those vessels some distance up the
9      Merrimack River?
10 A.  Kind of, yes. I think so.
11 Q.  Did he give you a place, I want you to leave them at
12     such and such a place?
13 A.  No, I think I just met Ron at some marina in the river
14     there and I think he told me what to do. He was pretty
15     much the boss.
16 Q.  Ron Daigle?
17 A.  Ron Daigle.
18 Q.  All right. You knew Ron would be aboard and he would
19     give you the instructions once you got underway?
20 A.  Yes.
21 Q.  Now, as I understand it from your previous deposition,
22     you assumed that you would be using the Albany to tow
23     the DS 64 barge and the Seawind?
24 A.  Yes.
25 Q.  In fact, possibly the Seawind would go inside the barge?

---

59

1  A.  Yes.
2  Q.  So you would be using the Albany to tow the barge up to
3      the Merrimack River?
4  A.  Yes. They don't need me for the Seawind. I figured it
5      was for the Albany.
6      MR. MURPHY: I didn't hear what you said.
7      THE DEPONENT: They don't need me to run the
8      Seawind. I just assumed it was for the Albany.
9  Q.  And I think we all know what you mean by that but just
10     so the record is clear, since no license is required to
11     drive the Seawind, it never occurred to you that you
12     would be brought all the way down to Gloucester for that
13     purpose?
14 A.  Right. I mean that job -- for that whole job, I was
15     running the Albany and Jack was running the Seawind so
16     when I got a call to go there, I just assumed it was on
17     the Albany.
18 Q.  If the mud job was over, the dredging job was over, then
19     Jack could have -- as far as it occurred to you, Jack
20     could have just as easily taken the equipment up to the
21     Merrimack River?
22 A.  Right.
23 Q.  So what did you -- I realize things turned out
24     differently. It was not the Albany. But as you were
25     driving down there so to speak, what was the sequence of

---

60

1      events that you thought was going to take place?
2  A.  Well, once I went to the Seawind and they were ready to
3      go, I figured I would be taking the barge with just the
4      Seawind to the mouth of the river.
5  Q.  The Annisquam River?
6  A.  Right.
7  Q.  So you would push the DS 64 down the Annisquam to the
8      mouth of the river, then what?
9  A.  I believe I had in my mind that we were going to spud it
10     off and again get the Albany and come back around and
11     get it.
12 Q.  Spud it off means dropping the barge so the barge would
13     stay in place?
14 A.  Right.
15 Q.  And then you would take the Seawind and go for the
16     Albany?
17 A.  Or back to the marina where our cars were to drive and
18     get the Albany, yes.
19 Q.  All right. But the Seawind had to go to the new job,
20     right?
21 A.  Yes.
22 Q.  So one way or another, you would have had to have the
23     Seawind and the barge together?
24 A.  Yes.
25 Q.  Would it be fair to say that you left the planning of

---

---

**61**

1    this to Ron Daigle?

2  A.  Yeah.

3  Q.  So that you assumed once you get down there, they will

4       tell me what to do?

5  A.  Yes.

6  Q.  But the end result would be that you would be using the

7       Albany to tow these other two vessels up to the

8       Merrimack?

9  A.  Right.

10 Q.  And you hadn't bothered to think out exactly where is

11      the Albany, how do I get from here to there, it was just

12      it was going to work out that way?

13 A.  Right.

14 Q.  Is that a fair way of putting it?

15 A.  Definitely.

16 Q.  I am not trying to put words in your mouth.

17 A.  No.

18 Q.  Do you know where the Albany was that night?

19 A.  As far as I know, I left it in Gloucester harbor so it

20      should have been there.

21 Q.  All right. So you drove down to Gloucester. Did you go

22      to the marina on this occasion?

23 A.  I believe it was -- I was never there for the job but it

24      was a marina, yeah. I am not sure if it was the one

25      they were working at or just the one they were tying up

**62**

1       at.

2  Q.  You got there around noon?

3  A.  I am not sure. I think so.

4  Q.  Sometime during the day?

5  A.  Yeah. It was daylight. I know that.

6  Q.  The testimony and other stuff indicating that you left

7       the marina around noon with the Seawind and pushing the

8       barge, does that seem accurate to you?

9  A.  Yes.

10 Q.  And at that point, who was with you; and by that I mean

11      on either vessel, who was on the Seawind with you as you

12      pushed down the Annisquam?

13 A.  Probably nobody. Probably everybody else was up on the

14      barge.

15 Q.  Okay. And everybody else was what group of people to

16      the best of your recollection?

17 A.  Jack, Ron and I think there was three other people

18      there. I am not sure of their names though. Probably

19      that Brian, Mike, whatever this logbook said earlier.

20      Bill, Brian, I guess.

21 Q.  The Coast Guard records indicate that there were a total

22      of five people onboard either vessel including yourself.

23      Is that possible that there were just two others?

24 A.  I think so, yeah.

25 Q.  So Jack, Ron and maybe two others?

**63**

1  A.  Yeah.

2  Q.  Before you set off, had you obtained the weather

3       forecast for the stretch of water you would be doing?

4  A.  I think so. Probably when I got on the boat, I turned

5       on the weather station.

6  Q.  And when you pushed the barge, the DS 64 with the

7       Seawind, you mentioned earlier the way it was rigged but

8       I wonder if you can describe that in a little more

9       detail.

10 A.  Well, you just -- if this is the barge, you just pull

11      the tug up to the --

12 Q.  Maybe you can make a rough sketch for me.

13 A.  -- stern of it.

14 Q.  You can do a couple of rectangles if that is suitable or

15      kind of a plan view.

16 A.  This would be the barge and we just pushed the nose of

17      the tug, it is a square boat, right up against it and

18      run a couple of wires to each side of it to hold it

19      straight.

20 Q.  All right. Why don't you -- I am going to mark this as

21      an exhibit so why don't you write barge on the bigger

22      rectangle. And tug or something. Seawind. Whatever

23      you want to call it.

24      So you would pull the Seawind up so it is touching

25      the what I will call the stern of the barge?

**64**

1  A.  Sure.

2  Q.  Does the barge have a bow, is it different at one end

3       than the other?

4  A.  I believe they are the same.

5  Q.  It is just a great big rectangle?

6  A.  Big cereal box, yeah.

7  Q.  Big cereal box.

8       Is the bow or the front end of the Seawind, is

9       that completely blunt like a smaller cereal box?

10 A.  Yes. It is square with I guess it has two big push

11      knees on it, rubber push knees.

12 Q.  All right. So instead of being one completely flat

13      surface against another, the Seawind has or had two of

14      these knees that I guess look more or less like what you

15      just described?

16 A.  Yes. Rubber fenders so you are not steel to steel. You

17      have rubber in there so you are not beating.

18 Q.  Were the knees made out of steel and covered with

19      rubber?

20 A.  I think they were steel I beams with rubber inside of

21      them or something.

22 Q.  You have indicated two lines. One going from the right

23      rear corner of the tug to the right rear corner of the

24      barge. The other going from the left rear corner of the

25      tug to the left rear corner of the barge. Are these

---

65

1    steel cables?
2  A.  Steel cables, yeah. I think we had one line just right
3       off the center.
4  Q.  Why don't you mark that as well.
5  A.  Just to hold the bow from sliding.
6  Q.  Okay. All right. The two diagonal lines that go from
7       the corners as I was describing, are those -- those are
8       steel cables?
9  A.  Yes.
10 Q.  And how were they attached on the barge?
11 A.  They have two big bollards on the barge, bits.
12 Q.  Bits.
13 A.  Yeah.
14 Q.  And is a bit a vertical pipe essentially with maybe a --
15 A.  Basically.
16 Q.  With a cross piece at the top?
17 A.  Looks like a steel piece with a rod through it, I guess.
18 Q.  Would these lines, these steel cables have an eye built
19      right into them and you can slip it over the bit?
20 A.  Yes.
21 Q.  And then at the stern of the tug, how are they attached,
22      the steel cable?
23 A.  I believe the portside one is just chained to a padlock
24      or something. And so you put that one on first and then
25      the second one goes to a hand crank winch on the back of

66

1       the boat.
2  Q.  So you tighten her down?
3  A.  Yeah. You threw up this one first.
4  Q.  The portside one first?
5  A.  Yes. And drop the other one on and you can crank that
6       one tight.
7  Q.  So it is set up so you only have to winch one side?
8  A.  Yes.
9  Q.  In order to get a tight junction between the two
10      vessels?
11 A.  Right.
12 Q.  And the line, you have written line there rather than
13      wire or cable. Is that like a soft line?
14 A.  Yes.
15 Q.  Some kind of a rope, in other words, as a layman would
16      call it?
17 A.  Yes.
18 Q.  And the purpose of that one in the center is just to
19      keep the tug from moving left and right?
20 A.  Right. Just keeps the bow from sliding back and forth.
21 Q.  The bow of the tug?
22 A.  Right.
23 Q.  Okay. Is the idea that once you got everything, all
24      these lines and wires attached and cinched down that to
25      the greatest extent possible, the tug and the barge will

67

1       move as a single unit?
2  A.  Yes.
3  Q.  Before I forget it, let me mark this sketch as an
4       exhibit. And let me say this, we both understand this
5       is not a scaled drawing or anything, it is just an
6       illustrative sketch you have made for me.
7  A.  Right.
8            (Sketch
9            Exhibit-No. 5 marked for identification.)
10 Q.  I will mark it as Exhibit 5 because I seem to have an
11      Exhibit 5 sticker left over here.
12          Moving down the Annisquam River, is that a fairly
13      narrow, windy river or not?
14 A.  As far as I can remember, yeah.
15 Q.  Is it difficult to maneuver the tug and barge that you
16      have just sketched for us on a windy river like that or
17      is it fairly easy with all the power you have got?
18 A.  Not really. It is not too bad with that because you
19      probably had a little skiff that was tied to the bow
20      helping pushing us around the corner if we needed it.
21 Q.  Oh, really?
22 A.  Yeah.
23 Q.  Would that be a skiff that was owned by Fore River?
24 A.  I think so.
25 Q.  And how long roughly did it take you to reach the mouth

68

1       of the Annisquam?
2  A.  I am not sure. A couple of hours, I guess. I don't
3       know.
4  Q.  You are not sure?
5  A.  No.
6  Q.  Okay. Now, as I understand it, from your earlier
7       testimony, after you reached the mouth of the Annisquam
8       at a point where you thought you were going to be
9       spudding the barge and going for the Albany one way or
10      another, someone basically pointed in the direction of
11      the Merrimack River, that is to say north, and told you
12      to keep going, is that right?
13 A.  Yes.
14 Q.  And who was that?
15 A.  Ron.
16 Q.  Ron Daigle?
17 A.  Ron Daigle.
18 Q.  And this was a -- again as I understand from your
19      previous testimony, this was a complete surprise to you?
20 A.  Yes.
21 Q.  First, you realized that you were not going to be using
22      the Albany afterall?
23 A.  Yes.
24 Q.  Did you have any conversation with Ron about that?
25 A.  I don't believe so.

69

1    Q.   Did you register your surprise to him in any way?  Did
2         you say, gee, I had no idea, I thought we were taking
3         the Albany?
4    A.   I am not sure.  I don't -- I don't know.  I remember
5         looking at Jack and Jack shaking his head.
6    Q.   Jake Eichhorn?
7    A.   Yes.
8    Q.   I think in your earlier testimony, you said you rolled
9         your eyes, both of you?
10   A.   Right.
11   Q.   And that was why, because it was going to be a long,
12        hard trip?
13   A.   Right.
14   Q.   Because the Seawind would not be able to take the barge
15        as fast as the Albany would have?
16   A.   Right.
17   Q.   Now, at that point, if they had -- I am sorry.  If Roger
18        Hale had decided to use the Albany, there was no
19        particular reason why Jack Eichhorn couldn't have
20        captained the Albany, is that fair to say?
21   A.   I don't know.  I know Jack always had a license and I
22        know he didn't renew it his last time it was up for
23        renewal but I am not sure if that was before or after
24        then.
25   Q.   Okay.  Assuming for the sake of argument that his

70

1         license was current, he could have captained the Albany?
2    A.   I think so.
3    Q.   And now that it turned out to be the Seawind and not the
4         Albany, there is no reason why Ron Daigle couldn't have
5         operated the Seawind?
6    A.   Right.
7    Q.   Or for that matter, any of the guys?
8    A.   Anybody onboard there.
9              MR. WHITMAN:  Off the record.
10             (Discussion off the record.)
11   Q.   Okay.  Back to where we were, we were talking about
12        December 11, 2002.  You were running the Seawind.  You
13        just pushed the barge 64, DS 64 down the Annisquam River
14        and had received the news that contrary to your
15        expectations, you were not going to be using the Albany
16        but were going to use the Seawind to take the barge all
17        the way to Merrimack River?
18   A.   Right.
19   Q.   And what is that, 20, 30 miles?
20   A.   I want to say I heard it was 20, I thought.  Say 20.
21   Q.   20 miles.
22             If you left the marina at around noon, it would
23        have been something like 2:00 o'clock when you got the
24        news that you were now going to be heading to Merrimack
25        with the Seawind?

71

1    A.   I think so, yeah.
2    Q.   And this being December 11, it would have been a pretty
3         short daylight day of the year, correct?
4    A.   Yes.
5    Q.   Sunset around 4:30, something like that?
6    A.   Uh-huh.  Yes.
7    Q.   So at that point, 20 miles to go, you only had about two
8         and a half, maybe three hours of daylight to work with?
9    A.   Right.
10   Q.   But leaving aside the weather, that would not otherwise
11        have been a problem, correct?
12   A.   No.
13   Q.   Now, speaking of the weather, when you started off,
14        would it be correct to say you were looking at about 15
15        to 20 knots of wind out of the east or the Northeast?
16   A.   When we started, I am not sure.  I know it wasn't bad
17        when we started.
18   Q.   Wind was out of the east, northeast?
19   A.   I think so.  Just coming around that way.
20   Q.   Okay.  But as you headed north toward the Merrimack, did
21        the wind pick up?
22   A.   Yes.
23   Q.   And jumping ahead for a minute, by the time you made the
24        turn and started to head into the mouth of the Merrimack
25        River, what was the wind doing then?  How much had it

72

1         freshened?
2    A.   I am not sure.  It was probably up to 25 knots or so.
3    Q.   When your -- when you are pushing the barge with the
4         Seawind, you were headed pretty much due north, is that
5         fair to say?
6    A.   Yes.
7    Q.   So the wind would have been off your starboard bow
8         somewhere?
9    A.   Yes.
10   Q.   Does that make it harder to push the barge?
11   A.   A little bit.  Not -- I mean it might slow you down a
12        little bit.
13   Q.   As far as steering, do you have to kind of aim into the
14        wind a little bit because it is pushing you to the left
15        or do you just aim straight ahead?
16   A.   You might have to compensate a little bit over the trip
17        but not much.
18   Q.   And are you just steering a compass course basically?
19   A.   Yes.
20   Q.   How far offshore were you at the point where you were
21        farthest offshore?
22   A.   I don't think much more than a couple of miles, if that.
23   Q.   As I understand it, there came a time when after you had
24        pushed the barge for two or three hours when the wind
25        had picked up or the waves had picked up to the point

73

1      where you decided to switch and tow the barge instead of
2      pushing?
3   A.  Right.
4   Q.  And that was because or at least one of the reasons as I
5      understand was that in spite of the tug being winched
6      tight against the barge, the waves were bad enough that
7      they were beginning to kind of beat against each other?
8   A.  Right.
9   Q.  So maybe as a wave came through, there would be a little
10     separation and the tug would start hitting the back of
11     the barge?
12  A.  Right.
13  Q.  Okay. While you were pushing those two or three hours,
14     was it just you on the Seawind or was someone else with
15     you?
16  A.  When we made up to the barge, it was probably just me on
17     the boat.
18  Q.  The other four guys were on the barge?
19  A.  Right.
20  Q.  And was it your decision to switch from pushing to
21     towing?
22  A.  Yes.
23  Q.  Did you have to get an okay from Ron Daigle or anybody?
24  A.  No.
25  Q.  Did you have a radio or something to communicate with

74

1      them on the barge?
2   A.  I think he had the radio or just blew a horn or
3      something and he would come out and see me.
4   Q.  At that point, could you step out of the wheelhouse and
5      just yell at them what you wanted to do?
6   A.  Yes.
7   Q.  And what you wanted to do was to, I take it, unfasten
8      the Seawind from the stern of the barge so that you
9      could go around to the bow of the barge and pick up a
10     line and tow from that point forward?
11  A.  Right.
12  Q.  What physically had to happen in order to do that? Did
13     you have to go back and loosen the winch?
14  A.  No, someone from the barge got on the boat with me and
15     they took in the lines.
16  Q.  Okay. And that's just a question of dropping down on to
17     the Seawind?
18  A.  Yes.
19  Q.  So one of the deckhands, I take it, one of the guys
20     whose names you are not sure of came back to handle
21     that?
22  A.  Right.
23  Q.  And so they had to undo three lines, the two wire
24     cables. Did they stay on the barge?
25  A.  No, they stayed on the boat.

75

1   Q.  On the Seawind?
2   A.  Yes.
3   Q.  All right. So after all three lines, the two wires and
4      the soft line were unfastened by the deckhand, then
5      what, did you proceed around to the front of the barge?
6   A.  Yes.
7   Q.  And meanwhile, the barge -- for whatever length of time
8      this takes, the barge is just kind of drifting?
9   A.  Right.
10  Q.  It maybe has some momentum but after awhile, it is just
11     kind of sitting there basically?
12  A.  Right. I probably stopped it before we let go of it
13     because you don't want it to run you over when you get
14     in front of it.
15  Q.  Good point. I wouldn't have thought of that.
16         So you are a couple of miles offshore. No
17     problem. You just have to take the time to come around.
18     When you get to the -- going into the towing mode, how
19     did you physically fasten the Seawind to the DS 64?
20  A.  I believe I just backed up to it and I don't know what
21     we had for a towline but it was a soft rope. And you
22     drop the eye on the bow of the boat and then pay it out
23     however far you want and tie it off to the back of the
24     tug so the eye drops on the barge and you are actually
25     tied up to the back of the tug.

76

1   Q.  All right. So there is some kind of a bit in the center
2      of the bow of the barge?
3   A.  Yup. I can't remember if we used the center.
4      Typically, you want to use each outside corner but I
5      can't remember how that boat was set up.
6   Q.  So if you are towing a barge with just a single line,
7      you would typically fasten it to one of the I will call
8      them the front corners of the barge?
9   A.  Both of them, yeah. Usually --
10  Q.  To both of them?
11  A.  It will have a set of steel, what they call bridles.
12  Q.  But you didn't in this case?
13  A.  I can't remember. I don't think so. I think we just
14     used the center cleat of the barge.
15  Q.  All right. So there was a cleat in the center of the
16     bow or front of the barge?
17  A.  Right.
18  Q.  About 18 feet from either side and you slipped the eye
19     of a soft towing line, in other words, a rope as a
20     layman would call it, over that cleat?
21  A.  Yes.
22  Q.  And then you paid out line from the Seawind?
23  A.  Yes.
24  Q.  What's the -- I am sorry. Strike that.
25         How much line did you pay out, how long a tow is

**77**

1  this?
2  A.  I can't remember how long that one is.  But probably 300
3  feet or so.
4  Q.  Now, if you had a bridle, the bridle would have been two
5  steel cables going forward from the front corners of the
6  barge and meeting at a point ahead of the center of the
7  barge?
8  A.  Yes.
9  Q.  And typically, on a barge of this size, how long would
10  each of those steel cables have been if it is a 36-foot
11  wide barge?
12  A.  Maybe 30, 40 feet.
13  Q.  All right.  So you got a triangle basically?
14  A.  Yes.
15  Q.  And is the advantage to using a bridle that it keeps the
16  barge going more or less straight ahead as opposed to
17  swinging from side to side?
18  A.  Kind of, yeah.  It will stay behind you better if you
19  are turning a lot.
20  Q.  If you are going straight ahead, the barge should track
21  pretty well behind the tug?
22  A.  Right.
23  Q.  But if it has just got this single line the way you had
24  on this occasion, it could -- the tail end or the stern
25  of the barge could swing out to the left or the right?

**78**

1  There would be no force holding it straight ahead?
2  A.  Right.
3  Q.  Okay.  So at that point, you began to tow and this would
4  be roughly 2:00 in the afternoon and as I understand it,
5  your speed towing was only -- with the Seawind was only
6  one and a half to two knots?
7  A.  Yes.
8  Q.  Where you had been pushing at maybe as much as five
9  knots, six knots?
10  A.  Yes.
11  Q.  Now, towing the barge behind the Seawind on this
12  300-foot line, if the wind is coming -- if you are going
13  north and the wind is coming from the east, would that
14  cause the barge to sort of instead of following you
15  directly to be blown somewhat offset behind you?
16  A.  Yeah.  If I am on the boat, it is probably just going to
17  follow me like that off to one side.
18  Q.  All right.  So what you are showing with your hands is
19  that the barge would go in the same direction as the tug
20  but it would be offset to the side to some degree
21  depending on how much of a crosswind you had?
22  A.  Right.
23  Q.  There is a Coast Guard -- one of the documents in the
24  Coast Guard report which I will get to in a minute, this
25  is a report of marine accident and it says that the

**79**

1  maximum size of the tow that you were doing including
2  the towboats was 350 feet long and 38 feet in width.
3  The 38 feet in width would be a reference to the width
4  of the barge?
5  A.  Yes.
6  Q.  And the 350 feet total would be from the bow of the
7  Seawind to the stern of the barge if they are right on
8  that number?
9  A.  Yeah.  Well, usually, they will call the length of the
10  tow from the stern of the tugboat to the stern of the
11  barge.
12  Q.  Okay.  So would that be roughly accurate or it might
13  have even been a little longer than that if you had 300
14  feet out?
15  A.  Right.  I mean it is hard to tell.  There is no way of
16  measuring it so.
17  Q.  How much soft line did you have on the Seawind, how
18  long, do you know?
19  A.  I don't know.
20  Q.  Did you use it all?
21  A.  300 feet keeps sticking in my mind for some reason.
22  Yes, I put out everything I can.
23  Q.  Does the barge tow better if you have a fairly long
24  towline?
25  A.  The longer it is, the faster you can go.

**80**

1  Q.  Oh, because the prop wash isn't pushing against the
2  barge?
3  A.  Right.
4  Q.  With a 300-foot towline, is the line ever completely
5  tight or is it always curved?
6  A.  No, it always has some kind of canter in it.
7  Q.  So if I am right about the daylight, you would have been
8  in dark considerably before you reached the sea buoy and
9  began to make your turn into the Merrimack River, is
10  that correct?
11  A.  Yes.
12  Q.  And was the weather okay as far as visibility?
13  A.  Yes.
14  Q.  Do I understand that in order to go up the Merrimack
15  River, if you'e heading north along the coast, rather
16  than going sort of at an angle into it, you would go to
17  a sea buoy or some sort that is right off the mouth of
18  the river and then make your left turn and head?
19  A.  Yes.
20  Q.  Were you using radar to find this sea buoy or could you
21  actually see it?
22  A.  I think both.  Radar to find it at first and then --
23  Q.  As you got closer, you could --
24  A.  You can pick it up.
25  Q.  From the wheelhouse of the Seawind, could you look over

81

1     the barge and see things ahead or did you rely on the
2     guys on the barge to do that?
3  A.  When we were pushing, it was just the guys on the barge.
4  Q.  Now you are towing?
5  A.  Towing, I am in front of it.
6  Q.  So you were the one with the best view?
7  A.  Right.
8  Q.  Now, if you are -- say this coaster is the sea buoy and
9     essentially you had to change course about 90 degrees to
10    the left, is that right?
11  A.  I think so. Yeah.
12  Q.  I am not trying to be exact.
13  A.  I wouldn't know without looking at a chart again, but I
14    believe it has -- Merrimack River has a couple of
15    breakwaters that come way out into the sea a little bit
16    so you have to line up so you can stay in the middle of
17    them.
18  Q.  All right. And the buoy is more or less aligned with
19    them?
20  A.  I believe so, yeah. It should be.
21  Q.  How do you make what I will just call a left turn with a
22    barge in tow that is 300 feet behind you?
23  A.  Just kind of slowly. Probably way before I got there, I
24    started going to the east of the buoy so by the time I
25    got there, I was a way offshore and I am lined up.

82

1  Q.  Okay. If you came up and the tug passed very near the
2    buoy and then made a left turn around it, I would think
3    that the towline might actually get fouled on the buoy,
4    is that fair to say?
5  A.  Yeah.
6  Q.  And I assume also leaving the buoy aside that if you are
7    towing a barge on a 300-foot towline and you were to
8    make a fairly sharp turn which you could do with the
9    Seawind, is that right?
10  A.  Yes.
11  Q.  Because it had all that maneuverability, you would
12    create problems for yourself because the barge would
13    never turn that fast?
14  A.  Right.
15  Q.  So does that mean it -- basically when you are towing a
16    vessel, a big barge like this that is 300 feet behind,
17    your turn has to be very gradual so the barge keeps
18    tracking behind you?
19  A.  Right.
20  Q.  If you made too sharp a turn, could the barge just keep
21    on going straight?
22  A.  Yes.
23  Q.  And --
24  A.  Probably flip the boat over.
25  Q.  So that you want to make a nice gradual turn?

83

1  A.  Right.
2  Q.  And this meant when you said you headed to the east, you
3    had been probably steering for the buoy just to have
4    something to aim for but once you got near enough to it
5    that you are thinking about the turn, you had to go out
6    to the east so you could make that gradual turn?
7  A.  Right.
8  Q.  The -- I think the Coast Guard records, some of which I
9    am going to mark as exhibits, suggest that by the time
10    you got there, the wind was northeast at about 20 to 30
11    knots with seas of eight to 10 feet. Does that seem
12    accurate to you from what you recall?
13  A.  For the river, yes.
14  Q.  By the time you actually got to the river?
15  A.  Yeah. I think that refers to the mouth of the entrance
16    to the harbor there.
17  Q.  All right. So the wind would have been just as much
18    offshore but you didn't see the eight to 10-foot seas
19    until you got right into the mouth?
20  A.  Right.
21  Q.  Is that correct?
22  A.  Right.
23  Q.  All right. What I have done, I have from some source,
24    one of these others attorneys has given me a packet of
25    materials which I understand comprise the U. S. Coast

84

1     Guard report on this incident and I am just going to
2     show you a few of these documents.
3        I have marked as Exhibit 7 the title page of that.
4     Did you ever look at this yourself, by the way, after
5     the --
6  A.  I think I did.
7  Q.  Glanced at it?
8  A.  Glanced at it a few times, yeah.
9  Q.  I have -- what I have done is to take isolated pages out
10    of that report because a lot of it is endless stuff all
11    blacked out about how you all passed your drug tests, I
12    guess, although I can't tell, you were drug tested and
13    everybody passed, right?
14  A.  Right.
15  Q.  I left that aside.
16        Exhibit 8 is a two-page document called an
17    incident brief which is kind of, I guess, a Coast Guard
18    account of what their investigation revealed. And I
19    think I had some question from this but do you recall
20    reading this?
21  A.  I believe so, yeah.
22  Q.  All right. Halfway down the first page, the tug and
23    barge -- it says, quote, the tug and barge were heading
24    into the channel with the barge on a 300-foot wire,
25    unquote.

85

1     That would be accurate except that it wasn't
2     actually a wire, it was a soft line?
3 A. Right. It was a soft line.
4 Q. But otherwise, you are comfortable with that?
5 A. Yes.
6 Q. Okay. A little further down, right under there is a
7     blacked out name, it says, quote, water was on the deck
8     of the tug. Some entered the machinery space and
9     possibly shut down the starboard main engine. Unquote.
10     Let me read the next sentence. According to the
11     master and deckhands, the hatch is usually left open for
12     ventilation. Unquote.
13     Is that accurate, at some point after you had made
14     the turn and you were trying to go into the mouth of the
15     river, one of the engines stopped?
16 A. It is possible. I can't say if it did or not.
17 Q. Where did this information come from? I mean you were
18     running the Seawind. Would you have known if one of the
19     engines quit on you?
20 A. Hard to tell. It is loud and as fast as everything is
21     happening but I would think I would know, yeah.
22 Q. So it might have, it might not have, you are not sure?
23 A. Right.
24 Q. All right. Continuing down, it says within one to two
25     minutes, the tug was alongside the barge, unquote.

86

1     Tell me what had happened here to cause the barge
2     that was 300 feet behind you to be now alongside.
3 A. Just pretty much once you line up for the entrance
4     there, all that wind was on the stern of it and with the
5     big waves, you can't really control the tug too good. I
6     mean you can keep it going pretty much straight but I
7     think with that wind, that was behind the barge, it
8     pushed the barge onto me faster than I could get away
9     with it.
10 Q. So the barge actually picked up speed?
11 A. It was catching up to me, yes.
12 Q. You were towing at one and a half to two knots?
13 A. Right.
14 Q. You think with all the winds and waves behind it, it
15     actually exceeded that speed?
16 A. Right.
17 Q. Meanwhile, you were running into like a standing wave or
18     something at the mouth of the river?
19 A. Right.
20 Q. So the tug, was it actually stopped dead by these waves?
21 A. It could have been pretty close to it, yeah.
22 Q. Out of curiosity, do you have any idea what the outgoing
23     tidal currents from that river is?
24 A. I believe it was going.
25 Q. Right. But do you have any idea how fast?

87

1 A. I am not sure what the current of it was, no.
2 Q. If the --
3 A. But I think with that sea that was there, it was
4     definitely going.
5 Q. I guess my question is this, and this may be a stupid
6     question, suppose there had been no wind at all, no
7     northeast wind, no waves, just flat calm but the water
8     is coming out of the river because it is an ebb tide, if
9     you are able to tow at only one and a half to two knots,
10     if the current was three knots, you wouldn't have been
11     able to get up there anyway, would you?
12 A. Right. I mean if it was flat calm, we would have been
13     pushing doing six or seven knots anyway.
14 Q. Point well taken. Okay.
15     Did you look back and see the barge coming at you?
16 A. Yes.
17 Q. That must be a scary sensation.
18 A. Yeah.
19 Q. Then it says the wind -- quote, the wind and tidal
20     conditions caused the tug and barge to be in a port to
21     port position which I take it means portside to
22     portside?
23 A. Right.
24 Q. And, quote, while in this position, the tug was being
25     slammed against the barge, unquote. So would it be fair

88

1     to say at this point, it was beginning to look like you
2     were not going to be getting up the Merrimack River with
3     that barge?
4 A. Right.
5 Q. On the next page, under conclusions, conclusion number
6     three, somebody wrote, I guess, a Coast Guard officer,
7     quote, the Seawind is an inadequate vessel to tow a
8     barge the size of the barge DS 64 and was unable to
9     control the barge in the worsening weather. Unquote.
10     That's actually two conclusions. I guess would you
11     agree it was fair to say that under these particular
12     circumstances, you were unable to control the barge in
13     the worsening weather?
14 A. Yes.
15 Q. Do you think in hindsight that the Seawind was an
16     inadequate vessel to tow this particular barge --
17     MR. FUREY: I am going to object.
18 Q. -- up the mouth of the river?
19     MR. MURPHY: Object.
20     MR. FUREY: Object. I don't believe this line of
21     questioning is relevant to the declaratory judgment
22     action. May be relevant to some of the other actions
23     pending. But not to this.
24     MR. WHITMAN: Okay. Your objection is noted.
25 Q. Go ahead and answer.

First Specialty v Maine Coast 7/30/07

89

1  A. Can you repeat that?

2  Q. Sure. Do you think that the Seawind was an inadequate
3     vessel to tow the barge DS 64 up the mouth of the
4     Merrimack River with the tide coming in?

5  A. Yes, I guess so. In any weather, yes.

6        MR. MURPHY: I am having trouble just hearing. I
7     think I have a cold.

8        (Reporter read back requested material.)

9        MR. MURPHY: In heavy weather?

10       THE DEPONENT: Any weather. More than none, I
11    guess.

12 Q. Well, I agree with Mark. It is not particularly germane
13    here, but in the interest of completeness, do you think
14    that with the tide coming out, you could have towed the
15    barge behind the Seawind up the Merrimack River in a
16    flat calm, no wind, no waves?

17 A. I think so.

18 Q. Let's move on.

19       Exhibit No. 9 is again part of the Coast Guard
20    report. This is a two-page document called report of
21    marine accident. A couple of questions prompted by
22    this. I have already asked you about the maximum size
23    of the tow which is item 25 C. 25 B down toward the
24    bottom says total horsepower of towing units and
25    somebody has written 600 horsepower. Is that accurate?

90

1  A. Yes. I think so. I think -- I believe this other sheet
2     said 350 horsepower for each engine.

3  Q. Six, 700?

4  A. Yes.

5  Q. That assumes both engines were running?

6  A. Yes.

7  Q. Earlier, halfway up the page, in No. 21, it says number
8     of persons onboard, five. Two on tug, three on barge
9     somebody has written.

10       At the point where the barge caught up to the tug
11    and the two vessels were beating against each other, was
12    that accurate, there were two of you on the tug and
13    three on the barge?

14 A. Yes.

15 Q. Who was the other fellow on the tug, the deckhand?

16 A. Yes.

17 Q. Whose name you don't recall?

18 A. I am not sure. I believe he is Roger Hale's nephew or
19    something.

20 Q. Up near the top, item 8, gross tons, there is a slash.
21    It says either 15 or 1.5 for the Seawind. Seawind was
22    26 feet long. Would that be 15 tons?

23 A. I believe it is 1.5 for the Seawind and 1,000 for the
24    barge.

25 Q. Oh, just 1.5 tons for the Seawind?

91

1  A. I believe so.

2  Q. And a thousand tons or gross tons, if you know, does
3     that -- does that actually denote the actual weight of
4     the barge or its displacement or some other thing?

5  A. Probably the displacement.

6  Q. Moving right along here, Exhibit 10, I am sure the other
7     lawyers have better maps or charts, but this is one that
8     was in the Coast Guard report or it is a copy of it. It
9     is a little hard to or at least for me to see, but if I
10    am reading this correctly, the Merrimack River comes in
11    from the left-hand edge of the page more or less halfway
12    down and everywhere there are little numbers, that would
13    denote some sort of depths in the Merrimack River?

14 A. Right.

15 Q. And then there is what seems to be somebody put a sticky
16    arrow for the point where the collision took place.
17    Again, I am guessing, but is that the approximate
18    location of where the tug and the barge collided with
19    each other as you just described?

20 A. Yes.

21 Q. And these two -- right where the collision took place is
22    kind of a space defined by two lines that go out that
23    are almost parallel but not quite. What do those lines
24    represent if you know?

25 A. Looking at it, I believe that's a lighthouse. So if you

92

1     are seeing white lights ahead of you, then that means
2     you are --

3  Q. In the channel?

4  A. -- in the middle of the range lights.

5  Q. In the middle of the range lights. So you are on the
6     right bearing to enter the river?

7  A. Yes.

8  Q. Navigation aide?

9  A. Right. Anything outside of those lines is probably --
10    you can see it right here. Red sector. You would see a
11    red light if you're outside of this line.

12 Q. Oh, yeah. I see you are pointing to sort of the
13    right-hand edge of the page about 2/3 of the way down?

14 A. Right. I am sure that intersects with it right there.

15 Q. Finally, there is another arrow that says grounding
16    which looks like it is on the shore of Plum Island. Is
17    that roughly where the vessels came to rest eventually?

18 A. Yes.

19 Q. Exhibit 11 from the Coast Guard report is a three-page
20    document, all of which seems to be printouts of weather
21    forecasts at different times on December 11, 2002. And
22    perhaps for different coastal waters.

23       Glancing at the ones on the first page, the first
24    of which seems to be 11:28 A.M., is this the weather
25    forecast or similar to the forecast that you received

First Specialty v Maine Coast 7/30/07

93

1    shortly before setting off from the marina in

2    Gloucester?

3  A.  It looks like that is from Cape Cod Bay so that's --

4  Q.  That would not be the one you would have gone with?

5  A.  Probably the next page is the one we listened to.

6  Q.  All right.

7  A.  Yup. Merrimack to Plymouth.

8  Q.  That would be -- Merrimack River to Plymouth would be

9    the right geographical area?

10  A.  Right.

11  Q.  This particular one on the second page seems to be 4:42

12    P.M. so it is already looking ahead toward the higher

13    winds and the --

14  A.  Right.

15  Q.  -- larger legs.

16    When you set out, you had a fairly benign weather

17    forecast?

18  A.  Right.

19  Q.  Nothing to be concerned about?

20  A.  Three to six feet for the night. That's not too bad.

21  Q.  All right. The next exhibit is No. 12. What I have

22    done here, I found in the Coast Guard materials five

23    handwritten statements which I am guessing were

24    requested by the Coast Guard from the five people

25    onboard. If you could just flip through these and see

94

1    whether that is an accurate description and if so, tell

2    me which of these is yours?

3  A.  The front one is mine.

4  Q.  The front one. We were in-bound at the first green can?

5  A.  Yes.

6  Q.  All right. And do you have any way of recognizing the

7    handwriting?

8  A.  This is Jack Eichhorn.

9  Q.  The second one, I was in the crane on the barge when I

10    heard the engines on the Seawind change sound. That's

11    his?

12  A.  Yes.

13  Q.  The third one, can you tell whose that is?

14  A.  This must be the kid that was on the boat with me.

15  Q.  I was on the Seawind so that's the deckhand. And the

16    fourth one, that begins barge in tow, seas mild?

17  A.  Yeah, I am not sure. One of them must be Ron Daigle and

18    the other one is the other guy but I am not sure.

19  Q.  You are not sure which is which?

20  A.  Which is which.

21    I would say this is Ron Daigle if he is leaving an

22    office number.

23  Q.  Begins barge in tow?

24  A.  Right.

25  Q.  And the fifth one would be the other deckhand?

95

1  A.  Right. I would say the last one is Ron Daigle.

2  Q.  Reading the last one, you have now concluded that is Ron

3    Daigle?

4  A.  Yeah. He seems to know a little bit more what's going

5    on. The other guy I think was a new guy and wouldn't

6    write in that detail.

7  Q.  Okay. So Ron's begins towing from Annisquam River?

8  A.  Right.

9  Q.  Exhibit 13, I am just about done, also from the Coast

10    Guard materials, I don't know what to call this, it is

11    some sort of additional report or maybe an earlier

12    version of it. It is three pages in all capital

13    letters. I was just curious, toward the bottom, about

14    an inch up from the bottom, it says 04 POB, does that

15    mean four persons onboard?

16  A.  Yes.

17  Q.  Have PFDs. Personal floatation device. Master unable

18    to retrieve his from tug. Is that accurate, that in the

19    heat of the moment, you had to get off the tug without

20    your PFD?

21  A.  Right.

22  Q.  All right. That's the last Coast Guard exhibit so to

23    speak that I have. I do have one other exhibit I would

24    like you to take a look at which is No. 15 and this is

25    a -- bottom half of this is a photocopy of a 1099 form

96

1    that apparently was sent to you by Fore River for the

2    calendar year 2002 reflecting total compensation of

3    $3,802 which I think corresponds to what we were looking

4    at earlier, do you recall getting this or getting a

5    1099?

6  A.  Yeah. I believe so.

7  Q.  And that would -- that 1099 as opposed to a form W-2

8    would reflect nonemployee income?

9  A.  Right.

10    (Check

11    Exhibit No. 6 marked for identification.)

12  Q.  Finally, I have got one exhibit sticker left over and I

13    hate to leave one out because everyone goes crazy

14    wondering what happened to it so I am going to mark this

15    as an exhibit. Exhibit 6, this is a check No. 6500

16    dated 12/13/2002 from Fore River payable to Maine Coast

17    Marine in the amount of $1,120. Did you ever see that

18    check?

19  A.  I don't know. I don't think so. Not if this is for the

20    last trip. No.

21  Q.  I have no more questions. Unfortunately, I am confident

22    that some of the other lawyers may, maybe not.

23    MR. FUREY: Off the record.

24    (Discussion off the record.)

25    MR. WHITMAN: On the record, just before I turn

BOYCE & LEIGHTON

97

1    this over to other counsel, it has been requested and I

2    agree and I think we all do that Guy Splettstoesser's

3    earlier deposition taken in the case of American Home

4    Assurance Company, et al. versus Maine Coast Marine

5    Construction, et al., that deposition was taken on June

6    27, 2006, we are in agreement that that deposition and

7    deposition transcript may be used in the present

8    lawsuit, the First Specialty lawsuit for all of the

9    purposes that would be permitted by the Federal Rules.

10   Mark, is that a satisfactory stipulation?

11        MR. FUREY: It can be used as though taken?

12        MR. WHITMAN: As though taken in this case, fair

13   enough. Everybody agree?

14        MR. CALLAHAN: Yes.

15        MR. MURPHY: Yes.

16        MR. BALTES: Yes.

17        MR. WHITMAN: Seems to be unanimous.

18   Q.   Guy, if that saves all of us some time, you are all for

19        it.

20   A.   That's fine.

21        MR. BALTES: I agree. So does anyone have any

22   questions then?

23        MR. CALLAHAN: Yes.

24        MS. WILLIAMS: We agree.

25        MR. WHITMAN: Off the record.

98

1        (Discussion off the record.)

2        EXAMINATION-BY ATTY. CALLAHAN:

3    Q.   I wasn't at the deposition last year. I have read it so

4         I may, you know, go over a few things but hopefully

5         won't overdo it here.

6         Guy, you had initially worked for Fore River

7         Docking & Dredge prior to Maine Coast Marine, is that

8         correct?

9    A.   I believe when I was there, it was called C. B. Marine.

10   Q.   Okay. C. B. Marine. You left them at the initiation --

11        when Maine Coast began, is that right, when Maine Coast

12        started out, you were one of their first employees?

13   A.   I think I left a little bit before that when Jimmy went

14        to work for South Port Marina.

15   Q.   Why did you leave Fore River Dock & Dredge?

16   A.   To go with Jimmy to help him. He was going to start

17        Maine Coast Marine eventually.

18   Q.   Who had the idea to create Maine Coast Marine?

19   A.   I believe Jimmy and Ricky Hale.

20   Q.   Do you know where that idea came from?

21   A.   No.

22   Q.   Do you know whether or not Roger Hale, Junior,

23        encouraged Jim and Rick to start that business?

24   A.   I am not sure.

25   Q.   But you testified earlier that Roger, Junior, was the

99

1         source of at least 50 percent of Maine Coast business,

2         is that right?

3    A.   Right.

4    Q.   And what was the relationship from your perspective from

5         Fore River -- between Fore River and Maine Coast?

6    A.   To me, it kind of felt like I was still working for

7         Roger but getting paid through Maine Coast Marine

8         because half of my jobs were Roger jobs anyway so. Half

9         of our equipment was leased from him so -- and we took

10        half of their employees with him, Rodney and Curtis

11        were, me, Jimmy and Rodney and Curtis used to be the

12        crew at C. B. Marine and we were all together at Maine

13        Coast Marine.

14   Q.   Roger, Junior, continued to use Maine Coast, obviously,

15        he -- there was no animosity that you folks went with

16        Maine Coast, right?

17   A.   Right.

18   Q.   And do you presume -- do you know whether or not it was

19        with Roger's understanding that there was going to be a

20        new company?

21   A.   I am not sure.

22   Q.   Okay. Did Maine Coast have any uniforms, shirts,

23        jackets, anything like that?

24   A.   I believe we had pants or something. Jeans and maybe a

25        jacket or something with a laundry service, cleaning

100

1         service.

2    Q.   So you had more than one, did you send them out?

3    A.   I think so, yeah.

4    Q.   How were they identified as Maine Coast Marine?

5    A.   I don't know. I know they had tags on them.

6    Q.   Did they have like your name, Guy?

7    A.   I think we had a jacket that said Maine Coast Marine.

8    Q.   Okay. You said -- you testified earlier that you got a

9         license to be a captain of 200 ton uninspected vessels.

10        And that was a two-week program down in New Orleans, is

11        that right?

12   A.   Yes.

13   Q.   Who paid for that trip?

14   A.   I believe it was Maine Coast Marine.

15   Q.   Was it to Maine Coast Marine's advantage that you were a

16        licensed captain?

17   A.   Yes. I believe so. Because the Seguin was longer than

18        26 feet so.

19   Q.   Was Jimmy Laplante a licensed captain?

20   A.   No.

21   Q.   Who other than you was a licensed captain at Maine Coast

22        Marine?

23   A.   No one.

24   Q.   There was a quote that I ran across in a motion and it

25        apparently is from Jimmy Laplante's deposition. I am

101

1     going to quote it to you and ask you if you can explain
2     it to us. If it came to the point where Guy wasn't
3     going to be able to make a living for running a tugboat
4     here or there, then him and I were going to have to
5     reduce our wages through the winter months in order to
6     survive until we got back to work.
7         Did you do -- you talked about side jobs during
8     the winter, is that correct?
9  A. Uh-huh, yes.
10 Q. How would your payment of these side jobs affect Maine
11    Coast Marine and the need to borrow or take money from
12    the profits if that's the case?
13 A. I don't know what you mean.
14 Q. Well, when you did these winter jobs, was it something
15    to do -- did you have any contribution to Maine Coast
16    with this money or was it entirely yours?
17 A. For my side jobs?
18 Q. Right.
19 A. It would be mine.
20 Q. Okay.
21 A. They were usually middle of the night jobs.
22 Q. When you were running the Albany doing the dump scow
23    work out of Gloucester, talking about middle of the
24    night, how many times did you do that trip, do you
25    recall?

102

1  A. Just from what I saw today, three.
2  Q. And you were paid how much?
3  A. $400 per trip.
4  Q. And so it wasn't a thing that you did every day, it was
5     just on occasion when called?
6  A. Right.
7  Q. How did you get notified to do those jobs?
8  A. Either Roger or Melody would call me.
9  Q. And would they call you directly or would they call you
10    somehow through Maine Coast Marine?
11 A. Probably --
12        MR. WHITMAN: Object to the form.
13 A. -- right on my phone or a pager or something.
14 Q. Who paid for that phone?
15 A. Roger -- Maine Coast Marine.
16 Q. And so you used his phone for business reasons?
17 A. Right.
18 Q. For Maine Coast?
19 A. No, I guess it wasn't for Maine Coast, no. I mean if
20    they were my side jobs, they were my jobs.
21 Q. Who paid for the phone?
22 A. Maine Coast.
23 Q. As a business expense?
24 A. Yes.
25 Q. Did you have a vehicle that Maine Coast owned or leased?

103

1  A. Yes.
2  Q. Was that how you got down to Gloucester for the Hale
3     jobs?
4  A. Yes.
5  Q. When you -- on the day of the accident, you were leaving
6     the Annisquam, did you go through Gloucester harbor or
7     did you go out the other end of the Annisquam?
8  A. Out the northern end of the Annisquam.
9  Q. Did I read somewhere in testimony that you were leaving
10    and you looked over or pointing toward the Albany and
11    that's when the handshake -- the headshaking or the
12    pointing was that we are going to continue to go out to
13    sea?
14        MR. WHITMAN: Object to the form.
15 A. I don't think so. You would never see the Albany from
16    where we were.
17 Q. So you went -- you are certain you went out the north
18    end of the river?
19 A. Yes.
20 Q. Not through Gloucester and out and around the Cape?
21 A. Right. I don't think you can go out through Gloucester
22    with a crane barge.
23 Q. But the dump scow made it through that bridge?
24 A. Right.
25 Q. There was a check, I think, that Attorney Whitman showed

104

1     you for $1,120 made out to Maine Coast. Is that the
2     price of the job for taking the chain up to the
3     Merrimack?
4  A. I don't know.
5  Q. How much were you going to get paid for that?
6  A. I thought $400.
7  Q. And you were paid $400?
8  A. I wasn't, no.
9  Q. Did you receive a check for $400?
10 A. I did.
11 Q. What happened to that check?
12 A. By the time I got to the bank -- actually, no, I didn't
13    get a check for that job.
14 Q. So you were never paid?
15 A. I had been paid a $400 check and by the time I got to
16    the bank, it was canceled because they thought they were
17    paying me for that trip with the accident but it wasn't.
18    It was for a trip before so I went back and told them
19    what trip it was from and then they rewrote me another
20    one.
21 Q. So you got a check for $400, you took it to the bank,
22    you found out it had been canceled; you went back to the
23    Hales and they gave you another check for $400?
24 A. Right.
25 Q. And you cashed that?

First Specialty v Maine Coast 7/30/07                                    Guy Splettstoesser

---

**105**

1  A.  Right.  That must have been for the job before the last
2       trip.
3  Q.  One of the dump runs?
4  A.  Right.
5  Q.  And the copy of that check for $1,120, do you know what
6       that is for?
7  A.  I don't.  I believe it is for the last trip.
8  Q.  But it was your understanding that you were going to get
9       paid $400 for that trip, is that correct?
10 A.  Well, I am not sure.  I mean when I worked on the
11      Albany, I got paid directly.  When I worked on the
12      Seawind, I got paid through the company so I had no idea
13      at that point how I was going to get paid.
14 Q.  So whenever you operated the Seawind, it was through
15      Maine Coast, is that correct?
16 A.  Yes.
17 Q.  And you did not negotiate the price of this job, is that
18      correct?
19 A.  No.
20 Q.  Do you know who did?
21 A.  No.
22 Q.  I also read in an earlier deposition that there was a
23      conversation between you and Jim Laplante during this
24      voyage from the Annisquam up to the Merrimack, is that
25      correct, where you discussed weather?

**106**

1  A.  He had told me about the river a little bit.  He had
2       worked up there.
3  Q.  Was this on the voyage or at some other time?
4  A.  It must have been before because he wasn't with us.
5  Q.  I mean on the telephone?
6  A.  I am not sure.
7  Q.  Do you have cell phones with you on the crane and barge?
8  A.  Yes.  I believe so.
9  Q.  Did you use them?
10 A.  I don't know.
11 Q.  But you had a VHF that could contact -- was there a
12      contact at the other end, could you use that to contact
13      Jimmy or Roger if you had to?
14 A.  With the radio?
15 Q.  Yes.
16 A.  No.  If I had my phone, I could use my phone.
17 Q.  As you sit here today, do you remember whether or not
18      you had a conversation with Jim on the phone while you
19      were taking the barge up to the Merrimack?
20 A.  I don't know.  I am not sure.
21 Q.  When you talked about the weather on the trip to the
22      Merrimack with Jim, you had just testified earlier, when
23      was that?
24 A.  When I talked about it with Jim?
25 Q.  Yes.

**107**

1  A.  I am not sure if it was the day of the trip, the day
2       before.  I am not sure.
3  Q.  And what did you and Jim say about the trip?
4  A.  He just talked about the mouth of the river, that it can
5       get rough there if the tide is going.
6  Q.  Guy, could you tell us your relationship as an owner to
7       Maine Coast, how did it come about that you became an
8       owner in the Maine Coast Marine?
9  A.  I had been offered a job by Portland Tugboat because I
10      had a captain's license and told Jimmy what they offered
11      me.  They said they wanted to make me an owner so I
12      stayed with Maine Coast.
13 Q.  What was the deal that you were going to get if you
14      stayed, became an owner of Maine Coast, how would that
15      be set up?
16 A.  I don't know.  I think higher pay and a company truck.
17      I don't know how many conversations about -- we had
18      about what I am going to get or anything.  Just I was a
19      young kid excited to own half a company.  Whatever he
20      said I would have done.
21 Q.  Did you buy into the company?
22 A.  I did.
23 Q.  How did you do that?
24 A.  Through loans.  Through a bank.
25 Q.  How much was the loan you took?

**108**

1  A.  70,000.  I am not sure exactly.
2  Q.  What happened to that $70,000?
3  A.  It was -- I believe it was all to pay Ricky Hale.
4  Q.  I am all set.
5              EXAMINATION-BY ATTY. FUREY:
6  Q.  Mr. Splettstoesser, my name is Mark Furey and I
7       represent C. B. Marine.
8              MR. FUREY:  John, will you be good enough to put
9       Exhibit 14 in front of the witness.
10 Q.  Mr. Splettstoesser, Exhibit 14 is a vendor quick report
11      for payments made to you personally by Fore River Dock &
12      Dredge between 1999 and 2002.  Is that correct?
13 A.  Yes.
14 Q.  As you sit here today, are those all the times you
15      worked personally for Fore River during those four
16      years?
17 A.  I am guessing just by seeing it, yes.
18 Q.  You can't think of any others as you sit here today?
19 A.  No.
20 Q.  That's essentially three jobs, is it not, the clean
21      harbors, salvage on the Northern Voyager, the salvage on
22      the Aaron and then the mud tows at Heron Way Marina?
23 A.  Three different jobs, yes.
24              (Invoice
25              Exhibit-No. 16 marked for identification.)

---

**BOYCE & LEIGHTON**

First Specialty v Maine Coast 7/30/07

Guy Splettstoesser

109

1   Q.  Mr. Splettstoesser, I am showing you what has been
2       marked as Exhibit No. 16. Do you recognize that
3       document?
4   A.  Yeah, I guess so, yup.
5   Q.  And I think you testified that part of your job at Maine
6       Coast was to actually write up the invoices?
7   A.  Right.
8   Q.  And in Exhibit 16, there is an invoice from Maine Coast
9       to Fore River for taking the equipment down to
10      Gloucester, correct?
11  A.  Yes.
12  Q.  And it is 20 hours you happened to be the person working
13      for Maine Coast, is that true?
14  A.  Yes.
15  Q.  And through Maine Coast, you billed yourself for 20
16      hours at $35 per hour?
17  A.  It looks like it, yes.
18  Q.  Okay. What's the date on that invoice?
19  A.  10/29.
20  Q.  '02?
21  A.  '02.
22  Q.  And when was the work done, is that shown, the tow?
23  A.  No. Oh, yeah, 10/21 to 10/22.
24  Q.  Do you recall exactly how Maine Coast towed the
25      equipment down to Gloucester, in other words, what

110

1       vessels were used?
2   A.  I would believe that is from on the Albany.
3   Q.  You think the Albany would have towed the DS 64 and the
4       Seawind down?
5   A.  The 64 and the Mary P.
6   Q.  Okay.
7   A.  Seawind would be inside the 64 barge.
8   Q.  Okay. Do you remember that or are you just assuming?
9   A.  I do remember towing them both down there, yeah.
10  Q.  Okay. And you say that you towed them to Gloucester?
11  A.  Right.
12  Q.  Did you tow it all to Gloucester?
13  A.  Did I tow them all to Gloucester?
14  Q.  Yeah.
15  A.  It was one trip. I towed everything in one shot.
16  Q.  Okay. In other words, you didn't bring the Seawind and
17      the DS 64 to Heron Way Marina?
18  A.  Right.
19  Q.  You dropped it all off in Gloucester?
20  A.  Right.
21  Q.  Now, I thought you indicated earlier that the crane
22      barge could not have gotten in and out of Gloucester
23      because of the height of the bridge?
24  A.  That's what I was thinking, yeah.
25  Q.  Okay. Obviously, Exhibit 16 says that you brought DS 64

111

1       is the crane barge, right?
2   A.  Right.
3   Q.  Okay. And Exhibit 16, the invoice from Maine Coast
4       would seem to suggest that you brought the crane barge,
5       DS 64, into Gloucester?
6   A.  Right.
7   Q.  Do you think that happened?
8   A.  Did I bring them into Gloucester?
9   Q.  Yes.
10  A.  Yes.
11  Q.  So the crane barge can go under the bridge?
12  A.  I guess so. I have never been up there. But I remember
13      a bridge they had to go through so I don't know.
14  Q.  Okay. But at any rate, your recollection is you brought
15      all this equipment -- working for Maine Coast, you
16      brought all this equipment from Portland, Maine, down to
17      Gloucester for this Heron Way Marina job?
18  A.  Yes.
19  Q.  Okay. Now, you indicated earlier that you had jackets
20      and perhaps shirts that said Maine Coast Marine?
21  A.  A jacket and pants. I don't think we had shirts. I
22      think just pants.
23  Q.  Did the pants say Maine Coast Marine on them somewhere?
24  A.  I don't know. It was probably just a little bar code
25      tab that had our name on it or something.

112

1   Q.  Did the jacket actually say Maine Coast Marine?
2   A.  Yes.
3   Q.  Okay. Were you wearing that jacket on the day you made
4       the tow to the Merrimack River?
5   A.  I don't know.
6   Q.  Okay.
7           (Invoice
8           Exhibit No. 17 marked for identification.)
9   Q.  Mr. Splettstoesser, I am going to show you what has been
10      marked as Exhibit 17 and I am going to look over your
11      shoulder because I only have one copy of it.
12          I show you what has been marked as Deposition
13      Exhibit No. 17. Can you tell me what it is?
14  A.  Here is an invoice. It is an invoice.
15  Q.  All right. The second page of Deposition Exhibit 17 is
16      an invoice from Maine Coast Marine to Fore River Dock &
17      Dredge, correct?
18  A.  Right.
19  Q.  And it is dated August 29, 2002?
20  A.  Yup.
21  Q.  You probably wrote that invoice, wouldn't you say?
22  A.  Yes.
23  Q.  Okay. The first entry, it says Guy, August 27, Seawind
24      to Long Island to reset chains on float. Move crane. P
25      and H to Kelsey Street and to Fleet Environmental. Did

113

1      I read that correctly?

2  A.  Yes.

3  Q.  Now, what does that indicate? Did you take the Seawind

4      out to Long Island?

5  A.  Probably many times, yes.

6  Q.  Okay. And this invoice is you operating the Seawind,

7      bringing it out to Long Island to do some work?

8  A.  Right.

9  Q.  Well, I say you, this invoice indicates that Maine Coast

10     took the Seawind to Long Island to do some work for Fore

11     River, correct?

12 A.  Right.

13 Q.  And it says move crane to Kelsey Street and to Fleet

14     Environmental. Where is Kelsey Street?

15 A.  I don't know.

16 Q.  It is not on Long Island, is it?

17 A.  No. That would be in the P and H. I would think it is

18     somewhere in town here. Not on a barge. It is a rubber

19     tired crane that you tow around town. I think these are

20     a couple of different jobs. One thing I did is move --

21     take the Seawind to Long Island to reset chains on a

22     float. Once I came back, I probably got the rubber

23     tired craned. Drove up to Kelsey Street and then Fleet

24     Environmental.

25 Q.  I was going to ask you if you were using the crane with

114

1      the Seawind.

2  A.  No, it is a rubber covered barge.

3  Q.  You said while you were working for Maine Coast Marine

4      Construction, you operated the Seawind many times, is

5      that correct?

6  A.  Yes.

7  Q.  And could you give us an idea of how many, would it be

8      hundreds?

9  A.  Yes. I mean it could be every day for more than

10     hundreds, I am sure.

11 Q.  Okay. Could you give us an idea of the types of jobs

12     Maine Coast would be doing while you were operating the

13     Seawind?

14 A.  Anything, moving a barge to a fishing pier to drive

15     piling for someone. Moving it upriver to help Roger at

16     Turner's Island. Any one of the islands.

17 Q.  Okay. Did you ever move -- well, did you while working

18     for Maine Coast ever move the DS 64 with the Seawind on

19     these many occasions you have talked about?

20 A.  I am sure. I mean I can't say for sure but half the

21     time when Roger would hire us, it would be me and Rodney

22     or somebody would go help his crew for the day so I am

23     sure it has happened many times.

24 Q.  Okay. In December of 2002, at the time of this

25     incident, you had a business credit card to cover your

115

1      business expenses for Maine Coast Marine Construction?

2  A.  Yes.

3  Q.  Did you have your own credit card, a personal credit

4      card as well?

5  A.  I don't know. I don't think so.

6  Q.  Okay. So if you had to charge anything, you would have

7      to do it on a company credit card, correct?

8  A.  Yes.

9  Q.  Do you recall whether you charged anything on the

10     company credit card going down to Gloucester and then

11     getting back?

12 A.  I am not sure. Probably gas or something. I am not

13     positive.

14 Q.  Now, as you indicated earlier, roughly half of the work

15     that Maine Coast had in the years 1999 to 2002, it got

16     through Fore River or as a subcontractor for Fore River,

17     correct?

18 A.  Yes.

19 Q.  Do you recall whether Roger, Junior or anybody else

20     connected with Fore River said to you or to Jim Laplante

21     in your presence, you guys can't work for me unless you

22     have insurance?

23 A.  Not that I recall, no.

24 Q.  Was it your understanding that Maine Coast couldn't be a

25     subcontractor for Fore River or for other companies

116

1      unless it was insured itself?

2  A.  I wouldn't know. I don't know.

3  Q.  How large is the Seguin?

4  A.  30 something, I believe. I am not sure. 32 maybe. 32

5      feet.

6  Q.  The Seguin is only 32 feet?

7  A.  I believe so. Somewhere around there.

8  Q.  What is the horsepower on it?

9  A.  Probably 200, 250.

10 Q.  250 horse?

11 A.  Yes. I mean I am guessing. 871s is a 350. This is a

12     671 so 200ish.

13 Q.  Thank you. That's all I have.

14        EXAMINATION-BY ATTY. MURPHY:

15 Q.  Hi, Guy. We met before. My name is Bob Murphy and like

16     everybody else, I will try not to repeat too much.

17        I understand from your testimony that you don't

18     need a Coast Guard license to operate the Seawind, is

19     that correct?

20 A.  Right.

21 Q.  But tell me this, do you need anything at all?

22 A.  Not that I know of.

23 Q.  A certificate?

24 A.  No.

25 Q.  A driver's license?

117

1  A.  I don't believe it, no.
2  Q.  Classes?
3  A.  No.
4  Q.  Experience?
5  A.  No.
6  Q.  And that's true whether or not -- so you don't need to
7      be a marine professional to captain the Seawind, is that
8      fair to say?
9  A.  Right. I don't think so.
10  Q.  And that's true whether you are pulling a barge or
11      pushing a barge?
12  A.  Right.
13  Q.  Okay. Now, remind --
14  A.  As far as I know. That's what I have always heard.
15  Q.  Yeah. And I am just -- I want to know what --
16  A.  Right.
17  Q.  Remind me again what your license was at the time of the
18      grounding?
19  A.  200 ton OUTV license.
20  Q.  O U, say it again?
21  A.  OUTV.
22  Q.  What is OUTV?
23  A.  Operator of uninspected towing vessel.
24  Q.  All right. And that lets you operate a tug like the
25      Albany?

118

1  A.  Right.
2  Q.  In Boston Harbor I see these tugboats with the tankers?
3  A.  Right.
4  Q.  Could you be one of those guys?
5  A.  Yes.
6  Q.  And just so we are clear, you see the tug on the hip
7      they call it?
8  A.  Right.
9  Q.  Guiding the tanker in and out of the harbor type of
10      thing?
11  A.  Right.
12  Q.  So the 200 ton refers to the tugboat?
13  A.  Yes. Vessel itself.
14  Q.  You don't count the tanker?
15  A.  No.
16  Q.  Because the tanker would be heavier than that, right?
17  A.  Right.
18  Q.  Okay. And let me ask you this, have you ever been a
19      captain of an oil tanker?
20  A.  No.
21  Q.  Do you have a license that would allow you to do that?
22  A.  No. It is only for towing vessels.
23  Q.  Have you ever -- have you ever been a captain of a
24      passenger vessel?
25  A.  No.

119

1  Q.  And it is fair to say that the license you had at the
2      time wouldn't allow you to be the captain of a passenger
3      vessel, isn't that right?
4  A.  I don't think so, right.
5  Q.  It is also fair to say you never worked transporting
6      passengers for a charge?
7  A.  Nope. I might have run the water taxi for one trip with
8      somebody but that was about it.
9  Q.  Aside from that, is it fair to say you never worked
10      operating a vessel that transported passengers for a
11      charge?
12  A.  Yes.
13  Q.  Okay. And how about -- you have never worked on a
14      container ship, have you?
15  A.  No.
16  Q.  Or a brake bulk cargo ship?
17  A.  No.
18  Q.  Or any kind of cargo ship, have you?
19  A.  No. Tugs and barges only.
20  Q.  Your license allow you to be a captain of a cargo ship?
21  A.  No.
22  Q.  So it is fair to say you never worked transporting cargo
23      for a charge, for anybody?
24  A.  Right. Not unless it was on a barge.
25  Q.  Do you have any familiarity at all with cargo documents,

120

1      bill of ladings, manifests, that sort of thing?
2  A.  No.
3  Q.  Okay. And you said you never worked transporting cargo
4      unless it was on a barge. There was no bill of lading
5      involved in the trip involved in the grounding?
6  A.  No.
7  Q.  And in your mind, you weren't giving tickets to the men?
8  A.  Right.
9  Q.  They didn't have to buy a ticket or anything, did they?
10  A.  No.
11  Q.  Was there any -- what was on the barge -- strike that --
12      on the tug?
13  A.  What do you mean what was on the tug?
14  Q.  I don't know. Was there anything in the tug, any
15      equipment, any --
16  A.  The engines. Food.
17  Q.  I mean other stuff, was there --
18  A.  Pumps, people.
19  Q.  All the stuff that was on the tug was stuff you need to
20      operate the tug, right?
21  A.  Right.
22  Q.  Okay. Let me ask you this: The grounding have anything
23      to do with you and Jimmy Laplante going your separate
24      ways, the business Maine Coast breaking up?
25  A.  Yes.

First Specialty v Maine Coast 7/30/07

Guy Splettstoesser

121

1   Q.  Tell me about that.
2   A.  I think it was a couple of days after whenever I went
3       back to work, he was just real mad about it and thought
4       that Roger was going to sue the company or whatever and
5       I finally just had it with Jimmy so I said you know
6       what, I am done.  And I left.
7   Q.  Tell me what the discussion you had was.  Did he say I
8       think Roger is going to sue the company?
9   A.  I think so.  Something like that.  I am not sure
10      exactly.
11  Q.  At the time, did you think Roger would sue the company?
12  A.  I don't think I really thought about it.
13  Q.  What did you say when Jimmy said to you that Roger is
14      going to sue the company?
15  A.  I am not sure.
16  Q.  Did you say anything like why would he sue the company,
17      I was on my own?
18  A.  I don't know.  I may have.
19  Q.  Did you say anything like hey, that's why we have
20      insurance?
21  A.  I don't know.  I don't think so.
22  Q.  Just don't recall?
23  A.  Right.  Yeah.  Long time ago.
24  Q.  The license, is it called a captain's license or a
25      master's license?  Are those two terms interchangeable?

122

1   A.  They are captain's licenses.
2   Q.  What's the captain's job on a -- just generally, the
3       captain's job on the tugboat?
4   A.  Just do the job, I guess.  Do the job, whatever is
5       required of the tug.
6   Q.  Fair to say you have ultimate responsibility for the
7       command of the tug?
8   A.  Yes.
9   Q.  Ultimate responsibility for the safety of the tug?
10  A.  Yes.
11  Q.  The property?
12  A.  Right.
13  Q.  Ultimate responsibility for the safety of the crew?
14  A.  Yes.
15  Q.  I think Chris Callahan was telling me, his son was a
16      co-captain on the hockey team with another kid.  Do
17      tugboats have that, are there ever co-captains?
18  A.  We have mates which I could be a mate.
19  Q.  The mate would be under the captain?
20  A.  Same license but only one guy is responsible for the
21      whole thing.
22  Q.  That's the captain?
23  A.  Right.
24  Q.  This is not -- I guess what I am saying, it is not done
25      by committee out there?

123

1   A.  Yes.
2   Q.  The captain is charge?
3   A.  Right.
4   Q.  And there is not co-equal people in charge?
5   A.  Yes.
6   Q.  The captain is in charge?
7   A.  Right.
8   Q.  There is no doubt in your mind about that?
9   A.  Right.
10  Q.  And part of the captain's responsibility is to prepare
11      for the voyage in question?
12  A.  Right.
13  Q.  And tell me what you do to do that.
14  A.  Not much.  Usually just listen to the weather and as you
15      go in, you can do the chart work while you are on your
16      way.
17  Q.  Okay.  And where do you listen to the weather?
18  A.  Right on the VHF radio.
19  Q.  That's on the tug?
20  A.  Yes.  Any tug has a couple of them.
21  Q.  Remind me, when you left, were you the only guy on the
22      tug?
23  A.  I guess so.  We were made up to the barge.  It is one
24      unit.  I was the only one in the wheelhouse of the tug
25      but it is like standing in that box.

124

1   Q.  Fair to say before this voyage, you checked the weather
2       on the VHF?
3   A.  Yes.
4   Q.  Is it fair to say you are the only person that did that
5       that you're aware of?
6   A.  Yes.
7   Q.  You wouldn't expect other people to be checking the
8       weather?
9   A.  Right.
10  Q.  You mentioned that you would bring your computer and
11      that -- you would hook that into the -- don't let me say
12      this wrong, the GPS and that would serve as an
13      electronic chart?
14  A.  That's what I do now.  I didn't have one back then.  I
15      believe that boat had a plotter or something on it.
16  Q.  That would be in the wheelhouse of the tugboat?
17  A.  Right.
18  Q.  And before you left on the voyage in question, did you
19      consult any physical charts as opposed to electronic
20      charts?
21  A.  Yeah.  I would imagine I do everything by charts anyway
22      so.
23  Q.  Okay.  So you are in the wheelhouse of the tugboat, do
24      they come in books?
25  A.  Either/or.  We probably -- yeah, we probably had a book

BOYCE & LEIGHTON

Page 121 - 124 of 151

First Specialty v Maine Coast 7/30/07                                    Guy Splettstoesser

125

1    on there.
2  Q.  And you open it up to the area in question?
3  A.  Right.
4  Q.  And you would consult it?
5  A.  Yeah.
6  Q.  As the captain?
7  A.  Right.
8  Q.  Is it fair to say that only you consulted the chart
9      before the voyage in question?
10 A.  Yes.
11 Q.  There is not five guys all chiming in, is there?
12 A.  No.
13 Q.  Just you?
14 A.  Right.
15 Q.  Is it also fair, you wouldn't expect anybody else to be
16     consulting the chart?
17 A.  Right.
18 Q.  Okay. I just want to be clear on something because you
19     were asked some questions I believe about whether the
20     tug Seawind was adequate to make the voyage in question.
21     Do you remember that?
22 A.  Uh-huh.
23 Q.  You just have --
24 A.  Yes.
25 Q.  And I just want to make sure I understand your

126

1      testimony.
2          If the weather is favorable in your opinion, the
3      tug is adequate, is that fair to say?
4  A.  Yes.
5  Q.  And it is also fair to say that you and you alone were
6      responsible for determining what the weather would be on
7      the day in question?
8  A.  Yes.
9  Q.  You were also asked a question, when you are towing the
10     vessel as opposed to pushing it, you can go faster?
11 A.  If you are pushing the vessel, you can go faster than
12     towing it.
13 Q.  Oh, I had it backwards. If you are pushing the vessel,
14     you go faster than towing?
15 A.  Right.
16 Q.  But if you are towing, the longer the line, the faster
17     you can go?
18 A.  The longer the line, you can go faster. Still not as
19     fast as pushing but faster than it being short.
20 Q.  Attorney Whitman asked you if that was because of the
21     wash from the prop?
22 A.  Prop wash, yes.
23 Q.  Is that the only reason?
24 A.  I don't know. I guess the drag. I mean the drag of the
25     boat itself, I guess.

127

1  Q.  Can you also go faster because you don't have to worry
2      as much about the barge ramming into you?
3  A.  No.
4  Q.  Okay. I am not going to dig out the exhibit right now,
5      but there is an exhibit that's been circulated that
6      purports to show Maine Coast Marine naming Fore River as
7      an additional insured under a certificate of insurance
8      for preferred specialty, have you seen that document?
9  A.  I don't know. I am not sure.
10 Q.  Do you know --
11 A.  I may have. I don't know if I would have read through
12     it or if I just -- I don't know.
13 Q.  Would it surprise you to learn that such a document
14     exists?
15 A.  No.
16 Q.  Why not?
17 A.  I never even thought about it.
18 Q.  So you never gave any thought to whose insurance the
19     thing was under?
20 A.  Right.
21 Q.  At the time in question, did you just have one cell
22     phone or more than one?
23 A.  I believe we just -- I had one and Jimmy had one. I
24     think that was all we had.
25 Q.  So --

128

1  A.  On the trip you mean?
2  Q.  No, no. At the time, just -- I got one cell phone.
3          Well, actually, I didn't even plan this. I have
4      two. How about you? Do you --
5  A.  I got one.
6  Q.  How about back at the time of the grounding, did you
7      have one or two?
8  A.  One.
9  Q.  So if -- where were you living at the time?
10 A.  Freeport maybe.
11 Q.  Who were you living there with at the time?
12 A.  My wife.
13 Q.  Okay. And if your wife wanted to call you and tell you
14     to bring home groceries, did she call you on the same
15     cell phone that business people --
16 A.  Yeah.
17 Q.  I guess that's what I am trying to ask you. Did you
18     take business calls on the same cell phone that you took
19     personal stuff?
20 A.  Yes.
21 Q.  Do you have separate rings or anything like that?
22 A.  No.
23 Q.  You had bought into Maine Coast, right?
24 A.  Yes.
25 Q.  And you had to take out a loan to do that?

BOYCE & LEIGHTON                                    Page 125 - 128 of 151

129

1   A.  Yes.
2   Q.  And you needed Jimmy to cosign the loan to do that,
3       right?
4   A.  Yes.
5   Q.  And your profit from Maine Coast went to pay off the
6       loan, right?
7   A.  Yes.
8   Q.  So at the end of the year, Jimmy would take profit above
9       his hourly wage, right?
10  A.  Right.
11  Q.  But you didn't, your profit went to pay off the loan?
12  A.  Yeah.
13  Q.  And did you sign the loan or did Jimmy sign the loan or
14      did you both sign the loan?
15  A.  I don't know. I would imagine both of us.
16  Q.  If you did a bunch -- I am asking hypothetically now.
17      The exhibit we have referred to earlier shows the
18      side jobs that you supposedly did for Fore River, right?
19  A.  Right.
20  Q.  But you did side jobs for other people, too, you said?
21  A.  Yeah. Portland Tugboat. Winslow Marine.
22  Q.  Okay. I just want to get this straight in my own mind.
23      If you are doing a bunch of side jobs, right, and you
24      flush, you are rolling it in, is there any understanding
25      or obligation that you are going to kick a little

130

1       upstairs to Jimmy to pay off the loan?
2   A.  I don't think so.
3   Q.  Did that ever happen?
4   A.  No.
5   Q.  You never did that many side jobs anyway, so that never
6       came about?
7   A.  Right. I mean the biggest ones I did were the Hale
8       ones. If I went for Portland Tugboat, it was 50 bucks a
9       job or something.
10  Q.  Back to the -- after this happened, you had a
11      conversation with Jimmy. And did that actually get
12      physical?
13  A.  Kind of.
14  Q.  Were the cops called? I just vaguely remember --
15  A.  I went to the cops after that.
16  Q.  And what did you tell the cops? Why did you go to the
17      cops?
18  A.  Well, when he started freaking out, he grabbed me and
19      pushed me and tried to hit me so I kind of just said
20      whatever. I am done. And then went --
21  Q.  Why was he so mad at you? I mean, look, let me put this
22      on the record, too, you know my position on this, my
23      client's position is that you were negligent here?
24  A.  Right.
25  Q.  But no one said you did it on purpose. We are saying

131

1       you made a mistake.
2   A.  Yup.
3   Q.  Why was he so physical if it was an honest mistake?
4           MR. WHITMAN: Objection. Foundation.
5   A.  He is like that a lot.
6   Q.  He is a bit of a hothead?
7   A.  Yup. Maine Coast Marine, I think, was his fourth time
8       trying to start a company so he was fired from Hale back
9       in the day for the same thing. Threatening to --
10  Q.  During this discussion, the heated discussion I will
11      call it, was the main topic the grounding?
12  A.  I believe so.
13  Q.  Was that what --
14  A.  I believe that's how it started.
15  Q.  Was that what he was principally upset about?
16  A.  I believe so.
17          MR. WHITMAN: Objection. Foundation.
18  Q.  What did he tell you about -- what did you talk about,
19      did you principally talk about the grounding?
20  A.  I think so. I mean for some reason, that's all I can
21      remember is he was just pissed off at thinking Roger, we
22      were done because of that. Roger was going to sue us or
23      something. I mean I can't remember exactly what went
24      on.
25      But he actually said that, Roger is going to sue us,

132

1       meaning Maine Coast?
2   A.  I believe so. I think so.
3   Q.  We have been talking about the barge and the dump scow,
4       the dump scow is a barge, right?
5   A.  Yes.
6   Q.  And a barge has no means of self-propulsion?
7   A.  Right.
8   Q.  The only way it moves -- I guess not the only way, but
9       the principal way it moves is it gets pushed or pulled
10      by a tug?
11  A.  Right.
12  Q.  And just this is a general question now, in the course
13      of your employment -- let me see how I can put this.
14      I was struck by you talked about before you might
15      be pushing or pulling a barge like five feet?
16  A.  Right.
17  Q.  When --
18  A.  If we are working at a dock and a crane won't reach, we
19      might move ahead five feet or if we are dredging,
20      constantly moving the barge. The crane can only reach
21      so far and you move ahead 20 feet.
22  Q.  On a typical dredge job, then, how far are you moving
23      the dredge in any one shot?
24  A.  Well, when you are dredging, probably just 20 feet at a
25      time.

First Specialty v Maine Coast 7/30/07                                    Guy Splettstoesser

133

1   Q.  All day long, 20 feet at a time?
2   A.  Yes.
3   Q.  So you move it 20 feet?
4   A.  Yup.
5   Q.  And then how long might the dredging operation go for?
6   A.  Depends how big the job is.
7   Q.  Before you have to move it again, I mean?
8   A.  Oh, I guess it depends on the size of the crane and the
9       crane operator.  An hour.
10  Q.  Give me the range.  You might move it 20 feet every
11      hour?
12  A.  Right.
13  Q.  That wouldn't be unusual at all?
14  A.  No.
15          MR. WHITMAN:  Off the record.
16          (Discussion off the record.)
17  Q.  I don't want to beat this in the ground so my last try
18      at this.  Were you aware of any understanding at the
19      time of the grounding that when Maine Coast worked for
20      Fore River, Maine Coast insurance would respond to any
21      kind of problem?
22  A.  I have no idea.
23  Q.  Okay.  Just let me look at my notes, Guy, I think I
24      am -- like a lot of guys in the industry, you got some
25      ink.  None of them say Maine Coast, do they?

134

1   A.  No.
2   Q.  Well, I think it probably was a big deal back when
3       you -- it was like a young guy, you got half the company
4       so --
5   A.  Right.
6   Q.  Didn't you know.  Are there regulations on your license as
7       to how much consecutive work you can do?
8   A.  Well, when you are on a trip, you are only allowed to
9       work for 12 hours per day.
10  Q.  You can't pull an all-nighter like --
11  A.  No.  When we go on trips, we -- captain, mate and we do
12      watches of six hours off, six hours on.
13  Q.  The reason for that is the Coast Guard that puts out
14      these regulations wants to make sure the person at the
15      helm has slept?
16  A.  Right.
17  Q.  You don't want a guy at the helm that has been up 24
18      hours and working a 16-hour shift and that he is
19      responsible for the vessel?
20  A.  Right.
21  Q.  That's all I have.  Thanks.
22          MR. CALLAHAN:  Guy, I have a couple of more.
23          MR. WHITMAN:  Actually, I have one.
24          EXAMINATION-BY ATTY. WHITMAN:
25  Q.  If I understand correctly, Guy, there is no licensing

135

1       requirement of any kind to drive the Seawind?
2   A.  Right.
3   Q.  Not only do you not need a captain's license or a Coast
4       Guard license, you don't need a driver's license,
5       correct?
6   A.  I don't think so, no.
7   Q.  And as far as you are aware, you don't even have to be
8       any particular age?
9   A.  Right.
10  Q.  So a nine-year-old girl could drive the Seawind as far
11      as the rules and regulations and laws are?
12  A.  As far as I know, yup.
13  Q.  But it wouldn't necessarily be a good idea to have sent
14      a nine-year-old girl to tow the DS 64 against a
15      freshened northeast gale in the dark into the Merrimack
16      River, would you agree with that?
17  A.  Right.
18  Q.  So there is a difference between whether it takes a
19      licensed marine professional to do it or whether it is a
20      job for a marine professional?
21  A.  Right.
22  Q.  In the case of the Seawind --
23          MR. MURPHY:  Objection.
24  Q.  -- you would not need a licensed marine professional, am
25      I right?

136

1   A.  Right.
2           MR. WHITMAN:  Thank you.
3           MR. FUREY:  No more questions.
4           MR. CALLAHAN:  I have a couple of questions.
5           EXAMINATION-BY ATTY. CALLAHAN:
6   Q.  You testified earlier you were the one that paid the
7       various invoices for Maine Coast, is that correct?
8   A.  I wrote them up, right.
9   Q.  How about paying bills that came in?
10  A.  Yeah, I think I did most of that.
11  Q.  So the insurance bills would have been paid by you, is
12      that correct?
13  A.  I think so, yes.
14  Q.  Do you remember who you paid bills -- I mean which
15      companies that you were using for your insurance
16      companies?
17  A.  I -- the only one I can think of is Clark Associates.
18  Q.  As far as you know, you wrote the checks for that
19      insurance, is that correct?
20  A.  I believe so.
21  Q.  What was your plan for taking the barge up to the
22      Merrimack River, to the job site, once you got inside
23      the breakwater, was there anything you were going to do
24      differently or were you just going to tow the barge up
25      there on the 300-foot line?

BOYCE & LEIGHTON                                    Page 133 - 136 of 151

First Specialty v Maine Coast 7/30/07

Guy Splettstoesser

137

1  A.  Well, I towed it into the basin of the harbor itself,
2      then make up alongside it and go wherever it was
3      supposed to go.
4  Q.  Had you discussed this plan with anyone?
5  A.  No.
6  Q.  You were aware, at least you had a conversation with
7      Jimmy Laplante prior to going up into the Merrimack
8      River that it could be real tough?
9          And you had significant standing wave when you
10     first entered in?
11 A.  Yes.
12 Q.  You had testified earlier apparently that you can push a
13     barge a lot faster than you can tow it?
14 A.  Right.
15 Q.  So it it also true that there is more power essentially
16     when you are behind a barge pushing it than when you are
17     dragging it -- pulling it?
18 A.  More power? I would assume so, yeah. You got better
19     control.
20 Q.  So under the circumstances, why didn't you out at sea
21     hook up from behind and start pushing it as opposed to
22     towing it?
23 A.  Because with as rough as it was, we would have smashed
24     them together and sunk them offshore.
25 Q.  It was too late?

138

1  A.  Yeah. We pushed as far as we could. Once it gets
2      rough, then you got to tow behind it.
3  Q.  So as you are sitting here today, it is not necessarily
4      the better move to be pushing up that river as opposed
5      to towing it?
6  A.  Not in that weather, no. Ideally, you want to be
7      pushing but you can't if there is any weather.
8  Q.  You can't make it up, right?
9  A.  Right.
10 Q.  And by saying make it up, put yourself behind it and tie
11     it up?
12 A.  Right.
13 Q.  That's it for me.
14     MR. FUREY: Nothing further.
15     MR. MURPHY: Just a couple of things:
16          EXAMINATION-BY ATTY. MURPHY:
17 Q.  What's the state of your license now?
18 A.  It is under suspension right now.
19 Q.  What's that a result of?
20 A.  Failing a random drug test.
21 Q.  And what was that all about?
22 A.  A Christmas party gone bad.
23 Q.  Was it drugs or alcohol or both?
24 A.  Drugs.
25 Q.  Did they tell you what drug it was?

139

1  A.  Yes.
2  Q.  What was it?
3  A.  Cocaine.
4  Q.  Is that the only -- and the Coast Guard does that?
5  A.  Yeah. Well, it is through the company but it is
6      regulated through the Coast Guard.
7  Q.  The entity that -- what did you say, it was suspended or
8      something?
9  A.  It is revoked right now under the terms that it can be
10     suspended if I don't continue doing what I am doing.
11 Q.  The entity that revokes the license is the Coast Guard
12     though?
13 A.  Right.
14 Q.  Has the Coast Guard ever at any time taken any action on
15     any license that you have had other than this incident?
16 A.  No.
17 Q.  Have you ever been investigated by the Coast Guard other
18     than this incident?
19     MR. WHITMAN: Objection. Foundation.
20 A.  Yes.
21 Q.  Can you tell me what that is about?
22 A.  I think I talked about it last time where a friend of
23     mine got killed, caught under an anchor chain, of a boat
24     that I was running.
25 Q.  Any other times other than that?

140

1  A.  Yeah, I think there was one incident up a river where we
2      dented a ship or something. Dented a stern of a ship I
3      think.
4  Q.  When was that?
5  A.  I have no idea. Last year sometime.
6  Q.  And did the Coast Guard investigate that?
7  A.  Yes.
8  Q.  Did they come with any finding that you were at fault?
9  A.  They tried to until we met with them and explained
10     everything that happened and then they were going to
11     give me a warning on my license and then we met with the
12     captain of the port and explained what happened and
13     decided that I am not getting a warning. It had nothing
14     to do with myself.
15 Q.  Was there a 2692 form filed like we saw as one of the
16     exhibits?
17 A.  I believe so. I am not sure.
18 Q.  At the bottom part that it says cause of the incident,
19     did that attribute fault to you?
20 A.  I don't know.
21 Q.  Operator error or something like that?
22 A.  I think so.
23 Q.  Yes.
24 A.  At first. And then they sent me another letter saying
25     they removed it.

BOYCE & LEIGHTON

First Specialty v Maine Coast 7/30/07
Guy Splettstoesser

141

1  Q.  Okay. And the incident involving the death with the
2      anchor chain, what was the result of the Coast Guard
3      investigation on that?
4  A.  I never heard -- after the first meeting with the Coast
5      Guard, I never heard from them again.
6  Q.  There was no action on your license as a result of that?
7  A.  No.
8  Q.  And do you know whether you were found at fault in any
9      way as a result of that?
10 A.  No. I don't think so because I think I would have had a
11     warning on my license for that.
12 Q.  Has there been action on your driver's license ever
13     taken?
14 A.  I had a couple of OUIs back when I was in high school.
15 Q.  Anything more recent?
16 A.  No.
17 Q.  Have you been convicted of any crimes?
18 A.  Nope. Just the OUIs.
19 Q.  Other than the OUIs, I mean?
20 A.  Nope.
21 Q.  And the terms of the state of your license right now,
22     then it is revoked but -- don't let me put words in your
23     mouth.
24         Is the idea if you stay out of trouble, you will
25     get it back?

142

1  A.  Well, they put me on a certain thing. So many drug
2      tests per year and stuff like that and I did a month of
3      counseling as well as that keeps going on, they just
4      hand it back to you.
5  Q.  And at what point will you get it back?
6  A.  I believe January, February.
7  Q.  And when was it revoked?
8  A.  It was just revoked recently but as soon as it happened,
9      I called the Coast Guard to tell them what had happened.
10 Q.  Okay. So the company makes you do a random drug test?
11 A.  Right.
12 Q.  That's not just you, everybody?
13 A.  Everybody.
14 Q.  And you failed the random drug test?
15 A.  Right.
16 Q.  And then you called the company or the company you're
17     working for calls the company; how does it work is what
18     I am asking?
19 A.  Eventually, the Coast Guard finds out by whoever does
20     the drug test. Some Choice Point.
21 Q.  The laboratory doing it?
22 A.  Yes. It takes them so long so I called my company and
23     let them know and a couple of weeks later, I called the
24     Coast Guard to let them know. Because if you wait for
25     them, it will be six months before they find out. I

143

1      wanted to get it straightened out before.
2  Q.  You might as well take your medicine and get it over
3      with?
4  A.  Right.
5  Q.  Was it revoked immediately after you informed the Coast
6      Guard?
7  A.  No. Well, they had to get paperwork together and stuff.
8  Q.  So take me through the timeline.
9  A.  It was probably a good month before they got all the
10     paperwork together after I had called them.
11 Q.  They still are letting you operate the tugs?
12 A.  No. Once I told Brian, they had to let me go before
13     they ever heard anything.
14 Q.  Brian is the boss at the company you were working for at
15     the time?
16 A.  Right.
17 Q.  What company were you working for at the time?
18 A.  Portland Tugboat.
19 Q.  Okay. And tell me what happened next.
20 A.  They just let me go for a while until everything got
21     straightened out.
22 Q.  Okay.
23 A.  I didn't know if it was illegal for me to ride the boat.
24     I told them right away before anyone found out about it.
25 Q.  About a month after that, the Coast Guard revoked your

144

1      license?
2  A.  Yes.
3  Q.  Is that the only action that they have had on your
4      license?
5  A.  Yes.
6  Q.  Did they have any hearings or did you have to file any
7      paperwork or --
8  A.  They made up some settlement agreement.
9  Q.  And did you sign that agreement?
10 A.  Yes.
11 Q.  Do you have a copy of the agreement?
12 A.  At the house, yeah.
13 Q.  Okay. And can you tell me what the terms of the
14     agreement are?
15 A.  I did a month of counseling and then the counselor said
16     it was fine so then they sent I can return back to work
17     letter as an unlicensed deckhand.
18 Q.  Was that -- you said it was a Christmas party gone bad?
19 A.  Right.
20 Q.  Was it the first time you had ever done cocaine?
21 A.  Since I was in high school, yep.
22 Q.  Did you do any drugs right around the time of the
23     grounding?
24 A.  No.
25 Q.  And you were drug tested after that and passed?

BOYCE & LEIGHTON

First Specialty v Maine Coast 7/30/07                                    Guy Splettstoesser

---

145

1  A.  Right. I mean that's why the Coast Guard has been so

2      nice to me. I have had thousands of drug tests over my

3      life. I had a problem with one so.

4  Q.  Okay. Thanks.

5          MR. WHITMAN: No more questions.

6          (This deposition ended at 1:10 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

147

1              STATE OF MAINE

2          I, Erin M. Leighton, a Notary Public in

3  and for the State of Maine, do hereby certify that

4  pursuant to notice there came before me on July 30,

5  2007, the following-named person to wit: GUY W.

6  SPLETTSTOESSER, who was duly sworn to testify to the

7  truth and nothing but the truth; that he was thereupon

8  carefully examined upon his oath and his examination

9  reduced to writing under my supervision; that this

10  deposition is a true record of the testimony given by

11  the witness.

12          I further certify that I am neither attorney

13  nor counsel for, nor related to, nor employed by any of

14  the parties to the action in which this deposition is

15  taken, and further, that I am not a relative or employee

16  of any attorney or counsel employed by the parties

17  hereto, or financially interested in this action.

18          IN WITNESS WHEREOF, I have hereunto set my hand

19  this 8th day of August 2007.

20

21          _Erin M. Leighton_

22          Erin M. Leighton

23

24

25  My Commission Expires:

    January 22, 2009

---

146

1          I, GUY W. SPLETTSTOESSER, do hereby certify

2  that the foregoing testimony taken on July 30, 2007 is

3  true and accurate to the best of my knowledge and

4  belief.

5

6

7  ____    _____    DATE    GUY W. SPLETTSTOESSER

8

9          At _____ in said County of _____

10  , this day of _____, 2007, personally

11  appeared GUY W. SPLETTSTOESSER, and he made oath to the

12  truth of the foregoing answers by him subscribed. ·

13          Before me, _____, Notary Public

14

15

16          My Commission Expires: _____

17

18

19

20

21

22

23

24

25

---

148

BOYCE & LEIGHTON
Plaza East Professional Offices
Post Office Box 954
Scarborough, Maine  04074
(207) 883-0378

August 6, 2003

John S. Whitman, Esq.
Richardson, Whitman

RE:  First Specialty v Maine Coast

Enclosed please find your copy of the deposition of GUY
W. SPLETTSTOESSER, taken in the above-mentioned action
on July 30, 2007.  Also enclosed is the original
signature page and a sheet for corrections.

Please have GUY W. SPLETTSTOESSER read your copy of the
deposition and sign the original signature page before a
Notary Public. If there are any corrections he wishes
to make, they should be made on the enclosed correction
sheet. Do not mark on the deposition.

Please send a copy of the signed original signature page
and correction sheet to other counsel within 30 days.

Thank you.

---

**BOYCE & LEIGHTON**