UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
       Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
       Defendants

## PLAINTIFF'S OPPOSITION TO MOTION OF C.B. MARINE CORPORATION FOR SUMMARY JUDGMENT

Now comes Keith Ablow who hereby opposes the Motion for Summary

Judgment by C.B. Marine Corp.

Please refer to the deposition recently taken of Roger P. Hale. In that

deposition testimony Roger P. Hale indicates that he purchased C.B. Marine and

its equipment for his son Roger A. Hale initially. Roger P. Hale is the father of

Roger A. Hale and is the president and sole owner of C.B. Marine at the time of

the grounding. Roger P. Hale Deposition, pages 4, 11-12.

In said deposition Roger P. Hale testified that he thereafter purchased

C.B. Marine from his son Roger A. Hale, and became the sole corporate officer

1

of C.B. Marine including at the time of the grounding and through the present. Page 7.

At the same time that Roger P. Hale purchased C.B. Marine his son Roger A. Hale, Roger A. Hale on or about the same time created a corporation called Fore River Dock & Dredge which is another defendant in this case. At that time C.B. Marine through Roger P. Hale its sole owner and employee leased the Tug Seawind II, the Barge DS64 and the crane which grounded to Fore River Dock & Dredge for a percentage of income made by Fore River Dock & Dredge.

In said deposition Roger P. Hale indicated that he actually designed and had built specially the Tug Seawind II which is less than 26 feet long and powered by only two 300 horsepower motors specifically to tow the Barge DS64 with the crane on it. He claims that he had done that activity himself many times. During the course of this litigation multiple experts have already testified in other cases that have arisen out of this grounding that the 600 horsepower 26 foot 11 inch tugboat was grossly under powered to make the trip on the open ocean from the Annisquam River to the Merrimac River. The fact that Roger P. Hale through his company C.B. Marine designed and had built the Seawind II for the specific purpose of avoiding the need for a licensed Captain and to save money on insurance coverage resulted in the small under powered Seawind being coupled with the 125 foot Barge DS64 and the crane with knowledge that it would be towed in open sea and it reasonable foreseeable that such event would occur in

2

adverse weather conditions. The fact that the ownership, lease and use of the Seawind II, Barge DS64 and crane through various purchase, sale and lease arrangements appears to be some what of a shell game between the father Roger P. Hale and the son Roger A. Hale it is inescapable that they each sanctioned the coupling of the under powered and under sized Seawind II with the 125 foot Barge DS64 and crane. The fact that the superior business tactics of Roger P. Hale and Roger A. Hale for the purposes of creating a superior tax structure, insulation against liability formula and reduced insurance premium circumstances is admirable and legal. However, the fact that at the time of the grounding Roger P. Hale was the owner of C.B. Marine and leased the under powered and under sized Tug Seawind II as well as the 125 foot long Barge DS64 and the large crane which was fixed thereon to Fore River Dock & Dredge owned exclusively by his son the sole corporate officer Roger A. Hale in consideration of receiving fifty percent of the profits of Fore River Dock & Dredge in its marine construction undertakings does not excuse the negligence of C.B. Marine simply because a master lease exists between the fathers corporation and the cons corporation when in fact C.B. Marine designed the under sized Tug and specifically coupled it with the oversized barge and crane which nearly all the of the experts involved in the prior cases arising out of the grounding as well as the Coast Guard have concluded was a contributory factor in the grounding. Roger P. Hale the owner of C.B. Marine at the time of the grounding completely sanctioned the coupling of the Seawind II and Barge DS64 and the crane fixed thereon for use on open sea regardless of the weather. Such sanctioning

3

constituted contributory negligence on behalf of C.B. Marine for the grounding as well as many other theories of liability against C.B. Marine.

## I.    C.B. Marine Corp. Has A Non-Delegable Duty To Provide A Competent Master And Crew

Although C.B. Marine did execute the Master Equipment Lease at issue thus relinquishing certain duties to Fore-River, C.B. retained a non-delegable duty to provide a competent master and crew. In the matter of the Complaint of Hercules Carriers 768 F. 2d 1558, 1566 (11th Cir. 1985). In light most favorable to the plaintiff, C.B.'s failure to hire a competent pilot resulted in Dr. Ablow's loss.

## II.    Bareboat Charter Does Not Dispose Of The Nuisance Claim

Even assuming arguendo that a demise charter would shield C.B. from liability in negligence, it is of no avail regarding the plaintiff's nuisance claim against C.B.

On or about February 6, 2003 the Town of Newbury served upon C.B. Marine the demand attached hereto as Exhibit 2. In the demand the Town of Newbury demanded the removal of the barge and its contents as it posed "a threat to the health safety and welfare of the citizens of the Commonwealth of Massachusetts." The plaintiff alleges that C.B. has created and failed to correct a

4

nuisance on and near his property. C.B. as the owner of the barge and its contents has a duty to remove the nuisance irrespective of the demise charter.

In its Motion for Summary Judgment, C.B. uses the following analogy regarding its position:

> "For example, owners/lessors of automobiles are not responsible for damages caused by the negligent operation of lessees or their employees"

C.B. does not address why the nuisance claim should be dismissed, only the negligence claim. C.B. as owner of the barge would be responsible to remove the barge in the nuisance claim, and the nuisance claim survives this Motion for Summary Judgment.

Regarding nuisance, therefore, the plaintiff argues that while the owner of the leased vehicle in C.B. analogy may not be responsible for the lessees negligence, the owner would certainly be obligated to remove the automobile if it was causing a nuisance. A demise charter is not a defense to a nuisance claim nor has C.B. provided even an argument for disposing of the nuisance claim on Summary Judgment.

C.B. Marine has put forth no authority which stands for the proposition that the owner of a vessel subject to a demise charter is immune or entitled to summary judgment on a nuisance claim. It was C.B. Marine's barge that was dismantled causing metal contamination and the demise charter is no defense to the nuisance cause of action.

Wherefore, the plaintiff respectfully requests that this Honorable Court deny C.B. Marine's Motion for Summary Judgment in its entirety, or in the alternative deny said motion as to the nuisance and trespassing counts which are not addressed on C.B.'s motion.

Respectfully Submitted,
Plaintiff by his attorney

/s/ John P. LeGrand

John P. LeGrand
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
617-623-3001
BBO # 550185

Dated: August 23, 2007

## CERTIFICATION OF SERVICE

I, John P. LeGrand, attorney for the plaintiff certify that on the 23rd day of August, 2007 I made service of the foregoing document titled;" Plaintiff's Opposition to to Motion of C.B. Marine Corporation for Summary Judgment" with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Cathy S. Roberts, Esquire
Robert J. Murphy, Esquire
Mark G. Furey, Esquire
Aaron K. Baltes, Esquire
Michael S. D'Orsi, Esquire
T. Christopher Donnelly, Esquire


/s/ John P. LeGrand
John P. LeGrand, Esquire

## Page 1

```
 1
 2            UNITED STATES DISTRICT COURT
 3                 DISTRICT OF MAINE
 4            Case No. 1:05-cv-10347-RGS
 5
 6
 7   KEITH R. ABLOW,
 8              Plaintiff,
 9        vs.
10   FORE RIVER DOCK & DREDGE, INC.,
11   CB MARINE CORPORATION and MAINE COAST
12   MARINE CONSTRUCTION, INC.,
13              Defendant.
14
15
16            DEPOSITION of ROGER P. HALE, taken pursuant
17   to notice, at the offices of Thompson, Bull, Furey, Bass &
18   MacColl, LLC, 120 Exchange Street, Portland, Maine, on
19   August 3, 2007, commencing at 10:28 A.M., before Catherine
20   Cook, a Notary Public in and for the State of Maine.
21
22
23
24            Downing & Peters Reporting Associates
25        211 Marginal Way, #821, Portland, Maine 04101
```

## Page 2

```
 1   For the Plaintiff:
 2                 John P. LeGrand, Esq.
 3                 Eric Stafford, Esq.
 4   John P. LeGrand & Associates, P.C., 375 Broadway, Suite 2,
 5   Somerville, Massachusetts 02145 - (617) 623-3001
 6
 7   For the Defendant Fore River Dock & Dredge, Inc.:
 8                 Robert J. Murphy, Jr., Esq.
 9   Holbrook & Murphy, 15 Broad Street,
10   Boston, Massachusetts 02109 - (617) 428-1151
11
12   For the Defendant C.B. Marine Corporation:
13                 Mark G. Furey, Esq.
14   Thompson, Bull, Furey, Bass & MacColl, 120 Exchange Street,
15   P.O. Box 447, Portland, Maine  04112-0447 - (207) 774-7600
16
17   For the Defendant Maine Coast Construction, Inc.:
18                 Cathy S. Roberts, Esq.
19   Thompson & Bowie, Three Canal Plaza, P.O. Box 4630,
20   Portland, Maine 04112-4630 - (207) 774-2500
21
22   For Guy Splettstoesser:
23                 Aaron K. Baltes, Esq.
24   Norman, Hanson & DeTroy, 415 Congress Street, P.O. Box
25   4600, Portland, Maine 04112-4600 - (207) 774-7000
```

## Page 3

```
 1                        INDEX
 2                                              PAGE
 3   EXAMINATION BY MR. LEGRAND                    4
 4   EXAMINATION BY MS. ROBERTS                   56
 5   EXAMINATION BY MR. BALTES                    58
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1       ROGER P. HALE, having been sworn by the Notary Public,
 2   was examined and deposed as follows:
 3          EXAMINATION BY MR. LEGRAND:
 4   Q.  Could you please state your full name.
 5   A.  My name is Roger Phillip Hale.
 6   Q.  Mr. Hale, are you the sole proprietor of C.B. Marine?
 7       MR. FUREY:  Objection to the form of the
 8   question.  It's a corporation.
 9   A.  I'm the president of C.B. Marine.
10   Q.  Are you the exclusive shareholder?
11   A.  I own no shares.
12   Q.  Who owns the shares in C.B. Marine?
13   A.  My grandchildren and my children.
14   Q.  Are you the sole corporate officer of C.B. Marine?
15   A.  I am.
16   Q.  Were you the sole corporate officer of C.B. Marine on
17   12/11/02 when the SEAWIND II and the barge DS 64 grounded
18   in Plum Island?
19   A.  I was.
20   Q.  Were you the -- or are you the sole corporate officer
21   of General Marine Construction?
22   A.  I am, unless you consider the clerk a corporate
23   officer.  I'm the president and treasurer of General
24   Marine.
25   Q.  Who is the clerk?
```

1 (Pages 1 to 4)

## Page 5

1  A.  John Bass.  Wait a minute, Jack Erler.

2  Q.  Is he an attorney?

3  A.  Yes, he is.

4  Q.  Does he own any shares in the company?

5  A.  No.

6  Q.  Who owns the shares of General Marine Construction?

7  A.  My children and grandchildren.

8  Q.  Do you own any?

9  A.  No.

10  Q.  Were you the sole corporate officer of General Marine

11  Construction when General Marine Construction purchased

12  C.B. Marine?

13  A.  I was.

14  Q.  What year did General Marine Construction purchase

15  C.B. Marine?

16  A.  It's in my former testimony. That's a little fuzzy.

17      MR. FUREY: Jack, will tell you, if you don't

18  remember, he will accept that as an answer.

19      MR. LEGRAND: I would appreciate if there was not

20  colloquy on -- during this deposition, other than

21  objections.

22  A.  I can't remember when we bought it, but it was prior

23  to the grounding. Years prior to.

24  Q.  Was your son Roger A. Hale the sole corporate officer

25  of C.B. Marine when General Marine Construction purchased

## Page 6

1  C.B. Marine?

2  A.  Yes.

3  Q.  Did you buy C.B. Marine for your son Roger A. Hale?

4  A.  Did I buy it from him?

5  Q.  Yes.

6  A.  I bought the corporate stock. General Marine bought

7  the corporate stock of C.B. Marine.

8  Q.  Was your son Roger A. Hale the sole corporate officer

9  of C.B. Marine when General Marine Construction purchased

10  C.B. Marine?

11  A.  He was.

12  Q.  What year did you buy C.B. Marine for your son Roger

13  A. Hale?

14      MR. FUREY: Object to the form.

15  A.  I don't have the date at the top of my head.

16  Q.  Why did you buy C.B. Marine for your son Roger A.

17  Hale?

18      MR. FUREY: Object to the form.

19  Q.  You can answer.

20  A.  Do I answer?

21      MR. FUREY: Yes. I objected to the form of the

22  question. You can answer if you understand it.

23  A.  Can you give me the question again.

24      MR. LEGRAND: Would you read it back, please.

25      (The reporter read the requested matter.)

## Page 7

1      MR. FUREY: Renew the objection. Go ahead.

2  A.  At the time, General Marine was called by the IRS a

3  personal holding company. We had more interest income than

4  we had operating income and I needed working assets again

5  to balance that out, so I bought the stock of C.B. Marine

6  which had working assets.

7  Q.  Why did General Marine Construction, of which you were

8  the sole corporate officer, then buy C.B. Marine off your

9  son Roger A. Hale?

10  A.  I just explained that to you.

11  Q.  I asked why you bought it off him, not why you bought

12  it for him in the second question.

13  A.  Off him? I bought it from him.

14  Q.  Did you buy it for him originally?

15  A.  I didn't buy it for him. He formed it himself.

16  Q.  Where did he get the money to make that purchase? Was

17  it from you or from MCM?

18  A.  Hard work. Hard work.

19  Q.  Was it from you or MCM?

20      MS. ROBERTS: Objection to form. MCM?

21      MR. LEGRAND: I'm sorry, General Marine.

22  A.  I loaned him some money in 1989. He went to a public

23  auction where I sold off all my equipment and bought

24  certain assets and that and other assets entail C.B. Marine

25  at the later date when I bought it -- the equipment from

## Page 8

1  him.

2  Q.  Why didn't you sell that equipment directly to your

3  son, rather than put it through an auction?

4  A.  I didn't think that would be --

5  Q.  Was there a tax problem?

6  A.  No, I didn't think that would be prudent in the IRS's

7  eyes. We have a greedy Big Brother in this country.

8  Q.  When your son Roger A. Hale was the owner of C.B.

9  Marine, was it exclusively in the business of leasing

10  equipment at that time?

11  A.  No, he was a piling driving contractor and he operated

12  C.B. Marine as his corporate company.

13  Q.  When Maine Coast Construction, of which you're the

14  sole corporate officer --

15  A.  No, no.

16      MS. ROBERTS: Objection.

17      MR. FUREY: You said Maine Coast Marine.

18      MR. LEGRAND: I'm sorry, I've got to get these

19  straight. Let me strike that and start again.

20  Q.  When General Marine purchased C.B. Marine, did its

21  business become simply leasing equipment or did you also do

22  marine construction, piling driving and so on?

23  A.  No. When I bought C.B. Marine, it had gotten out of

24  the construction business. It was a leasing company at

25  that point. He had formed Fore River Dock & Dredge and

2 (Pages 5 to 8)

Page 9

1  Fore River Dredge was his operating or working company.
2  C.B. Marine was a leasing company when I bought it.
3  Q. It was a leasing company when you bought it from Roger
4  A.?
5  A. Correct.
6  Q. But prior to that time, it had also been a marine
7  construction company?
8  A. It had been, yup.
9  Q. Did that transition occur in preparation for you
10  purchasing C.B. Marine?
11  A. No, not to my knowledge.
12  Q. In 2002, were you the sole employee of C.B. Marine?
13  A. I was.
14  Q. As of today, you are the sole employee of C.B. Marine?
15  A. I am.
16  Q. Have you always been the sole employee of C.B. Marine?
17  A. I am, have.
18  Q. Are you the sole employee of General Marine
19  Construction?
20  A. No.
21  Q. Were you the sole employee of General Marine
22  Construction on 12/11/02?
23  A. No.
24  Q. How many employees did you have on 12/11/02?
25  A. Four.

Page 10

1  Q. And can you tell us their names and what they did for
2  work.
3  A. We have my wife Dorothy, works in the office.
4  Q. Doing what?
5  A. Secretarial work, counting the money. Larry Rowe who
6  just works in operations, deals with the tenants, works
7  with the different properties, and I believe we had a
8  painter on staff that year and myself. Four employees.
9  Q. What did the painter paint, property, boats?
10  A. Everything, primarily property.
11  Q. So when C.B. Marine was purchased by General Marine,
12  the business was strictly leasing equipment at that point?
13  A. It was.
14  Q. After you, as sole corporate officer of General
15  Marine, purchased C.B. Marine from Roger A. Hale, did you
16  lease some of the same equipment to Roger A. Hale that you
17  purchased from C.B. Marine?
18  A. I did.
19  Q. When you made that lease -- so, he was basically
20  leasing the same equipment that he had owned prior to the
21  sale?
22  A. Correct.
23  Q. How much did you pay to Roger A. Hale for the purchase
24  of C.B. Marine?
25  A. I don't remember that number, but it was a substantial

Page 11

1  amount of money.
2  Q. Not substantial enough for you to remember, though?
3  A. No. I paid him in corporate stock, but there was a
4  figure to base the value on.
5  Q. So, in summary, you financed your son to purchase C.B.
6  Marine; is that accurate?
7     MR. FUREY: Objection.
8  A. That's not accurate. I certainly loaned him some
9  money, but my son was in business prior to 1989 when he
10  bought those assets from General Marine at my auction.
11  Q. And next, you bought your son Roger A. Hale's company
12  C.B. Marine and its equipment?
13  A. Yes, I did.
14  Q. And next, you bought C.B. Marine and its equipment off
15  your son, have we established that?
16  A. You are saying the same thing twice, I think. He
17  formed a company called C.B. Marine, bought assets from
18  General Marine. Two years, three years later. I bought
19  those assets and the whole company back again.
20  Q. Then after you bought C.B. Marine back again, you then
21  leased C.B. Marine's equipment to your son Roger A. Hale's
22  new company, Fore River Dock & Dredge?
23  A. Correct.
24  Q. Did the ownership of the SEAWIND II transfer to your
25  son as sole corporate officer of C.B. Marine to you as sole

Page 12

1  corporate officer of C.B. Marine when you purchased C.B.
2  Marine from your son?
3     MR. FUREY: Object to the form of the question.
4  You may answer.
5  A. The SEAWIND was an asset of C.B. Marine. When you buy
6  the corporate stock, I'm sure you are familiar, you get the
7  assets of the underlying corporation. I acquired the
8  SEAWIND II with that purchase.
9  Q. So your answer is yes?
10  A. I believe that's my answer.
11  Q. What year did C.B. Marine purchase the SEAWIND II?
12  A. 1989.
13  Q. But you don't know what year you purchased C.B. Marine
14  from your son?
15  A. I can get that information. We have been through this
16  before in my last deposition. It's just a number that's
17  not very accurate in my mind. Do you remember when you
18  bought that ring on your finger? You probably do.
19  Q. Which one, I do. I know them all. St. Thomas,
20  Arizona?
21  A. I guess you have a better memory than me.
22  Q. I guess it is harder to remember when you bought
23  companies than it is rings. What year did you first lease
24  C.B. Marine's equipment to Fore River Dock & Dredge?
25  A. The day that the purchase was done -- and we can get

3 (Pages 9 to 12

Page 13

1  you that date. I'm sure it is in my other deposition,
2  isn't it, Mark?
3  Q.  You have been asked in every deposition and you never
4  know the answer.
5  A.  No. I don't. It's nothing that I keep at the top of
6  my head.
7  Q.  And you're the sole employee of C.B. Marine, correct?
8  A.  Yeah.
9  Q.  So, if you don't know, there is nobody else to go to,
10  correct?
11  A.  Oh, sure. The attorneys would know. That's what you
12  guys are for, keeping track of stuff like that.
13  Q.  Are you prepared to waive your attorney client
14  privilege so we can ask them when you bought that company?
15  A.  Yes, I am. You can ask anybody you want. It's a
16  public record. It is in the minutes of the corporation
17  when we bought it.
18  Q.  When did C.B. Marine purchase the ALBANY?
19  A.  At the same time.
20  Q.  Same time as what?
21  A.  The ALBANY -- oh, boy, now wait a minute -- the ALBANY
22  got bought after we lost the REED. The REED sank in -- I
23  would have to look back. I could get that information. It
24  is very unpleasant. Nothing I like to remember.
25  Q.  Do you know what decade?

Page 14

1  A.  Huh?
2  Q.  Do you know what decade the ALBANY was purchased by
3  C.B. Marine?
4  A.  Decade?
5  Q.  Yes.
6  A.  It was purchased in the -- I have to go back. I have
7  to go back and check. We own thousands of pieces of
8  equipment, hundreds, thousands pieces of equipment.
9  Q.  How many tugs do you own right now?
10  A.  We are down to one.
11  Q.  And what's the name of that tug?
12  A.  SEAWIND.
13  Q.  Where is the ALBANY now?
14  A.  Scrapped.
15  Q.  How many horsepower did the ALBANY have?
16  A.  1800.
17  Q.  That was true on 12/11/02 when the grounding occurred?
18  A.  It didn't change the engine, but the ALBANY was not in
19  the grounding -- involved in this grounding.
20  Q.  When did C.B. Marine first purchase the barge DS 64?
21  A.  Yes.
22  Q.  Was that barge called the NORMA when you purchased it?
23  A.  No.
24  Q.  That's a different barge?
25  A.  Different barge. For your information, we purchased

Page 15

1  the NORMA to replace the DS 64.
2  Q.  After the grounding?
3  A.  Yes.
4  Q.  When did C.B. Marine first lease the barge DS 64 to
5  Fore River?
6  A.  That's the same question again and I don't have that
7  answer.
8  Q.  When did C.B. Marine first lease the ALBANY to Fore
9  River?
10  A.  After the purchase. I don't have that answer either.
11  Q.  When did C.B. Marine first lease the SEAWIND II to
12  Fore River?
13  A.  1989.
14  Q.  Was C.B. Marine the owner of the SEAWIND II, the barge
15  DS 64 and the ALBANY on December 11, 2002 when the SEAWIND
16  II and the barge DS 64 grounded on Plum Island?
17  A.  Yes.
18  Q.  Do you own a pleasure boat?
19  A.  Yes, I do.
20  Q.  What kind?
21  A.  Grady White.
22  Q.  What kind of engines does she have?
23  A.  Yamahas.
24  Q.  How many horsepowers do they generate?
25  A.  300.

Page 16

1  Q.  Same as the SEAWIND?
2  A.  SEAWIND is 700.
3  Q.  Have you read your survey that indicates that the
4  SEAWIND has twin 300-horsepower engines?
5  A.  What's that?
6  Q.  Have you read your survey that indicates the SEAWIND
7  has twin 300-horsepower engines?
8  A.  I have not.
9  Q.  Is it fair to say that your Grady White has the same
10  horsepower as the SEAWIND?
11  A.  No. I have 300 and it has 600, but I could take my
12  pleasure boat and push barges around all day long.
13  Q.  Do you think you could have made it up the Merrimack
14  River with the DS 64 with your Grady White?
15  A.  In the right tide, young man, I could have come up
16  the -- at one time, I pulled a barge with 150 horse steel
17  work boat up the Kennebec River.
18  Q.  That didn't end up grounding on the beach in bad
19  weather, did it?
20  A.  No, it didn't because I was captain.
21  Q.  How long is the Grady white?
22  A.  24-foot.
23  Q.  One single engine?
24  A.  Two.
25  Q.  What size were they again?

4 (Pages 13 to 16)



Page 17

1 A. 150s.
2 Q. Twin 150s. When you leased the SEAWIND II to Fore
3 River, did you know that the vessel was under 26 feet in
4 length?
5 A. It was built under 26 feet in length.
6 Q. Why?
7 A. Because it doesn't require a licensed captain.
8 Q. When you leased the SEAWIND II to Fore River, did you
9 know that the two engines were 300-horsepower each?
10 A. You're saying they are 300 horsepower each. We might
11 have a difference of opinion what they are in horsepower.
12 Q. When the SEAWIND was damaged in the grounding, did you
13 get paid to have it repaired?
14 A. Fore River had it repaired, which was their obligation
15 under the lease.
16 Q. Did you take a look at the survey that was done for
17 the repair to make sure that the work that was done on it
18 was everything that was repaired?
19 A. I believed, and I did go to the shipyard, that the
20 work that was done on the SEAWIND II was sufficient for
21 back in -- the condition pregrounding.
22 Q. Did you look at the survey report that evaluated the
23 damage to the SEAWIND.
24 A. I look at survey reports all the time, but what they
25 arc is actually one man's opinion. In this particular

Page 18

1 case, Marine Safety Consultants is not high on my list of
2 opinion-givers.
3 Q. Do you dispute the fact that that survey said the
4 engines on the SEAWIND II, at the time of the accident,
5 were 300-horsepower each?
6 A. Again, we're probably talking the same thing. A
7 marine engine is derated. When it's in a truck, it has a
8 different rating of horsepower than it does when it's in a
9 boat, and they can say that those are 300-horsepower
10 engines. I believe them to be 350.
11 Q. Do you know who makes that particular engine?
12 A. Detroit.
13 Q. Detroit Diesel?
14 A. Yes.
15 Q. Do you know the name or the model number of the
16 engine?
17 A. It's an 871.
18 Q. Do you know how Detroit Diesel rates that engine in
19 terms of horsepower?
20 A. I don't have that book and specifications, but in ten
21 different applications, they rate it ten different ways.
22 Q. Do those engines prone to overheat?
23 A. No.
24 Q. Do they tend to stall when they overheat?
25 A. Didn't say they overheated.

Page 19

1 Q. Did you operate the SEAWIND yourself as captain?
2 A. I operated the SEAWIND many times as captain.
3 Q. Did you operate the ALBANY as captain?
4 A. Not as captain. I've operated the ALBANY.
5 Q. Did you know that the barge DS 64 was 150 feet long
6 when you leased it to Fore River?
7 A. I did.
8 Q. Do you know what the weight of the DS 64 was when you
9 leased it to Fore River?
10 A. I know approximately the weight.
11 Q. What is it?
12 A. About 300-ton.
13 Q. That's unloaded?
14 A. That's as it was when I leased it. That's a
15 guesstimate.
16 Q. Do you know how much water she draws, the barge DS 64
17 draws when she is loaded?
18 A. Loaded, clarified the question, if you know.
19 Q. Packed with mud?
20 A. Don't get packed with mud.
21 Q. What does it get packed with?
22 A. Nothing, it's an empty hopper.
23 Q. What do you bring it out to the ocean to dump?
24 A. Don't dump.
25 Q. You never dump with the DS 64?

Page 20

1 A. I never have. It's not a dump barge. It was a hopper
2 barge.
3 Q. What's the difference between a dump barge and a
4 hopper barge?
5 A. A dump barge dumps. A hopper barge holds.
6 Q. How much did the barge DS 64 draw as a hopper barge
7       MR. FUREY: Empty or loaded?
8       MR. LEGRAND: Well, I just asked him loaded.
9 A. Don't know. You can load it until it sinks or you
10 can -- it depends on what's in it or what's on it.
11 Q. Do you know how much it draws empty?
12 A. About 4 feet.
13 Q. Do you know how much the SEAWIND draws?
14 A. 3-1/2.
15 Q. Do you know how much the ALBANY draws?
16 A. 11.
17 Q. How long is the ALBANY?
18 A. 100-foot.
19 Q. How much did the ALBANY weigh back in 12/11/02?
20 A. 400-ton.
21 Q. How much?
22 A. 400, 300. 400, depends on how she was ballasting.
23 Q. Can you give me that range again?
24 A. 3 to 400-ton.
25 Q. Did you know --

5 (Pages 17 to 2'

Page 21

1  A. Could weigh from 2 to 400-ton depending on what you
2  had on it for fuel, ballast.
3  Q. I understand. Did you know that the SEAWIND 2 weighed
4  less than 10,000 pounds when you leased it to Fore River?
5  A. I don't think it weighs less than 10,000 pounds. I
6  think you're wrong there.
7  Q. Once again, referring to that survey, when the SEAWIND
8  was repaired after the grounding, did you ever see the
9  portion of the survey that indicated the SEAWIND weighed
10  less than 10,000 pounds, when the survey was down after the
11  grounding to determine what needed to be repaired?
12  A. I don't recall any of that, but I believe you're wrong
13  on the 10,000 pounds. I believe that's more of a
14  surveyor's myth.
15  Q. You think I'm wrong or you think the survey is wrong?
16  A. I think the survey is wrong and you are giving the
17  same wrong information that he gave you. You have no
18  knowledge of your own. He is supposed to have knowledge.
19  Q. He didn't give it to me. The survey is at made out at
20  the request of C.B. Marine. That's your company, correct?
21  A. Right.
22  Q. Are you saying that you never saw the survey that was
23  made out--
24  A. I'm sure I've seen it. I'm sure I've seen it, but
25  just because I buy a newspaper and read something in it

Page 22

1  doesn't mean I believe it. You can write anything you want
2  in the paper and the surveyor can write anything he wants
3  on the survey.
4  Q. Mr. Hale, you have to let me finish my question before
5  you answer.
6  A. Well, I'm trying to be very pleasant here. I'm trying
7  to be a cooperative.
8  Q. You are doing a nice job. Let me finish the question
9  before you answer.
10  A. Good. Go ahead.
11  Q. Did you ever inform Fore River Dock & Dredge that the
12  SEAWIND II was too underpowered to tow the barge DS 64 in
13  open seas and bad weather?
14  A. Why would I ever say anything stupid like that?
15  Q. Isn't that what the Coast Guard determined in their
16  investigation following the grounding?
17  A. That's more stupid stuff from stupid people.
18  Q. So the survey that said the --
19      MR. FUREY: Just answer the question.
20  Q. -- SEAWIND II had 300-horsepower is giving stupid
21  information, correct, according to you?
22  A. It is not accurate in my mind.
23  Q. And the survey that said the SEAWIND II weighs less
24  than 10,000 pounds is giving more stupid information
25  according to you, correct?

Page 23

1  A. I don't believe he's correct.
2  Q. And in the Coast Guard report when it is determined
3  that the SEAWIND II is too underpowered to be pulling the
4  barge DS 64 in the open seas, in the weather conditions
5  that it was when it went aground, was more stupid
6  information by the Coast Guard, according to you, correct?
7      MR. MURPHY: The Coast Guard report is
8  inadmissible.
9      MR. FUREY: I object, as well.
10  Q. You can answer.
11      MR. LEGRAND: The question can be stricken by the
12  judge.
13  A. I told you that a good captain could have towed that
14  up the river --
15      MR. FUREY: Now wait a minute.
16  A. You asked me a question, I am giving you an answer.
17      MR. LEGRAND: Move to strike. Nonresponsive.
18  Can you read the question back again.
19      (The reporter read the requested matter.)
20  Q. And the Coast Guard report regarding the grounding
21  that concluded that the SEAWIND II was too underpowered to
22  pull the DS 64 in those conditions and caused and
23  contributed to the grounding, you think that's more stupid
24  information?
25      MR. MURPHY: Objection.

Page 24

1      MR. FUREY: Objection.
2      MR. BALTES: Objection to the form of the
3  question.
4      MS. ROBERTS: Objection.
5      MR. FUREY: The question is, do you think it's
6  stupid. I don't think that's the question he wants to ask
7  you.
8  Q. More stupid information.
9  A. It may not be stupid, but it's wrong because you're
10  talking about people that don't do it. They just talk
11  about it.
12  Q. The Coast Guard?
13  A. Yes. If you have a problem on the ocean in our day
14  and time, the last people you want to call is the Coast
15  Guard.
16      MR. FUREY: Stick to the question.
17  Q. Well, don't you think that it's lucky the Coast Guard
18  were there at the day of the grounding?
19      MR. FUREY: That's argumentative.
20  Q. I'm going to move off that, but think about it. Do
21  you think it was appropriate for a 600-horsepower, 25 and
22  11 inch boat to pull a 150 pound barge in open seas in bad
23  weather with the tide against you?
24  A. 150-pound barge? You're off on the --
25  Q. 150-foot?

6 (Pages 21 to 24)

Page 25

1       MR. BALTES: Objection. Foundation.
2   A.  Bad weather, I don't know that there was bad weather
3   there, but I wouldn't tow that barge in bad weather with
4   that tug. I'd tow it in good weather. I towed it up that
5   river with no problem.
6   Q.  Did you ever instruct your son, Roger A. Hale. not to
7   tow that barge in bad weather?
8   A.  I don't instruct my son in any of this. I lease
9   equipment.
10  Q.  Is it your testimony that would have prudent to wait
11  for the bad weather to pass before trying to tow the DS 64
12  with the SEAWIND II?
13      MR. MURPHY: Object to the form.
14      MR. FUREY: Objection to the form and foundation.
15      MR. LEGRAND: Read the question back and I'll
16  wait for my answer.
17      MR. MURPHY: But, Jack, I think you have got
18  to tell him what the weather was.
19      MR. LEGRAND: I don't want to hear any comments.
20      MR. MURPHY: You can't just say bad weather.
21  Does that mean sprinkles? He said he didn't know the
22  weather.
23      MR. LEGRAND: Read the question back.
24      (The reporter read the requested matter.)
25  Q.  On the day of the grounding?

Page 26

1       MR. FUREY: Renew the objection.
2   A.  I don't know that there was bad weather. I don't
3   believe there was. I was there later that night and there
4   was no bad weather.
5   Q.  Have you, yourself, ever pushed or towed or strapped
6   the SEAWIND alongside the barge DS 64 and moved it
7   yourself?
8   A.  Yes.
9   Q.  Have you ever pushed or pulled, towed the barge DS 64
10  with the ALBANY?
11  A.  No.
12  Q.  Do you hold a license that would qualify you to
13  operate the ALBANY?
14  A.  No.
15  Q.  Prior to leasing the SEAWIND II and barge DS 64 to
16  Fore River, did you ever seek an expert opinion as to
17  whether or not the SEAWIND II had enough power to tow the
18  barge DS 64 in open seas?
19      MS. ROBERTS: Objection to form.
20  A.  I never asked for an expert opinion. I did it.
21  Q.  Are you a marine architect?
22  A.  No.
23  Q.  Did you ever ask a marine architect for an opinion as
24  to whether or not the DS -- the SEAWIND II had enough power
25  to tow the barge DS 64 in open seas?

Page 27

1   A.  I wouldn't ask a marine architect and I certainly
2   wouldn't ask you.
3   Q.  Why wouldn't you ask a marine architect?
4   A.  Because it would be no bearing. I consider marine
5   architects to be cartoonists, and they draw funny papers
6   and the funny papers are the plans we build boats by. When
7   you can take a boat that weighs 400 tons and put funny
8   papers together that says it weighs 150 tons, you wouldn't
9   put much credibility in what the man said.
10  Q.  Would that also apply to a boat that weighed less than
11  10,000 pounds with respect to marine architect's opinion,
12  meaning the SEAWIND II?
13      MR. MURPHY: Objection.
14      MR. FUREY: Objection.
15  A.  SEAWIND II, I designed and had the SEAWIND II built,
16  and worked on the SEAWIND II. I know a lot about the
17  SEAWIND II and it weighs more than 10,000 pounds, first.
18  You keep saying 10,000 pounds. I just roughed out the
19  calculations and it weighs quite a bit more than that. I
20  think --
21  Q.  With fuel and water?
22  A.  You will be happy that it weighs more than 10,000
23  pounds.
24  Q.  I really don't care how much it weighs. That's what
25  the survey says.

Page 28

1   A.  You keep saying it is 10,000 pounds like it's Bible
2   and verse and you're wrong.
3   Q.  I'm not saying it's like Bible and verse, Mr. Hale.
4   I'm asking you. if you read the survey that says it weighs
5   less than 10,000 pounds --
6   A.  I didn't read that part of the survey.
7   Q.  Hold on, I'm talking. I'm asking the question, please
8   let me finish.
9   A.  Sure.
10  Q.  And I'll let you finish. I'm asking you, did you read
11  the survey report that was requested by C.B. Marine after
12  the SEAWIND grounded that said the vessel weighs less than
13  10,000 pounds?
14  A.  I probably did. I did four and a half years ago, but
15  I don't remember that part where it says it weighs less
16  than 10,000 pounds because I would have disputed it.
17  Q.  It actually say less than five tons but that's the
18  same thing, correct?
19  A.  Yeah, that would be less than 10,000 pounds. It
20  depends if they are long tons or short tons.
21  Q.  What's the difference between a long ton and a short
22  ton?
23  A.  A long ton is 2,280 pounds and a short ton is 2,000.
24  Q.  When do you use long tons instead of short tons?
25  A.  In nautical business, you use them all the time.

7 (Pages 25 to 2:

Page 29

1  Depends on what they want to use.
2  Q.  So, is the ALBANY 2 to 400,000 long tons or short
3  tons?
4  A.  You would have to go to one of your gentleman that --
5  Q.  I don't have any gentleman, Mr. Hale. I'm an
6  attorney, not a maritime architect.
7  A.  All right, but you would have to go to one of your
8  maritime architects and have them tell you.
9  Q.  You don't know whether the ALBANY is 2 to 400 long
10  tons or short tons, correct?
11  A.  I don't.
12  Q.  When the survey report says that the SEAWIND is 5,000
13  tons, you don't know if it's long tons or short tons and
14  you dispute it is even that, correct?
15  A.  I say it weighs more.
16  Q.  Do you know whether C.B. Marine, when your son was the
17  sole corporate officer, leased out the SEAWIND and barge
18  DS 64 combination to be used together in open ocean when he
19  was the sole corporate officer of C.B. Marine?
20  A.  I believe he did.
21  Q.  Now, General Marine Construction, C.B. Marine and Fore
22  River Dock & Dredge, are they all in the same office?
23  A.  No.  They were.  They are not anymore.
24  Q.  Back on December 11, 2002, were they all in the same
25  office?

Page 30

1  A.  Yes, they were.
2  Q.  Were they actually all in the same room?
3  A.  All the same office, yes.  It would be a bigger room.
4  There are dividers and whatnot.
5  Q.  And you were the exclusive employee for C.B. Marine at
6  that time?
7  A.  I was.
8  Q.  Who else was in the office on behalf of General Marine
9  Construction in that room?
10  A.  My wife, Larry Rowe.
11  Q.  That it?
12  A.  Uh-huh.
13  Q.  Who was in that room back on December 11, 2002 on
14  behalf of Fore River Dock & Dredge?
15  A.  Melody, Roger's wife.
16  Q.  Your daughter-in-law?
17  A.  Yes.
18  Q.  So you had you, your wife, your daughter-in-law and
19  Larry Rowe in that one room representing General Marine,
20  C.B. Marie, Fore River Dock & Dredge as of December 11,
21  2002; is that correct?
22  A.  That's correct, and Simba, Fore River Properties and
23  Sterling Realty.
24      MR. LEGRAND:  Move to strike.  Nonresponsive.
25  A.  I'm trying to tell you the companies represented

Page 31

1  there.
2      MR. LEGRAND:  Move to strike.  Nonresponsive.
3  Q.  If any one person was in that room, you, your wife or
4  your daughter-in-law, they would answer the phones on
5  behalf of General Marine Construction, C.B. Marine and Fore
6  River Dock & Dredge, correct?
7  A.  We handled the calls for General Marine, C.B. Marine
8  Simba, and the different corporations we were involved
9  with.
10  Q.  That's all of your other companies that you are trying
11  to get into this answer, correct?
12  A.  No, that's who we -- you asked me who we answered the
13  phone for and I told you.
14      MR. LEGRAND:  Can you read my question back,
15  please, and see if I can get an answer to that question.
16      (The reporter read the requested matter.)
17  Q.  Yes or no would be fine.
18  A.  I don't understand the question.  Would you read it
19  again.
20      MR. LEGRAND:  Read it again, please.
21      (The reporter read the requested matter.)
22  A.  I don't know if that's correct, no.  I don't think
23  that's correct because you are asking me a very pointed,
24  odd question here.
25  Q.  Let me ask it a different way.  If you're sitting in

Page 32

1  that office and the phone rang for General Marine
2  Construction, C.B. Marine, Fore River Dock & Dredge, and
3  you were the only one in there, would you pick the phone up
4  on behalf of all three of those companies in that room?
5  A.  I would pick up the phone and direct the call to who
6  it belonged to.
7  Q.  Would your wife do the same thing --
8  A.  Correct.
9  Q.  -- pick the phone up on behalf of General Marine,
10  C.B. Marine and Fore River Dock & Dredge if she was the
11  only one in the room?
12  A.  She would direct the call to whoever it belonged to.
13  Q.  And would your daughter-in-law, Melody Hale, pick up
14  the phone up, if it rang in that room, on behalf of General
15  Marine Construction, C.B. Marine and Fore River Dock &
16  Dredge?
17  A.  She would pick the phone up and direct it to
18  whoever --
19  Q.  That's a yes?
20  A.  She would direct the call to whoever it belonged to.
21  Q.  Is that a yes?
22  A.  I guess that's a yes.
23  Q.  Did C.B. Marine get a letter dated March 6, 2003 from
24  Douglas Packer of the Town of Newbury Conservation
25  Commission demanding the removal of the barge DS 64 and its

8 (Pages 29 to 32)

Page 33

1   contents from the beach on Plum Island?
2   A.  It did.
3   Q.  When you received the letter dated February 6th, 2003,
4   from Douglas Packer of the Town of Newbury Conservation
5   Commission, what did C.B. Marine do about the removal of
6   the barge DS 64 from the beach?
7   A.  We went to our insurance company and told him that we
8   needed to remove this barge.
9   Q.  Now, that letter was dated February 6, 2003 and the
10  grounding was 12/11/2002.  Would you please tell us
11  everything C.B. Marine did to remove the barge DS 64 and
12  its contents from the beach on Plum Island between 12/11/02
13  when the grounding occurred and February 6, '03 when the
14  letter was sent to C.B. Marine by the Town of Newbury
15  Conservation Commission?
16  A.  C.B. Marine leases equipment.  We really did nothing.
17  We relied on the lease to Fore River Dock & Dredge and the
18  insurance company.
19  Q.  So that's your answer, you did nothing during that
20  period of time, meaning C.B. Marine?
21  A.  Nothing we could do.  We don't have equipment to do
22  any of that.
23  Q.  Is that your answer, you did nothing?
24       MR. FUREY:  Wait a minute.  Finish your answer as
25  you decide to phrase it.

Page 34

1   A.  We did all we could to have our insurance company and
2   our equipment that was leased from us removed from the
3   beach.
4   Q.  When you say you did all we could, was that nothing?
5   A.  We talked to these people.  We talked to my son who is
6   leasing the equipment and said, you know, you have got to
7   get this off the beach, and he in turn talked to the
8   insurance company who was working with Marine Safety
9   Consultants to get this off the beach.
10  Q.  Is it fair to say that nothing was done to remove the
11  barge DS 64 between the time of the grounding on 12/11/02
12  and the time that that letter went out to C.B. Marine by
13  the Town of Newbury Conservation Commission on 2/6/03?
14       MR. FUREY:  Object to the form of the question.
15  A.  C.B. Marine leased the equipment.  We actually --
16       MR. LEGRAND:  Objection.  Move to strike.
17       MR. FUREY:  No, he is going to phrase the answer
18  the way he wants to phrase it.
19       MR. LEGRAND:  He's going to answer the question
20  the way I asked it also.
21       MR. FUREY:  He is answering the question.  Go
22  ahead.
23  A.  We have leased equipment.  We did everything we could
24  to prompt others that were leasing the equipment to get it
25  off the beach.

Page 35

1        MR. LEGRAND:  Move to strike.  Can you read the
2   question back.  I would like an answer to my question.
3        THE DEPONENT:  I sure think I'm giving one.
4        (The reporter read the requested matter.)
5   Q.  Yes or no would be fine.
6   A.  I can't answer yes or no, because we were not involved
7   in that.  We were not on the beach.  The people that leased
8   the equipment and our insurance company were on the beach.
9   Q.  My question is, what did C.B. Marine, your company,
10  the owner of the equipment, do between December 11, 2002
11  and February 6, 2003 when the Town of Newbury Conservation
12  Commission sent you the letter.  What did you do?
13       MR. FUREY:  That's been asked and answered.  You
14  can answer again, if you want.
15  A.  We couldn't do anything.  We physically couldn't do
16  anything.  We had leased equipment.  We had people in place
17  that had leased the equipment.  It was their responsibility
18  to get the equipment off the beach, not ours.
19  Q.  In your opinion --
20       MR. LEGRAND:  Move to strike.  Nonresponsive.
21  Q.  So, during the period of time we have been talking
22  about, C.B. Marine did nothing, correct?
23       MR. FUREY:  Object to the form of the question.
24  He has told you what they have done.
25       MR. LEGRAND:  He has told us he deferred to other

Page 36

1   people to do things.
2        MR. FUREY:  He said he prompted everyone else to
3   do it and his company didn't have the equipment.
4        MR. LEGRAND:  Objection to the coaching.
5        MR. FUREY:  If you want, we can read back the
6   former question.  He told you exactly what he did.
7        MR. LEGRAND:  I know what the former answer was.
8   I moved to strike it.  It's nonresponsive.
9        MR. FUREY:  It is not the answer you want, but it
10  is certainly responsive.
11       MR. LEGRAND:  Not true.  Absolutely not, I'm not
12  going to get into a conversation with you on the side.
13       MR. FUREY:  Ask another question.
14  Q.  Are you aware that children in the water on Plum
15  Island where the barge DS 64 grounded found two large
16  pieces of metal in the water last week?
17       MR. MURPHY:  Objection.
18  Q.  Did anybody inform you about that?
19  A.  No.
20  Q.  Are you aware that another piece of metal washed up
21  onto Dr. Keith Ablow's property on July 7, 2007, which is
22  three weeks ago?  Anybody inform you about that?
23       MR. BALTES:  Object to form.
24  A.  I may have been told about that.  I don't remember.  I
25  don't think so.  Washed up on Dr. Keith Ablow's property?

9 (Pages 33 to 36)

Page 37

1  Q. Yes.
2  A. You mean it washed up in his front yard? Must have
3  been quite a storm.
4  Q. Is that a yes or a no? Did you know about it?
5  A. No.
6  Q. Tell us everything C.B. Marine has done since the
7  grounding of the barge DS 64 to remove the barge debris and
8  its contents from Plum Island.
9      MR. FUREY: Asked and answered. Go ahead.
10  A. We have done everything we could.
11  Q. From the time it grounded up to the present?
12  A. We have done everything we could.
13  Q. Tell us what that is.
14  A. We have prompted the people that leased the equipment
15  to remove and return to us our property.
16  Q. Your son's company?
17  A. Right.
18  Q. What did your son do, to your knowledge -- your son's
19  company do to your knowledge?
20  A. You'd have to ask my son that.
21  Q. Who is James LaPlante?
22  A. An employee of Maine Coast Marine.
23  Q. Is he a co-owner with Guy Splettstoesser?
24  A. Yes, he is.
25      MS. ROBERTS: Objection. I object to the

Page 38

1  timeframe.
2  A. He's a corporate officer or something I really don't
3  know what kind of setup they have there -- had.
4  Q. Did James LaPlante work for companies owned by you for
5  approximately 15 years prior to December 11, 2002?
6  A. He had worked for me for a number of years in
7  different companies that I owned.
8  Q. Approximately -- approximately 15 years?
9  A. Could be, yeah, I believe.
10  Q. That was prior to the grounding, correct?
11  A. Yeah, but he did not work for me probably three or
12  four -- well, since '89.
13  Q. Did James LaPlante also work for your son Roger A.
14  Hale prior to the grounding?
15  A. I don't know whether he ever did or not.
16  Q. According to you, with respect to your prior
17  deposition testimony, does James LaPlante fit into the
18  category of one of your employees that call you their
19  adopted father?
20  A. Yes.
21  Q. And in his capacity as co-owner of Maine Coast Marine,
22  did James LaPlante provide captains to run equipment owned
23  by you, namely the SEAWIND and the ALBANY?
24      MS. ROBERTS: Objection.
25  A. We lease the equipment. We didn't actually operate

Page 39

1  any of this equipment to do anything. He -- I have
2  knowledge that he provided captains to run the equipment
3  for my son, but he didn't run anything for C.B. Marine.
4  Q. I understand that. Thank you for clarification. Did
5  you know that your daughter-in-law's deposition was taken a
6  couple weeks ago?
7  A. Yes.
8  Q. I was not here and we did not ask any questions, but I
9  have seen the records that were produced. Are you aware
10  that Maine Coast Marine provided captaining to Fore River
11  Dock & Dredge many times?
12      MS. ROBERTS: Objection.
13  A. I believe they do. Yeah. I believe they did, rather.
14  Q. Do you know James LaPlante was one of the owners of
15  Maine Coast Marine at the time of the grounding?
16  A. I believe he was.
17  Q. Do you know if Captain Guy Splettstoesser was
18  operating the SEAWIND II at the time of the accident was
19  his partner in ownership of Maine Coast Marine at the time
20  of the grounding?
21      MS. ROBERTS: Objection to form.
22  A. I believe he was, but again I have no direct knowledge
23  of any of that.
24  Q. Do you have knowledge about the fact that captain Guy
25  Splettstoesser was operating the SEAWIND II when the

Page 40

1  grounding occurred?
2  A. Yeah. I believe -- I was down there and he was the one
3  that was the captain so --
4  Q. Did you talk to Guy Splettstoesser about the
5  grounding?
6  A. Sure, I talked to all the men.
7  Q. Did he tell you he was captaining the vessel at the
8  time it grounded?
9  A. I don't think he jumped up and down and said: I'm the
10  captain, but that was my impression that he was the
11  captain.
12  Q. Do you know -- is it Mr. Eichhorn, Hans Eichhorn?
13  A. Eichhorn.
14  Q. Do you know him?
15  A. Yes, I do.
16  Q. How long have you known Mr. Eichhorn?
17  A. Since 1976.
18  Q. Has he ever worked for you?
19  A. Yes, he did.
20  Q. Has he ever worked for you as a captain?
21  A. Yes, he has.
22  Q. What kind of vessels did Mr. Eichhorn -- don't want to
23  get that wrong -- is he a Norwegian?
24  A. German.
25  Q. Almost as bad. What kind of vessels did Mr. Eichhorn

10 (Pages 37 to 40)

Page 41

1  operate for you when he worked for you?
2  A.  SEAWIND II, tug SALTEC, tug REED, tug ALBANY, maybe he
3  never ran ALBANY for us.  He ran the REED.
4  Q.  What kind of license did Mr. Eichhorn have to hold in
5  order to run, let's say, for instance, the tug boats, the
6  big tugs?
7  A.  Big tugs he had to have a captain's license.
8  Q.  And he has that as far as you know?
9  A.  Yes, he did.
10  Q.  Do you know how many years experience he has as a
11  captain?
12  A.  He started working for General Marine when he was 16
13  years old.  He worked there until he retired, well, until I
14  sold it in '89, until I got out of the construction
15  business basically in '89.  That's when he --
16  Q.  Is that in excess of 30 years that he was a captain?
17  A.  Yes.
18  Q.  After 1989, did he ever work for you again after 1989?
19  A.  No.
20  Q.  But he did work for your son with Fore River Dock &
21  Dredge?
22  A.  Yes, he did.
23  Q.  At the time of the grounding, he was a crane operator?
24  A.  Yes.
25  Q.  A question for educational purposes, when the barge

Page 42

1  was being towed from the Anasquam to the Merrimack, was any
2  work being done by the Fore River crew?  I know you don't
3  know personal information, but based on your experience,
4  wouldn't there be work being done to get set up for what
5  they would have to do when they arrive at the chain bridge
6  or are they just along for the ride?
7  A.  I think they are along for the ride, but I don't know
8  that.  If there was a problem, that's what they were there
9  for.
10  Q.  I guess I should have asked your son or Eric should
11  have.  Does that crew sleep down in New Gloucester when
12  they are working down there?
13  A.  Come again.
14  Q.  Do you know if the Fore River crew sleeps in
15  Gloucester, for instance, when they are working up there or
16  do they commute daily?
17  A.  I believe they slept down there.  I'm not sure, but I
18  believe so.  It would be crazy to come back and forth every
19  day.
20  Q.  That's what I'm thinking.  To the best of your
21  knowledge, at the time of the grounding, was the business
22  of Maine Coast Marine to provide captains to operate
23  vessels?
24      MS. ROBERTS:  Objection.
25  A.  I can answer your question in the basic -- Maine Coast

Page 43

1  Marine company was to do marine construction.  They did
2  pile-driving and dredging, the same as my son.  They leased
3  a barge from us to do it at one time.  I believe, although
4  I'm not sure we had the barge back at that point.  No, no,
5  they still had it.  They were still on charter to them.
6  Q.  When you say they, are you talking about Guy
7  Splettstoesser?
8  A.  Guy Splettstoesser.
9  Q.  And Jimmy LaPlante?
10  A.  Right.
11      MS. ROBERTS:  Objection.
12  Q.  So, your understanding is that Maine Coast Marine,
13  back in December of 2002, not only made captains available
14  to operate other vessels but also did pile-driving?
15  A.  Uh-huh.
16  Q.  Dredging too?
17  A.  Yeah.  They did everything.  Marine construction.
18  Q.  As a result of this grounding, did you, as a sole
19  corporate officer of C.B. Marine, sue your son Roger Hale
20  as sole corporate officer of Fore River Dock & Dredge in a
21  case in Maine Superior Court in Cumberland County?
22  A.  I believe I did.
23  Q.  What did you claim Fore River Dock & Dredge did wrong
24  for which you brought a lawsuit against them in the Maine
25  Superior Court as a result of the grounding?

Page 44

1  A.  I can't say that they didn't do anything wrong.  We
2  just wanted our money for the equipment they lost.  They
3  lost our equipment.
4  Q.  Did that case settle before trial?
5  A.  Yes, it settled.
6  Q.  Do you know which insurance companies contributed to
7  the settlement?
8      MR. FUREY:  I'm going to object.  We can talk
9  about this off the record if you want.  That settlement is
10  confidential by court order.
11      MR. LEGRAND:  Okay.
12      MR. FUREY:  I'm going to instruct him not to
13  answer.
14      MR. LEGRAND:  That's fine.  I'll accept that.
15  Q.  This may also be objectionable.  There were other
16  defendants, in addition to your son's company Fore River,
17  if I'm not mistaken, in that litigation in the State of
18  Maine, correct?  The question is, do you know which
19  defendants contributed to the settlement?
20      MR. FUREY:  I'll answer the first question
21  because it is a matter of public record.  There were other
22  defendants, but the settlement itself, the second half of
23  the question --
24      MR. LEGRAND:  Including who made contributions?
25      MR. FUREY:  The whole thing is confidential by

11 (Pages 41 to 44)

Page 45

1   court order. I can get you a copy of the order.
2       MR. LEGRAND: No, your say-so is good enough for
3   me.
4   Q.  Do you know who towed the SEAWIND II off the beach?
5   A.  Fore River Dock & Dredge hired a guy with a little
6   work boat and they loaded it off the beach.
7   Q.  Do you know who the guy was with the little work boat?
8   A.  No.
9   Q.  Are you aware that your son tried to call for a tow --
10   for a tug boat at Boston Fuel at the night of the grounding
11   to try to pull the DS 64 off the beach right away?
12   A.  I don't know.
13   Q.  You didn't know about that?
14   A.  If I do, I don't remember it. I don't remember it
15   right now.
16   Q.  Getting near the end. Now, in that case in Maine,
17   that C.B. Marine sued Fore River and Maine Coast Marine,
18   you were identified as an expert on behalf of C.B. Marine,
19   correct; do you remember that?
20   A.  I believe I was, yeah.
21   Q.  What do you believe Fore River did to cause or
22   contribute to the grounding? What were you going to
23   testify to had that case gone to trial that was going to
24   attached responsibility to Fore River Dock & Dredge for the
25   grounding?

Page 46

1   A.  I don't know that they did anything wrong. All I know
2   is that our equipment was gone and it was up on the beach.
3   Q.  That was going to be your expert testimony at the time
4   of trial?
5   A.  Well, obviously, there is probably a hundred things
6   that contributed to that grounding.
7   Q.  I'm going to ask you about those, but right now I'm
8   focusing on what Fore River -- what you were going to say
9   as an expert that Fore River did that caused or contributed
10   to the grounding?
11       MR. FUREY: I think if you will look at the
12   designation, I think where you and he are not connecting,
13   is you're trying to identify it to a particular party as
14   opposed to what his testimony in general was going to be.
15       MR. LEGRAND: I'll accept whatever he says.
16   A.  The problem lie with the captain and the captain's
17   decisions that night of what he did, back to I could have
18   taken that barge up that river with no problem. But I
19   probably wouldn't have taken it up at that tide. He took
20   it up at the bottom of the tide with an easterly wind.
21   That's not the thing to do. That's not prudent seamanship.
22   Q.  How much time have you spent captaining vessels in the
23   North Atlantic yourself?
24   A.  Very little. Very little time. I work on the harbors
25   and bays and intown and inshore, up the rivers.

Page 47



1   Q.  Do you have any experience with the weather in the
2   open seas in the northeast?
3   A.  Lots of it.
4   Q.  And when weather is coming in like it was on 12/11/02
5   from that direction, from the northeast, isn't it expected
6   that weather is going to get worse before it gets better?
7   A.  That's a general fact, that it usually gets worse
8   before it gets better.
9   Q.  You know that even with your limited experience on the
10   open seas, correct?
11   A.  Uh-huh.
12   Q.  You expect that the captain, Guy Splettstoesser,
13   should have known that?
14   A.  He should have know that.
15   Q.  Do you expect that Hans Eichhorn should have known
16   that as an experienced captain?
17   A.  He would have known that, but in his capacity as a
18   crane operator --
19   Q.  He's a crew member for a pile-driving crew?
20   A.  Right.
21   Q.  He's not even the foreman, correct?
22   A.  Right.
23   Q.  So, he had no authority to take any action?
24   A.  Correct.
25   Q.  But nevertheless, it was something he would have known

Page 48



1   as a seasoned captain in the North Atlantic, correct?
2       MR. FUREY: Objection to the form of the
3   question.
4   A.  I can't say what Mr. Eichhorn knows. He worked for me
5   for years. He was a very competent person. He did a great
6   job for me.
7   Q.  Let's move on to the next -- you might have a long
8   answer on this one, if I'm gleaning where you are going.
9   What do you believe Maine Coast Marine did to contribute to
10   the grounding?
11       MS. ROBERTS: Objection to the form.
12   Q.  Let me withdraw that question and ask it properly.
13   What do you believe Maine Coast Marine did to contribute to
14   the grounding?
15       MS. ROBERTS: Objection again, form.
16   A.  Again, I don't know that Maine Coast Marine -- I
17   believe that Captain Guy Splettstoesser, whatever capacity
18   you want to call him. I believe -- and my particular belief
19   is that he was a captain hired from Maine Coast Marine and
20   that he made some errors in judgment.
21   Q.  Could you list those for us.
22   A.  Well, first of all, when he was towing the barge up
23   the river, my understanding he ran it aground once.
24   Q.  Coming up the Anasquam?
25   A.  Right. Right, and that caused him to be late coming

12 (Pages 45 to 48)

Page 49

1  up the shore.
2  Q.  What, did he have to wait for a tide?
3  A.  Right because he had to get off when he got stuck.
4  The tide lifted the barge off.  It's just my understanding
5  and it's hearsay.  You should talk to others that were
6  there.
7  Q.  Okay.  I'm just asking you, as an expert, and I'm
8  going to ask what you knew about -- you were going to
9  testify at that trial up in Maine.
10  A.  Well, obviously --
11  Q.  I want only the information you have.  I think --
12  A.  The information I have is that those things happened,
13  he was late for the tide, and as he started up the river,
14  because it was low tide and easterly winds stands those
15  soldiers up at the mouth and he took a couple over the
16  boat.
17  Q.  Was your barge damaged at all as a result of the two
18  groundings on the Anasquam when the SEAWIND II was bringing
19  it out?
20  A.  If it was damaged, it would have been -- mud.
21  Anasquam mud.
22  Q.  What do you think had to happen to get the barge
23  floating again?
24  A.  Tide had to come.
25  Q.  They didn't try to get any weight off the barge.  They

Page 50

1  just waited for the tide to come?
2  A.  Tied to come.  That's my understanding of what
3  happened.  Hearsay again.
4  Q.  Do you remember who told you that the SEAWIND II had
5  grounded with the barge twice on the Anasquam on the way up
6  to the Merrimack on 12/11/02?
7       MR. FUREY:  Objection.
8  A.  I don't.
9  Q.  Don't remember?
10  A.  No.
11  Q.  Going back to that expert disclosure in the State of
12  Maine case, the language indicates that:  The defendants
13  were negligent in the following respects:  By attempting to
14  enter the harbor given adverse tide and weather conditions.
15  Can you tell me what is meant by that.  Want me to read
16  that again?
17  A.  I just did.  I just told you that they hit it at the
18  bottom of the tide and that's the wrong time to try and go
19  up that river.
20  Q.  Tell the us why it's the wrong time.
21  A.  Because it is very shoal at that point and the water
22  coming out of the river and tide and the wind blowing in
23  back of it stands up soldiers, big waves.  It's just a
24  horrible time to try and go up that river.  People just
25  don't do it.

Page 51

1  Q.  So your understanding is that the tide was still
2  coming out of the Merrimack and the wind was blowing in
3  from the northeast?
4  A.  Right.
5  Q.  Was that pulling the barge back up onto the SEAWIND?
6  A.  Well, yeah -- all kinds of things can happen out
7  there, but as they tried to go up through and they took a
8  couple of waves over the SEAWIND, it got chaotic.
9  Q.  Did you hear that the hatch was off the SEAWIND at the
10  time of the grounding?
11  A.  They were running with the hatch up.  I understand
12  that.
13  Q.  Why?
14  A.  Stupid.
15  Q.  Agreed, but do you know why?  Ventilation?
16  A.  No.  There is no reason.  No reason.
17  Q.  There's no good reason.
18  A.  No good reason.  No reason.
19  Q.  Do you know who opened the hatch?
20  A.  No, no idea.
21  Q.  Do you know what types of dogs the hatch on it?
22  A.  It has got a latch and dogs that dogs in under.
23  Q.  So. it could have been locked down tight --
24  A.  Absolutely.
25  Q.  That expert disclosure goes on to say:  The defendants

Page 52

1  were negligent by failing to properly exit the Anasquam
2  River thereby delaying arrival.  Can you elaborate on that
3  a little, explain that?
4  A.  That's the groundings and the time it took and then
5  being late at the mouth of the Merrimack, that caused this
6  whole thing.
7  Q.  Then by allowing the tug engine room to flood.  Is
8  that the hatch?
9  A.  Yes.
10  Q.  Also putting yourself in a position where the tide is
11  coming out, the wind is coming behind and the waves are
12  coming over?
13  A.  Yup.  Terrible seamanship.
14       MR. LEGRAND:  Just about done.  About three
15  pages.
16  Q.  You go on to say, the expert disclosure goes on to
17  say:  The defendant was negligent by failing to control the
18  tug and barge such that the tug was washed up against the
19  barge.  Can you tell us what you meant by that or what is
20  meant by that?
21  A.  They managed to follow the line, when they took a
22  couple of waves over -- when I got to the beach that night,
23  the tow line was in the wheel of the SEAWIND, and so after
24  he got the tow line in the wheel, then he was a crippled
25  boat, with one engine trying to -- of a twin engine boat,

13 (Pages 49 to 52

Page 53

1  real hard to move a twin engine boat with one engine.
2  Q.  Is it your understanding that one engine stalled, died
3  or went out and then the second engine seized when it got
4  caught in the rope?  Is that your understanding of how it
5  happened?
6  A.  No.
7  Q.  Tell us how you believe it happened.
8  A.  When I arrived at the scene that night, the barge
9  DS 64 was end over to the beach and the tug SEAWIND was
10 washed up on the shore.  Both engines were still running.
11 Q.  Was it similar to this Exhibit 1?
12 A.  No, not at all.  The barge was turned 90 degrees.  The
13 spuds were there, attempted to spud it down were broken
14 off.
15 Q.  The spuds broke off.  Please start again.  Sorry for
16 interrupting.
17 A.  Looking at this picture, this barge was turned
18 90 degrees from the direction as it is in this picture, the
19 endo to the sea.  This little tug right here was sitting on
20 this end of it, beside it, with its line in the wheel, as
21 you can see it, its still got it in its wheel at this
22 point, I believe.  Both engines were running.  My son
23 climbed aboard and shut the engines off.
24 Q.  So both engines were running, as far as you know?
25 A.  To the best of my knowledge both engines were running,

Page 54

1  climbed aboard and shut them off.
2  Q.  But the tow line was caught in one wheel?
3  A.  Correct.
4  Q.  Do you know if it was starboard or port?
5  A.  I can't tell you.
6  Q.  Can you point to the line still in the wheel?
7  A.  In that picture?  I wouldn't be able to see it, buried
8  under the sand right there.  The tow line was down in the
9  wheel.
10 Q.  Was it still attached to the tug?
11 A.  Yes.
12 Q.  What kind of a line was that, meaning how big?
13 A.  Nylon, big nylon, 12-inch nylon.
14 Q.  Getting back, do you remember a survey report that was
15 done at the request of C.B. Marine of the barge DS 64 and
16 its equipment on February 10, 2003 by John McDonough while
17 the barge was still grounded on the beach concerning the
18 value of C.B. Marine's loss?  Do you remember that?
19 A.  Yes, I do.
20 Q.  Do you remember that the survey estimated your
21 pre-loss or C.B. Marine's pre-loss value of the barge and
22 crane at $350,000?
23 A.  I believe that's correct.
24 Q.  Does C.B. Marine still have any lawsuits ongoing to
25 recover those damages?

Page 55

1  A.  No.
2  Q.  I'm not sure if you know about this, but there was a
3  five-page list of equipment that was lost on the barge
4  DS 64 and its equipment that was put together that was
5  presented as an exhibit at your daughter-in-law Melody
6  Hale's deposition a week or two ago.
7  A.  My daughter April worked in my office at that time.
8  In fact, I'm sorry, I didn't tell you that, but there was
9  one more employee in my office at that time.  My daughter
10 April worked for us at that time.  She, at my request, went
11 and interviewed the crews and wrote down everything she
12 could find that was aboard and everything that belonged to
13 us aboard the barges.  Some of it might have got askew in
14 that the nails weren't ours, the hammers probably weren't
15 ours, but the majority of that list was our equipment that
16 was on that barge.
17 Q.  Can you tell me, did I hear you say that the spuds
18 broke off when the DS 64 grounded?
19 A.  When I got there, there was a broken off spud in the
20 bow pocket.  It was still holding, but it wasn't 30 feet
21 long like it was before it left.
22 Q.  How long would you estimate it was?
23 A.  I want to say like 20.  Looks like a piece had been
24 broken off or it was awful deep in the sand.  I don't know.
25 Q.  Do you know how many spuds were down when you arrived?

Page 56

1  A.  Two.
2  Q.  Can you tell me what the design of the spuds were?
3  You said 30 feet long.  How thick is the metal?  What is
4  the diameter?
5  A.  Those are -- that particular barge had 20-inch spuds,
6  20-inch half-wall spuds.  I believe the bow spud was a
7  1-inch wall and then the stern spud was a 14-by-14 square
8  spud.
9        MR. LEGRAND:  That's all I have.  Thank you.
10       MS. ROBERTS:  I have some questions, Mr. Hale.
11       EXAMINATION BY MS. ROBERTS:
12 Q.  Did you drive down to the grounding site with Roger
13 that night?
14 A.  Yes, I did.
15 Q.  Did you stay with him the entire time he was there and
16 return with him?
17 A.  Yes.
18 Q.  When did you return to Portland?
19 A.  He may have come back -- he may have come back with
20 somebody else.  I believe he came back with me the next
21 morning.
22 Q.  Did you go to work at your office the next day?
23 A.  Yes.
24 Q.  Did Roger come into the work at the office the next
25 day?

14 (Pages 53 to 56)

1-800-540-3376      211 Marginal Way, #821, Portland, Maine  04101      207-772-6221

Page 57

1   A.  Roger spends most of his time out on the job sites.
2   In those days, he breezed through our office for 30 minutes
3   here and 30 minutes there.  I mean he didn't sit at a desk
4   in an office.
5   Q.  That's not my question.  Did he come in at any time
6   the next day?
7   A.  I'm sure he did.
8   Q.  Did you talk with Jimmy LaPlante the day after
9   accident?
10  A.  I don't know if I talked to him the day after the
11  accident, but I talked to him, you know, subsequently after
12  this mess.
13  Q.  Did you talk to Guy Splettstoesser the day after the
14  accident or two days after?
15  A.  I'm sure I did.
16  Q.  Did you ever see Guy Splettstoesser in your office
17  within a day or two of the accident?
18  A.  Boy, our office has 25, 35, 40, 50 people come through
19  a day, lots of days.  I'm sure he was through.
20  Q.  Did you call Key Bank to stop payment on a check that
21  was issued to Guy Splettstoesser by Melody the day after
22  the accident?
23  A.  I don't have anything to do with checks Melody writes.
24  Q.  That's not my question.  Did you call Key Bank to put
25  a stop payment on an account or on a check that Melody had

Page 58

1   written?
2   A.  Not me.
3   Q.  She would have written a check to him for any work
4   that he had done for Fore River on Fore River's account?
5   A.  Right.
6   Q.  So that wouldn't have anything to do with you?
7   A.  Nothing to do with us.
8   Q.  Did you have anything to do to with making a decision
9   that a stop payment should be made on a check that was
10  issued to Guy Splettstoesser the day after the accident?
11  A.  I have nothing to do with Fore River Dock & Dredge at
12  all other than that's my son who runs the company.
13  Q.  Because it's your son who runs the company, you have
14  an interest in protecting his company?
15      MR. MURPHY:  Objection.
16  A.  I don't know if it's an interest in protecting the
17  company, but it's my son, and obviously I have an interest
18  in my son.
19      MS. ROBERTS:  That's all I have.  Thank you.
20      MR. BALTES:  I have got a couple questions.
21      EXAMINATION BY MR. BALTES:
22  Q.  Roger, am I correct you don't have a captain's
23  license?
24  A.  No.
25  Q.  You've never had one?

Page 59

1   A.  No.
2   Q.  Have you ever been on a vessel in the Merrimack River?
3   A.  No.
4   Q.  So you never captained a vessel in the Merrimack
5   River?
6   A.  No.
7   Q.  Never captained a vessel exiting or entering the mouth
8   of Merrimack?
9   A.  No, but it's very common knowledge of the Merrimack or
10  how it runs and what it does?
11  Q.  Do you know what the weather forecast was for the
12  Gloucester/Newburyport area on the morning of December 11,
13  2002.
14  A.  I don't.
15  Q.  During the voyage of the SEAWIND and the barge, on the
16  Anasquam to the Merrimack, do you know how high the seas
17  were on that voyage?
18  A.  How high the seas were?
19  Q.  Yeah, how high the seas?
20  A.  When I got there, there was a small ripple rolling in.
21  The wind was from the northeast maybe 10, 15.  That's when
22  the barge was already ashore and up on the beach.
23  Q.  Prior to that, during the voyage from the Anasquam to
24  the Merrimack --
25  A.  I have no idea.  I wasn't there.

Page 60

1       MS. ROBERTS:  Let him finish the question first,
2   Mr. Hale.
3   Q.  Do you know what time high tide was on December 11,
4   '02?
5   A.  No, I do not.
6   Q.  Do you know when low tide was on December 11, 02?
7   A.  I don't have that information.  That's 4-1/2 years
8   ago.
9       MR. BALTES:  I think that's all I have.
10      MR. FUREY:  Are we done?
11      MR. LEGRAND:  We are done.
12          (TIME:  11:47 A.M.)
13
14
15
16
17
18
19
20
21
22
23
24
25

15 (Pages 57 to 60)



RECEIVED

FEB 0 7 2003

AI MARINE - BOSTON

TOWN OF NEWBURY
Office of
The Conservation Commission
Newbury, Ma. 01951-4799

C-B Marine Corporation
446 Commercial St.
Portland, ME. 04101

February 6, 2003

Dear Sirs,

On or about Dec. 11,2002, the barge "DS-64" with its cargo "(barge)" stranded on Plum Island, Newbury, Massachusetts .On December 12 2002. The Newbury Conservation Commission ordered the removal of the wrecked barge "DS-64" and the tugboat Seawind. The tugboat has been retrieved and the barge remains. The Commission is again demanding the removal of the barge and its contents from the barrier beach. It remains a threat to the health, safety, and welfare of the citizens of the Commonwealth of Massachusetts. The fact that two months have passed is making it harder to justify our original decision to allow the barges removal under Emergency Certification. The Commission members may require the filing of a Notice of Intent and receipt of an Order of Conditions before proceeding as time does not seem to be of the essence. This would increase costs. If an additional incentive is needed, The Wetlands Bylaws of the Town of Newbury gives the Commission the authority to assess fines of up to $300.00 per violation, per day. We have no real interest in delay, only in seeing removal of this obstruction. Our next regularly scheduled meeting will held on Feb.18, 2003. I would encourage you to attend and inform us of your intentions, as debate on the above items will occur.

Regards,

Douglas Packer
Conservation Agent

CC: Marine Safety Consultants Inc.

CC: AI Marine Adjusters, Inc.