UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
    Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
    Defendants

## PLAINTIFF KEITH ABLOW'S OPPOSITION TO GUY SPLETTSTOESSER'S MOTION FOR SUMMARY JUDGMENT

Now comes the plaintiff Keith Ablow who hereby opposes Guy Splettstoesser's Motion for Summary Judgment.

In addition to Plaintiff's Statement of Genuine Material Fact in Opposition to Guy Splettstoesser's Motion for Summary Judgment, Keith Ablow states as follows:

1. In the light most favorable to the plaintiff, Guy Splettstoesser was an employer of Maine Coast Marine Construction who was responsible for his conduct. Guy Splettstoesser was the pilot of the Seawind when it and barge DS64 grounded on December 11, 2002.

1

2.  Maine Coast Marine Construction was hired to pilot the Seawind II and/or the Albany and deliver barge DS64 for Fore River Dock & Dredge, Inc. on December 11, 2002.

3.  On December 11, 2002 the Tug Seawind II and the barge DS64 grounded on or near the property of Keith Ablow.

4.  Fore River Dock & Dredge, Inc. and C.B. Marine were ordered to remove the barge by the Town of Newbury.

5.  After the passage of several months, the barge was removed by cutting it into pieces and trucking it away.

6.  The plaintiff alleges that pieces of the barge remain on and near his property.

7.  The plaintiff has obtained an expert opinion that the value of his land has been reduced by between $400,000.00 and $500,000.00 due to the grounding.

8.  Signs are visible on the property and in adjacent areas warning of the danger of sharp metal from the grounded barge.

## MEMORANDUM OF LAW

### I.A.   This Motion Should Be Stayed Pending The Deposition Of Guy Splettstoesser

The plaintiff believes this Motion has been brought prematurely as Guy Splettstoesser has not been, but is scheduled to be deposed on September 4, 2007. The plaintiff duly noticed Splettstoesser's deposition during the discovery period and postponed the deposition to accommodate counsel, especially Mr. Splettstoesser's. The plaintiff alleges that negligence could be established at the deposition of Guy Splettstoesser and it is unfair to the plaintiff for this Honorable Court to decide this Motion without availing the plaintiff of his right to conduct Guy Splettstoesser's deposition. This motion, therefore, should be stayed pending Splettstoesser's deposition.

The plaintiff further argues several parties have already testified as to Splettstoesser's negligent operation of the tug and barge including Splettstoesser himself in depositions in other cases. For instance, Splettstoesser has admitted that the Tug Seawind was an inadequate vessel to tow the barge DS64 up the Merrimac River with the tide coming in. Splettstoesser Depo page 89.

In addition, other parties to this action have testified as to Guy Splettstoesser's negligence such that expert testimony is not required.

3

For Instance, Roger P. Hale has testified that Captain Splettstoesser was negligent in his operation of the Seawind. Deposition of Roger P. Hale pages 50-52.

**I.B.** **Liability Can Be Proven Without Expert Testimony As Evidence Of The Grounding Sets Out A Prima Facie Case Of Negligence**

It is not in dispute that the Tug Seawind and Barge DS64 grounded in Newbury, Massachusetts on December 11, 2002 while being piloted by Guy Splettstoesser.

The plaintiff argues that as a matter of law expert testimony is not required to prove the negligence claim. Most importantly, the plaintiff puts forth the line of cases which hold.

> "when a moving vessel collides with
> a fixed object there is a presumption
> that the moving vessel is at fault, and
> this presumption suffices to make out
> a prima facie case of negligence against
> all parties participating in the management
> of the vessel at the time of the contact."

4

The Oregon, 158 U.S. 186 (1895). Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co. 377 F. 2d 724, 726 (5th cir. 1967). Once the plaintiff establishes that a vessel collided with the shore, as in the present case, the burden of proof shifts to the defendant to rebut the presumption of negligence. Bunge Corp. v. Freeport Marine Services, 240 F 3d 919, 923 (11th cir. 2001). This presumption is very strong and places a "heavy burden" on the defendant to rebut. Id @ 923.

The presumption of negligence is also present upon evidence of a grounding. Mid-America Transportation Co., Inc. v. National Marine Service, Inc., 497 F. 2d 776 (8th cir. 1974). The presumption of negligence has the effect of a prima facie case of negligent navigation. Once evidence of the grounding is introduced, the burden is on the tug to rebut the prima facie case" Mid-America at 780.

The presumption of negligence is binding on all parties involved in the management of the vessel as well as the moving vessel. Bunge Corp. v. Freeport Marine Services, at 923.

In addition, the doctrine of res ipsa loquiter applies in the current case where: 1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of

5

the type that ordinarily does not occur in the absence of negligence. Lone Star Industries v. Mays Towing Co. at 1456-58 *citing* Stevens v. The White City, 285 U.S. 195 (1932) and Agri-Trans Corp v. Peavey Corp., 742 F.2d 1137, 1139 (8th Cir. 1984); American River Transportation v. Paragon Marine Services, 213 F. Supp.2d 1035, 1058 (E.D.Mo. 2002), *aff'd* 2003 WL 21251982 (8th Cir. 2003).

Although Dr. Ablow has the initial burden of showing negligence, this burden is met by the presumption of negligence followed by the Oregon Rule. Once Dr. Ablow establishes the grounding, it will be incumbent on Maine Coast Marine and other defendants to rebut this presumption. Expert testimony, therefore, must be brought by Maine Coast Marine to survive a directed verdict.

The plaintiff will be able to put on a prima facie negligence claim by virtue of the grounding and by testimony and admissions of parties and witnesses. Expert testimony, therefore is not required to prove negligence. The negligence count must survive as well as the related contribution and indemnification claims.

II.    Regarding the Trespass Claim, Guy Splettstoesser's Intent is a Question of Fact for the Jury

It is well established that the intent of a party, where the intent goes to the cause of action, is a completely improper area for disposition by summary

judgment. Quincy Mutual Fire Insurance Company v. Abernathy, 393 Mass 81 (1984).

In addition, the law which follows in section III is equally applicable to trespass claims.

III. **Maine Coast Marine, Or In The Alternative, Guy Splettstoesser's Contamination of Land Constitutes a Nuisance**

In his argument, Splettstoesser erroneously states that he cannot be held liable on a nuisance theory because he does not own the beach where the metal contamination took place. This argument is misplaced.

In the case of Lewis v. General Electric, Co., 254 F. Supp. 2d 205 (D.C. Mass 2003) the plaintiffs sued General Electric for depositing fill dirt containing PCBs on their property and in the vicinity of their property. General Electric was not an adjacent landowner to the plaintiffs. Rather, General Electric offered free fill dirt to it's employees and other Pittsfield residents. The fill dirt contaminated parts of Pittsfield and 33 plaintiffs who had positive PCB findings as well as 6 plaintiffs who could not demonstrate contamination brought nuisance claims against General Electric. The 6 non-contamination plaintiffs brought nuisance claims under a developing area of law which recognizes damages for "stigma" or proximity to contamination which reduces property values. General Electric

7

moved for summary judgment on the nuisance claims which was denied as "claims for diminution of property value... will lie, however, under theories of public or private nuisance, even where no physical contamination of the property has occurred." Lewis @ 217. Judge Ponsor further found although decisions have gone both ways on common law nuisance claims for diminution in property value caused by nearby contamination, "the stronger strand of jurisprudence favors recognizing such claims." Id @ 217. The Court further cited Allen v, Uni-First Corp., 151 VT. 229, 558 A. 2d 961 (VT 1988) "finding that the trial Court erred when it prevented the jury from properly considering the plaintiffs' claims their property values had decreased due to widespread contamination and the resulting public perception that [their town] was an unsafe place in which to live" Lewis @ 218.

The case at bar is identical in theory to Lewis. Dr. Ablow alleges that Maine Coast Marine, by it's pilot Gut Splettstoesser, contaminated both his land and adjoining beach front land by depositing a metal barge carcass upon it. To this day pieces of barge are still being found and signs surrounded his property which state:

> Danger
>
> Barge debris and sharp metal
>
> objects in shore waters and on
>
> beach. Use caution and avoid

this area.

It is the plaintiff's position, therefore, that the grounding and cutting up of the DS64 have created a nuisance which is recognized by Massachusetts Law.

## CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests that Guy Splettstoesser's Motion for Summary Judgment be denied or stayed pending Guy Splettstoesser's deposition.

Respectfully Submitted,
Plaintiff by his attorney

/s/ John P. LeGrand

_____
John P. LeGrand
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
617-623-3001
BBO # 550185

Dated: August 23, 2007

## CERTIFICATION OF SERVICE

I, John P. LeGrand, attorney for the plaintiff certify that on the 23rd day of August, 2007 I made service of the foregoing document titled;" Plaintiff Keith Ablow's Opposition to Guy Splettstoesser's Motion for Summary Judgment" with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

> Cathy S. Roberts, Esquire
> Robert J. Murphy, Esquire
> Mark G. Furey, Esquire
> Aaron K. Baltes, Esquire
> Michael S. D'Orsi, Esquire
> T. Christopher Donnelly, Esquire

> /s/ John P. LeGrand
> John P. LeGrand, Esquire




Case 1:05-cv-10347-RGS   Document 69-3   Filed 08/23/2007   Page 1 of 2
Case 1:05-cv-10347-RGS   Document 63-8   Filed 08/10/2007   Page 23 of 37
First Specialty v Maine Coast 7/30/07                            Guy Splettstoesser

**89**

1  A. Can you repeat that?
2  Q. Sure. Do you think that the Seawind was an inadequate
3     vessel to tow the barge DS 64 up the mouth of the
4     Merrimack River with the tide coming in?
5  A. Yes, I guess so. In any weather, yes.
6     MR. MURPHY: I am having trouble just hearing. I
7     think I have a cold.
8     (Reporter read back requested material.)
9     MR. MURPHY: In heavy weather?
10    THE DEPONENT: Any weather. More than none, I
11    guess.
12 Q. Well, I agree with Mark. It is not particularly germane
13    here, but in the interest of completeness, do you think
14    that with the tide coming out, you could have towed the
15    barge behind the Seawind up the Merrimack River in a
16    flat calm, no wind, no waves?
17 A. I think so.
18 Q. Let's move on.
19    Exhibit No. 9 is again part of the Coast Guard
20    report. This is a two-page document called report of
21    marine accident. A couple of questions prompted by
22    this. I have already asked you about the maximum size
23    of the tow which is item 25 C. 25 B down toward the
24    bottom says total horsepower of towing units and
25    somebody has written 600 horsepower. Is that accurate?

**90**

1  A. Yes. I think so. I think -- I believe this other sheet
2     said 350 horsepower for each engine.
3  Q. Six, 700?
4  A. Yes.
5  Q. That assumes both engines were running?
6  A. Yes.
7  Q. Earlier, halfway up the page, in No. 21, it says number
8     of persons onboard, five. Two on tug, three on barge
9     somebody has written.
10    At the point where the barge caught up to the tug
11    and the two vessels were beating against each other, was
12    that accurate, there were two of you on the tug and
13    three on the barge?
14 A. Yes.
15 Q. Who was the other fellow on the tug, the deckhand?
16 A. Yes.
17 Q. Whose name you don't recall?
18 A. I am not sure. I believe he is Roger Hale's nephew or
19    something.
20 Q. Up near the top, item 8, gross tons, there is a slash.
21    It says either 15 or 1.5 for the Seawind. Seawind was
22    26 feet long. Would that be 15 tons?
23 A. I believe it is 1.5 for the Seawind and 1,000 for the
24    barge.
25 Q. Oh, just 1.5 tons for the Seawind?

**91**

1  A. I believe so.
2  Q. And a thousand tons or gross tons, if you know, does
3     that -- does that actually denote the actual weight of
4     the barge or its displacement or some other thing?
5  A. Probably the displacement.
6  Q. Moving right along here, Exhibit 10, I am sure the other
7     lawyers have better maps or charts, but this is one that
8     was in the Coast Guard report or it is a copy of it. It
9     is a little hard to or at least for me to see, but if I
10    am reading this correctly, the Merrimack River comes in
11    from the left-hand edge of the page more or less halfway
12    down and everywhere there are little numbers, that would
13    denote some sort of depths in the Merrimack River?
14 A. Right.
15 Q. And then there is what seems to be somebody put a sticky
16    arrow for the point where the collision took place.
17    Again, I am guessing, but is that the approximate
18    location of where the tug and the barge collided with
19    each other as you just described?
20 A. Yes.
21 Q. And these two -- right where the collision took place is
22    kind of a space defined by two lines that go out that
23    are almost parallel but not quite. What do those lines
24    represent if you know?
25 A. Looking at it, I believe that's a lighthouse. So if you

**92**

1     are seeing white lights ahead of you, then that means
2     you are --
3  Q. In the channel?
4  A. -- in the middle of the range lights.
5  Q. In the middle of the range lights. So you are on the
6     right bearing to enter the river?
7  A. Yes.
8  Q. Navigation aide?
9  A. Right. Anything outside of those lines is probably --
10    you can see it right here. Red sector. You would see a
11    red light if you're outside of this line.
12 Q. Oh, yeah. I see you are pointing to sort of the
13    right-hand edge of the page about 2/3 of the way down?
14 A. Right. I am sure that intersects with it right there.
15 Q. Finally, there is another arrow that says grounding
16    which looks like it is on the shore of Plum Island. Is
17    that roughly where the vessels came to rest eventually?
18 A. Yes.
19 Q. Exhibit 11 from the Coast Guard report is a three-page
20    document, all of which seems to be printouts of weather
21    forecasts at different times on December 11, 2002. And
22    perhaps for different coastal waters.
23    Glancing at the ones on the first page, the first
24    of which seems to be 11:28 A.M., is this the weather
25    forecast or similar to the forecast that you received

Case 1:05-cv-10347-RGS   Document 69-3   Filed 08/23/2007   Page 2 of 2
Case 1:05-cv-10347-RGS   Document 63-8   Filed 08/10/2007   Page 22 of 37
First Specialty v Maine Coast 7/30/07                    Guy Splettstoesser

**85**

1  That would be accurate except that it wasn't
2  actually a wire, it was a soft line?
3  A. Right. It was a soft line.
4  Q. But otherwise, you are comfortable with that?
5  A. Yes.
6  Q. Okay. A little further down, right under there is a
7  blacked out name, it says, quote, water was on the deck
8  of the tug. Some entered the machinery space and
9  possibly shut down the starboard main engine. Unquote.
10     Let me read the next sentence. According to the
11  master and deckhands, the hatch is usually left open for
12  ventilation. Unquote.
13     Is that accurate, at some point after you had made
14  the turn and you were trying to go into the mouth of the
15  river, one of the engines stopped?
16  A. It is possible. I can't say if it did or not.
17  Q. Where did this information come from? I mean you were
18  running the Seawind. Would you have known if one of the
19  engines quit on you?
20  A. Hard to tell. It is loud and as fast as everything is
21  happening but I would think I would know, yeah.
22  Q. So it might have, it might not have, you are not sure?
23  A. Right.
24  Q. All right. Continuing down, it says within one to two
25  minutes, the tug was alongside the barge, unquote.

**86**

1  Tell me what had happened here to cause the barge
2  that was 300 feet behind you to be now alongside.
3  A. Just pretty much once you line up for the entrance
4  there, all that wind was on the stern of it and with the
5  big waves, you can't really control the tug too good. I
6  mean you can keep it going pretty much straight but I
7  think with that wind, that was behind the barge, it
8  pushed the barge onto me faster than I could get away
9  with it.
10 Q. So the barge actually picked up speed?
11 A. It was catching up to me, yes.
12 Q. You were towing at one and a half to two knots?
13 A. Right.
14 Q. You think with all the winds and waves behind it, it
15  actually exceeded that speed?
16 A. Right.
17 Q. Meanwhile, you were running into like a standing wave or
18  something at the mouth of the river?
19 A. Right.
20 Q. So the tug, was it actually stopped dead by these waves?
21 A. It could have been pretty close to it, yeah.
22 Q. Out of curiosity, do you have any idea what the outgoing
23  tidal currents from that river is?
24 A. I believe it was going.
25 Q. Right. But do you have any idea how fast?

**87**

1  A. I am not sure what the current of it was, no.
2  Q. If the --
3  A. But I think with that sea that was there, it was
4  definitely going.
5  Q. I guess my question is this, and this may be a stupid
6  question, suppose there had been no wind at all, no
7  northeast wind, no waves, just flat calm but the water
8  is coming out of the river because it is an ebb tide, if
9  you are able to tow at only one and a half to two knots,
10  if the current was three knots, you wouldn't have been
11  able to get up there anyway, would you?
12 A. Right. I mean if it was flat calm, we would have been
13  pushing doing six or seven knots anyway.
14 Q. Point well taken. Okay.
15     Did you look back and see the barge coming at you?
16 A. Yes.
17 Q. That must be a scary sensation.
18 A. Yeah.
19 Q. Then it says the wind -- quote, the wind and tidal
20  conditions caused the tug and barge to be in a port to
21  port position which I take it means portside to
22  portside?
23 A. Right.
24 Q. And, quote, while in this position, the tug was being
25  slammed against the barge, unquote. So would it be fair

**88**

1  to say at this point, it was beginning to look like you
2  were not going to be getting up the Merrimack River with
3  that barge?
4  A. Right.
5  Q. On the next page, under conclusions, conclusion number
6  three, somebody wrote, I guess, a Coast Guard officer,
7  quote, the Seawind is an inadequate vessel to tow a
8  barge the size of the barge DS 64 and was unable to
9  control the barge in the worsening weather. Unquote.
10  That's actually two conclusions. I guess would you
11  agree it was fair to say that under these particular
12  circumstances, you were unable to control the barge in
13  the worsening weather?
14 A. Yes.
15 Q. Do you think in hindsight that the Seawind was an
16  inadequate vessel to tow this particular barge --
17     MR. FUREY: I am going to object.
18 Q. -- up the mouth of the river?
19     MR. MURPHY: Object.
20     MR. FUREY: Object. I don't believe this line of
21  questioning is relevant to the declaratory judgment
22  action. May be relevant to some of the other actions
23  pending. But not to this.
24     MR. WHITMAN: Okay. Your objection is noted.
25 Q. Go ahead and answer.

Page 49

1  up the shore.
2  Q. What, did he have to wait for a tide?
3  A. Right because he had to get off when he got stuck.
4  The tide lifted the barge off. It's just my understanding
5  and it's hearsay. You should talk to others that were
6  there.
7  Q. Okay. I'm just asking you, as an expert, and I'm
8  going to ask what you knew about -- you were going to
9  testify at that trial up in Maine.
10 A. Well, obviously --
11 Q. I want only the information you have. I think --
12 A. The information I have is that those things happened,
13 he was late for the tide, and as he started up the river,
14 because it was low tide and easterly winds stands those
15 soldiers up at the mouth and he took a couple over the
16 boat.
17 Q. Was your barge damaged at all as a result of the two
18 groundings on the Anasquam when the SEAWIND II was bringing
19 it out?
20 A. If it was damaged, it would have been -- mud.
21 Anasquam mud.
22 Q. What do you think had to happen to get the barge
23 floating again?
24 A. Tide had to come.
25 Q. They didn't try to get any weight off the barge. They

Page 50

1  just waited for the tide to come?
2  A. Tied to come. That's my understanding of what
3  happened. Hearsay again.
4  Q. Do you remember who told you that the SEAWIND II had
5  grounded with the barge twice on the Anasquam on the way up
6  to the Merrimack on 12/11/02?
7      MR. FUREY: Objection.
8  A. I don't.
9  Q. Don't remember?
10 A. No.
11 Q. Going back to that expert disclosure in the State of
12 Maine case, the language indicates that: The defendants
13 were negligent in the following respects: By attempting to
14 enter the harbor given adverse tide and weather conditions.
15 Can you tell me what is meant by that. Want me to read
16 that again?
17 A. I just did. I just told you that they hit it at the
18 bottom of the tide and that's the wrong time to try and go
19 up that river.
20 Q. Tell the us why it's the wrong time.
21 A. Because it is very shoal at that point and the water
22 coming out of the river and tide and the wind blowing in
23 back of it stands up soldiers, big waves. It's just a
24 horrible time to try and go up that river. People just
25 don't do it.

Page 51

1  Q. So your understanding is that the tide was still
2  coming out of the Merrimack and the wind was blowing in
3  from the northeast?
4  A. Right.
5  Q. Was that pulling the barge back up onto the SEAWIND?
6  A. Well, yeah -- all kinds of things can happen out
7  there, but as they tried to go up through and they took a
8  couple of waves over the SEAWIND, it got chaotic.
9  Q. Did you hear that the hatch was off the SEAWIND at the
10 time of the grounding?
11 A. They were running with the hatch up. I understand
12 that.
13 Q. Why?
14 A. Stupid.
15 Q. Agreed, but do you know why? Ventilation?
16 A. No. There is no reason. No reason.
17 Q. There's no good reason.
18 A. No good reason. No reason.
19 Q. Do you know who opened the hatch?
20 A. No, no idea.
21 Q. Do you know what types of dogs the hatch on it?
22 A. It has got a latch and dogs that dogs in under.
23 Q. So, it could have been locked down tight --
24 A. Absolutely.
25 Q. That expert disclosure goes on to say: The defendants

Page 52

1  were negligent by failing to properly exit the Anasquam
2  River thereby delaying arrival. Can you elaborate on that
3  a little, explain that?
4  A. That's the groundings and the time it took and then
5  being late at the mouth of the Merrimack, that caused this
6  whole thing.
7  Q. Then by allowing the tug engine room to flood. Is
8  that the hatch?
9  A. Yes.
10 Q. Also putting yourself in a position where the tide is
11 coming out, the wind is coming behind and the waves are
12 coming over?
13 A. Yup. Terrible seamanship.
14     MR. LEGRAND: Just about done. About three
15 pages.
16 Q. You go on to say, the expert disclosure goes on to
17 say: The defendant was negligent by failing to control the
18 tug and barge such that the tug was washed up against the
19 barge. Can you tell us what you meant by that or what is
20 meant by that?
21 A. They managed to follow the line, when they took a
22 couple of waves over -- when I got to the beach that night,
23 the tow line was in the wheel of the SEAWIND, and so afte
24 he got the tow line in the wheel, then he was a crippled
25 boat, with one engine trying to -- of a twin engine boat,

13 (Pages 49 to 5