UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO: 05-10347-RGS

KEITH R. ABLOW,
    Plaintiff

V.

FORE RIVER DOCK & DREDGE, INC.,
C.B. MARINE CORPORATION AND
MAINE COAST MARINE CONSTRUCTION, INC.,
    Defendants

## PLAINTIFFS' STATEMENT OF GENUINE MATERIAL FACT IN OPPOSITION TO GUY SPLETTSTOESSER'S MOTION FOR SUMMARY JUDGMENT

Now comes the plaintiff who hereby states for the purposes of this Motion with Guy Splettstoesser's Statement of Undisputed Material Facts his agreement of disagreement as follows:

1.    Agreed.

2.    Agreed.

3.    Agreed.

4.    Agreed.

5.    Agreed.

6.    Agreed.

7.    Agreed.

8.    Agreed.

9.    Agreed.

10.    Agreed.

11.    Agreed.

12.    Agreed.

13.    Disputed – there is ample evidence that fore River Dock & Dredge believed it was contacting Maine Coast Marine Construction to request a pilot. This is a central disputed fact in the litigation put forth in complaints, answers and third-party complaints.

14.    Agreed.

15.    Agreed.

16.    Agreed.

17.    Disputed – Splettstoesser was warned about the weather by Maine Coast Co-owner James LaPlante and Roger P. Hale.

18.    Agreed although this is a statement of opinion rather than fact.

19.    Denied – for the same reasons as # 17.

20.    Agreed.

21.    Agreed.

22.    Agreed.

23.    Agreed.

24.    Agreed.

25.    Agreed.

26.    Agreed.

27.    Agreed.

28.    Agreed.

29.    Agreed.

30.    Agreed.

### Plaintiff Keith Ablow's Further Statement of Genuine Material Fact

1.    Captain Splettstoesser testified previously that the Tug Seawind was underpowered to manage the expected and typical currents of the Merrimack River.

Joint Pre-Trial Memorandum American Home Assurance Co. v. Maine Coast Marine and Guy Splettstoesser, C.A. No.: 04-CV-12597 WGY page 2.

Splettstoesser deposition page 89.

2.    Splettstoesser testified in hindsight he would not again attempt to negotiate the Merrimac River with a Tug with Seawind's size and horsepower.

Joint Pre-Trial Memorandum page 2.

3.    James LaPlante, co-owner of Maine Coast Marine Corporation warned Splettstoesser prior to the grounding not to attempt to navigate the Merrimack River in an underpowered vessel.

Joint Pre-Trial Memorandum page 3.

4.    Splettstoesser and Maine Coast Marine had a non-delegable duty to safeguard persons and property.

5.    Splettstoesser admits that at the time of the grounding, he was working within the scope of his employment at Maine Coast Marine.

Joint Pre-Trial Memorandum page 3.

6.    Splettstoesser drove to the job site in a Maine Coast Marine vehicle.

7.    Splettstoesser was called by Fore River on a cell phone owned by Maine
      Coast Marine.

      Joint Pre-Trial Memorandum page 4.

8.    Prior to the grounding, Fore River Dock & Dredge hired Maine Coast
      Marine to supply a licensed Captain.

      Affidavit of Roger Hale paragraph 10 page 2.

9.    Maine Coast Marine provided Guy Splettstoesser, a part owner and
      employee of Maine Coast to operate the towboat from Gloucester to
      Newburyport.

      Fore River Dock & Dredge, Inc.'s Motion for Partial Summary Judgment
      C.A..: 03-10318 WGY page 4.

10.   The U.S. Coast Guard report concluded that the Seawind was an
      inadequate vessel to tow the barge DS64.

11.   Prior to the commencement of the tow, Splettstoesser assumed he would
      be using the Albany, a much larger and powerful vessel to tow the DS64
      up the Merrimac River.

      Joint Pre-Trial Memorandum – Splettstoesser's Summary of Evidence
      C.A. No.: 04-cv-12597.

12.   Roger P. Hale has testified that the Pilot of Seawind was negligent in his operation. Roger P. Hale Deposition Pages 50-51 and 52.

13.   After the grounding, the Town of Newbury ordered C.B. Marine and Fore River Dock & Dredge to remove the barge DS64 from the beach.

Demand letters from the Town of Newbury.

14.   Pieces of metal have washed up on the beach until the present day.

15.   The washed up metal pieces have caused personal injury.

16.   The Town of Newbury has posted signs at the grounding site which state:

Danger Barge Debris & Sharp Metal Objects in Shore Waters & on the Beach. USE CAUTION & AVOID THIS AREA

Respectfully Submitted,
Plaintiff by his attorney

/s/ John P. LeGrand

_____
John P. LeGrand
John P. LeGrand & Associates, P.C.
375 Broadway, Suite 2
Somerville, MA 02145
617-623-3001
BBO # 550185

Dated: August 23, 2007

## CERTIFICATION OF SERVICE

I, John P. LeGrand, attorney for the plaintiff certify that on the 23rd day of August, 2007 I made service of the foregoing document titled;" Plaintiffs' Statement of Genuine Material Fact in Opposition to Guy Splettstoesser's Motion for Summary Judgment" with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Eric Stafford, Esquire
Cathy S. Roberts, Esquire
Robert J. Murphy, Esquire
Mark G. Furey, Esquire
Aaron K. Baltes, Esquire
Michael S. D'Orsi, Esquire
T. Christopher Donnelly, Esquire


/s/ John P. LeGrand
John P. LeGrand, Esquire

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ) | | |
| AMERICAN HOME | ) | |
| ASSURANCE COMPANY, | ) | |
| **Plaintiff** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | **04-cv-12597 WGY** |
| | ) | |
| MAINE COAST MARINE | ) | |
| CONSTRUCTION, INC. and | ) | |
| GUY SPLETTSTOESSER | ) | |
| **Defendants** | ) | |
| | ) | |

## JOINT PRE-TRIAL MEMORANDUM

The parties in the above captioned action, by their attorneys. submit the following Pre-

Trial Memorandum pursuant to and in accordance with Local Rule 16.5. The Final Pre-Trial

Conference is scheduled for July 5, 2006.

1.   **Concise Summary of the Evidence**

a.   **Plaintiff's Summary of Evidence**

**1(a) Plaintiff American Home Assurance Company's Summary of Evidence**

*LIABILITY*

At all times material hereto. American Home insured C.B. Marine Corporation, Fore

River Dock and Dredge and Roger Hale under a policy of marine insurance. C.B. Marine owned

the Tug SEAWIND. the Barge DS64 and the barge's tools and equipment. C.B. Marine leased

the Tug, Barge, tools and equipment to Fore River pursuant to a written agreement. The Tug

SEAWIND is a 25.5 foot steel-hulled push boat with a flat bottom and a blunt raked bow and

stern. The Barge DS64 was a dump scow fitted with a Comex Box containing a wide variety of tools and equipment used in Fore River's marine construction business.

Prior to December 11, 2002, Fore River hired defendant Maine Coast to provide a licensed captain to transport the Tug and Barge from Gloucester, Massachusetts to the "Chain Bridge" job site in Amesbury, Massachusetts. In its dealing with Maine Coast, Fore River dealt directly with Guy Splettstoesser, who was a 50% owner of Maine Coast and the only principal of the company who had a captain's license.

On or about December 11, 2002, the Tug SEAWIND and Barge DS64 and related tools and equipment grounded on the beach near Plum Island, at the mouth of the Merrimack River in or around Newburyport, Massachusetts. At the time of the grounding, Guy Splettstoesser was the vessels' Master. American Home respectfully asserts that it is beyond reasonable dispute that Maine Coast, through its employee and principal Splettstoesser, was negligent in causing the grounding.

Captain Splettstoesser himself testified that the Tug SEAWIND was underpowered to handle the expected and typical currents of the Merrimack River. He testified that he nonetheless brought the Tug and Barge to the mouth of the Merrimack River because at the time he was ignorant of the typical and normal prevailing conditions. He testified that in hindsight he would never attempt to negotiate the treacherous waters of the Merrimack with a vessel of the Tug SEAWIND'S size and horsepower. American Home respectfully asserts that the Captain's ignorance is clear and inexcusable negligence.

James LaPlante (the other 50% owner of Maine Coast) opined that Splettstoesser was at least partially to blame in causing the grounding. Mr. LaPlante testified that Mr. Splettstoesser unadvisedly attempted to navigate the mouth of the Merrimack River in an underpowered vessel.

2

Significantly, prior to the voyage. Mr. LaPlante warned Splettstoesser not to attempt to navigate the Merrimack River in an underpowered vessel. Mr. LaPlante testified that his warning "fell on deaf ears." At the time, Mr. Splettstoesser was preoccupied with financial difficulties, business disputes, marital/extramarital issues and an apparent pornography addiction.

The defendants' suggestion that Fore River was contributorily negligent is providing an underpowered vessel is specious. Fore River wanted to transport its vessels to the new job site and it hired a licensed captain to accomplish this task. Fore River relied on Splettstoesser's knowledge, education, training and expertise. As Captain. Splettstoesser had a non-delegable obligation to the owner and crew to insure the safety of person and property.

If Splettstoesser had reservations regarding the appropriateness of the Tug SEAWIND to withstand the expected conditions, he should have voiced these concerns to Fore River, and alternate arrangements could have been made. For example, Splettstoesser testified that Fore River's Tug ALBANY was of sufficient size and horsepower to safely tow the Tug SEAWIND and Barge DS64 on the voyage. However. Splettstoesser never voiced any concerns because he was allegedly ignorant of the dangers. Such ignorance by a licensed captain is clear negligence. However, when viewed in light of LaPlante's warning, Mr. Splettstoesser's actions can only be viewed as foolhardy.

Maine Coast's argument that Splettstoesser was not working within the scope of his employment at the time of the grounding is also specious. In his pleadings filed in this case. Splettstoesser has admitted he was working within the scope of his employment at Maine Coast at the time of the grounding.

Maine Coast's argument that even though Splettstoesser was a 50% owner of Maine Coast, his oral agreement with LaPlante prohibited him from bringing business into the company

is difficult to believe. However, even if it is true, this unusual arrangement is irrelevant to the case because Maine Coast and Splettstoesser failed to communicate it to Fore River. Fore River contacted a principal of Maine Coast by calling Splettstoesser on a cell phone paid for by Maine Coast. Splettstoesser drove to the job site in a truck paid for by Maine Coast. Fore River reasonably believed it was dealing with Maine Coast. As such, Maine Coast cannot argue that Splettstoesser was acting in his individual capacity based on Splettstoesser and LaPlante's alleged secret agreement that the job in question was not a "Maine Coast" job.

Prior to the grounding, Fore River was Maine Coast's biggest customer, accounting for 50% of Maine Coast's work. On one previous job, where Splettstoesser was running the Tug Albany at night, Splettstoesser requested that Fore River make the check payable to him individually. Fore River's acquiescence in this regard is irrelevant to the instant case, which does not involve the Tug Albany and does not involve a night job. Moreover, Fore River acquiescence in the way it drafted a prior check on a prior job certainly does not absolve Maine Coast from liability.

*DAMAGES*

The plaintiff suffered the following damages as a proximate cause of the defendants' negligence:

| | | |
|---|---|---|
| 1. | Sterling Equipment/Testa Demolition, wreck removal: | $205.000 |
| 2. | Additional wreck removal costs, per escrow report: | $50,475.98 |
| 3. | Liability for Fore River's clean up costs, per court order: | $33,199.87 |
| 4. | Liability for insured's tools and equipment, per court order | Appx. $300.000 |

**b.    Defendant's Summary of Evidence**

**1(b) Defendant Maine Coast Marine's Summary of Evidence**

Background and Discussion Regarding Liability

This litigation is a subrogation action filed by he insurance company that insured Fore
River Dock and Dredge and C-B Marine. American Home. The case stems from the December
11, 2002 grounding of the Tugboat SEAWIND II ("Tugboat") and its Barge DS64 ("Barge") on
Plum Island in Newbury. Massachusetts. The Tugboat and Barge were damaged in the accident.
Both vessels were owned by C-B Marine and leased to Fore River under an equipment lease
agreement entered into by the President of Fore River. Roger A. Hale, and C-B Marine. Fore
River is a maritime dredging and construction business that operates its business entirely with
leased vessels, tools and equipment. C-B Marine is owned by Roger A. Hale's father.

Maine Coast Marine Construction is a maritime construction company founded by James
LaPlante and another individual in the late 1990's. At the time of the grounding, Guy
Splettstoesser had recently become a co-owner and the Treasurer of Maine Coast Marine
Construction, Inc. His duties primarily consisted of performing labor on the job sites. be it on
barges, tugs or piers. His only administrative business task. as co-owner, was to do the billing.
He did not schedule any jobs, procure business or negotiate the terms of any contracts for the
company.  All of these business decisions were handled by James LaPlante. Financially. LaPlante
and Splettsoesser split the finances and profits evenly; but all the business decisions were left to
LaPlante by agreement. based on LaPlante's greater experience in these matters. LaPlante was 46
years old at the time of the 2002 grounding; and Splettsoesser was 26.

Both LaPlante and Splettsoesser expected to be paid a weekly check by their own
company based on the number of hours per week they worked. LaPlante was dissatisfied with
Splettstoesser's diminished attention to MCM business and with Splettstoesser's reduced hours

spent on the business in 2002. In late 2002, if Splettstoesser worked for MCM for less than 40 hours a week, he and LaPlante agreed he was going to be paid a weekly check based strictly on the hours he worked. In 2002, Splettstoesser personally performed several independent "side jobs" to earn more money, in addition to the weekly checks he drew from MCM.

MCM will establish that on December 11, 2002, Fore River hired Guy Splettsoesser in his individual capacity as a subcontractor to operate the tugboat involved in the subject grounding incident. Splettstoesser has been hired directly by Fore River before and this was one more occasion during which he was "moonlighting' to earn additional money.

Splettsoesser has testified in deposition that he was personally hired by Fore River to tow a barge from Gloucester, Massachusetts to Newburyport, Massachusetts on December 11, 2002. He testified he scheduled this job and only James LaPlante scheduled the jobs for MCM. He is also expected to testify at trial that he was neither acting on behalf of MCM nor doing anything to further MCM's interests at the time.

The U.S. Coast Guard concluded in its report on the grounding incident that the Tugboat Guy Splettstoesser used to tow the Barge was an inadequate vessel to tow a barge the size of the Barge DS64. Defendant Splettstoesser is expected to present expert testimony that C-B Marine and Fore River provided him with a Tugboat that was unseaworthy and that was inappropriate for the job.

MCM can only be found liable in this lawsuit under the doctrine of *respondeat superior*. MCM maintains that the evidence will not support the plaintiffs' claim that Splettstoesser was acting as an agent of MCM at the time of the grounding.

Damages

6

The damages were not the proximate cause of Maine Coast Marine. Damages will be left to proof. Any damages awarded will be reduced by the contributory negligence of the assureds in this subrogation action.

**c.   Defendant's Summary of Evidence**

1(c) Defendant Guy Splettstocsser Summary of Evidence

Background and Discussion Regarding Liability

This litigation is a subrogation action filed by American Home Assurance Company ("American Home"), the insurance company that insured Fore River Dock and Dredge, Inc. ("Fore River") and C-B Marine Corporation ("C-B Marine"). The case stems from the December 11. 2002 grounding of the Tugboat SEAWIND II and its Barge DS64 ("Barge") on Plum Island in Newbury. Massachusetts. The SEAWIND II and Barge were damaged in the accident. Both vessels were owned by C-B Marine and leased to Fore River under an equipment lease agreement entered into by the President of Fore River, Roger A. Hale, and C-B Marine.

Fore River is a maritime dredging and construction business that operates its business entirely with leased vessels, tools and equipment. C-B Marine is owned by Roger A. Hale's father, Roger P. Hale. The senior Hale is a successful businessman from Portland, Maine, and has worked in the marine construction business for decades.

Guy Splettstoesser is a 32-year-old resident of South Portland, Maine. He started working for the Hale family in high school as a deckhand, and worked for them for most of his adult life until joining Maine Coast Marine Construction. Inc. ("MCM") in 2002. At that time, Splettstoesser became licensed to operate vessels up to 200 tons.

MCM is a maritime construction company co-founded by James LaPlante in the late 1990's. LaPlante is 50 years old and had worked for the Hale family for many years prior to

founding MCM. In early 2002, Splettstoesser became a co-owner and the Treasurer of MCM. His duties primarily consisted of piloting ships and performing labor on the job sites. be it on barges, tugs or piers. His principal administrative business task. as co-owner. was to do the billing. He did not typically schedule any jobs. procure business or negotiate the terms of any contracts for the company. These business decisions were usually handled by LaPlante because he had greater experience in these matters. Financially, LaPlante and Splettsoesser split the finances and profits evenly.

Approximately half of MCM's work was with companies owned by the Hale family. Further, in the early winter of 2002, with LaPlante's blessing. Splettstoesser performed several independent "side jobs" for Fore River on a dredging job off Gloucester, Massachusetts. This job involving dredging mud near a marina on the Annisquam River near Gloucester and piling it on the Barge. The SEAWIND II would then bring the Barge to the open ocean, where the tugboat ALBANY would pick the Barge up and haul it three miles off the coast and dump the mud.

The ALBANY is a large tugboat over 100 feet in length that is designed to operate offshore. In contrast to the ALBANY, the SEAWIND II is a small tugboat 25.5 feet in length that is designed to operate in coastal areas. Splettstoesser was licensed to operate the ALBANY, but no license was needed to operate the SEAWIND II because it is less than 26 feet in length. Even deckhands would operate the SEAWIND II from time to time. All of Splettstoesser's prior side jobs with Fore River involved piloting the ALBANY.

On December 11, 2002. Splettstoesser was called by Fore River and asked to pilot the Barge from Gloucester approximately 10 miles to a new job site off Newburyport, Massachusetts. There was no discussion of which particular vessel would pilot the Barge, or

whether this particular job was through MCM or a side job. In any event, Splettstoesser agreed

to pilot the Barge and drove from Maine to Gloucester later that morning. At that time, the

Barge was located on the Annisquam River with the SEAWIND II. Splettstoesser assumed he

would pilot the Barge to the open ocean, stop and anchor the Barge. pick up the ALBANY. and

haul both the Barge and the SEAWIND II with the ALBANY to Newburyport. Based on these

assumptions. Splettstoesser assumed this was a side job, not a job through MCM.

Splettstoesser and four other crew members were on board either the SEAWIND II or the

Barge as it traveled up the Annisquam River. The leader of the crew was Ron Daigle, an

experienced foreman under whom Splettstoesser had worked for many years in his prior employ

with the Hale family. When the vessels reached the open ocean and Splettstoesser prepared to

stop, Daigle motioned for Splettstoesser to keep going and head directly for Newburyport.

Splettstoesser and another crewmember, Hans Eichorn, exchanged glances because they knew

the voyage would take longer (and be louder) because the SEAWIND II was a smaller boat with

noiser engines. Splettstoesser still felt the journey could be completed safely before rougher

weather forecast for that evening blew in.

Halfway to Newburyport. the weather got rougher earlier than expected. Because of this.

the SEAWIND II switched from pushing the Barge to pulling it. This slowed the vessels down.

By the time the vessels reached Newburyport. the weather had become quite rough. The

SEAWIND II passed the buoy for the Merrimack River and began to turn upriver, but a couple of

large twelve foot waves struck and the Barge could not make the turn. The SEAWIND II lost

control and hit the Barge. and both vessels ended up grounding on Plum Island.

After the grounding, Fore River tendered a check to MCM for Splettsoesser's services.

which LaPlante of MCM refused to cash. Roger A. Hale will testify that Fore River hired

9

Splettsoesser in his capacity as an employee of MCM to pilot the Barge to Newburyport using

the SEAWIND II. Fore River did not consider this particular job to be a "side job" because

Splettsoesser was not piloting the ALBANY, a vessel which required Splettsoesser's special

license. Splettsoesser has never been paid by Fore River for this job.

Damages

Whether the damages were the proximate cause of Splettsoesser's negligence, or caused

by Fore River's foreman insistence on using the SEAWIND II instead of the ALBANY, is an

issue in dispute. The extent of damages will be left to proof. Any damages awarded will be

reduced by the contributory negligence of the assureds in this subrogation action.

**2.     Facts Established by Pleadings or by Stipulation or Admissions of Counsel**

1.       The plaintiff, American Home Assurance Company (hereinafter "American

Home"), was and now is and at all pertinent times hereto, a corporation duly organized and

existing by virtue of the laws of the State of New York, with a principal place of business at 70

Pine Street, New York, New York, 10270. American Home is in the business of, *inter alia*,

underwriting marine risks.

2.       The defendant, Maine Coast Marine Construction, Inc., (hereinafter "Maine Coast

Marine") was and is a corporation duly organized and existing by virtue of the laws of the State

of Maine. At all times material hereto, Maine Coast Marine was in the business of, *inter alia*,

marine construction.

3.       At all times material hereto, Guy Splettstoesser was an individual residing within

the State of Maine. At the time of the grounding, Guy Splettstoesser was a principal of Maine

Coast Marine.

4.      At all times material hereto. Fore River Dock & Dredge, Inc. (hereinafter "Fore

River"), was a corporation duly organized and existing by virtue of the laws of the State of

Maine, with a principal place of business in Portland, Maine.

5.      At all times material hereto, C.B. Marine Corporation (hereinafter, "C.B.

Marine"), was a corporation duly organized and existing by virtue of the laws of the State of

Maine, with a principal place of business in Portland, Maine.

6.      At all times material hereto. Roger A. Hale. was and now is an individual residing

within the State of Maine.

7.      At all times material hereto. C.B. Marine owned the Tug SEAWIND. the Barge

DS64 and the barge's tools and equipment. C.B. Marine leased the Tug, Barge. tools and

equipment to Fore River pursuant to a written agreement. The Tug SEAWIND is a 25.5 foot

steel-hulled push boat with a flat bottom and a blunt raked bow and stern.

8.      Fore River, C.B. Marine and Roger A. Hale (hereinafter collectively. "the

Assureds"). entered into a contract of marine insurance. Protection & Indemnity Policy No.

B208102, along with various endorsements (hereinafter the "P&I Policy") as named Assureds.

with American Home. American Home agreed to insure the Assureds' vessels, Tug SEAWIND

and Barge DS64. among others. pursuant to the policy's terms, conditions and limitations.

against certain perils for the period of May 1, 2002 to May 1, 2003.

9.      On or about December 11. 2002. the Tug SEAWIND and Barge DS64 and related

tools and equipment grounded on the beach near Plum Island. at the mouth of the Merrimack

River in or around Newburyport. Massachusetts. At the time of the grounding. Guy

Splettstoesser was the vessels' Master.

10.    After the grounding. the Town of Newbury, through its Conservation
Commission, ordered C.B. Marine and Fore River to remove the Tug SEAWIND and the Barge
DS64 from the beach.

11.    Thereafter, through counsel, the plaintiff's Assureds made claim against American
Home under the policy's wreck removal provision, for costs incurred for the removal and salvage
of the Tug SEAWIND and Barge DS64, as well as for costs incurred in providing security. and
for the loss of certain equipment that was aboard the vessel at the time of the grounding.

**3.    Contested Issues of Fact**

1.    Whether the defendants were negligent. and if so. whether said negligence caused
the plaintiff's damages;

2.    Whether the defendants breached a Warranty of Workmanlike Performance. and if
so, whether said breach caused the plaintiff's damages;

3.    Whether the defendants breached a contract with the plaintiff. and if so. whether
said breach caused the plaintiff's damages;

4.    Whether the plaintiff is entitled to indemnity from the defendants for its damages
arising out of or incidental to the grounding of the Tug SEAWIND and the Barge DS64.

5.    Whether the plaintiff is entitled to contribution from the defendants for its
damages arising out of or incidental to the grounding of the Tug SEAWIND and the Barge DS64.

6.    The amount. nature and extent of the plaintiff's damages.

7.    Whether Defendant Splettstoesser was acting as an agent of/within the scope of
his employment with Maine Coast Marine Construction at the time of the grounding incident on
December 11, 2002:

8.    Whether Defendant Splettstoesser was negligent in performing his captain's duties on December 11, 2002;

9.    Whether Fore River, the Tug owner, and the assured in this subrogation case, was contributorily negligent in providing an unseaworthy or underpowered vessel for the tow on December 11, 2002:

10.    Whether the negligence, if any, of Defendant Splettsoesser was the proximate cause of the plaintiff's damages?

11.    Whether the negligence, if any, of Fore River was the proximate cause of the plaintiff's damages?

12.    Whether Defendant Splettstoesser was acting as an agent of/within the scope of his employment with Maine Coast Marine Construction at the time of the grounding incident on December 11, 2002;

13.    Whether Defendant Splettstoesser was negligent in performing his captain's duties on December 11, 2002;

14.    Whether Fore River, the Tug owner, and the assured in this subrogation case, was contributorily negligent in providing an unseaworthy or underpowered vessel for the tow on December 11, 2002:

15.    Whether the negligence, if any, of Defendant Splettsoesser was the proximate cause of the plaintiff's damages?

16.    Whether the negligence, if any, of Fore River was the proximate cause of the plaintiff's damages?

**4.    Jurisdictional Questions**

None.

5.   **Questions Raised by Pending Motions**

None.

6.   **Issues of Law**

The parties do not expect any unusual issue of law.

7.   **Requested Amendments to the Pleadings**

American Home has brought this case as subrogee of C.B. Marine, Fore River and Roger

Hale. The monies expended by American Home were monies paid on behalf of its insureds

under the policy of insurance. As such, American Home respectfully prays that the case caption

as communicated to the jury be styled in the names of the insured and that the jury not be

informed of the presence of insurance.

8.   **Additional Matters to Aid in Disposition of the Action**

None at this time.

9.   **Probable Length of Trial**

The Parties estimate that the trial of this case will take approximately 5 days.

10.   **Witnesses**

a.   **Plaintiff's Witnesses**

In addition to those witnesses listed by the Defendants, the Plaintiff reserves the right to

call the following witnesses:

1.   Lincoln Purdy
c/o American International Marine Agency of MA
99 High Street
Boston, MA

2.   Carole Peterson
c/o American International Marine Agency of MA
99 High Street

Boston, MA

3.  Christine Crawford
    c/o FM Global Insurance
    Norwood, MA

4.  Roger P. Hale
    W. Scarborough, ME

5.  Roger A. Hale
    Limington, ME

6.  Attorney Leonard Langer
    Portland, ME

7.  David Sterling
    Cape Elizabeth, ME

8.  Representative of ARI Insurance

9.  Representative of USCG

10. David Dubois, Neil Rosen or other representative of Marine Safety Consultants
    22 Water Street
    Fairhaven, MA

11. Michael Collyer (factual/expert)
    Marine Safety Consultants
    22 Water Street
    Fairhaven, MA

12. Richard Harden
    Marine Safety Consultants
    Portland, ME

13. Douglas Packer or other representative Town of Newbury

14. Guy Splettstoesser and/or other representative of Main Coast Marine Corporation

15. Ron Daigle
    Durham, Me

16. Hans Eichorn
    Portland, ME

17.     Michael Buchanan
        Gorham. ME

18.     John T. Harding Esq.
        Morrison Mahoney & Miller
        20 Summer St.
        Boston, MA

19.     Representative First Specialty Ins.
        Overland Park, Kansas

20.     Capt. Dave Swiss
        or other representative of Sea Tow Services

21.     Representative Cashman Equipment Corp.
        Boston, MA

22.     Representative Testa Demolition
        Boston, MA

23.     Lorna Rosquites
        Al Marine Adjusters
        99 High Street
        Boston, MA

24.     James LaPlante
        Main Coast Marine Construction

25.     Melody Hale
        Limington. ME.

26.     Attorney Nico Walsh
        Portland, ME

**b.     Defendant's Witnesses**

**Defendant Maine Coast Marine's Witnesses:**

In addition to those witnesses listed by the other parties. the Defendant Maine Coast Marine Construction, Inc. reserves the right to call the following witnesses:

1.      Roger A. Hale
        Limington, ME

2.      Melody Hale

Limington, ME

3.      Guy Splettstoesser
        So Portland, ME

4.      James LaPlante
        So. Portland, ME

5.      Nico Walsh, Esq.
        Portland, ME

6.      Roger P. Hale
        West Scarborough, ME

7.      Rick Harden
        Marine Safety Consultants

### c.    Defendant's Witnesses

**Defendant Splettsoesser's Witnesses:**

In addition to those witnesses listed by the other parties, the Defendant reserves the right to call the following witnesses:

1.      Roger A. Hale
        Limington, ME

2.      Melody Hale
        Limington, ME

3.      Guy Splettstoesser
        So Portland, ME

4.      James LaPlante
        So. Portland, ME

5.      Nico Walsh, Esq.
        Portland, ME

6.      Roger P. Hale
        West Scarborough, ME

7.      Thomas Hill
        Marine Expert

11.   **Proposed Exhibits**

A.   **Plaintiff's Proposed Exhibits**

In addition to the exhibits listed by the Respondents, the Petitioner reserves the right to

introduce the following exhibits:

      a.     Exhibits attached to Petitioner's Motion for Summary Judgment in the case of American Home Assurance Company v. C.B. Marine Corp., et al.

      b.     Exhibits attached to Respondents Motion for Summary Judgment in the case of American Home Assurance Company v. C.B. Marine Corp.. et al.

      c.     Photographs of vessels and wreck removal scene;

      d.     Exhibits attached to Affidavit of Lincoln Purdy;

      d.     No cure no pay removal contract;

      e.     Invoices for wreck removal;

      f.     Documents concerning previous payments received by Maine Coast Marine;

      g.     Pleadings;

      h.     Fore River invoices

      i.     Removal Orders, Town of Newbury

      j.     USCG Report

      k.     Plan of vessel

      l.     Survey of vessel

      m.     Underwriting File

      n.     Files of Marine Safety Consultants

      o.     Escrow Print out

p.      List of damaged/lost equipment provided by Fore River

q.      List of damaged/lost equipment provided by Fore River (with values)

R.      Correspondence from Great Meadow Farm to Mike Collyer regarding dune restoration

S.      Correspondence from Attorney Remmel dated September 1, 2004, September 9, 2004, August 31, 2005,

T.      Wreck removal plan

U.      Master Equipment Lease Agreement between C.B. Marine and Fore River

V.      WPA Emergenct Certification Form

W.      American Home Ins. Policy

X.      American Home checks re:  wreck removal and related costs

Y.      Nautical Chart

Z.      All exhibits from depositions

AA.     Charges of Fore River for work at site

BB.     Deposition Transcripts

CC.     Deposition transcripts of individuals aboard Tug Seawind and Barge DS64 prior to grounding

DD.     Maine Coast Payroll records

EE.     Maine Coast invoices

## B.      **Defendant's Proposed Exhibits**

### Defendant Maine Coast Marine's Proposed Exhibits

In addition to the exhibits listed by the other parties, Defendant Maine Coast Marine reserves the right to introduce the following exhibits:

a.      Deposition exhibits to Roger A. Hales's 11/14/05 deposition transcript;

b.      Deposition exhibits to James LaPlante's 11/14/05 deposition transcript;

c.      Maine Coast Marine's payroll records:

d.      Records of payments made to Guy Splettsoesser by Fore River;

e.      Interrogatory Answers of Guy Splettstoesser filed in lawsuit of C.B. Marine v Maine
        Coast Marine and Fore River v Guy Spletttstoesser, docket number CV-04-774

f.      Records of payments made to Maine Coast Marine by Fore River;

g.      Maine Coast Marine Invoices to Fore River;

h.      Fore River Vendor Quick Reports;

i.      Fore River Employee Quick Reports;

j.      Fore River Account Quick Reports

k.      Deposition Transcript of Guy Splettstoesser of 6/27/06

l.      Deposition Exhibits to Guy Splettstoesser deposition transcript of 6/27/06

m.      Deposition Transcript of James LaPlante of 6/27/06

n.      Deposition Exhibits to James LaPlante's deposition transcript of 6/27/06.

o.      Deposition transcript of Roger A. Hale of 11/14/05

p.      Deposition Exhibits to Roger A. Hale's deposition transcript of 11/14/05.

q       Deposition transcript of Roger P. Hale of 11/12/05.

r.      Corporate records of Maine Coast Marine Construction, Inc.

**c.      Defendant's Exhibits**

        In addition to the exhibits listed by the other parties, Defendant Splettsoesser reserves the
right to introduce the following exhibits:

a.      Map of voyage from Gloucester to Newburyport;

20

**American Home Assurance Company**


/s/_____
Robert J. Murphy, BBO # 557659
HOLBROOK & MURPHY
15 Broad Street
Boston. MA  02109
(617) 428-115


**Maine Coast Marine Construction**


/s/

_____
Cathy Skeirik Roberts, Esq.
BBO #547407
THOMPSON & BOWIE. LLP
Three Canal Plaza
P.O. Box 4630
Portland, ME  04112
(207) 774-2500


**Guy Splettsoesser**


 /s/_____
Aaron K. Baltes, ME Bar No. 8754
NORMAN, HANSON & DETROY, LLC
415 Congress Street
Portland. ME 04103
(207) 774-7000

Case 1:05-cv-10347-RGS   Document 70-3   Filed 08/23/2007   Page 1 of 1
Case 1:05-cv-10347-RGS   Document 63-8   Filed 08/10/2007   Page 23 of 37
First Specialty v Maine Coast 7/30/07                              Guy Splettstoesser

## 89

1   A.   Can you repeat that?

2   Q.   Sure. Do you think that the Seawind was an inadequate

3        vessel to tow the barge DS 64 up the mouth of the

4        Merrimack River with the tide coming in?

5   A.   Yes, I guess so. In any weather, yes.

6            MR. MURPHY: I am having trouble just hearing. I

7        think I have a cold.

8            (Reporter read back requested material.)

9            MR. MURPHY: In heavy weather?

10           THE DEPONENT: Any weather. More than none, I

11       guess.

12  Q.   Well, I agree with Mark. It is not particularly germane

13       here, but in the interest of completeness, do you think

14       that with the tide coming out, you could have towed the

15       barge behind the Seawind up the Merrimack River in a

16       flat calm, no wind, no waves?

17  A.   I think so.

18  Q.   Let's move on.

19           Exhibit No. 9 is again part of the Coast Guard

20       report. This is a two-page document called report of

21       marine accident. A couple of questions prompted by

22       this. I have already asked you about the maximum size

23       of the tow which is item 25 C. 25 B down toward the

24       bottom says total horsepower of towing units and

25       somebody has written 600 horsepower. Is that accurate?

## 90

1   A.   Yes. I think so. I think -- I believe this other sheet

2        said 350 horsepower for each engine.

3   Q.   Six, 700?

4   A.   Yes.

5   Q.   That assumes both engines were running?

6   A.   Yes.

7   Q.   Earlier, halfway up the page, in No. 21, it says number

8        of persons onboard, five. Two on tug, three on barge

9        somebody has written.

10           At the point where the barge caught up to the tug

11       and the two vessels were beating against each other, was

12       that accurate, there were two of you on the tug and

13       three on the barge?

14  A.   Yes.

15  Q.   Who was the other fellow on the tug, the deckhand?

16  A.   Yes.

17  Q.   Whose name you don't recall?

18  A.   I am not sure. I believe he is Roger Hale's nephew or

19       something.

20  Q.   Up near the top, item 8, gross tons, there is a slash.

21       It says either 15 or 1.5 for the Seawind. Seawind was

22       26 feet long. Would that be 15 tons?

23  A.   I believe it is 1.5 for the Seawind and 1,000 for the

24       barge.

25  Q.   Oh, just 1.5 tons for the Seawind?

## 91

1   A.   I believe so.

2   Q.   And a thousand tons or gross tons, if you know, does

3        that -- does that actually denote the actual weight of

4        the barge or its displacement or some other thing?

5   A.   Probably the displacement.

6   Q.   Moving right along here, Exhibit 10, I am sure the other

7        lawyers have better maps or charts, but this is one that

8        was in the Coast Guard report or it is a copy of it. It

9        is a little hard to or at least for me to see, but if I

10       am reading this correctly, the Merrimack River comes in

11       from the left-hand edge of the page more or less halfway

12       down and everywhere there are little numbers, that would

13       denote some sort of depths in the Merrimack River?

14  A.   Right.

15  Q.   And then there is what seems to be somebody put a sticky

16       arrow for the point where the collision took place.

17       Again, I am guessing, but is that the approximate

18       location of where the tug and the barge collided with

19       each other as you just described?

20  A.   Yes.

21  Q.   And these two -- right where the collision took place is

22       kind of a space defined by two lines that go out that

23       are almost parallel but not quite. What do those lines

24       represent if you know?

25  A.   Looking at it, I believe that's a lighthouse. So if you

## 92

1        are seeing white lights ahead of you, then that means

2        you are --

3   Q.   In the channel?

4   A.   -- in the middle of the range lights.

5   Q.   In the middle of the range lights. So you are on the

6        right bearing to enter the river?

7   A.   Yes.

8   Q.   Navigation aide?

9   A.   Right. Anything outside of those lines is probably --

10       you can see it right here. Red sector. You would see a

11       red light if you're outside of this line.

12  Q.   Oh, yeah. I see you are pointing to sort of the

13       right-hand edge of the page about 2/3 of the way down?

14  A.   Right. I am sure that intersects with it right there.

15  Q.   Finally, there is another arrow that says grounding

16       which looks like it is on the shore of Plum Island. Is

17       that roughly where the vessels came to rest eventually?

18  A.   Yes.

19  Q.   Exhibit 11 from the Coast Guard report is a three-page

20       document, all of which seems to be printouts of weather

21       forecasts at different times on December 11, 2002. And

22       perhaps for different coastal waters.

23           Glancing at the ones on the first page, the first

24       of which seems to be 11:28 A.M., is this the weather

25       forecast or similar to the forecast that you received

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY, )<br><br>Petitioner )<br><br>v. )<br><br>FORE RIVER DOCK & DREDGE, INC., C.B. MARINE CORPORATION and ROGER A. HALE, )<br><br>Respondents ) | CIVIL ACTION<br>NO.: 03 10318WGY |

## AFFIDAVIT OF ROGER A. HALE

My name is Roger A. Hale and this Affidavit is given under oath and is true and accurate based upon my personal knowledge.

(1) I am the sole owner and President of Fore River Dock & Dredge, Inc. "Fore River") which is a Maine corporation with offices in Portland, Maine.

(2) The principal business of Fore River is providing marine construction and dredging services in New England, primarily in Maine, Massachusetts and New Hampshire.

(3) Fore River does not itself own barges, towboats, tools and equipment to perform its work, except for some small amount of hand tools. It is a project oriented company, and leases vessels, cranes, towboats, tugs, tools and equipment from others when needed to perform its work.

(4) A principal supplier of vessels and equipment to Fore River is C-B Marine, Inc. ("C-B"), also located in Portland, Maine. At the time of the loss in question on December 11, 2002, the Barge DS-64 ("Barge"), the Towboat Sea Wind II ("Towboat") and the tools and equipment aboard the Barge, including a Lima 1200 crane, were leased from C-B under a Master Lease Agreement annexed hereto as Exhibit 1.

(5) As part of the operations of Fore River, it obtains insurances for its business through local insurance brokers. Until 2002, I had caused Fore River to obtain insurances

through ARI Insurance Agency in Portland, using as a contact David Sterling who had handled my company's insurances and my family's insurances for many years. Mr. Sterling retired in approximately 2001, and for 2002 Fore River moved its insurance business to Clark Associates in Portland.

(6) I explained to Clark's representatives how Fore River's business operated, and filled out insurance applications for carriers contacted by Clark for coverage. This included written information that we operated with leased vessels and equipment. For example, annexed hereto as Exhibit 2 is the Bumber Shoot (Excess) Application to American Home Assurance Corporation ("American Home") for 2002 describing that all our vessels and equipment were leased (question 21 on application). American Home issued a Bumber Shoot policy along with the other policies annexed hereto as Exhibit 3.

(7) I have a high school education, and am not an expert in marine insurance, which can be very confusing. My business is in marine and construction work. Insurance coverage is very important to me, and I relied upon Clark to obtain all coverages necessary to protect Fore River for its business and business operations.

(8) American Home provided the relevant insurance policies that were in force at the time of the stranding on December 11, 2002. Annexed hereto as Exhibit 3 are the P & I policy with related endorsements, and the Bumber Shoot policy, which are the subject of this litigation. Fore River purchased and owned these policies, and it added the additional names as insureds to have Fore River's insurance extend to parties which owned and/or leased equipment to Fore River, or to those company's owners, any of whom might be drawn into litigation if an accident occurred.

(9) On December 11, 2002, Fore River had completed a marine dredging project on the Anasquam River near Gloucester, Massachusetts. The crane, tools and equipment used on the job were leased from C-B and were secured on the deck of the Barge DS-64 for transport to a new job site on the Merrimac River in Newburyport, Massachusetts, a total distance of approximately 15 miles. There is no below deck storage for the crane, tools and construction equipment on the Barge. The Barge was towed by the Towboat, Sea Wind II.

(10) Fore River is a marine dredging and construction company. When it needs to move barges and to transport equipment between job sites, it hires independent towing companies which supply the tugs or towboats, or it obtains Coast Guard licensed captains from companies which supply crews and/or captains to operate Fore River's chartered towboats. On December 11, 2002, Fore River hired an independent company, Maine Coast Marine, Inc. ("Maine Coast") based in Portland, Maine to supply a licensed captain. Maine Coast provided Captain Guy Splettstoesser, a part-owner and employee of Maine Coast, to operate the Towboat to transport the Barge with the crane, tools and equipment on deck from the Anasquam River to Newburyport.

2

Page 49

1  up the shore.
2  Q. What, did he have to wait for a tide?
3  A. Right because he had to get off when he got stuck.
4  The tide lifted the barge off. It's just my understanding
5  and it's hearsay. You should talk to others that were
6  there.
7  Q. Okay. I'm just asking you, as an expert, and I'm
8  going to ask what you knew about -- you were going to
9  testify at that trial up in Maine.
10  A. Well, obviously --
11  Q. I want only the information you have. I think --
12  A. The information I have is that those things happened,
13  he was late for the tide, and as he started up the river,
14  because it was low tide and easterly winds stands those
15  soldiers up at the mouth and he took a couple over the
16  boat.
17  Q. Was your barge damaged at all as a result of the two
18  groundings on the Anasquam when the SEAWIND II was bringing
19  it out?
20  A. If it was damaged, it would have been -- mud.
21  Anasquam mud.
22  Q. What do you think had to happen to get the barge
23  floating again?
24  A. Tide had to come.
25  Q. They didn't try to get any weight off the barge. They

Page 50

1  just waited for the tide to come?
2  A. Tied to come. That's my understanding of what
3  happened. Hearsay again.
4  Q. Do you remember who told you that the SEAWIND II had
5  grounded with the barge twice on the Anasquam on the way up
6  to the Merrimack on 12/11/02?
7      MR. FUREY: Objection.
8  A. I don't.
9  Q. Don't remember?
10  A. No.
11  Q. Going back to that expert disclosure in the State of
12  Maine case, the language indicates that: The defendants
13  were negligent in the following respects: By attempting to
14  enter the harbor given adverse tide and weather conditions.
15  Can you tell me what is meant by that. Want me to read
16  that again?
17  A. I just did. I just told you that they hit it at the
18  bottom of the tide and that's the wrong time to try and go
19  up that river.
20  Q. Tell the us why it's the wrong time.
21  A. Because it is very shoal at that point and the water
22  coming out of the river and tide and the wind blowing in
23  back of it stands up soldiers, big waves. It's just a
24  horrible time to try and go up that river. People just
25  don't do it.

Page 51

1  Q. So your understanding is that the tide was still
2  coming out of the Merrimack and the wind was blowing in
3  from the northeast?
4  A. Right.
5  Q. Was that pulling the barge back up onto the SEAWIND?
6  A. Well, yeah -- all kinds of things can happen out
7  there, but as they tried to go up through and they took a
8  couple of waves over the SEAWIND, it got chaotic.
9  Q. Did you hear that the hatch was off the SEAWIND at the
10  time of the grounding?
11  A. They were running with the hatch up. I understand
12  that.
13  Q. Why?
14  A. Stupid.
15  Q. Agreed, but do you know why? Ventilation?
16  A. No. There is no reason. No reason.
17  Q. There's no good reason.
18  A. No good reason. No reason.
19  Q. Do you know who opened the hatch?
20  A. No, no idea.
21  Q. Do you know what types of dogs the hatch on it?
22  A. It has got a latch and dogs that dogs in under.
23  Q. So, it could have been locked down tight --
24  A. Absolutely.
25  Q. That expert disclosure goes on to say: The defendants

Page 52

1  were negligent by failing to properly exit the Anasquam
2  River thereby delaying arrival. Can you elaborate on that
3  a little, explain that?
4  A. That's the groundings and the time it took and then
5  being late at the mouth of the Merrimack, that caused this
6  whole thing.
7  Q. Then by allowing the tug engine room to flood. Is
8  that the hatch?
9  A. Yes.
10  Q. Also putting yourself in a position where the tide is
11  coming out, the wind is coming behind and the waves are
12  coming over?
13  A. Yup. Terrible seamanship.
14      MR. LEGRAND: Just about done. About three
15  pages.
16  Q. You go on to say, the expert disclosure goes on to
17  say: The defendant was negligent by failing to control the
18  tug and barge such that the tug was washed up against the
19  barge. Can you tell us what you meant by that or what is
20  meant by that?
21  A. They managed to follow the line, when they took a
22  couple of waves over -- when I got to the beach that night,
23  the tow line was in the wheel of the SEAWIND, and so afte
24  he got the tow line in the wheel, then he was a crippled
25  boat, with one engine trying to -- of a twin engine boat,

13 (Pages 49 to 5



**TOWN OF NEWBURY**
Office of
The Conservation Commission
Newbury, Ma. 01951-4799

C-B Marine Corporation
446 Commercial St.
Portland, ME. 04101

February 6, 2003

Dear Sirs,

On or about Dec. 11,2002, the barge "DS-64" with its cargo "(barge)" stranded on Plum Island, Newbury, Massachusetts .On December 12 2002. The Newbury Conservation Commission ordered the removal of the wrecked barge "DS-64" and the tugboat Seawind. The tugboat has been retrieved and the barge remains. The Commission is again demanding the removal of the barge and its contents from the barrier beach. It remains a threat to the health, safety, and welfare of the citizens of the Commonwealth of Massachusetts. The fact that two months have passed is making it harder to justify our original decision to allow the barges removal under Emergency Certification. The Commission members may require the filing of a Notice of Intent and receipt of an Order of Conditions before proceeding as time does not seem to be of the essence. This would increase costs. If an additional incentive is needed, The Wetlands Bylaws of the Town of Newbury gives the Commission the authority to assess fines of up to $300.00 per violation, per day. We have no real interest in delay, only in seeing removal of this obstruction. Our next regularly scheduled meeting will held on Feb.18, 2003. I would encourage you to attend and inform us of your intentions, as debate on the above items will occur.

Regards,

Douglas Packer
Conservation Agent

CC: Marine Safety Consultants Inc.

CC: Al Marine Adjusters, Inc.



TOWN OF NEWBURY
Office of
The Conservation Commission
Newbury, Ma. 01951-4799

December 12, 2002

Fore River Dock & Dredge, Inc.
440 Commercial St.
Portland, Maine 04101

The Town of Newbury Conservation Commission orders the Fore River Dock & Dredge Inc. of 446 Commercial St. Portland Me. To remove the wrecked Barge DS-64 and the tugboat "Seawind" It is the Boards opinion that the vessels pose a possible threat to the safety, of the citizens of the Commonwealth of Massachusetts.

Respectfully;

Douglas Packer
Conservation Agent

**COPY**



tabbies®

PLAINTIFF'S
EXHIBIT
28
Packet
3/29/07



# DANGER

BARGE DEBRIS &
Sharp Metal Objects
in Shore Waters
& on the Beach

USE CAUTION &
AVOID THIS AREA

TOWN of NEWBURY
TEMPORARY POSTING